743

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2    - - - - - - - - - - - - - - - X

 3   UNITED STATES OF AMERICA,           08cr240 (BMC)

 4              v.                        U.S. Courthouse
                                          Brooklyn, New York
 5   JOHN FRANZESE,
     JOHN CAPOLINO,
 6   JOSEPH DiGORGA,
     CHRISTOPHER CURANOVIC            June 15, 2010
 7
                       Defendants.    9:30 a.m.
 8
      - - - - - - - - - - - - - - - X
 9

10              TRANSCRIPT OF TRIAL
                BEFORE THE HONORABLE BRIAN M. COGAN
11              UNITED STATES DISTRICT JUDGE, and a jury.

12
     APPEARANCES:
13

14


15
     For the Government:     LORETTA E. LYNCH, ESQ.
16                           United States Attorney
                             By:  CRISTINA MARIE POSA
17                                RACHEL J. NASH
                             Assistant U.S. Attorneys
18                           271 Cadman Plaza East
                             Brooklyn, New York 11201
19


20

21   For the Defendant:      RICHARD B. LIND, ESQ.
     John Franzese          745 fifth Avenue
22                           Suite 902
                             New York, N.Y. 10151
23

24

25
```

744

```
1    For the Defendant:       KENNETH A. PAUL, ESQ.
     John Capolino           111 Broadway
2              `             New York, N.Y. 10006

3

4

5    For the Defendant:       RAYMOND L. COLON, ESQ.
     Joseph DiGorga          233 Broadway
6                            New York, N.Y. 10279

7

8

9    For the Defendant:       MARION A. SELTZER, ESQ.
     Christopher Curanovic   1725 York Avenue
10                           New York, N.Y. 10128

11

12

13   Court Reporter:          Burton H. Sulzer
                              225 Cadman Plaza East
14                           Brooklyn, New York 11201
                              (718) 613-2481
15                           Fax # (718) 613-2505

16

17

     Proceedings recorded by mechanical stenography, transcript
18   produced by CAT.

19

20              *****

21

22

23

24

25
```

745

1          (Open court-case called-appearances noted.)

2          THE COURT:  Good morning.  Let's have the jury,

3  please.

4          MS. SELTZER:  Your Honor, I have a matter before

5  Judge Garaufis at eleven.  Could I just leave at eleven and my

6  co-counsel will cover and I'll be back by 11:30?

7          THE COURT:  Yes.  Do you want the jury advised that

8  you're doing that or not?

9          MS. SELTZER:  No.  I have a very brief

10  cross-examination, but from my understanding of the timing it

11  would be after your morning break.  My client agrees.

12          THE COURT:  That's all right with your client?

13          MS. SELTZER:  Yes.

14          THE COURT:  Get the jury.

15          (Jury present.)

16  JOHN FRANZESE JUNIOR,

17      called as a witness, having been previously duly

18      sworn, was examined and testified as follows:

19          THE COURT:  Good morning.  Please be seated.

20          Good morning, ladies and gentlemen.  I hope you had

21  a good evening.

22          Mr. Paul, you may continue.

23          MR. PAUL:  Thank you, your Honor.

24

25

J. Franzese - cross/Paul

746

1    CROSS-EXAMINATION

2    BY MR. PAUL:

3    Q    Sir, let me go back to where we left off yesterday.  We

4    were talking about a couple of transcripts, specifically 136 A

5    and 136 B in the binder.

6             Turn to 136 A.  It indicates -- you have it in front

7    of you?

8    A    Yes.

9    Q    It indicates this is a conversation that took place on

10   June 16, 2005; is that right?

11   A    Yes.

12   Q    Do you remember where this specific conversation took

13   place?

14   A    Not right now.  No.

15   Q    Well, if you were to look -- withdrawn.

16            Do you remember having a conversation with John

17   Capolino in a restaurant?

18   A    I don't remember, no.

19   Q    You don't remember?

20   A    I don't remember where.

21   Q    Okay.  So looking through this conversation, or this

22   transcript, it does not refresh your recollection as to where

23   the conversation took place.

24            This, may I remind you, is a conversation where in

25   the middle you get a phone call from your wife, Denise.

J. Franzese - cross/Paul                            747

1   A     I don't remember where we were.

2   Q     Okay.  So would it be fair to say it was someplace in

3   Brooklyn?

4   A     It's very possible.

5   Q     You don't recall?

6   A     I don't remember.

7   Q     You don't remember therefore how this meeting got set up

8   or initiated?

9   A     I don't remember the restaurant or exactly where this

10  conversation took place.  I knew it was somewhere in New York

11  and that I went to meet John.

12  Q     Do you remember how it came to pass that you had this

13  meeting with John?

14  A     Probably had an appointment over a phone call.

15  Q     So that would have been a phone call that you would have

16  made to him suggesting getting together and having this

17  meeting?

18  A     Or vice versa.

19  Q     But that's not recorded?

20  A     I guess not.

21  Q     Now, you testified yesterday that when you would have

22  these recorded conversations often, if not always, Agent

23  Lewicki would in advance tell you basically where the

24  conversation should go, right?

25             MS. NASH:  Objection.  Not the testimony.

J. Franzese - cross/Paul                    748

1    THE COURT:  Overruled.

2  A    No.  He would tell me to record the conversation and keep

3  the piece in a place where it would be more clearer to pick

4  up.

5  Q    Let's take the specifics of meeting John Capolino in

6  June, specifically June 16, 2005.

7         Is it your testimony that Lewicki on such an

8  occasion would not advise you in advance of meeting Capolino,

9  you know, you should kind of gear the conversation towards

10 this guy Mike the Butcher?

11 A    Well, there was other information picked up on other

12 recordings like Flemmo and Michael Catapano talking about

13 their situation with John.  So when --

14 Q    I'm asking you about Agent Lewicki.

15 A    That's why he would say, on this conversation keep the

16 phone on cause --

17 Q    He would tell you that he would like you to continue

18 discussing with Capolino the loan he had with Mike the

19 Butcher?

20 A    Yes, I would tell him I'm going to see John about the

21 loans with Mike the Butcher and he would say make sure you

22 record that.

23 Q    Okay.  Now, we had gone through this transcript

24 yesterday, I'm talking about 136 A, where there was discussion

25 about Anthony and later referred to the same person as Vincent

J. Franzese - cross/Paul

749

Guardino, remember that?

A     Yes.

Q     And do you remember that Capolino tells you at this
meeting or this conversation that he had taken out this loan
with Mike the Butcher because he was gambling, remember that?

A     Yes.

Q     But he also tells you, does he not, that that wasn't the
only reason he needed the money; correct?

A     I believe so.

Q     Well, what's your understanding as to what -- let's zero
in on the specific mention in the transcript itself.  Why
don't you turn to page 10 line 19.

A     Okay.

Q     Capolino says to you, but you know, I don't,
unintelligible, I got another year I'll be even.

       He's referring to the loan with Mike the Butcher,
right?

A     Yes.

Q     And you say, Right.  I know the pay down is a -- he says
yeah.  And you say -- pain in the ass.  And he says, Between
my family, my bills at home.  And you say, I know.

       You see that?

A     Yes.

Q     So in fact it wasn't just gambling that caused Capolino
to go and attempt to get a loan, he needed the money to pay

J. Franzese - cross/Paul                    750

1   for his family and the bills accompanying the upkeep of his

2   family, right?

3   A    That's what he's saying.

4   Q    Do you have any reason to believe otherwise, yes or no?

5   A    No.

6   Q    If you go to page 14, of that conversation, line 12, you

7   say, I know.  So what happens, how is it when you see the

8   Butcher now?

9        Capolino says to you, I don't pay em.  You say,

10       Oh, you don't see him?  And he says, I don't go to

11   the neighborhood.  I don't really stay in the neighborhood no

12   more.

13       And then you say, Then how do you pay him?  You

14   gotta pay him.  He says, I give it to Anthony.

15       Do you see that?

16   A    Yes.

17   Q    That's Anthony Flemmo, right?

18   A    Yeah, I already knew that.

19   Q    When we go to 136 B, which is the next transcript in the

20   binder, you see that that is a continuation of the same

21   meeting; is that right?

22   A    I guess.  I don't know how this reads like that, but if

23   you say so I believe you.

24   Q    136 A says June 16, 05?

25   A    Right.

J. Franzese - cross/Paul                751

1  Q    136 B says June 16, 05?

2  A    Okay.

3  Q    You've listened to the tape, right?

4  A    Yes.

5  Q    And you hear noise and eating and chewing and coughing

6  all taking place throughout both of these transcripts.  Do you

7  remember that?

8  A    Sometimes on the transcripts I heard that, yeah.

9  Q    You mean on the audio?

10 A    On the audio.

11 Q    On 136 B, Capolino is now telling you how everyone owes

12 Mike the Butcher, right?

13 A    Yes.

14 Q    He mentions a guy by the name of Moosie owing him, right?

15 A    Yeah.

16 Q    Jimmy Rossotti on page two, is referred to as owing him?

17 A    Yes.

18 Q    And he goes on to tell you that his money in fact isn't

19 on record, remember that?

20 A    I remember talking about that with you, yes.

21 Q    Well, that was from the audio and the transcript, right?

22      I didn't just mention it, it was right in the

23 transcript?

24 A    He said that, yeah.

25 Q    And the loan that he had outstanding with Mike the

J. Franzese - cross/Paul

1   Butcher was 20 thousand dollars; do you remember that?

2   A    I thought it was -- I thought he ended up saying it was

3   more with the vig and everything.

4   Q    Why don't we look back at 136 A, we go to page 3.  If you

5   look at line -- starting at line 15, Capolino says, I no, 20

6   something thousand with him, 10,000 to Big Lou.

7             See that?

8   A    Yes, I do remember that.

9   Q    So in fact he had an outstanding loan of 20,000 with Mike

10  Virtuoso, Mike the Butcher, and another 10,000 with this guy

11  Big Lou, right?

12  A    Yes.

13  Q    For which he's already gotten down the loan with Big Lou

14  to about $5,000.  Do you see that?

15  A    I don't see it, but I think I remember.

16  Q    Go to page 3 of the same transcript right below where he

17  says, on line 15, I know, 20 something thousand with him,

18  meaning Mike the Butcher, 10,000 to Big Lou, and you say,

19  you're kidding?  Are you even with Big Lou?

20            And he says, No, I still owe him about $5,000.  And

21  you say, yeah, but that's okay though, I mean.  And he says,

22  Lou's good with me.

23  A    I'm lost as to where you are.  I don't know if you're in

24  136 B on page 3 --

25  Q    Go to 136 A.

J. Franzese - cross/Paul

1   A    Okay.

2   Q    And go to page 3.

3   A    Okay.

4   Q    Go to line 15.  And he says, once again, I know,

5   responding to you, you say, All together from the previous

6   line, and he says, I know, 20 something thousand with him,

7   meaning Mike Virtuoso, 10,000 to Big Lou.

8            See that?

9   A    Yes.

10  Q    And you go, You're kidding?  Are you even with Big Lou?

11  And he says, No, I still owe him about 5 thousand dollars.

12  And you said, Yeah, but that's okay though, I mean -- and he

13  says, Lou's good with me.  And you say, Yeah.  And Capolino

14  says, Me and Lou are very tight.

15           See that?

16  A    Yes.

17  Q    So it would be fair to say that he had originally a 20

18  thousand dollar loan with Mike Virtuoso, ten thousand dollars

19  with Big Lou, which, according to this conversation, he had

20  gotten down the outstanding loan with Big Lou to five thousand

21  dollars, right?

22  A    That's what John says, yes.

23  Q    You have no reason to believe he was lying to you, do

24  you?

25  A    No.  But I think other people were saying there was more

J. Franzese - cross/Paul

754

1   money owed and stuff.  I am I'm not sure.

2   Q    Have we heard any recordings about that?

3   A    No.  But you're asking me -- I don't think he's lying, I

4   think that's what he's saying.

5   Q    Okay.

6         You don't think he's lying, you think that's what

7   he's saying?

8   A    Yeah.  I think -- wasn't there other money also that he

9   talked about with vig and then it was knocked down to 20 and

10  so you're asking me to say is it only 20,000.  I'm not sure.

11  Q    I see.  But clearly that's what he says in the

12  conversation, right?

13  A    That's what he says here.

14  Q    Okay.

15        Now, if you would again turn to 136 B, and here once

16  again Capolino doesn't tell you once but in fact he tells you

17  two times that the loan he has with Mike the Butcher isn't on

18  record.

19        Do you remember that in this conversation?  If not

20  we'll go through it.

21  A    Yes.

22  Q    You do remember?

23  A    I remember him saying it.

24  Q    Not once but two times, right?

25  A    Yes.

J. Franzese - cross/Paul

1   Q    So specifically, if you would look at page 3, line 22, he

2   says, But, ah, I know my money wasn't on record with him.

3              See that?

4   A    Yes.  My cousin's saying that.

5   Q    Yes.  Capolino?

6   A    Not the Butcher.

7   Q    Capolino is telling you that?

8   A    He can't make a decision like that.

9   Q    My question to you is, Capolino's telling you --

10  A    He's saying it.

11  Q    Listen to the question, okay, and you can answer.  I'm

12  not going to stop you, you can answer.

13             The question to you is, when Capolino is telling you

14  this, it's his understanding, Capolino's understanding that

15  his money was not on record with Mike the Butcher.

16             Is that true?

17  A    That's what he's saying.

18  Q    All right.

19             And, in fact he says it again in the same

20  conversation with you, page 4 where he's talking first at the

21  top of the page about the old man -- meaning Joey Saunders --

22  wouldn't have wanted him to get involved in something like

23  this, right?

24  A    Yeah.  I remember that.

25  Q    Because Joey Saunders was close to his father and he

J. Franzese - cross/Paul

1   would be upset if he knew that Capolino was borrowing money,

2   right, getting himself in a hole; correct?

3   A    Yes.

4   Q    And he goes on to say at line 10, So, he goes, meaning

5   Mike the Butcher, he's quoted, yeah, all right.  If it's not

6   on record it's just between me and you, end quote.

7        Do you see that?

8   A    That's what he said.

9   Q    That's what he's telling you that Mike the Butcher told

10  him when he went to see him and arrange this deal, right?

11  A    Yeah, but obviously it wasn't true.

12  Q    That was the understanding he had initially, John

13  Capolino with Mike the Butcher, and that's what he's telling

14  you; correct?

15  A    That's what he's saying, yeah.

16  Q    Okay.

17       And later in that conversation he goes on to talk

18  about the threats he was now receiving for not coming up with

19  the payments of whatever arrangement he had with Mike the

20  Butcher, right?

21  A    Exactly.

22  Q    All right.

23       And, in fact if you turn to page 4 of that

24  transcript, at line 16, Capolino says to you, I went to him on

25  my own.  I said, quote, listen, I can't pay this fuckin' juice

J. Franzese - cross/Paul

1    no more, end quote.  I said, quote, Listen, let me give two

2    hundred a week, and it goes on.  And he says, No, can't do it.

3            And you say, Just like that, and you had to go back

4    on other loans?  And Capolino says, Yeah.  He said, quote, no,

5    I can't do that, meaning Mike the Butcher is telling him that,

6    right?

7    A    Yes.

8    Q    And you say, No kidding?

9            See that?

10   A    Yes.

11   Q    Line 23.  And then he goes on to talk about how he got

12   hot and there were threats being made, right, because if you

13   turn to the top of page 5, he says, He was making threats,

14   meaning Mike the Butcher, right?

15   A    Yeah, I think that was later on.

16   Q    Okay.

17           But later on meaning he was getting more and more in

18   the hole, he couldn't come up with meeting his responsibility

19   of paying this loan, and now there are being threats made

20   again, right?

21   A    I would assume yeah.

22   Q    Okay.

23           One of the threats he talks about is this incident

24   where he says he's been running a club, at the time he was

25   running a club, Capolino, and how he came in, Mike the

J. Franzese - cross/Paul

1   Butcher, and made some threats to him in front of Big Lou.

2           See that?

3   A    Yes.

4   Q    And that basically Big Lou said to Mike the Butcher,

5   you're not going to touch this guy, leave him alone.

6           Right?  Or words to that effect?

7   A    Fairly so, yes.

8   Q    And Capolino goes on to say, at the top of page 6 where

9   he's describing this incident with Big Lou, You ain't touching

10  this kid, and he goes on to say, This was before he got

11  button.

12          He's referring to Mike the Butcher there, isn't he?

13  A    Yeah.

14  Q    So at the time, would it be fair to say that Capolino

15  takes a loan out with Mike the Butcher, Mike the Butcher is

16  not a made man, to use your language, right?

17  A    This was over a period of time though.

18  Q    I understand that.

19  A    The loan of 20,000 was accrued over time.

20  Q    That may be so, but we are talking about certainly in

21  June of '05, long after this loan was taken out, he's talking

22  about an incident where Mike the Butcher, even in June -- he's

23  referring backwards to an incident that happened in this

24  club -- Mike the Butcher wasn't a made man at that time,

25  right?

J. Franzese - cross/Paul                    759

1    A    That's what this is saying.

2    Q    Okay.

3              That was June of '05.  Turn to T-113.  This is a

4    conversation between you and John Capolino on July 29, the

5    next month.

6              Do you have that in front of you?

7    A    Yes.

8    Q    Now, it's a conversation where Capolino is telling you

9    these threats that he was relaying to you in this June

10   conversation continued, right?

11   A    Yes.

12   Q    In fact, he says, on page two, line 4, he says, He came

13   to my fuckin' house.

14             Who is he referring to?

15   A    Mike the Butcher.

16   Q    Okay.  Because you on the previous line started that

17   conversation by saying, I heard Mike, and then he responds, He

18   came to my fuckin' house.

19             Right?

20   A    Right.  But I had heard about that before I went there.

21   Q    Okay.

22   A    So we were concerned for him.

23   Q    And it goes on to say, he says, About a month ago, and

24   you go, No kiddin, on line 7.  He says, continuing, line 8,

25   'cause I was a little fucking late, bro.  What the fuck?  And

J. Franzese - cross/Paul

1    you go, Right, I heard that.

2            And he goes, I ain't going nowhere.  And you say,

3    What did Flemmo say?  And the conversation continues, What, he

4    wants his money, that's what he said.

5            And you say, That's all Flemmo said?  Capolino says,

6    Yeah.  I can't fuckin' believe it.  So you know what I did?  I

7    went in on my own.

8            You go, You went to the Butcher yourself?  And he

9    says yep.

10           Do you see that?

11   A    At this time --

12   Q    I'm asking you, do you see that?

13   A    Yeah, I see that.

14   Q    Is he telling you in this conversation that he himself

15   went into discuss with Mike the Butcher about his loan once

16   again?  Yes or no?

17   A    Yes. He did.

18   Q    And he goes on to say, because you asked him, And what

19   did he say, meaning Mike the Butcher, correct?  That's who

20   you're referring to, What did he say?

21   A    Yes.  And he said, I told him, listen, here it is.  I

22   says, I can't give you fuckin' 6 hundred a month no more.  And

23   you go, Right.

24           He says, I says, I gotta knock it down to 4 hundred

25   a month.  And you say, What did he say?  And Capolino says, No

J. Franzese - cross/Paul

1   problem.

2          It continues the next page.  Really?  And Capolino

3   says, He did.  And you say, You should have called me.  I

4   would have went with you.

5          He says, He's like a fuckin' gentleman now.  Yeah, I

6   know, you respond.  And then it goes on, But, my wife got all

7   fucking freaked out.  You say, Yeah, I know.

8          And he says, 12:00 o'clock at night, John -- talking

9   to you -- I was fuckin' sleeping.  And it continues, Ya know

10  what I mean, cuz?

11         And you say, I don't like him.  And he goes on to

12  say on line 12, I ain't going nowhere, where the fuck am I

13  going?  He's getting my wife involved now.  My wife's

14  hysterical, she calls my mother.  So it's like a chain

15  reaction.

16         You see that.

17  A    Yeah, he was concerned.

18  Q    Right.  He's describing an incident where he's being

19  bothered in the middle of the night and his wife gets upset,

20  according to him she freaks out and she calls John Capolino's

21  mother who also gets upset, and that's what he's describing as

22  a chain reaction, right?

23  A    Yes.

24  Q    You had said yesterday when I asked you some questions

25  with regard to a conversation between you and Michael Catapano

J. Franzese - cross/Paul

762

1  which took place on August 1, 2005, which would have been

2  three days after, three days after the conversation you just

3  referred to, right, July 29?

4  A    Yeah.

5  Q    Okay.  And in that conversation, I asked you do you

6  remember where you told Michael Catapano that Capolino had

7  told you that he went in to see Mike the Butcher on his own

8  and worked out his own deal for himself, and I asked you those

9  questions and you didn't recall that happening, even after I

10 showed you some documents.

11       Do you know, after reviewing these transcripts in

12 chronological order, does it now refresh your recollection

13 that on August 1, 2005 you did in fact have this conversation

14 with Michael Catapano about Capolino telling you that he had

15 gone in on his own to Mike the Butcher, yes or no?

16 A    If there's tapes I probably had them.  I don't remember

17 it at this point, what you're saying, but I do remember that

18 this was all because The Butcher was a goodfellow, so what

19 you're -- what you asked me before, that's why I didn't

20 understand what you were saying cause he said he wasn't on

21 record or he wasn't a goodfellow.  He was a goodfellow here.

22 Q    He said he wasn't not on record?

23 A    He was a goodfellow here, if it's the same conversation.

24 Q    But he wasn't a goodfellow, to use your words, when the

25 loan was taken out?

J. Franzese - cross/Paul

763

1   A    I'm not sure because he just might have been making a

2   mistake when he said that.

3   Q    I see.

4        Now, the next conversation take place a month

5   later -- less than a month later, September 14, 2005, 125 C in

6   your binder.

7        This is a conversation where it begins, We're in

8   Queens, on page two, We're on our way to Queens.

9        Remember that, this is a time when you are driving

10  Capolino to Mike the Butcher's location so that he can make a

11  payment on this loan.

12       Remember that?

13  A    Yeah, I think I do remember this.

14  Q    You want to look at it so you do.  I believe you also

15  testified -- well, you look at it first.

16       (Pause.)

17  A    Yeah, I remember.

18  Q    Okay.  Now that's the same time that he I believe gets a

19  phone call while he's in the car with you after the fact from

20  Mike the Butcher saying that, You know what, you shorted me a

21  hundred bucks.

22       Remember that?

23  A    Yes, I remember that.

24  Q    Now I would like -- now, you were driving to Queens from

25  where, Brooklyn?

J. Franzese - cross/Paul

1  A    Yeah, I think -- yeah, because we had to go to The

2  Butcher's.

3  Q    Where was that?

4  A    Somewhere on either Graham or -- somewhere in

5  Williamsburg/Greenpoint.  I'm not exactly sure, Lorimer or

6  Graham.

7  Q    If we could play 125 A.

8         I will display to the jury the transcript which is

9  not in evidence.  This is a continuation earlier of the same

10 conversation.

11        MS. POSA:  Objection, your Honor.

12        THE COURT:  Well, are you offering the tape?

13        MR. PAUL:  I'm offering to play the audio and use

14 the transcript, yes, sir.

15        THE COURT:  The objection is?

16        MS. NASH:  This isn't a tape that is in evidence.

17        THE COURT:  What about his position that it's part

18 of the earlier tape?

19        MS. NASH:  If we can see it to determine whether

20 it's really necessary for completeness purposes --

21        THE COURT:  That's what I understand the proffer to

22 be, right?

23        MR. PAUL:  Absolutely, 106.

24        THE COURT:  Why don't you take a look at it, Miss

25 Nash, and see if you agree.

J. Franzese - cross/Paul

1           (Pause.)

2           MS. NASH:  Judge, we don't concede that this is

3    necessary.

4           THE COURT:  I want to know if you're objecting.

5           MS. NASH:  We are willing to let him play it.  We

6    don't have it to play.

7           MR. PAUL:  It's part of what has been introduced,

8    125.

9           MS. NASH:  That's not the point.  We did not

10   introduce this so we don't have this as a recording to play.

11          As I said, I don't object to it -- I don't concede

12   that it's necessary but I won't object to it.

13          MR. PAUL:  Your Honor, since we can't play it, with

14   your Honor's permission, I'll just use the transcript itself.

15          THE COURT:  Any objection?

16          MS. NASH:  No, Judge.

17          THE COURT:  All right.  Fine.

18   Q    Now, this is earlier than what has been introduced by the

19   government as 125 C.  This is the same date, September 14,

20   you're in the car.

21          THE COURT:  Mr. Paul, I'm not following you.  Are

22   you now about to show the jury -- I thought you said 106.

23          MR. PAUL:  125 C, your Honor, has been introduced.

24   I'm introducing 125 A and B, which is the same part of --

25   earlier part of 125 C.

J. Franzese - cross/Paul

1  A    All right.

2         MR. PAUL:  I think we need the screen.

3  Q    Let's read this together.

4         You say, Why?  He don't like you bringing one in

5  here?  Capolino says, No, I mean -- and you say, He, he, don't

6  care, does he?  Capolino says, I don't, I mean I haven't been

7  in.  My father's been bringing him money.

8         You say, Oh, you're kidding?  And Capolino

9  continues, This is the first time I'm seeing this guy in, in a

10 year.

11        And you say, Oh, you're kidding?  You told me you've

12 seen him.

13        No, my father goes in.

14        Oh, I told you Flemmo wouldn't care or nothing,

15 remember?

16        And he says, Capolino, About what?  And you say, I'm

17 saying with the changing that you went there.  Capolino says,

18 oh, I know.

19        And you go on to say, I mean, they weren't happy

20 about it.  Then fuck it.  I mean, that's why I want them to

21 know me and you, I've telling Michael.  And he says, They

22 weren't happy about it?

23        And you say, And Flemmo, no, they weren't happy you

24 went there on your own.

25        And Capolino says, Why?  And you say, Cause they

J. Franzese - cross/Paul

1    thought you shouldn't have done that.

2            And then it continues about parking the car.

3            Back there it is, and you say, Where?  Oh, where do

4    you want to park?  Can you make a U-turn.  Yeah, so, but I

5    want them to know you and me are close.  I keep telling

6    Michael you helped me out.

7            You see that?

8    A    Yes, I see it.

9    Q    Does that refresh your recollection with regard to this

10   conversation you had with Capolino, yes or no?

11           Yes or no?

12   A    It's a different conversation this is talking about than

13   what you are.

14   Q    It's a different conversation than what I'm talking

15   about?

16   A    This is referring to me going in to see the Butcher with

17   him, and he kept saying, No, I haven't seen him, because he

18   didn't want me to talk to the Butcher about his loans because

19   he hadn't been honest with Flemmo and Michael, which is why

20   they were upset that he went in there.

21   Q    He didn't want you to go in but he's telling you, he

22   hasn't been going in, right?

23   A    Yeah, but --

24   Q    In fact, he's telling you -- in fact asked you, when you

25   respond, They -- meaning Michael and Flemmo, I suppose -- they

J. Franzese - cross/Paul

1   weren't happy with you doing that.  And he responds, Why?  Why

2   weren't they happy?

3          He doesn't even know why they should be unhappy,

4   right?

5   A    He does know.

6   Q    Not according to this?

7   A    He was supposed to be paying Michael and Flemmo.  They

8   worked a deal out with the Butcher because they are both --

9   because Michael was a goodfellow and so was the Butcher, to

10  settle John's loan.

11  Q    We have just gone through transcripts where he's telling

12  you, Mike the Butcher tells him initially it's not going to be

13  on record.

14         He then goes on to say he went in there and made an

15  arrangement on his own and then he went in there again and

16  said, I can't continue paying the 600 dollars, you gotta knock

17  it down to less.

18         Remember those transcripts and those conversations,

19  yes or no?

20  A    No.

21  Q    You don't remember that?

22  A    I remember John saying that he thought it wasn't on

23  record.

24  Q    Excuse me.  Listen to the question.

25         You don't remember us just going through those

J. Franzese - cross/Paul

769

1    transcripts and those conversations, yes or no?

2    A    You said that Mike said it wasn't on record.

3         MR. PAUL:  Your Honor, could the witness respond to

4    the question?

5         THE COURT:  Mr. Franzese, you need to answer his

6    question narrowly.  If the government thinks it's important

7    they will ask you more questions and let you expand later.

8    A    Yes.

9    Q    Do you remember us just going through those transcripts?

10   A    That transcript, yes.

11   Q    Do you remember us going through a few other transcripts?

12   We haven't been here that long.

13   A    Why he.

14   Q    Where John Capolino is telling you he arranged a deal

15   with Mike the Butcher, Mike the Butcher wasn't a made man at

16   that time, at least as far as he thought -- he negotiated a

17   deal that was better for him.

18        He went in there and told Mike the Butcher, I can't

19   continue paying you what you're asking, you gotta bring it

20   down to 4 hundred.

21        He was doing this all on his own and you were

22   telling Michael Catapano what Capolino know was telling you

23   and Michael Catapano wasn't happy?

24        MS. NASH:  Objection.

25        THE COURT:  Sustained as to form.

J. Franzese - cross/Paul

770

1  Q    Do you remember us going through all those series of

2  transcripts, sir, yes or no?

3  A    The series of transcripts, yes.  Not what you just said.

4  Q    Not what I just said?

5  A    No.

6  Q    Okay.  The transcripts and the audios are in evidence..

7  they speak for themselves.

8  A    Yes.

9  Q    Again, continuation of the same conversation, September

10 14, 2005.

11        Can you see that on your screen?

12 A    Yes.

13 Q    Capolino says once again, So, Michael got mad at me that

14 I went down on my own?  And you say, Well, he was wondering

15 why you switched up without telling Flemmo, but you know what,

16 he didn't get mad.  He -- and Capolino says, I told Flemmo, I

17 straightened it out for, I went in there, that's all.  You go

18 on, All right.  They're not mad like mad.  And he says, I went

19 in there tried to get a better deal for myself.

20        Do you see that?

21 A    I see that.

22 Q    All right.

23        So once again, Capolino is telling you he made this

24 deal on his own, he went in there to see Mike the Butcher on

25 his own, he told Mike the Butcher at various times he couldn't

J. Franzese - cross/Paul

1   pay it and he tried to work out a better deal for himself;

2   isn't that what he's telling you in these conversations, yes

3   or no?

4   A    Yes, if the transcript -- it's what the tapes are saying.

5   Q    Okay.

6           MR. PAUL:  If I could have one minute, please,

7   Judge?

8           THE COURT:  Sure.

9           (Pause.)

10  BY MR. PAUL:

11  Q    Now, sir, is it fair to say that the best you can recall,

12  you don't have another conversation with John Capolino

13  concerning anything about his loan with Mike the Butcher until

14  some point in March, 2006?

15  A    I don't remember.

16  Q    Okay.  Do you recall on March 22, 2006 where you placed a

17  telephone call -- not a recording, not a meeting -- a

18  telephone call to John Capolino and in that conversation

19  Capolino refers to --

20          MS. NASH:  Objection.  Hearsay.

21          THE COURT:  Sustained.

22  Q    Do you remember having a conversation with Capolino at

23  any time where you came to learn that the loan was paid, any

24  loan he had outstanding with Mike the Butcher?

25  A    No, I don't recall.

J. Franzese - cross/Paul

1  Q    I'm going to show you two documents, JF 93 and RL 4, 3500
2  RL 4. (Handing.)
3         Look at both.  Take your time.  If you want, look at
4  this document as well.
5         (Pause.)
6  A    Yeah.
7  Q    Does that refresh your recollection of making a telephone
8  call on March 22, 2006 to John Capolino?
9  A    Yes.
10 Q    Does it refresh your recollection that you came to learn
11 that Capolino, with the help of his brother, had in fact paid
12 off the outstanding loan he had with Mike the Butcher?
13 A    That's what it says there.  If that's me, it must have
14 been said and done.
15 Q    Let's put aside the transcripts for a minute, sir.
16        Did you ever come to learn that in fact this loan
17 was paid off with the assistance of Capolino's entire family
18 to Mike the Butcher?
19 A    You know, until I saw that I didn't remember that, that
20 he started getting in trouble with Big Lou too.  I didn't
21 remember any of that.
22 Q    We just went through a transcript where he talks about
23 Big Lou?
24 A    But here it says Big Lou's getting mad at him, but he
25 died somebody is looking for the money he owed.

J. Franzese - cross/Paul                          773

1  Q    Sir, the question is, did you come to learn that he had

2  paid off whatever outstanding debt he had with Mike the

3  Butcher, with the assistance of his brother and his entire

4  family and his own money?

5  A    If that's me there, yes.  But I don't remember.

6  Q    If that's you, meaning the person who made a phone call

7  to Capolino?

8  A    Yes.

9  Q    Do you know anybody else who was working with the

10  government recording and making calls for the government to

11  Capolino?

12         MS. NASH:   Objection.

13         MR. PAUL:  Withdrawn.

14  Q    Now, if in fact this is you, as you say, this is March

15  2006, was that at or about the time, or shortly thereafter you

16  left New York?

17  A    Very possible.  I left in 2006, so it's probably close.

18  Q    So whatever cooperation or whatever you were doing for

19  the government pretty much ended as far as recordings were

20  concerned; is that right?

21  A    Fairly much.

22  Q    And you had done this once before, you testified, back in

23  2001 where you tried to cooperate with the government but you

24  kept getting high so that didn't work out, right?

25  A    No, that's not -- that was way back in 90 -- that was in

J. Franzese - cross/Paul

1    the nineties.

2    Q    You said at one time you went back to California in

3    September '01 and you were still high.

4         Remember that?

5    A    I went to California not sober yet.

6    Q    And that's when you told us you were living with your

7    brother, right?

8    A    For three weeks, yeah.

9    Q    Michael?

10   A    Yes.

11   Q    And you also said that after a few weeks you attended the

12   AA meeting, right?

13   A    Yes.

14   Q    And from the moment or that day that you went to that AA

15   meeting, as far as you are concerned or testified, that was

16   the end of your drugs or reliance on alcohol, right?

17   A    Absolutely.

18   Q    So that was an important date to you, correct?

19   A    Yes.

20   Q    And, in fact, you testified it was such an important date

21   that you tattooed it on your arm?

22   A    Yes, I did.

23   Q    And would it be -- that date was that, sir?

24   A    10/9/01.

25   Q    And, in fact, the true and correct date that you went to

J. Franzese - cross/Paul

1    the AA meeting which turned your life around was October 5,

2    2001, wasn't it?

3    A    No.  But a lot of people thought it was so I let them

4    believe I tattooed the wrong date on my arm.

5              I still tell people that cause people in California

6    thought I had the wrong date but I didn't.

7    Q    So this is just a big joke?

8    A    It just happened.  The real date's on my arm.

9    Q    It worked out that you tattooed this most important date

10   in your life, that you turned your life around, and word got

11   out it's not even the true date, right?

12   A    It would have made me sober longer not shorter.

13   Q    By a few days?

14   A    What's the difference?  It's one day at a time.

15   Q    Sir, you were making a joke and actually lying to anybody

16   who ever saw your tattoo because in fact it's the wrong date,

17   right?

18   A    It's the right date.

19   Q    I see.

20             But you continued this joke with everybody out there

21   who asked you about it, right?

22   A    I didn't want to bother telling them, I let them believe

23   it so I agreed.

24   Q    You didn't want to bother telling them so you let them

25   believe that you made a joke about the most important date in

J. Franzese - cross/Paul

1    your life, right?

2    A    It's good to make jokes about important things.

3    Q    I see.  So this moment or this sobriety date that you

4    told us turned your life around, you think it's a good thing

5    to make a joke about that, right?

6              MS. NASH:  Objection.

7              THE COURT:  Sustained.

8    Q    When you went to the Odessa program, this also was a

9    joke, or this was serious?

10   A    Odessa was just a sober living house where a bunch of men

11   stood sober.  It wasn't a program.  So --

12   Q    A facility for men to dry up, right?

13   A    No.  You dry up.  You will just have a safe environment

14   to live while you're learning how to live sober.

15   Q    Isn't that where you met with your current wife, Denise?

16   A    Yes, I did.

17   Q    So she wasn't living there, this is a facility for men,

18   right?

19   A    It was a men's sober living home.  It was not a facility

20   like accredited with any counselors or therapists, it was none

21   of that.

22   Q    Excuse me.  You met her there because she was working

23   there?

24   A    She was one of the --

25              MS. NASH:  Objection.  Relevance.

J. Franzese - cross/Paul

1       THE COURT:  Sustained.

2   Q    You told us the other day that you moved on in your life

3   and you were relocated; correct?

4   A    Since when?  I don't know what time frame you're talking

5   about now.

6   Q    Well, you told us when you were receiving all this money,

7   this over 350 thousand, totaling 500,000, whatever the amount

8   was, this was after you were relocated and cooperating with

9   the government, right?

10  A    I no longer live in my -- where I used to live.

11  Q    Correct.  That's because you left your wife behind,

12  right?

13       MS. NASH:  Objection.

14       THE COURT:  Sustained.

15  Q    Did you leave your wife behind?

16       MS. NASH:  Objection.

17       THE COURT:  I will allow him to answer the question.

18       We have been through it, Mr. Paul.

19       MR. PAUL:  I understand, Judge.  With the court's

20  permission, just a couple of questions.

21       THE COURT:  You can answer.

22  A    Let's say that my wife chose drugs over me.

23  Q    What was your -- your drug of choice was crack and then

24  shooting up cocaine, right?

25  A    Yes.

J. Franzese - cross/Paul

1    Q    What was her drug of choice?

2    A    It was pills.

3    Q    What kind of pills?

4    A    Whatever kind of pills.

5    Q    And because she had chosen that life and you had moved

6    on, you couldn't relocate with her, is that your testimony?

7    A    Let's just say it would not have been a life she would

8    have been able to succeed at because of her drug and alcohol

9    addiction and her child would be better off with her -- with

10   his real father than with a mother who is still using and me

11   wanted to move her far away.

12   Q    So you made no attempt to straighten her out so she could

13   join you in your new life?

14   A    You know, you remember a lot of my testimony except the

15   testimony that told you for about two years in our

16   relationship I tried to get her into a rehab and I told her

17   that if she did, within the next year I might have some money

18   put aside for us to go to.

19        She was never able to meet that and that was okay

20   with me, I understand.

21   Q    So it was okay with you that you then moved on and

22   gathered together about five hundred thousand dollars that you

23   now don't even have to share with her?

24        MS. NASH:  Objection.

25        THE COURT:  Sustained.

J. Franzese - cross/Paul

1  Q    You're not sharing that money that we have been talking

2  about with Denise in any way, are you?

3           MS. NASH:  Objection.

4           THE COURT:  Sustained.

5  Q    Talking about money.  You told us earlier in your

6  testimony, you were very rich growing up, right?  Remember

7  that testimony?

8  A    Extremely rich.

9  Q    You were living in Roslyn, I believe?

10  A    Yes.

11  Q    On Long Island?

12  A    Yes.

13  Q    And you were living at 47 Shrub Hollow Road?

14  A    Yes.

15  Q    That was your address?

16  A    Yes.

17  Q    That was where you and your family lived?

18  A    Yes.

19  Q    With all this money, right?

20  A    Yes.

21  Q    And that happened up until 2002, right?

22  A    Yes.

23  Q    Because in 2002 your father and your family that were

24  living in this life of luxury were in fact kicked out and

25  evicted for nonpayment on that mortgage on the house; remember

J. Franzese - cross/Paul

1    that?

2    A    Yes.

3    Q    In fact, they are now no longer living that Roslyn house

4    as of 2002, they are living in a rental in North Port, Long

5    Island?

6    A    Yes.

7    Q    So in fact, at this time, your mother, who is at that

8    point, what, in her early seventies -- she's working, right?

9    A    Yes, she always wanted to work.

10   Q    She's working to help pay the rent on this house, right?

11   A    My mother worked -- I don't want to discuss my family'

12   business, but we never really wanted my mother to work.

13   Q    You don't want to discuss your family's business?

14   A    Not their personal business.

15   Q    What have we been doing for days on end?

16   A    We're discussing organized crime.

17   Q    This is personal.  Right?

18        You don't want to talk about your mother because

19   that's personal?

20   A    I'm not talking about my father as a man, I'm talking

21   about the life he chose.

22        MR. LIND:  Judge, I move to strike that remark and

23   ask the jury to disregard it.

24        THE COURT:  All right.

25        The motion is granted.  The jury is instructed to

J. Franzese - cross/Paul

781

1   disregard that remark.

2   Q    Now, you testified earlier that one of the reasons you're

3   cooperating with the government is to turn your life around;

4   you told us that several times, right?

5   A    I had already turned my life around.  That's why, once

6   you're able to look over the -- this life absorbs you and you

7   only see one way, and when this thing happened to me in

8   California, I realized there was a whole world out there that

9   I missed with people that work and try to do the right thing

10  and actually followed other beliefs --

11              MR. PAUL:  Your Honor, could the witness answer the

12  question?

13  A    I'm answering the question.

14  Q    You are?

15              THE COURT:  Put another question and I'll have him

16  answer it narrowly.

17  Q    At this point now in your life, you could possibly even

18  cash in on your name, right?

19  A    I guess if you look at the way things were, that probably

20  could be true.

21  Q    Well, sir, you told us about an attempt to work as a

22  consultant in some reality show, right?

23  A    It wasn't an attempt.

24  Q    Okay.  You worked as a consultant in reality show, right?

25  A    Yes.

782

J. Franzese - cross/Paul

1  Q    What background or experience could you possibly have had

2  as a consultant to a TV channel that was doing a reality show?

3  A    Well, they were aware of my father's lifestyle and it was

4  about gangsters.

5  Q    I see.  So as I said --

6  A    What they wore, how they talked, what it was like to talk

7  in Brooklyn and what do goodfellows look like and how do they

8  carry themselves at sitdowns.  That was appealing to these

9  people in California.

10 Q    Right.

11 A    Okay.

12 Q    So you were going to earn -- what did you say -- 15

13 hundred dollars a session or a week?

14 A    That's what they told me I was getting paid.

15 Q    How much?

16 A    Fifteen hundred whenever we actually shot.  I never got

17 to sit on the first shoot.

18 Q    So there was an example that you were going to be table

19 to cash in on your name and your experience, right?

20 A    Well, that's actually funny.

21 Q    Is it?

22 A    Yes.

23 Q    I'm not laughing.

24 A    Because that's not thousand that came to be.  There was a

25 man whose life had fallen apart because he lost -- he was

Burton H. Sulzer, OCR, CRR, CSR, CM

J. Franzese - cross/Paul

1   divorced from his wife, and a friend of mine who thought my

2   life had changed thought I might help him, and we became

3   friends for a year and he got better, and all of a sudden he

4   sold the show.

5        And when he sold the show he said, because of our

6   friendship and the things we were doing with each other in our

7   lives, that he wanted me to work with him because it would fit

8   right into the show.  So it had more to do with the way I was

9   living than who I was.

10  Q   It had nothing -- it had nothing to do with what you just

11  told us moments ago, with your background, your name, people

12  you knew or who were associated with, it had to do with this

13  life you turned around, redemption, right?

14  A   It had to do with sharing certain principles with a

15  person who kind of felt broken in his life, that if I hadn't

16  had the experiences I did I wouldn't have been able to -- to

17  relate to him and help him identify with some of the same

18  things.

19       And we grew a great strong friendship out of that is

20  how, which is funny, because when I tried to do things usually

21  in my past and succeed, I always fail.  That's why this life

22  is so important to me.

23            (Continued next page)

24

25

John Franzese - cross - Paul                    784

1    EXAMINATION CONTINUES

2    BY  MR. PAUL:

3    Q    I see.

4         Now you are gong to be a success story, right?

5    A    Let's just say I live a very simple life but I am very

6    happy.

7    Q    It is not so simple because you have attempted in your

8    own way to start writing a book, right?

9    A    In --

10   Q    Yes or no?

11   A    No.

12   Q    No?

13   A    As of now?  No.

14   Q    Who is Steve Anderson?

15   A    Okay.  I'm glad you asked.  Steve was a drunk that had

16   nowhere to live.  He had left Odessa House and had no money

17   and I let him live in my apartment.  That's part of the things

18   that we do.  That's part of the work that we do when we go and

19   work in the sober living.  He happened to be a kid who liked

20   to write.

21        And at that time I thought as my whole family

22   thought the -- the talking about my family as far as what it's

23   like to be the son of somebody who is in this kind of life,

24   the dealings with their mother, the personal relationships

25   between me and my sisters, and then of course being in

1   Hollywood, you throw in some of the gangster garbage.

2   Q    The gangster garbage?

3   A    Yes.  Because that's the marketing tool.

4   Q    Oh.  You talked about marketing your background, right?

5   A    That was very early on, yes.

6   Q    Do you remember with the assistance I suppose of this

7   person who could write, Steve Anderson, you attempted to write

8   the John Franzese Story, Family, Crime, Drugs, Redemption,

9   subtitled?

10          Do you remember that?

11  A    You know, that's also a part of something I did in my

12  life that --

13  Q    Just answer the question.

14  A    That was therapeutic.

15          THE COURT:  You have to answer the question.

16  Q    You do remember that, right?

17  A    I remember writing with Steve that.

18  Q    Once again, sir, you were going to try to cash in on your

19  name, your background and who you were, right?

20          And it hasn't stopped there, has it?

21          Yes or no?

22  A    That wouldn't have been a bad avenue at that time.

23  Q    I see.

24  A    It was in my thoughts.

25  Q    That avenue is closed?

John Franzese - cross - Paul                    786

1            So when this case is over and the jury has made

2      their decision, that avenue can't be explored anymore?

3      A    No.

4      Q    Is that what you are saying?

5      A    No.  I signed an agreement never to write a book.

6      Q    With who?

7            THE WITNESS:  Can I answer?

8            THE COURT:  Is there any objection from the

9      government?

10           MS. NASH:  Can we have a brief either break or

11     side bar?

12           THE COURT:  Let's take a side bar, please.

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

John Franzese - cross - Paul                787

1              (Side bar.)

2              MS. NASH:  I am informed that I guess as a part of

3    the Witness Security Program he signs such an agreement.  We

4    do not have such an agreement.  My understanding is he

5    believes he signed one.  We obtained the documents that I

6    provided to you from the marshals from Wit Sec.  They tell me

7    that's all they have.

8              I have no objection to answering that he thinks --

9              MS. POSA:  Sorry.  We just spoke to the FBI agent.

10   The FBI agent just confirmed for us in the Wit Sec program he

11   is not allowed to write such books because it compromises his

12   security.

13             I think he needs to be instructed clearly.

14             THE COURT:  Is that a written requirement of the

15   program?

16             MS. POSA:  I don't know.

17             MR. PAUL:  He said he signed an agreement.  It

18   sounded like it is written.

19             MS. NASH:  As I said, you have the documents that I

20   have from Wit Sec.  To the extent he recalls that he signed

21   something else with Wit Sec, unless there is an issue from the

22   marshals that they don't want people testifying about their

23   policies, I don't really have an objection to him answering

24   it.

25             MR. LIND:  Unless we see the written agreement,

John Franzese - cross - Paul                    788

1    Judge, I don't trust anything this guy says.

2            THE COURT:  We know that to start out, Mr. Lind.

3            You can't get what doesn't exist.  If the witness

4    thinks it exists, you can certainly flesh out that he thinks

5    it exists.

6            I will ask the government to make a further inquiry

7    of the marshals and the FBI and see if there is anything that

8    the witness might be talking about in writing that they know

9    about.

10           MS. NASH:  Certainly.

11           THE COURT:  For now get the witness' understanding

12   of what his obligations are.  I don't see a security issue

13   with this.

14           MR. PAUL:  I will do that, Judge.

15           However, I would also ask that once the government

16   pursues this line of investigation, that if in fact there is

17   no such document, I am going to ask for Your Honor to give an

18   instruction to the jury that there is in fact no such

19   document.

20           THE COURT:  Let's deal with that after they have

21   done their search.

22           MS. POSA:  He doesn't seem to understand that he can

23   talk about Wit Sec.  He said can I answer this?  I think he

24   needs to be reinstructed that he can in fact talk about it.

25           THE COURT:  I don't know that he didn't understand

John Franzese - cross - Paul                          789

1    the instruction I gave him yesterday which is that he is

2    allowed to testify about the program, at least as a general

3    matter.  I think he thought there might have been some

4    separate prohibition on him stating this.

5           If it comes out, I will reinstruct him, that he can

6    answer.  For now let me just tell him, because he asked me if

7    he can answer this question.  I'll tell him that he can.

8           MR. PAUL:  That he can?

9           THE COURT:  Can.

10          MR. PAUL:  Yes.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    GR      OCR      CM      CRR      CSR

John Franzese - cross - Paul                    790

1            (In open court.)

2            THE COURT:  All right.  Let me have the reporter

3   read back the last question, please.

4            (Read.)

5            THE COURT:  You may answer the question,

6   Mr. Franzese.

7   A    With the government.

8   EXAMINATION CONTINUE.

9   BY MR. PAUL:

10  Q    And this was an agreement that was written out and you

11  reviewed it and you signed it?

12  A    Yes.

13  Q    When did that take place?

14  A    About two years ago.

15  Q    Where did that take place?

16           Withdrawn.

17           Was your attorney present?

18  A    No.

19  Q    So it's your understanding that two years ago you entered

20  a written agreement with the government, or through the

21  government, that you were not permitted to write any book, is

22  that right?

23  A    Yes.

24  Q    Now, is it your understanding that that agreement also

25  limited you with regard to pursuing other avenues in Hollywood

GR       OCR       CM       CRR       CSR

John Franzese - cross - Colon                    791

1   as you have referred to?

2   A    My life is so good I can assure you that none of you are

3   going to see me ever again anywhere.

4            THE COURT:  Mr. Franzese, you have to answer his

5   question.  He is asking about the prohibitions upon you that

6   you believe you are subject to.

7            THE WITNESS:  Okay.  Pardon me?  Then I'm sorry.

8            MR. PAUL:  Sir, you have answered my question.

9            Thank you.

10            THE COURT:  All right.  Mr. Colon?

11            MR. COLON:  Yes, Judge.

12            Are we going to break around eleven?

13            THE COURT:  Around eleven, yes.

14            MR. COLON:  Do you want to advance that so we can go

15   through?  Do you want me to proceed now?

16            THE COURT:  I think we should proceed now.  I'd

17   rather break so that we don't give the jury more time off than

18   they need.

19            MR. COLON:  Very well.

20   CROSS-EXAMINATION

21   BY MR. COLON:

22            MR. COLON:  One second, if I may, Your Honor?  I am

23   just -- I will just organize my material.

24            THE COURT:  All right.

25   Q    Good morning, Mr. Franzese.

John Franzese - cross - Colon                              792

1   A    Good morning.

2   Q    I can't hear very well.  So I am going to ask you to

3   speak up.  Try to draw the mike closer to you, if you could.

4   A    I can do that.

5   Q    Thank you so much.

6   A    You are welcome.

7   Q    I -- you understand, I represent Mr. Joseph DiGorga,

8   correct?

9   A    I do now.

10  Q    Okay.

11  A    I couldn't tell.

12  Q    I was going to go right to Mr. DiGorga and look at the

13  tape but I want to carry -- to pick up on where Mr. Paul just

14  left off with respect to your -- we will call it, at the

15  attempt at a manuscript, the John Franzese Story.

16       Are you with me?

17  A    Yes.

18  Q    You testified just a few seconds ago on questions from

19  Mr. Paul that you didn't want to discuss your family, correct?

20       In front of this jury, right?

21  A    Personal issues, as mother, father, son, children, aunts,

22  uncles.

23  Q    Right.

24       But, in fact, the subtitle of the John Franzese

25  Story is, Family, Crime, Drugs and Redemption, correct?

John Franzese - cross - Colon                    793

1   A     That was eight years ago.

2   Q     That's the subtitle, correct?

3   A     Yes.

4   Q     And you discuss your family at length over there, don't

5   you?

6   A     I don't remember that, what I wrote in there.  He made a

7   lot of stuff up.  I mean --

8   Q     Who made a lot of stuff up, you or Mr. Anderson?

9   A     Me and Mr. Anderson.

10  Q     So that was back what, eight years or so ago, as you

11  tried this, this -- this effort that you --

12  A     What you have is eight years ago.

13           MR. COLON:  Your Honor, I am going to ask that this

14  document be marked for identification as defense Exhibit D, I

15  believe we are up to.

16           THE CLERK:  D.

17           THE COURT:  All right.  We can mark it for

18  identification, certainly.

19           (So marked.)

20           MR. COLON:  I am specifically referring to JF --

21  excuse me -- 3500 JF-8.

22           May I approach, Your Honor?

23           THE COURT:  You may.

24           MR. COLON:  I am showing it to the government.  I

25  believe they are familiar with it.

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                    794

1              (Pause.)

2              Thank you.

3   Q    Mr. Franzese, I am going to show you what's been marked

4   for identification as defense Exhibit D.  It's not in evidence

5   but it has been marked so I just want you to take a look at

6   that and familiarize yourself with that.

7              Okay?  Is that something that you -- that you are

8   partially responsible for?

9              Just take a look at it.  Take your time.

10             (Pause.)

11             Have you seen that document before?

12  A    Yes.

13  Q    I don't believe Mr. Paul showed you the document but I

14  believe he may have waved it in front of you.

15  A    He read the wrong thing from it.  It doesn't say what he

16  said.  It says from a loving devoted son to a mafia man to a

17  hopeless drug addict to a life of service to his fellow man.

18  Why did he read it -- something else?

19             THE COURT:  Mr. Franzese, you have to just answer

20  the questions.

21             THE WITNESS:  Okay.

22  Q    I actually noted that the subtitle was the John Franzese

23  Story, Family, Crime, Drugs, Redemption, correct, just a few

24  seconds ago?

25  A    Yes.

GR       OCR       CM       CRR       CSR

John Franzese - cross - Colon                    795

1   Q    And then when you flipped the page, you -- it indicates

2   as a subtitle from a loving devoted son to a Mafia man to

3   hopeless drug addict to a life of service to his fellow man,

4   correct?

5   A    Yes.  That's --

6   Q    Which one did you write?

7   A    I didn't write any of the titles.

8   Q    I see.

9           But you are familiar with the document?

10  A    I am familiar with -- with writing stuff like that, yes.

11  Steve putting it together.

12  Q    Right.

13          I think you testified just a few second ago that it

14  was partially fact, yes?

15  A    Yes.  Some of the stuff is true.

16  Q    And partially fiction, correct?

17  A    Yes.

18  Q    You collaborated with Mr. Anderson with respect to this

19  undertaking, this work, yes?

20  A    Yes.

21  Q    Okay.  And about how long did you collaborate with

22  Mr. Anderson?

23  A    He lived with me about four months I think.  Maybe five

24  or six.

25  Q    Back when?

GR      OCR      CM      CRR      CSR

1  A    In 2000 and -- well, I don't remember dates.  I know I

2  was out -- it was probably 2002, now that I think of it.

3  Q    You were sober at the time, right?

4  A    Yes, I was.

5  Q    Both of you were at Odessa House?

6  A    We had lived at Odessa House first.  Then I left because

7  I got my apartment finally and then about six months later

8  Steve I think wanted to move out and he had nowhere to go.

9  Q    So getting back to the, let's say, not the nature but the

10  contents of that, the John Franzese Story, you -- as you

11  testified earlier, some of it was true and some of it was made

12  up, correct?

13  A    Yes.  I mean, that's how I write.

14  Q    That's how you write?

15  A    That's how I write.

16  Q    So this is a work --

17  A    Thank you.

18  Q    So this is a work of fiction, right?

19  A    Mostly it's a work of both.

20  Q    Okay.

21  A    Hey, I don't know what kind of work it is.  I wrote stuff

22  down.  Steve tried to make it into a story.  We thought how we

23  would write it and that was just having fun together.

24  Q    But you were sober at the time, right?

25  A    Yes, I was sober.

John Franzese - cross - Colon                    797

1   Q    So you collaborated with him over the time that he was
2   with you, that month or two?
3   A    Yes.
4   Q    You wrote about your father, Sonny Franzese, correct?
5   A    I think I wrote about my dad, yes.
6   Q    In fact, Mr. John Franzese, Senior, who is here, also
7   known as Sonny, you wrote about him as being a good father,
8   wasn't he?
9   A    Yes.
10  Q    He went to your baseball games, didn't he?
11  A    Yes.
12  Q    He participated in as much of your life as he could and
13  you appreciated that, correct?
14  A    He was a great father.
15  Q    He was a great father.
16       And for being a great father, you came here to
17  testify against him, correct?
18       That's the price he's paying, yes?
19  A    No.
20  Q    No?
21  A    I am not here to testify because he's a great father.
22  Q    You are an apparition?
23       You are not here testifying before him?
24  A    I am here testifying that he is a member of organized
25  crime.

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                798

1    Q    I see.

2          You are a semi-expert on organized crime, aren't

3    you?

4    A    I don't know.  I have lived around it so long I just know

5    a lot about it.

6    Q    You know a lot about the terminology that's used,

7    correct?

8    A    They wanted to make me goodfella.

9    Q    Yes or no, you know a lot about the terminology?

10   A    Somewhat.

11   Q    You know about points and loansharking, correct?

12   A    I know, yes.

13         Pretty much I can get by pretty well.

14   Q    You know about all sorts of schemes that are committed,

15   right, by the mob, yes?

16   A    Yes.

17   Q    Goodfella is somebody who is a made member, correct?

18   A    Yes.

19   Q    You are sure about that, right?

20   A    I'm positive about that.

21   Q    Okay.  In that -- that John Franzese Story that was

22   written somewhere about 2002, you also mentioned how devoted

23   your father was to your family, right?

24         Yes?

25   A    Yes.

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                    799

1    Q    You also spoke about Michael Franzese, didn't you?

2    A    Yes, I did.

3    Q    In fact, Michael Franzese is in this courtroom today,

4    isn't he?

5    A    Yes, he is.

6    Q    He's your older brother, correct?

7    A    Yes, he is.

8    Q    And Michael Franzese, he's written several books,

9    correct?

10   A    Yes, he has.

11   Q    In fact, he wrote -- do you know the names of those

12   books, by the way?

13   A    No, I don't remember.

14           MR. COLON:  Judge, may I just mark for

15   identification defendant's E?  I will show it to the

16   government.  Excuse me.  I will make that defendant's E  and

17   defendant's F.

18           May I approach, Your Honor?

19           (Marked.)

20           THE COURT:  You may.

21           MR. COLON:  Thank you.

22   Q    So your brother Michael has written a couple of books.

23   You don't remember their names.  Maybe this will help you out.

24           What's been marked for identification as defendant's

25   D, is that one of your brother's books?

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                    800

1   A    Yes.

2        But I think I knew it under a different name.  But I

3   think he was writing this while I was out there, reediting it

4   I remember.

5   Q    Back in the early nineties?

6   A    I don't remember the times.

7   Q    Leet's try to speak one at a time.

8        In the early nineties maybe?

9   A    I don't remember.

10  Q    Okay.  What's the name of that book, by the way?

11  A    Blood Covenant.

12  Q    By Michael Franzese, right?

13  A    Yes.

14  Q    That was one of his first books, wasn't it?

15  A    I think this was the reedited version.

16  Q    Of the first book?

17  A    Yes, I believe.

18  Q    All right.  That would have been somewhere about the

19  nineties, right, that first book, even if this is reedited?

20  A    Probably, yes.

21  Q    He also wrote, I am showing you what has been marked for

22  identification as defense Exhibit E -- excuse me -- F, rather,

23  for identification.  Take a look at that.

24  A    Yes.

25  Q    Are you familiar with that book?

John Franzese - cross - Colon                801

1    A    No.  I've never seen it.

2    Q    That's a recent book, perhaps, correct?

3    A    Okay.  Very good.

4    Q    Did you read the first one, by the way, what's been

5    marked --

6    A    No.  I never read this one.

7    Q    -- E.

8         You have --

9    A    I think I read the other one.

10   Q    Which one?

11        Something in-between?

12   A    The first book that we were just discussing, this is the

13   reedited version, February.

14   Q    What was the title of the first book?

15   A    I told you, I don't remember.

16   Q    You read the whole book?

17   A    I'm fairly sure I did.

18   Q    That book was written, will you agree with me, perhaps

19   ten years ago, maybe more?

20   A    I don't remember.  I just don't.

21   Q    But you did read it?

22   A    Yes.  I read it.

23   Q    Okay.  Is there any mention of Joseph DiGorga in that

24   book?

25   A    No.  He -- no.

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                802

1   Q    Does your brother in that book, that first book you read,

2   does he turn on his father like you did and supply information

3   to the government about his father like you have in front of

4   this jury?

5            MS. NASH:  Objection.

6            THE COURT:  Sustained.

7   Q    If you recall reading the book, is there any information

8   in that book about your father?

9   A    Yes, I believe my father is mentioned in there.

10  Q    I see.

11           Do you know whether Mr. Franzese testified against

12  his father, like you have?

13           MS. NASH:  Objection.

14           THE COURT:  Sustained.

15  Q    If truth be told here, Mr. Franzese, you will agree with

16  me, that defense Exhibit D, the John Franzese Story, was

17  actually created after all these other books by Michael

18  Franzese, correct?

19  A    It was -- we did it after my brother wrote his books,

20  yeah.

21  Q    But you did it because, as Mr. Paul mentioned earlier,

22  you were looking to cash in on your father's coattails and now

23  on your notoriety, correct?

24  A    At that time I guess I -- options.

25  Q    Yes or no?

1    A    No, not what you said.

2    Q    Because you have --

3    A    Coattails and stuff like that didn't have anything to do

4    with it.

5    Q    You have one more chapter to add to the Michael Franzese

6    story, because otherwise no one would buy your book, isn't

7    that true?

8    A    What book are you talking about?

9    Q    The book that you are going to write after you leave this

10   courtroom after you finish testifying.

11             MS. NASH:  Objection.

12             THE COURT:  Sustained.

13   Q    There is one more chapter or one chapter would make a

14   distinction between what Michael Franzese has written in his

15   lifetime and what you wrote back in 2001 or 2002 with

16   Mr. Anderson, right?

17   A    Can you repeat that?

18   Q    Yes.

19             The difference between you and Michael Franzese is

20   that you are testifying against your father, correct?

21   A    That's a difference, yes.

22   Q    And as a result of that, you are able now to write a

23   different book that will sell because, quite frankly, no one

24   cares about your story, do they?

25   A    I wouldn't say that.

John Franzese - cross - Colon                        804

1   Q     Let's talk about Joseph DiGorga.

2               THE COURT:  Let's take a break as long as you are

3   transitioning.

4               We reconvene, ladies and gentlemen, at 11:13,

5   probably 11:15.

6               Please do not discuss the case amongst yourselves or

7   with anyone else.  Keep an open mind.

8               We will see you at 11:15.

9               (The following occurred in the absence of the jury.)

10              THE COURT:  All right.  11:15.

11              It should give you enough time?

12              MS. SELTZER:  Otherwise, I will walk in quietly.

13              THE COURT:  We can start without you?

14              MS. SELTZER:  Yes.

15              THE COURT:  Okay.

16              (Recess taken.)

17              THE COURT:  All right.  I will note, we are missing

18  some people.

19              MR. LIND:  Yes.  I'm sorry.  I will get my client.

20              THE COURT:  Okay.  I will note we are missing

21  Ms. Seltzer who said we should proceed without her.  Her

22  client has consented to that.

23              All right.  Let's have the jury.

24              (Continued on next page.)

25

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                    805

1          (Jury present.)

2          THE COURT:  All right.  Be seated, please.

3          Mr. Colon, you may continue.

4          MR. COLON:  Thank you, Your Honor.

5     EXAMINATION CONTINUES

6     BY  MR. COLON:

7     Q    Mr. Franzese, we started to mention at the end, we wanted

8     to start talking about Joseph DiGorga.

9          In your John Franzese Story, you didn't mention the

10    name Joseph DiGorga at all, did you?

11    A    No.

12    Q    Tell the jury about how long you have known Joseph

13    DiGorga?

14    A    I think since about 1997.

15    Q    That's about the time that you started to go to his adult

16    club near JFK Airport, correct?

17    A    I think I went there to meet him, I have a feeling.

18    Q    Okay.

19    A    I knew him first and then he opened the club or something

20    like that.  I am not sure.

21    Q    You knew him as a family friend, correct?

22    A    No, I didn't.

23         All of a sudden he was doing business with my

24    father.

25    Q    Business, right?

GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                         806

1    A    Yes.

2    Q    Okay.  He wasn't the boss of the Colombo Family, was he?

3    A    No.

4    Q    He wasn't the underboss, right?

5    A    No.

6    Q    He wasn't a captain in the Colombo Crime Family, right?

7    A    No.

8    Q    He certainly wasn't a made man, right?

9    A    No.

10   Q    And so, therefore, if he wasn't a made man, he was not a

11   goodfella, correct?

12   A    Correct.

13   Q    But do you recall giving testimony just a couple of days

14   ago with respect to Mr. Joseph DiGorga and being asked this

15   question and giving this answer or these questions and these

16   answers?

17          I am referring to a transcript of June 10, 2010,

18   page 380.

19          Do you recall being asked this question and giving

20   these answers?  Line ten, actually, page 380.

21          Question:  What did you understand Michael Catapano

22   to mean when he said -- continuing on page four of -- line

23   three -- I said if you are telling me I got to give this

24   because I got to do this because I got to do it because it is

25   the right thing to do and I got to listen.

John Franzese - cross - Colon                    807

1           Question, line 15:  What did you understand that to
2   mean?
3           Answer:  Oh, that Tommy had told him that because
4   Joe was a friend and helped him out collecting the 30, the 30
5   thousand, that it would be okay to lend him the ten thousand
6   because it wasn't Michael's money to lend out and if Tommy
7   said it was okay, then he could do it.
8           Answer:  What do you mean by friend?
9           Question:  What do you mean by friend?
10          Answer:  Pardon?
11          Question:  In the context of organized crime, what
12  do you mean by the term friend?
13          Answer:  Well, generally, goodfellas who
14  are -- referred to themselves as friends.
15          Do you recall being asked those questions and giving
16  those answers on your testimony?
17  A    Yes.
18  Q    So you will correct the record now clearly for the jury
19  that a friend is not a goodfella necessarily, correct?
20  A    I think it said generally in that.  So sometimes they are
21  also like friends too.
22  Q    I see.
23          But Joseph DiGorga was, as you said -- testified
24  earlier, is not a goodfella?
25  A    No.

John Franzese - cross - Colon                    808

1   Q    He is not a made member, correct?

2   A    No.

3   Q    You have known him for about, I don't know, 13 years or

4   so?

5   A    Yes.

6   Q    In fact, he's such a good friend of your family though

7   that at one time when your mother Tina's home went into

8   foreclosure, he actually extended his help and provided her

9   some $10,000, did he not?

10  A    I don't remember that.

11  Q    I see.

12        The $10,000 that Mr. Catapano was told to give him

13  by Mr. Gioeli, you remember that, correct?

14  A    Yes.

15  Q    You know where that $10,000 is going?

16        That was going to help your mother, correct?

17  A    No.

18        That was going to Joe DiGorga, for -- he need the

19  money.

20  Q    Isn't it a fact that Joseph DiGorga assisted your mother

21  in pulling her house out of foreclosure on at least two

22  occasions while your father was in jail?

23  A    No.

24        Joe bought the house after my mother got evicted and

25  then lived in it.  Then my mother had to leave.

John Franzese - cross - Colon                            809

1  Q     Joe bought the house?

2  A     I believe so, something like that.

3  Q     So you are making this up.  You don't really know, do

4  you?

5  A     All I know is my mother left the house.  She never got

6  any help from Joe.

7  Q     You don't know --

8  A     I am positive she didn't get any help from Joe.

9  Q     You believe she didn't get any help from Joe?

10         MS. NASH:  Objection.

11         THE COURT:  Sustained.

12  Q     But you don't really know?

13         MS. NASH:  Objection.

14         THE COURT:  Sustained.

15  Q     Your testimony today is that Joseph DiGorga did not help

16  your mother with respect to her foreclosure, that all he did

17  was buy the house from her?

18  A     Yes.

19         The person that's currently living there got

20  to live.

21  Q     Have you seen any documentation with respect to --

22  A     No, I didn't --

23  Q     -- any of your testimony here?

24  A     I saw my mother leave the house.

25  Q     Your testimony is that Joe DiGorga bought the house,

John Franzese - cross - Colon                              810

1    correct?

2    A    My testimony is he had something to do with the fellow

3    that bought the house now.

4    Q    And your mother had to move after Joe DiGorga helped her

5    buy -- bought the house?  Is that what you are testifying?

6    A    No.

7              I'm saying, that the current resident, at 47 Trump

8    Hollow Road I believe, and Joe had something to do with buying

9    the house after my mother had left it.

10   Q    When did your mother leave, what year, if you recall?

11   A    I don't remember.

12   Q    Is it five years ago?

13   A    Once again, I don't remember.

14   Q    In fact, Joseph DiGorga helped your mother with respect

15   to either foreclosure action or nonpayment on two occasions,

16   right?

17             MS. NASH:  Objection.

18             THE COURT:  Sustained.

19   Q    In your -- didn't Joseph DiGorga help your mother when

20   she failed to pay rent later on?

21             MS. NASH:  Objection.

22             MR. COLON:  This is a different line, Judge.

23             THE COURT:  Overruled.

24   A    Once again, I don't remember.

25   Q    I'm sorry?

                 GR     OCR     CM     CRR     CSR

John Franzese - cross - Colon                811

1   A    I don't remember.

2   Q    Okay.  Fair enough.

3        Now getting back to '97, when you start having some

4   sort of a relationship or interaction with Joseph DiGorga,

5   that's as a result of a -- an establishment that he owned by

6   the name of The Airstrip, correct?

7   A    That might have been the name, yeah.

8   Q    That was the first name, over there by JFK?

9   A    Yes.

10       I remember the place.  The name I -- I don't

11  remember exactly.

12  Q    You testified just a few days ago, I believe, you used

13  the name déjà vu, correct?

14  A    Yes.

15       That's what I thought that was.  I thought it was

16  the name of the place.

17  Q    Joseph DiGorga, according to your testimony just a few

18  days ago, was actually -- was the owner of the establishment,

19  correct?

20  A    Yes, he was.

21  Q    Okay.  He had formed a corporation, correct?

22  A    I don't know what he did.  I know he ran the place and he

23  told me he was the owner many times.

24  Q    You had many discussions with Joseph DiGorga before you

25  tape-recorded those conversations in 2005, correct?

John Franzese - cross - Colon                812

1   A      Probably so.  But -- yes.

2   Q      Especially between the period of 1997 when you started to

3   go to The Airstrip slash déjà vu, and -- hold on a

4   second -- and 2001 before you left for California, correct?

5   A      Probably not as many as you think.  I was still using

6   drugs so I didn't go there that often.

7   Q      When you did go there, in fact, Joseph DiGorga had to

8   bail you out a few times when you stiffed cab drivers, right?

9   A      Yes.

10  Q      In fact, tell the jury -- I don't believe you testified

11  to this earlier, but you actually committed the crime of theft

12  of services by not paying those cab drivers when they took you

13  to The Airstrip or déjà vu, correct?

14  A      If he paid them I didn't commit the crime.  But I would

15  have.  I didn't have money.

16  Q      You failed to pay those cab drivers, correct?

17  A      Are you saying Joe paid them?

18  Q      I'm asking you.  You failed to pay those cab drivers,

19  right?

20  A      It's not a crime if he paid it on my behalf.  That's the

21  truth.

22          MR. COLON:  Move to strike.

23          THE COURT:  Mr. Franzese, he is just asking, did you

24  pay the cab drivers?

25          THE WITNESS:  No, I did not pay the cab drivers.

John Franzese - cross - Colon                    813

1   Q    You had no intention of paying those cab drivers, plural,

2   correct?

3   A    Well, I was hoping Joe would lend me money.

4   Q    Before you made -- or you undertook that thought process

5   of hoping Joe would lend you money, your intent was not to pay

6   them, right?

7   A    No.

8         My intent always was to pay but I -- once I'm high I

9   end up never being able to do that.

10  Q    Fair enough.

11        So when you left the cab did you tell those cab

12  drivers hold on, I intend to pay you.  I am going to see if my

13  friend has money.

14        Did you tell them that?

15  A    Generally that's what I would end up saying.

16  Q    I see.

17        Only you and those cab drivers would know, right?

18  A    No.  Whoever I was asking for the money.

19  Q    No.  In terms of having told the cab driver that you were

20  going to come back and pay or have somebody else pay, right?

21  A    If we were the only ones in the car.

22  Q    Only you two would know, correct?

23  A    Yes.

24  Q    Right.

25        Your testimony is that your intent was to pay and

John Franzese - cross - Colon                814

1   that you would go into the club hoping to borrow money from

2   Joe, right?

3   A    Yes.

4         Probably sometimes my intent was also not to pay.

5   Q    Thank you.

6         And, in fact, cab drivers on more than one occasion

7   ran into the club to get you to pay, correct?

8   A    Probably.

9   Q    Yes.

10        And Joe had to put the money out for you, correct?

11  A    Yes.

12        Because it was taking too long to pay.

13  Q    You never paid Joe back any of that money, did you?

14  A    No, I did not.

15  Q    In fact, you actually owe Joseph DiGorga about, I don't

16  know, close to $5,000 for money he gave you, meals he gave

17  you, drinks he gave you, when you were down on your luck out

18  on the street and you went to his club and you begged for

19  help, right?

20        You owe him about four to five thousand dollars,

21  isn't that a fact?

22  A    I owe him about $250 maybe.  Any meals he gave me he gave

23  me while I was eating with my father or anybody else.

24  Q    So your testimony is that you only owe him about $250?

25  A    Probably.

John Franzese - cross - Colon                    815

1   Q     Okay.  When you were back there at Odessa, do you recall
2   that period between '01 and '05?
3             Do you recall that?
4   A     I remember being at Odessa.
5   Q     You were on the road to sobriety, do you recall?
6   A     Yes.
7   Q     One of the conditions of the program is that you redeem
8   yourself?
9   A     It's not about redemption.  I don't know what you are
10  talking about.
11            THE COURT:  Let him finish the question.
12  Q     It's not about redemption?
13            I thought you testified earlier that that was the
14  subtitle in your book, the John Franzese Story,
15  Redemption -- excuse me -- family, Crime, Drugs, Redemption.
16            Didn't you say it was -- aren't those your words?
17  A     Are you referring to --
18  Q     Aren't these your words?
19  A     Excuse me. I don't understand what you are referring to.
20  Q     I am referring to the --
21  A     No.  Steve wrote that.  We already discussed that.  You
22  said that Steve wrote the title.
23  Q     With your concurrence, your acknowledgment, right?
24  A     He just wrote it.
25  Q     He gave you the name of the title too?

                GR      OCR      CM      CRR      CSR

John Franzese - cross - Colon                    816

1    A    That was his -- this was all his.

2    Q    I see.

3         So you had nothing to do with the word redemption on

4    that John Franzese Story, did you?

5    A    I -- as far as hearing it and saying all right, write it.

6    Probably no.

7    Q    Let me get back to the question.

8         With respect to your attempt at sobriety, between

9    '01 and '05, at the Odessa House, was it a condition -- wasn't

10   one of the conditions of your making amends for what you had

11   done to call up individuals that you had wronged or stolen

12   money from or robbed or assaulted or injured in any way,

13   wasn't that one of the conditions that they placed on you?

14   A    Not at all.

15   Q    Oh.  So when -- do you recall a conversation that you had

16   with Joseph DiGorga from California in which you called him in

17   New York.

18        Do you recall that?

19   A    Are you --

20   Q    Yes or no?

21   A    Are you -- I need to know if you are referring to this

22   being a condition of Odessa House because that's what I am

23   saying no to.

24   Q    Yes.

25   A    No.

GR        OCR        CM        CRR        CSR

John Franzese - cross - Colon                          817

1    Q     Did you ever call Joseph DiGorga while you were in

2    California rehabilitating yourself?

3    A     Quite frankly, I don't remember making that amends

4    process to Joe.

5    Q     Did you do it to anybody?

6    A     Yes.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*J. Franzese - cross/ Colon*                    818

1   CROSS-EXAMINATION (Cont'd)

2   BY MR. COLON:

3   Q    Tell the jury who you did it to?

4   A    That is something that is a personal thing.

5   Q    Well, tell the jury.

6            MS. NASH:  Objection; relevance.

7            THE COURT: Sustained.

8   Q    You don't recall making that telephone call to

9   Joe DiGorga?

10  A    Personally I think I would have remembered making amends

11  to Joe but I didn't think I had to.

12  Q    The $250 you acknowledge was for what exactly that you

13  owed him?

14  A    Probably for every -- because everyone knew not to lend

15  me known.  So they, generally, wouldn't.  That's why I say it

16  was only $250.

17  Q    Everybody knew because they knew you weren't going to

18  pay, right?

19  A    They knew I was a junkie, yes.  My father didn't want

20  them giving me money.

21  Q    And Joseph DiGorga was aware you were a junkie, right?

22  A    Yes.

23  Q    And nevertheless, he lent you the money anyway?

24  A    Yes.

25  Q    And you are here to testify against him for gratitude for

*J. Franzese - cross/ Colon*                             819

1    him lending money?

2              MS. NASH: Objection.

3              THE COURT: Sustained.

4    Q    So it is only $250 and yet, Joseph DiGorga allowed you to

5    come to that club how often, between '97 and 2001?

6    A    I don't remember.

7    Q    Well, did you go once a week?

8    A    No.  I probably only went when I was sober in between

9    those periods of time which, probably, wasn't a lot.  I also

10   was in jail for one of those -- for a year, so I don't think I

11   spent a lot of time in clubs at that point. I didn't drink and

12   get high to go to clubs any more.  Kind of isolated.

13   Q    Between '97 and 2001?

14   A    Between 1990 and 2001 I drank myself into complete

15   isolation.  Unless it was very close to me being sober,

16   generally you didn't see me anywhere.

17   Q    Why would you go to Joseph's club?

18   A    Because he was friends of my dad's.

19   Q    And there were girls dancing there, exotic dancers?

20   A    Yes.

21   Q    And you became friendly with them, correct?

22             MS. NASH: Objection.

23             THE COURT: Sustained. You want to give me a proffer

24   at side bar.

25             MR. COLON:  Yes, Judge.

*J. Franzese - cross/ Colon*                    820

1          (The following took place at side bar)

2          THE COURT:  He was friendly with the girls and that

3   shows what?

4          MR. COLON:  We mentioned this earlier.  This is

5   different from the issue of --  he is exposing women to HIV.

6   For example, this has to go to bis in light of the fact that

7   Joe DiGorga stopped him, impeded him, for having sexual

8   relationship.  This is different.  This is the reason why he

9   would be mad and take out his anger with Joe and revenge would

10  be and personal bias would be something that I think

11  Your Honor even noted on the record that bias is different

12  than what we had discussed earlier.

13         THE COURT: Well, if you want to ask him if

14  Mr. DiGorga stopped him from having sex with women without the

15  HIV thing comments coming out at all, that's fine if you think

16  that is a motive for bias.

17         MS. NASH: Judge, in light of the prior question I

18  think that that's incredibly prejudicial.  They have already

19  heard now the question about intentional exposure.  They are

20  going to understand when he makes that reference what he's

21  referring back to.

22         THE COURT: I don't think I allowed the prior

23  testimony in.

24         MS. NASH: He asked the question.

25         THE COURT: But I think he's allowed to ask whether

*J. Franzese - cross/ Colon*                                    821

1   Mr. DiGorga stopped him from having sex with women who were

2   working in Mr. DiGorga's club, for which there could be a lot

3   of reasons for doing that.  So I'll let you have just that

4   question. If you go anywhere near, Mr. Colon, the HIV part of

5   it, I'm not going to be pleased about that.

6             MR. COLON:  I understand.

7             MS. NASH: Can I at least propose, rather than making

8   --  posing a question like stopped him from having -- stopped

9   him from having -- rather than, he stopped him from making

10  romantic advances or something?  We have no idea if this was a

11  first date, whether this was intended to have sex the first

12  time he met her.

13            THE COURT: You can ask him if he tried to come at

14  some women there, if Mr. DiGorga stopped him.

15            MR. COLON:  You are telling me I can't go any

16  further than say he attempted to have sexual relations with

17  any of these women?

18            THE COURT:  There are ways to do that without saying

19  sexual relations.

20            MR. COLON:  Becoming intimate with these women.

21            THE COURT:  We could all think of a hundred

22  euphemisms.  That is not problem. If the implication is that

23  Mr. DiGorga didn't want him approaching his employees, that's

24  fine. Okay.  If the implication is Mr. DiGorga was protecting

25  his employees from HIV, that's not fine.

*J. Franzese - cross/ Colon*                                    822

1          MR. COLON:  Well, Judge, if I may respectfully,

2    that's the whole point to Mr. DiGorga's a concerns was, of

3    course, protecting his employees, but also, not wanting them

4    to contract this very serious and devastating application.

5          THE COURT:  I'm sustaining the objection.

6          MR. COLON:  You are saying I can't ask him the next

7    question, the question you alluded to?

8          THE COURT:  You just identified by the proffer what

9    you intend to do it with it and what you intend to do with it

10   is improper and I am sustaining the objection.

11         MR. LIND:  I realize Your Honor has sustained the

12   objection.  I just want to chime in for a second. Your Honor

13   prevented questioning about him having sex with prostitutes.

14   These are, from what I can tell, not prostitutes and I don't

15   understand the basis for Your Honor's sustaining the

16   objection.

17         THE COURT: Let me explain it again. The question

18   asked whether these questions go to the witness' veracity and

19   truthful telling capacity, and since you can't find a single

20   woman he had sex with without testifying he had HIV, it all

21   irrelevant. That's the basis for my order. Did he try --

22   attempted perjury, attempted nondisclosure, that doesn't go to

23   credibility.

24         MR. COLON:  If I may? Let me.  I will -- stop for a

25   second.  Judge, I don't want to mention the name of the

*J. Franzese - cross/ Colon*                              823

1   individual, but I have specific information with respect to a

2   woman who happened to be a bartender and if you want to limit

3   me, Judge, to at least not allowing him to come on to certain

4   employees, then I will have to live with that, but the jury

5   already knows he contracted --

6           THE COURT:  Mr. Colon, at this the point I am not

7   allowing it all because I think it's quite clear what they are

8   trying to do.  They are trying to show he was reckless in not

9   advising women he might give them HIV and that is not

10  acceptable because even if your bartender who you proffered to

11  me before -- he didn't have sex with her. We don't know what

12  would have happened. So it doesn't matter.  It doesn't go to

13  his credibility. It might make him a bad person for even

14  thinking about it, but that doesn't mean he's not a credible

15  person.  So I'm sustaining the objection.  Move on to another

16  line of question.

17               (End of side-bar).

18               (Continued on next page)

19

20

21

22

23

24

25

*J. Franzese - cross/ Colon*                                                  824

1    BY MR. COLON:

2    Q     So when we left off, you mentioned the issue of $250.

3    Are your sure that is all you owed Mr. DiGorga?

4    A     No, I am not.  It's approximate.

5    Q     He also let you eat there for free, even though your

6    father was not there; correct?

7    A     Sometimes.

8    Q     He didn't charge you?

9    A     Probably not.

10   Q     Did he charge you for drinks at all?

11   A     I didn't drink.

12   Q     Well, the entire period you went there between '97 and

13   2001, you didn't drink?

14   A     No, I didn't drink.  I didn't stay long there.  I don't

15   think I spent a lot of time in there.

16   Q     Now, you made the statement or you testified that at one

17   time you had a conversation with Joe, and you made mention,

18   you in your testimony, of a club that he shut down.  You

19   recall that?

20           You testified just a couple of days ago.

21   A     I don't remember it in that context.

22   Q     Well, do you know whether -- do you have any personal

23   knowledge of Joe DiGorga shutting down any clubs in Manhattan,

24   yes or no?

25   A     In Manhattan?

J. Franzese - cross/ Colon                     825

1   Q    Anywhere.

2   A    Shutting it down?

3   Q    Yeah.

4   A    Off the top of my head, nowhere in Manhattan do I know of

5   Joe shutting a club down.

6   Q    How about any other place?

7   A    Yeah, the one in -- I think it was in Lindenhurst or so.

8   Q    When you say "shutting it down" you meant not in any

9   sense that he threatened it in way anyone.  In fact, he shut

10  it down, the club, because it wasn't making any money or he

11  didn't have the proper finances, right?

12  A    I don't think he even ever opened a club on Long Island.

13  Q    So to the best of your knowledge, whether it is Manhattan

14  your any other part of New York City, New York State,

15  Joe DiGorga did not shut any club down, correct, in an

16  organized crime sense?

17  A    In an organized crime sense, the word "shut" might seem

18  something different.

19  Q    But do you know of him having shut any sort of club down

20  in an organized crime sense?

21  A    Do you mean like take the key out of the door and get rid

22  of all the employees, send people home, don't pay the bills,

23  no longer occupied as an owner; is that what you are saying?

24  Q    In an organized crime sense.

25  A    Then I can't answer that -- that I would say, yes, I do

*J. Franzese - cross/ Colon*                                      826

1   know a place if shut is in an organized crime sense, yeah.

2   Q    So, really, what club was that that he shut down in an

3   organized crime sense?

4   A    I would say shook down.  It would seem like more that's

5   the worked to describe here than shut here.

6   Q    Well, you testified just a couple of days ago, you're

7   saying that you're testimony is actually that he shut them

8   down or rather, that is he shook them down?

9   A    In an organized crime sense he shook the club down. I

10  think what you are referring to in shut is the only club I

11  know that he physically no longer occupied the place he rented

12  and was not going to open the club that he began to open was

13  Long Island.

14  Q    The club in Lindenhurst, correct?

15  A    I believe it was Lindenhurst.

16  Q    But you testified earlier that -- during your testimony

17  on direct that he needed a club in Manhattan, do you recall

18  that?

19  A    When I came back and he was doing this he was already

20  involved in the Hustler Club.  He already made his move on

21  there.

22  Q    He made his move?

23  A    Yes.

24  Q    You mean he wasn't a consultant for the Hustler or Deja

25  Vue Corporation?

*J. Franzese - cross/ Colon*

827

1  A    That is was the result of the sit-down they had with them

2  guys from the Genovese Family.

3  Q    You weren't at that sit-down, were you?

4  A    No, but Joe told me.

5  Q    But you weren't there?

6  A    No.

7  Q    So you had conversations, apparently, with Joe about his

8  activity with his clubs, correct?

9  A    Yes.

10  Q    Like the Hustler, for instance?

11  A    Yes.

12  Q    The Penthouse, correct?

13  A    Many.

14  Q    You also had conversations with respect to him and Joe

15  Toursto, right?

16  A    Yes.

17  Q    And also with respect to Cujini Due?

18       You had conversations involving with Cujini Due,

19  ,correct.

20  A    Yes.

21  Q    And you testified to that on your direct testimony just

22  couple of day ago last week, right?

23  A    Yes, I did.

24  Q    So we're going to go to some audiotape recordings and we

25  are not going to play them, Your Honor.

*J. Franzese - cross/ Colon*                                    828

1          MR. COLON: I'm just asking that the jury draw its

2    attention to the March 30th, 2005, tape-recording and

3    specifically just note in their book.

4          THE COURT: Mr. Colon, you have to give us tab

5    numbers.

6          MR. COLON:  102 A, Judge.

7    Q    Now, before I get into 102 A, you had numerous

8    conversations with DiGorga and with your father and numerous

9    conversations with Mr. Catapano, with respect to Joe DiGorga;

10   correct?

11   A    Yes.

12   Q    So outside of Joe DiGorga, let's just look at some of the

13   things that reference Mr. DiGorga.  The reality is that many

14   times Joseph DiGorga didn't know what was going on, correct?

15   A    I didn't feel that way.

16   Q    But you had conversations with him where it was clear

17   that he didn't know what you were talking about, correct?

18   A    I don't know what you are referring to.

19   Q    Well, isn't it a fact that neither you nor Michael

20   Catapano, for instance, and sometimes even your dad fully

21   trusted Joe DiGorga, did they?

22   A    There was -- we had suspicions sometimes.

23   Q    That he wasn't a team player, right?

24   A    There were more conversations, but yeah, that's what we

25   were saying.

*J. Franzese - cross/ Colon*                              829

1  Q    That he really wasn't, a, cooperating in the schemes that

2  you were trying to develop information on, right?  Yes?

3  A    No. He was cooperating. Sure.

4  Q    But you mistrusted him, correct?

5  A    Well, he always seemed to get the money and never  --

6  sometimes some of the money wasn't paid back.

7  Q    Get the money sometimes.  Always seemed to get the money,

8  not pay back.  He also attempted to stall and block your

9  efforts from moving on people, correct, yes or no?

10 A    No, actually.

11 Q    Well, that's why you didn't trust him, correct?

12 A    One of the reasons he tried to stall was to keep us from

13 knowing how much money he was actually taking, because if we

14 got there, then the guys would tell us how much they gave him.

15 Q    And in fact, at times Mr. Catapano and yourself even

16 threatened Joe DiGorga, did you not?

17 A    No, I don't think we threatened him.

18 Q    What kind of language did you use when you were upset

19 because you thought he was holding out on you?

20 A    I don't think we threatened him. Can you show me where

21 maybe?

22 Q    We'll, let's go to 102 A and referring to the issue of

23 Joe -- where Mr. Catapano, Sonny, and yourself were meeting on

24 about March 30th, 2005.

25        Do you recall that date?

*J. Franzese - cross/ Colon*                                    830

1    A    I remember here again.

2    Q    Where did that meeting take place?

3    A    Hold on (perusing). I don't remember.

4    Q    And that meeting, essentially, if you are acknowledging

5    that it took place on March 30th, about what time of day did

6    it take place, if you recall?

7    A    No, I actually don't.

8    Q    So you don't remember where it took place, right?

9    A    No.

10   Q    And you don't remember what time of the day it took

11   place?

12   A    No.

13   Q    But you were wearing a recording device that day?

14   A    Yes, only because I see the transcript.

15   Q    How long did the meeting last in total -- not just

16   conversation on the tape, but in total, that meeting?

17   A    I don't know that -- how long it lasted?  Twenty minutes.

18   I don't know. I could say anything.

19   Q    I understand. But it's your testimony that you only

20   recorded this part of the conversation?

21   A    Pardon?

22   Q    You only recorded this part of the conversation?

23            MS. NASH: Objection.

24            THE COURT: Witness can answer the question.

25   A    I don't know.

J. Franzese - cross/ Colon                                831

1   Q    So let's talk about 102 A. In that conversation

2   Mr. Catapano starts.

3           He called you right up, this Joe -- referring to Joe

4   D; is that correct?  You are talking about page two at the

5   top.

6   A    Yes.

7   Q    Yes, referring to Joe D?

8   A    Yes.

9   Q    And Joe DiGorga is also known as Joe D, right?

10  A    Yes.

11  Q    And Sonny asks:  What?

12          And Mr. Catapano says:  He called you right up?

13  Joe.

14          And Sonny says:  No.  He didn't call up, no.  He you

15  know, (unintelligible) he didn't say nothing about even no I

16  don't even know what he thinks about it.  I haven't seen him

17  yet.

18          Do you recall that on the tape?

19  A    Yes.

20  Q    Would you like some water?

21  A    I'm okay. Just yawning.

22  Q    So do you recall that on the tape?

23  A    Yeah.

24  Q    There's a question.  Do you recall that?

25          THE COURT:  He said yeah.

*J. Franzese - cross/ Colon*                                          832

1          MR. COLON:  I'm sorry.

2          THE COURT:  I believe he said yes.

3          MR. COLON:  It is difficult for me to hear if he

4     doesn't talk into the mike.  I wouldn't be able to hear him.

5          THE WITNESS:  Sorry.

6     Q    So at that point your father doesn't even know what you

7     are talking about or what the conversation is about, correct?

8     A    At that point, yes, at that time point.

9     Q    Yes.  Well, what was the subject matter at that point?

10    A    The subject matter was after me and Michael had seen Joe

11    or questioning him about the money, we had thought he had

12    called my father right up.

13    Q    And in fact, you overreacted and your father admonished

14    you.  He tells you in the next line:

15             Yeah, John ahh, John told me something. I told John,

16    I says, you shouldn't have went, you shouldn't have went that

17    far with him, I said.

18             Do you recall that?

19    A    That's what he said here.

20    Q    And Catapano says:  Well, we were just, you know, we were

21    just asking him general questions about the place?

22             Correct?

23    A    That's what Michael said.

24    Q    And right?

25             And further down on line 19 page two he says: Yeah,

*J. Franzese - cross/ Colon*                                   833

1   I know.  I know.  I know.  I think so.

2          And Sonny says:   Huh?

3          And Catapano says:  You know, he says I think so. I

4   says, you know, it's not right what he did. He's, like, I know

5   I know. And I told him about ahh and he was  complaining about

6   Toursto.

7          Right?  You got that?

8   A    That's what you're referring to in the transcript, yeah.

9   Q    There's no mention about Hustler whatsoever, correct?

10  A    In that sentence that Michael is saying, no.

11  Q    From line -- all the way down to line where Catapano says

12  line 25, no mention about Hustler is there?  Yes or no?

13  A    No. Not the word Hustler.

14  Q    And there's no mention about the Penthouse either, right?

15  A    No.

16  Q    And there's no mention about Toursto until the very next

17  line when he's complaining about Toursto?

18         And Sonny says: So why don't he go looking for em?

19  I told em point blank.

20         Catapano says: That's what we told em.  Yo, right?

21  Didn't we tell him?

22         And you say --  you chime in:  Absolutely.

23         And Catapano says:  Go get em.

24          And Sonny says:  Go get em.

25         And Catapano said he says he's home.  I said, well

*J. Franzese - cross/ Colon*                                    834

1  why ain't you waiting for em?

2          And Sonny says:  I told em I'd go with him.

3          Catapano:  Right.

4          You say:  Yeah.

5          Sonny says:  Mike, I told em to go with him.

6          Catapano:  That's well, we told 'em the same thing.

7  Joe, you want help? We'll come help ya.

8          Sonny says: Sure.  You don't wanna move.

9          Do you recall that?

10 A   I recall seeing it, yeah, right here.

11 Q   You don't wanna move, talking about who Joe D, right?

12 A   Yes.

13 Q   Meaning Joe D doesn't want to move, he doesn't want to

14 take any action, right?

15 A   More like lazy.

16 Q   Lazy?

17 A   Yeah.

18 Q   He doesn't want to take any action. You're the one who

19 that's pushing the action, aren't you?

20 A   No. I don't think I'm pushing it.  I'm -- we're just

21 doing what -- talking about the subject.  Asking him why he's

22 so lazy.

23 Q   I see.

24          And this is about a guy who owes him a significant

25 amount of money, Mr. Toursto, right?

*J. Franzese - cross/ Colon*                                    835

1   A    Yes.

2   Q    In fact, he's owed him the money for, like, three years,

3   doesn't he?

4   A    I believe it is somewhere like that.  It could be longer.

5   Q    And Joe D who shakes people down, he doesn't go after a

6   guy for three years. At that point you understand that to be

7   the facts right?

8   A    Yes.

9   Q    And it's only you and Mr. Catapano that are pushing Joe

10  to go get it, right?

11  A    Yes.

12  Q    Joe DiGorga has no interest in going after anybody,

13  especially Mr. Toursto, right?

14  A    That's not true. No interest in anybody?  I mean --

15  Q    Not interested in Mr. Toursto, is he?

16  A    No, because Michael gave him the $14,000 that Toursto

17  owed him, so why should he care about going -- chasing the guy

18  for money that Michael already gave him.

19  Q    Michael gave him $14,000 -- lent him $14,000; right?

20  A    Well, it was because of the loan for Toursto.

21  Q    Michael Catapano loaned to Joe DiGorga $14,000; yes or

22  no?

23  A    Yes.

24  Q    So going to line 11 page three:

25           Sure:  He don't want to move.

1              Catapano says:  No, no.

2              And then you say:  He said he ran into him at the

3    train station.

4              And Sonny says:  I mean, ya know what I mean Joe?

5    What?  The guy owes you money --

6              THE COURT:  Mr. Colon, the reporter is not going to

7    be able to get it, as good she is.  You've got to slow down.

8              MR. COLON:  I'm sorry.

9    Q    Sonny I says:  I mean ya know what I mean Joe?  What?

10   The guy owes you money, go look for him.

11             You say:  Yeah.

12             And Catapano says on line 18 I told em about the ahh

13   about those guys over there with, unintelligible, the guy in

14   Michigan, Jim, that you should meet 'em.

15             That's a different subject.  We are done with Mr.

16   Toursto, do you remember that, that conversation, those

17   statements made by yourself and --

18   A    Yes.

19   Q    Mr. Catapano?

20   A    Yes.

21   Q    And now going back to Mr. Toursto, for a second,

22   Mr. Toursto is actually a nephew of yours; isn't he?

23   A    No, that's incorrect.

24   Q    I'm sorry?

25   A    No, he beat a nephew of mine out of money.

1    Q    So Mr. Toursto is not nephew, he beat a nephew of yours?

2    A    Yes.

3    Q    He didn't beat him physically, right?

4    A    Right.

5    Q    What you are referring is with respect to that situation

6    with Mr. Toursto where he rents Mr. DiGorga's club, correct?

7    A    Yes.

8    Q    The club at the Air Strip, correct?

9    A    Yes.

10    Q    And in that situation your nephew agrees to be the, what,

11    videographer?

12    A    I believe so.

13    Q    What is your nephew's name?

14    A    I don't remember which nephew.

15    Q    Okay.  But you do recall that Mr. Toursto entered into an

16    oral contract with Mr. DiGorga to rent out the space to have a

17    video recording or performance of women modeling underwear?

18    A    Yes.

19    Q    And your nephew was given a bounced check -- a check that

20    bounced by Mr. Toursto, right?

21    A    Yes.

22    Q    Maybe 3 or $4,000?

23    A    I think Joe says it was 4900 or something.  I am not

24    sure.

25    Q    Forty-nine hundred.

*J. Franzese - cross/ Colon*                                    838

1              Mr. Toursto bounced a check on your nephew?

2    A    Yes.

3    Q    He also bounced checks with respect to the two young

4    ladies that performed in the video, right?

5    A    Yes.

6    Q    And he never paid Joe DiGorga back, did he?

7    A    At this point, no.

8    Q    You're talking about all that money that was owed to

9    Joe DiGorga, your nephew, and the two young ladies when you

10   talk about Joe Toursto, right?

11   A    Plus the 16,000 I think that -- are you saying that's all

12   the money that we are talking about with Joe Toursto?

13   Q    Well, you didn't see any sort of loan between Joe DiGorga

14   and Joe Toursto, did you?

15   A    Every time I --

16   Q    Did you see a loan -- any sort of --

17   A    I did see a transaction, no.

18   Q    But you are aware of all the money that Joe Toursto owed

19   those individuals after he stiffed them with respect to that

20   video recording performance at Joe D's club?

21   A    I am aware of those individuals and others, too.

22   Q    There's $14,000 that Mr. Catapano gave to Joe D.  Isn't

23   it a fact that that money was used to help your mother with

24   either her mortgage or non-payment or her relocation?

25   A    No.

*J. Franzese - cross/ Colon*                                      839

1    Q    Are you saying that, once again, that Joe had nothing to

2    do with helping your mother out while your dad was in jail?

3              MS. NASH: Objection.

4              THE COURT: Sustained.

5    Q    Now, moving on to that same 102 A.  When you talk about

6    -- or Mr. Catapano talks:

7              I told 'em about the ahh those guys over there with,

8    (unintelligible) you know, ahh, the guy in Michigan, Jim that

9    you should meet him, you know.

10             You remember that.

11   A    Yes.

12   Q    That's Mr. Catapano pushing that, correct?

13   A    He's bringing up the subject.

14   Q    And he happens to be a captain, doesn't he happen?  He

15   happens to be a captain, isn't he, in the Colombo Family?

16   A    Yes.

17   Q    And he says or actually you say:  Grant. That's  you

18   talking about Michael Grant or Anthony Grant?

19   A    I don't know the first name.

20   Q    In fact, you don't know any of the individuals up in

21   Michigan, do you?

22   A    No.

23   Q    And Mr. Catapano says:  No, no, that was the other two

24   guys in Connecticut?

25             You say:  I got all confused.

*J. Franzese - cross/ Colon*                                   840

1          Mr. Catapano says:  You should meet him but --

2          And then you say: I don't know what he was talking

3    about, but I told him about.

4          Catapano says:  I told him about the other thing

5    that you did for him with Springfield that does him a favor

6    and they don't even do anything for him.  I said that's not

7    right at all.

8          You recall that, right?

9    A    Yes.

10   Q    That had to do with, let's say, the Grant brothers and

11   Hustler Club being shaken down by some Genovese made guys up

12   from Massachusetts, right?

13   A    Yes.

14   Q    And you wouldn't know who those Genovese people were,

15   would you?

16   A    No, I wouldn't.

17   Q    You have no firsthand knowledge, you weren't there?

18   A    I wasn't there.

19   Q    And essentially, what Mr. Catapano is referring to is the

20   fact that Joe DiGorga may have done the Hustler Club a favor

21   by getting the Genovese crew off their backs, right?

22   A    Yes.

23   Q    A favor, right?

24   A    We -- that was the deal we made with them.

25   Q    Joe DiGorga may have done them a favor, correct?

*J. Franzese - cross/ Colon*                                              841

1    A    It was a business deal.

2    Q    But you didn't participate in that business deal, did

3    you?

4    A    No, but later on they're talking about it.

5    Q    In fact, you also know therefore  -- well,  strike that.

6              What you're saying is that you were part of this

7    deal and you are very familiar with the facts with respect to

8    those guys up in Massachusetts, right?

9    A    I'm -- I know that -- I know, I've been told, and I knew

10   of what happened up there, and why we were in the Hustler Club

11   because of it.

12   Q    So you would know, therefore, that it was actually the

13   FBI that got the Genovese members off the Hustler's back when

14   the individuals up in the Genovese crew encountered some FBI

15   business cards that were provided to them by one of the

16   Hustler owners, right?

17   A    No, I wouldn't know that.

18   Q    You didn't know that?

19   A    No.  I knew that they met them.  All I knew is that they

20   were met by two guys, Tommy and Michael here, went to see

21   them.

22   Q    So you had no idea that the FBI --

23              MS. NASH: Objection.

24              THE COURT: Sustained.

25   Q    Now, going back further down to line five:

1          Sonny says: They're gonna do something for me I.  I

2    ain't worried about that, Michael.

3          And John, you say: That's not what he said.

4          Sonny:  Huh?

5          Catapano jumps in and says:  He says he don't trust

6    'em.

7          And you say: That's why he ain't gonna get anything.

8    He don't want to approach them with nothing.

9          You recall saying those words on that recording,

10   right.

11   A    Yes.

12   Q    Those are your words, right?

13   A    Umm-Humm.

14   Q    When you say:  He ain't gonna to get nothing.  He don't

15   want to approach them with nothing, you are referring to Joe

16   D; right?

17   A    Yes.

18   Q    And then as we go a little bit further down on 102 A:

19          Sonny says: He don't trust 'em, then why did you

20   bring us into it?

21          And you say:  That's what I said to 'em.

22          Catapano:  Well, yeah, yeah.

23          You say: I said that to 'em.

24          And Catapano says: That's what he said.

25          Sonny said:  Don't trust 'em. You know, that's the

*J. Franzese - cross/ Colon*                            843

1   game of a beekeeper.

2                   Catapano says:  Yeah.

3                   You say: Yeah.

4                   Catapano says: Yeah that what we went right into

5   that.

6                   Sonny says: Yeah.

7                   And then Catapano essential threatens or admonishes

8   Joe and says: And ahh I told him, meaning by who by the way,

9   Mr. Franzese?  Mr. Franzese, when he says I told him, who?

10  Joe D?

11  A    Yes.

12  Q    And I told him:  And ahh, I told 'em don't lie.  I said

13  whatever you do, I said, 'cause you know the,  unintelligible.

14                   And Sonny says: You run out of options.

15                   Catapano says. I says you know what happens Joe,

16  then your credibility is going to be shot, and you don't have

17  no -- you're on the shit list. He's like, no, I never knew.

18                   You recall that conversation going that way and even

19  repeating to Mr. Catapano and your dad that Joe said he never

20  knew, you recall that going that way, correct?

21  A    That's what it was said here.

22  Q    Yeah.

23                   And with respect to the issue of Joe's stalling and

24  Joe wanting to keep everybody at bay, your father's quoted as

25  saying on line three:

*J. Franzese - cross/ Colon*                                        844

1              What'd he, and what'd he say about the club?

2              Catapano:   He says ahh what he said about two

3    weeks, right, he was saying?

4              Sonny: Yeah. Two weeks.

5              Catapano: About two weeks he should have everything

6    done.

7              He's talking about what?  The Hustler Club or the

8    club in Lindenhurst, which one?

9    A    At this point he's talking about, I believe, the club in

10   Lindenhurst.

11   Q    I see.

12             And Catapano says:  About two weeks he should have

13   everything done.

14             Sonny says:  He got the rest of the money.

15             Catapano:  Yeah, that's what he told me.

16             Sonny: You know, yeah, he got the rest, he got the

17   rest of the money on account of me.

18             Catapano:  Of course, anything he gets is cause of

19   you.

20             Franzese says:  Yes.

21             Sonny says:   Yes, he then he goes in there and tell

22   --  he goes and talks and tells him, you know, Sonny get some

23   money over here. And I know what he's doing.

24             Catapano says:  Of course.

25             Sonny says: That's why he don't want me to meet

*J. Franzese - cross/ Colon*                                845

1   nobody.

2          Catapano: No, because then, I, then, then they can

3   cut him out and come right to you.

4          Sonny says:  Yeah, but he should realize I don't do

5   them things.

6          You remember the conversation going like that,

7   right.

8   A    I remember this conversation.

9   Q    Meaning that Joe wanted to keep everybody at bay. He

10  wanted to keep you guys away from anybody he was doing

11  business with in general, right?

12  A    That he was benefitting from the -- 'cause of the favors

13  that were done for him because he was around us.

14  Q    So you thought that Joe D was cheating your crew, that's

15  what you're telling the jury?

16  A    Joe D was getting money from them guys.

17  Q    And when people in your line of business or former line

18  of business, when people don't pay, what happens to them?

19  A    Eventually they end up getting hurt.

20  Q    You didn't hurt Joe D, did you?

21  A    No.

22  Q    But the bottom line is if he was going to continue to

23  hold back on those in The Family, that he was going to get

24  hurt, right?

25  A    I seen that to be the end result of things in my life,

J. Franzese - cross/ Colon                                846

1   yes.

2   Q    So your testimony is that Joe D wasn't going to be immune

3   to that, he too would have gotten hurt eventually, right?

4   A    I guess he would have been subject to that to.  So would

5   have everyone else.  All of us.

6   Q    We are talking about Joe D here specifically?

7   A    Okay, but I think that applies to all of us.

8   Q    I'm talking about Joe D specifically.

9   A    Yes.

10  Q    Now, by the way, did Mr. Catapano ever get any money from

11  Hustler?

12  A    Not at the time I was there in New York that I know of.

13  Q    Not at the time while you were recording the

14  conversations?

15  A    That I know of, no.

16       MR. COLON:  Judge I'm going to move on to 103, if I

17  may, for a second.

18       THE COURT:  You may and you may take more than a

19  second.

20  Q    And specifically, turn to Exhibit T 103.

21       Do you have that, Mr. Franzese?

22  A    April 5th?

23  Q    Yes.

24  A    Okey dokey.

25  Q    Once again, you participated in that conversation with

*J. Franzese - cross/ Colon*                                    847

1    Mr. Catapano, right?

2    A    Yes.

3    Q    Would you tell the jury where that conversation took

4    place?

5    A    I don't recall where it was taking place.

6    Q    Do you know what time of day it took place, by the way?

7    A    I don't know offhand.  Do you want me to read the

8    transcript and try to figure it out?

9    Q    We will read it in a second.  I'm just wondering if you

10   know at this point by looking at the date, April 5th, if you

11   know where it took place.

12   A    No, I don't recall.

13   Q    And you were wearing a recording device at that time,

14   yes?

15   A    Yes.

16   Q    And you recall when you turned that on April 5th with

17   respect to yourself and Mr. Catapano.

18   A    No, I don't.

19   Q    Do you recall whether Agent Lewicki, was nearby in the

20   vicinity?

21   A    I would assume if it was during the day, I would think

22   very much that he was nearby.

23   Q    You don't know where he was at that particular moment on

24   April 5th when you were recording this?

25   A    No.

1    Q    Did he give you instruction when to turn it on that day?

2    A    Once again, I don't recall specifically.

3    Q    Do you recall meeting with Agent Lewicki that day before

4    this meeting with Mr. Catapano on April 5th?

5    A    No, I don't recall meeting with him but i may have turned

6    the thing on, so I don't remember it, no.

7    Q    And he had provided some general instructions with

8    respect to the operation of the recording device, yes?

9    A    Yes.

10   Q    He also provided you, let's say, in general, with either

11   suggestions or recommendations as topics you should talk

12   about?

13   A    Sometimes we covered some of the stuff we had gone over

14   from before each meeting.

15   Q    Okay.  And how often would you meet with Agent Lewicki

16   with respect to these recordings or prospective recordings

17   that you were going to tape?

18   A    Sometimes for a short period of time, and others for a

19   little bit longer.

20   Q    Did you meet with Agent Lewicki just before every

21   recording that's in evidence here, if you can tell the jury?

22   A    I don't remember if every recording in evidence. If I did

23   meet with him before the meeting, it was generally quick.  We

24   turned it on and I went on my way. If -- I don't know. I mean

25   I'm not sure.

*J. Franzese - cross/ Colon*                                    849

1   Q    And at all times when you were recording your father, and

2   your cousin and your family friend, did you do that with the

3   authorization or the concurrence of Agent Lewicki or another

4   agent?

5   A    Yes, everything I recorded, yes.

6   Q    You got specific permission each time you recorded

7   someone?

8   A    Yes.

9   Q    So let's turn to, as I said, 103 and April 5 and it's

10  you and Mr. Catapano, and I believe this is a point where

11  you're both criticizing Joe DiGorga for holding back; correct?

12  A    Yes.  What was that?  What did you just say?

13  Q    You are both criticizing --  you're talking about

14  Joe DiGorga holding back, right?

15  A    The last conversation we were talking about?

16  Q    This conversation, April 5th, 2005.

17            Let's go to line -- let's start with line one.

18            MR. COLON: Strike that, Judge.

19  Q    (Cont'd):  Let's go to line 7.

20            You say: I know what he does. I know how he

21  operates.

22            And Catapano says -- oh, by the way, who are they

23  talking about when they say I know what he does, I know how he

24  operates?

25  A    I don't know right here exactly. I think he's talking

*J. Franzese - cross/ Colon*                               850

1   about Joe D.

2   Q    Okay. And you're clearly in line one initiating this

3   conversation, right?

4   A    Yes, in line one.

5   Q    And so, after the he says:  I know how he operates in

6   line 7 Mr. Catapano -- after you say that, rather,  Mr.

7   Catapano says: He's like Joe D, and the rest of those guys,

8   Joe D.  Carmine and the rest of them?

9           Who is Carmine, by the way?

10  A    Carmine is another fellow I met through my father.  I

11  knew of his Carmine Q.

12  Q    And you say: That F-ing Joe D, boy, what a mother and you

13  stop.

14          And Catapano says: He said he's gonna to see me.  I

15  gotta call him tomorrow.

16          John Franzese says:  Oh, yeah. What about? The Pent.

17  Ahh I wanna to something with that Penthouse.

18          You recall that, yes?

19  A    Yes.

20  Q    And you're introducing the topic of Penthouse in that

21  conversation with your cousin, Mr. Catapano, right?

22  A    In this conversation, yes.

23  Q    Right. And so you want to do something with the Penthouse

24  in furtherance of your, I would, say confidential informant

25  undercover activity, right?

*J. Franzese - cross/ Colon*                              851

1   A    I don't understand what you mean.

2   Q    In other words, you wanted to do something with respect

3   to the Penthouse, you wanted to develop that Penthouse

4   situation in order to facilitate this investigation and carry

5   on with your role as confidential informant, correct?

6   A    In here, I think, I was just telling Michael about my

7   intentions about what me and Joe had probably talked about

8   with the Penthouse club.  Maybe I didn't tell Michael yet.

9   Q    Joe is not recorded in any of this?

10  A    Here, no.

11  Q    Just you initiating the Penthouse conversation, right?

12  A    Here, yes.

13  Q    Okay. And then it says:

14          Catapano: I know he told me I gotta see you.  It's

15  important. I'll see you Friday. I called him up.  I said, Joe,

16  you wanna meet. I'm all jammed up. I said all right.  Good

17  'cause I hadda go.

18          You said:  Good.

19          Catapano says:  Anyway, I hadda meet somebody.

20          He said but I'll get back to you the earlier part of

21  the week.  I'm gonna call him tomorrow and say, Joe, what's

22  going on buddy. You want to meet or what. Hoping he tells me

23  he gotta a check for 50.

24          There Mr. Catapano is looking for what?  $50,000

25  from Joe DiGorga, correct?

1    A    Yes.

2    Q    And a check for 50 from Joe DiGorga for what

3    establishment, that is what I want to know?

4    A    The Hustler Club.

5    Q    Hustler Club.

6              A check for $50,000 is that what it says there,

7    right?

8    A    That's what it said.  That is what Michael said, yeah.

9    Q    Now, you've been in the Mafia, cosa nostra, organized

10   crime business, all your life essentially, you've been exposed

11   to it; right?

12   A    I've been exposed to it, yes.

13   Q    And you know that mobsters and people in organized crime,

14   they deal almost exclusively in cash, right?

15   A    Not these days and not if you have a consulting

16   agreement.

17   Q    You are talking about back in 2005?

18   A    Right.

19   Q    Okay. But in general you agree with me that it's

20   generally cash, right?

21   A    Yes.

22   Q    But in this case Joe DiGorga was going to give or at

23   least Catapano expected him to get a check for $50,000; right?

24   A    Yes.

25   Q    You testified earlier that some of the crimes you had

*J. Franzese - cross/ Colon*
1   committed were on behalf of or pursuant to your Mafia life,
2   correct?
3   A    They went hand in hand.
4   Q    How many times did you deal with checks, with respect to
5   your Mafia crimes?
6   A    Some of the stocks and the stuff paid with checks and
7   bank account.
8   Q    You mean securities?
9   A    Yes.
10   Q    And shares of stock, yes?
11   A    Oh, yeah.
12   Q    But security and shares of stock had nothing to do with
13   Hustler, right?
14   A    No.
15   Q    How much:  You ask. Catapano hall?
16        You say: How much.
17        Catapano: For the -- for the place.
18        You recall that?
19   A    Yes.
20   Q    What place is he talking about?  Tell us.  Tell the jury
21   what place is he talking about? It's not clear there what
22   place.
23   A    I think it's the Hustler Club.  It's the same
24   conversation.
25   Q    You think but you don't know, right?

*J. Franzese - cross/ Colon*                                854

1   A     The first one is about the Hustler Club.  The second one

2   I am not sure what place he's talking about for.

3   Q     Where does it say anywhere on page two the Hustler Club?

4   A     Doesn't say it.

5   Q     Where does it state on page three anything about the

6   Hustler Club?

7   A     Page three -- wait.  I didn't read it (perusing).

8             I don't see any name Hustler here.

9   Q     Right.  And when he says on top of page three, and when I

10  say he, Mr. Catapano:  No, I think he's going to give me your

11  father's fuckin' money, right?

12  A     Umm-Humm.

13  Q     It doesn't say anything about the Hustler Club there,

14  right?

15  A     No.

16  Q     And then you say:  Oh good?

17            And Catapano says:  That's all I want. That's all I

18  want is your father's money back.

19            Right?

20  A     That's what he said.

21  Q     Meaning your father's money back as though your father

22  had lent, perhaps, Joe money and Joe was going to pay him

23  back, right?

24  A     No.  This was for the $30,000 from Angelo's that they got

25  from Angelo.

J. Franzese - cross/ Colon                                855

1    Q    Angelo from Cujini Due?

2    A    Yeah.

3    Q    And does, it say anything there about anything Mr. Angelo

4    Cujini Due there page three at all?

5    A    No, but I know that's what he was talking about.

6    Q    But you didn't say that on the tape, right?

7    A    Not on this tape.

8    Q    And then further down on line 19 page three you say:

9             Is that what you're are talking about with Joe, the

10   money out of there?

11            What money are you talking about?

12            Catapano says: I'm talking about the money we're

13   doing out of California.

14            And you say: Oh, me and you.

15            That is something totally different than anything

16   that Joe DiGorga is involved, isn't it.

17   A    This part is something separate from the earlier.

18   Q    There's nothing on this tape here that says any of this

19   money that Mr. Catapano is expecting had anything to do with

20   Hustler?

21            There's nothing on this tape anywhere, is there?

22   A    No, there's nothing on the tape that says Hustler.

23   Q    Right.

24   A    The name Hustler is not used.

25   Q    Thank you.

*J. Franzese - cross/ Colon*                                    856

1          MR. COLON: We'll move on to tape 105 A, if we could,

2    Judge.

3          THE COURT:  All right.

4    Q    105 A is a conversation that happened on or about May 4

5    2005; do you recall that?

6    A    Yes.

7    Q    And would you tell the jury where that took place?

8    A    I'm sorry.  I can't right now (perusing). I don't

9    remember.

10   Q    When it took place, the time, if you recall?

11   A    I don't recall.

12   Q    You will agree that's yourself, Joe DiGorga and Sonny

13   Franzese, right?

14   A    Yes.

15   Q    And the theme or the subject matter here has to do with

16   the Hustler Club supposedly being shaken down by the Colombo

17   Crime Family and Joe DiGorga having a role in it, correct.

18   A    I'd have to hear the whole thing at once.  There might

19   have been certain elements of it.  I don't know if it's the

20   whole thing.

21   Q    Right?

22          So let's start reading on page two line number one:

23          DiGorga: F-ing guy, what's his name, went to the

24   F-ng grand jury yesterday.

25          You say:  Who.

*J. Franzese - cross/ Colon*                                857

1           DiGorga:  Guys from Hustler.

2           And you say:  Well, they gave money, them guys.

3           DiGorga:  Who.

4           Well, them guys.

5           You say:  Can they testify they gave you money?

6           DiGorga says:   Yeah. More than that, I got them two

7    F-ing jerks up in F-ing Connecticut.  They went the day before

8    and those are the guys I'm worried -- I'm not worried about.

9           And Sonny says:  John, we're ready.

10          And then probably not related to -- we will stop

11   down.

12          Joe DiGorga:  Says on page two line 27:  I'm in a

13   lotta fuckin' hot water right now. The guy don't seem to think

14   so.

15          You say:  Yeah, I don't think so either but -- ahh.

16           Joe says: I think there's gonna F-ing indict me

17   you.

18          Say:  You do.

19          For what?  What did they say.

20          And Joe says: You got to impress these guys.

21          And you say:  Well, what did you do? You didn't do

22   nothing, but settle that favor with them.

23          You recall that?

24   A    Yes, I'm trying to ease him down a little bit.

25   Q    Because you knew that Joe didn't do anything.  He was

*J. Franzese - cross/ Colon*                                      858

1    just, what, doing somebody a favor?  Getting people off other

2    people's backs, so he thought?

3    A    Are you asking me why I said that?

4    Q    I'm asking -- I am not asking you why you said that.

5    That is what you said, correct?

6    A    I answered, yeah, for a reason.

7    Q    For Joe is doing somebody a favor, correct?

8    A    That' what I told him in that context.

9    Q    You believed that as well, it was a favor; right?

10   A    No, it was is shakedown.

11   Q    Well, when you say "a shakedown" who did he shakedown?

12   A    The hustler Club.

13   Q    Tell us who the Hustler Club he shook down.  Tell the

14   jury.

15   A    The same guys that he's worried about that he said that

16   you get money from them and he said, yeah, a little bit

17   earlier.

18   Q    Who are those guys?

19   A    I don't know them.

20   Q    Would the name Michael Grant -- is that familiar?

21   A    Sometimes I get confused between the names Grant and the

22   guys specifically from the Hustler Club but I don't forget the

23   names of the club, and what we did with each club.

24   Q    How about Anthony Grant?

25   A    I don't know.

*J. Franzese - cross/ Colon*                                        859

1   Q    How about William Grant?

2   A    I don't know.

3   Q    How about Jim St. John?

4   A    I don't know.

5   Q    How about Harry Moody?

6   A    I don't know.

7   Q    You don't know any of those individual's names?  You know

8   who they are?

9   A    I think the guy named Harry Mooney had something to do

10  with the Penthouse Club.

11  Q    Any of those individuals I just rattled off, any of them

12  connected to the Hustler Club?

13  A    I am not familiar.

14  Q    But it's the Hustler Club that was shaken down by

15  Joe DiGorga, that's your testimony; right?

16  A    The Hustler Club, right.

17  Q    And you can't tell this jury who in the Hustler club was,

18  in fact, shaken down by Joe DiGorga, can you?

19  A    The two main guys from the Hustler Club.

20  Q    Give the jury some names.

21  A    I don't have the specific names.

22  Q    Because you don't know, do you?

23  A    I don't know the specific names, no.

24  Q    Because you had no personal knowledge of the shakedown of

25  this extortion scheme, do you?

*J. Franzese - cross/ Colon*                                        860

1  A     From many conversations with Joe Michael and my dad, I

2  do?

3  Q     You have no personal knowledge?

4  A     Was I there, no, I was in California.

5  Q     You don't even know who the victims were in this case, do

6  you, the names of victims?

7  A     The Hustler Club was a victim.

8  Q     Names of individuals, human beings, people with 98.7 body

9  temperatures, the human being, who is the victim?

10 A     I don't know the name, if that's what you're asking.

11 Q     You can't tell the jury can you?

12 A     I can't tell jury the name.

13 Q     So this May 4th conversation, it keeps ongoing.

14        And DiGorga says: I'm not worried about -- John --

15 I'm not worried, John, we're ready.  Go down to -- he's in a

16 lot of F-ing trouble.  We are in hot water.

17        We are on page three now.

18        Page three line eight:  Yeah, well, settle that

19 favor with them, it's those other guys there, Felix and

20 Anthony are under the, they've been arrested by the feds.

21        You say: Who is Felix and Anthony?

22        DiGorga:  For extortion. Those were the guys that we

23 had.

24        Yeah, for the Genovese crew.  Yes.  You say:  Yeah,

25 so they went to these guys. Yes.

*J. Franzese - cross/ Colon*                                        861

1          And then you say:  You met with them, ah, too, they

2   know you?

3          DiGorga says: They know me, yes so.  And what

4   happened was that these two guys, the Grant brothers, they

5   went around bullshitting about, ahh, being in trouble with

6   these guys.  And he's referring to Felix and Anthony, correct.

7   A    Yes.

8   Q    And we're gonna kill them and all of that.  And they, of

9   course, told them that I stepped into the fuckin' picture and

10  ya, you know, they didn't mention his name, thank fuckin' God

11  'cause I didn't.  I kept it from them.

12         And you say:  Right.

13         DiGorga says:  You know? And then these guys backed

14  off 'cause they went to see, see people here -- told 'em back

15  off, you know.

16         Right.

17         And on the next page, page four DiGorga again:

18         These guys, because they went to the West Side.

19         You say:  So yas did 'em a big favor.

20          Did them a big favor DiGorga yeah but.

21         Franzese: Guys.

22         DiGorga on line six: But the F-ing guys now the feds

23  are in -- involved, call them in called in, Jim called in,

24  called Harry Mooney in.  They got Willy for.

25         You say:  How'd they find out?  These guys musta

*J. Franzese - cross/ Colon*                                    862

1    ratted.

2              DiGorga says:  Grant  I think they fuckin' gave

3    them me up and then we have another problem in New York.

4              And then he goes down to talk about Carlo and the

5    Penthouse.

6              THE COURT:  Mr. Colon, you got to read slowly.

7              MR. COLON:  I will slow down.

8    Q    That's the extent of what you know is on this tape?

9    A    On this particular tape.

10   Q    And there may be some other exchanges on other tapes with

11   respect to this tape.  This still doesn't tell you who the

12   victims at the Hustler Club are, right?

13   A    This tape tells us we were shaking them down.  I think

14   that's what it tells us.

15   Q    We were shaking them down" meaning who, you?

16   A    No.

17   Q    The Genovese guys Felix and Anthony?

18   A    They were trying to.

19   Q    Until someone intervened, right?

20   A    Yes.

21   Q    According to you, it would be Joe that intervened, right?

22   A    Joe brought the problem into, I think, my cousin Michael,

23   who then went and sat with those two guys from the Genovese

24   club, supplemented the favor, and then after the deal was made

25   that we get money from the Hustler Club and Joe becomes a

*J. Franzese - cross/ Colon*                                    863

1   consultant.

2   Q     So the extortion scheme or the attempt to extort the

3   Hustler Club was really on the part of Felix and Anthony,

4   you'll agree first?  Yes?

5   A     It was another shakedown, yeah.

6   Q     By someone totally unrelated to Sonny or your dad or Joe

7   DiGorga, right?

8   A     Yes.

9   Q     And you don't know about the feds coming in before Joe

10  was involved, do you?

11  A     The feds?  I knew of my involvement.  That was about it.

12  Q     Not your feds.  Some feds up in Connecticut.

13  A     I knew there was trouble up in Connecticut.

14  Q     But did you know the feds were involved?

15  A     I had known that there were problems up there, too.

16  Q     The question is did you know the feds were involved?

17  A     Yes. Generally, any kind of law enforcement with us was

18  always the FBI.

19  Q     So when you say there was trouble there wasn't only

20  trouble with respect to the Genovese, there was trouble with

21  respect to the FBI, yes?

22  A     FBI in regards to what was going on with this place in

23  Connecticut and the guy Felix and Anthony, the two captains up

24  there, got a lot of heat.

25  Q     Felix and Anthony, they're the ones that were extorting

*J. Franzese - cross/ Colon*                                              864

1    the Hustler Club, correct?  Yes?

2    A    They didn't extort them yet.  Because of us they

3    couldn't.

4    Q    So you guys actually stopped the extortion from going

5    forward, correct, by Felix and Anthony, yes?

6    A    They solidified our position to extort the Hustler Club.

7    Felix and Anthony did.

8    Q    But you didn't extort Hustler, did you?

9    A    Me personally, no.

10   Q    And neither did Joe DiGorga, for that matter?

11   A    Joe DiGorga was part of it.

12   Q    He was?

13   A    Yes.

14   Q    But because he did them a favor and got these two guys

15   Felix Anthony from Massachusetts off their back?

16   A    Unfortunately it's commonly referred to things that we do

17   if terms like favors and stuff, for obvious reasons.

18   Q    And you're sure that Joe DiGorga was involved, right?

19   A    I'm positive he was involved.

20   Q    And you recall when he got involved in?

21   A    Not exact date or time?

22   Q    You don't remember the month at all?

23   A    I think it began back in the 1970s when he started doing

24   business with Deja Vue and all of them.

25   Q    In the 70s?

*J. Franzese - cross/ Colon*                                    865

1    A    1990s when he started -- when he first met them from his

2    first club.

3    Q    But you were drunk most of the time, right?

4    A    Yeah, but that's where he met them from that club, I

5    believe.

6    Q    I see.

7              So you had personal knowledge of that?

8    A    Yeah, Joe told me.

9    Q    Joe told you?

10   A    Sure.

11   Q    Okay. Did you have that recorded anywhere?

12   A    Probably not that and other things, too, I guess.

13   Q    Did you have any other recording we don't know about?

14   A    Not that I know of.

15             THE COURT:  Mr. Colon, how are you doing on time?

16   Shall we take a lunch break?

17             MR. COLON:  I have about another hour, at least.

18             THE COURT: Another 15 minutes and then we'll break

19   for lunch.

20             MR. COLON:  Sure.  Let's go to 106 B, if we could,

21   May 9, 2005.

22             THE WITNESS; I'm sorry.  What was that, again?

23   Q    I'm sorry, Mr. Franzese, 106 B.  May 9, 2005.

24   A    I got it.

25   Q    Take a look at that first page. Confirm for me who the

*J. Franzese - cross/ Colon*                          866

1  participants were, if you could?

2          Do you know who the participants were on May 9,

3  2005?

4  A    Yes.

5  Q    Who are they?  Tell the jury, please.

6  A    John Franzese, Michael Catapano and Carlo Tieri.

7  Q    Carlo Tieri.  We have had his name in some of these

8  transcripts before, right?

9  A    Yes.

10 Q    With respect to Penthouse?

11 A    Yes.

12 Q    Carlo Tieri is somebody doing time somewhere in either

13 federal, state prison, right?

14 A    Well, I don't know.  No one -- the government was never

15 allowed to tell me about anything about the case but I always

16 wondered.

17 Q    You know about that now, don't you?

18 A    You just said it, so it must be so.

19 Q    And Carlo Tieri, this is another example of, I think of

20 you and Mr. Catapano and people like Carlo Tieri, not trusting

21 Joe DiGorga because you know that you can squeeze and pressure

22 and intimidate a guy like Joe DiGorga to doing whatever he

23 needs to do to survive?

24          And Mr. Carlo Tieri, he starts with:  Like, like

25 remember you used to tell me I don't like that guy. I gotta a

*J. Franzese - cross/ Colon*                                    867

1   funny feeling.

2            Do you recall that?

3   A    Yes.

4   Q    And you actually start to talk about Joe D, aren't you?

5   A    I'm talking about when me and Carlo used to get high

6   together.

7   Q    Well, did you and Carlo get high on May 9, 2005?

8   A    No, but that's what he's referring to that I used to tell

9   him.

10  Q    Okay. So this is -- you were -- you were buddies from the

11  old days in terms of getting high, right, cocaine?  Yes?

12  A    I partied with Carlo, yes.

13  Q    When you say "partied" you mean, what, cocaine, crack?

14  A    We used cocaine?

15  Q    Crack, too?

16  A    Carlo didn't use crack.

17  Q    Did you sniff heroin, by the way?

18  A    Me?

19  Q    Yeah.

20  A    Never -- twice by accident.

21  Q    Twice by accident?

22  A    Yeah.

23  Q    Let's go back to Carlo over here.

24            Then you say:  Yeah.

25            And then Carlo says: Just after meeting him for,

*J. Franzese - cross/ Colon*                                    868

1   like, three minutes.  That's, well, I don't know what you do

2   with Joe.

3            By the way, he's referring to, who, Joe D?

4   A    Umm-humm.

5   Q    I'm sorry?

6   A    I believe so, yes.

7   Q    He made all of that up in the paperwork and you know and

8   the thing with the closing. Eeh. So yu burn it all?

9            What did he mean by that?

10  A    The club in Lindenhurst where he was getting money to

11  open.  He ended up never opening it and keeping the money and

12  closing it before it opened.

13  Q    And did you give him money for that?

14  A    Personally.

15  Q    Yeah?

16  A    No.

17  Q    Did you know if anybody gave him money for that?

18  A    He kept telling me he was getting this money and that

19  money and this money every time I went there and he fixing it

20  a little bit.

21  Q    He didn't get any from Catapano, do you know?

22  A    I don't think for the club, but I think over -- before

23  then he had gotten from Michael Catapano.

24  Q    Borrowing money from Catapano?

25  A    I think he was -- he asked for money that they collected

*J. Franzese - cross/ Colon*                                869

1    on that Angelo thing.

2    Q    Angelo, meaning Cujini Due?

3    A    Yeah.

4    Q    But you agree that he also may have borrowed money from

5    Michael Catapano as well?

6    A    I don't know personally if he borrowed money from

7    Michael.  I know that he took 14,000 I think from Michael for

8    -- because he had no money left because of the loan from Joe

9    Toursto.  Something he kept saying to me.

10   Q    So that 14,000, was that a loan to Joe D?

11   A    I think eventually he had to pay it back, yeah.

12   Q    And generally, you have to pay back loans, right?

13   A    Yes.

14   Q    So Catapano then chimes in with:  Yeah on line nine?

15           And then Carlo says:  You, uh worry abut that guy

16   really.

17           Catapano: I'll tell you the truth, me, my personal

18   opinion is if he gets nailed he ain't standing up. He's not

19   standing up.

20           What do you understand him, Mr. Catapano, to mean by

21   he "ain't standing up" tell the jury?

22   A    Meaning that he had become an informant.

23   Q    So you guys thought that Joe D would become an informant?

24   A    That seems to be what they were talking about.

25   Q    Because you didn't trust him, did you?

1    A    There were questions about him.

2    Q    Joe D is seated here at defense table?

3    A    Yes.

4    Q    He is not an informant like you are an informant,

5    correct?

6    A    No, he's not.

7              THE COURT: Overruled.

8    Q    He certainly not testifying against your father, is he?

9              MS. NASH: Objection.

10             THE COURT: I'll overrule that.

11   A    Not that I know of.

12   Q    Then John Franzese:  No, they won't give 'im hair care in

13   there.

14             Catapano: No. You can't go.

15             Carlo:  They won't give 'im hair care.

16             You say:  No, they take it right off you.

17             You say:  Sure, but you can put all kinds of

18   contraband in that F-ing thing.

19             You're ridiculing Mr. DiGorga, aren't you?

20   A    I am referring to Carlo and Carmine -- Carlo and my

21   cousin Michael who pushed -- we're talking about Joe D.

22   Q    Making fun of him, right?

23   A    Well, yeah.

24   Q    Ridiculing him, right?

25   A    Making fun of what would it be like to go to prison

*J. Franzese - cross/ Colon*                                871

1   wearing - a -- unfortunately, yes.

2   Q    So you are all ridiculing him, actually, aren't you?

3   A    We are joking around.

4   Q    Because's really he's not one your crew, is he?  Yes or

5   no.

6   A    Yes, he was a part of our crew.

7   Q    He is a "made" guy?

8   A    No, he was not a made guy.

9   Q    I see.

10          And Carlo on line 26 page two:  It's Carlo actually

11  initiates the Penthouse discussion, correct, line 26?

12  A    I believe he brings up the topic first, yes.

13  Q    Ahh, no. Then there was something.  What'd he say he was

14  going to Penthouse, I talked to the owner of the Penthouse,

15  I'm trying to get him to lean, if it falls our way telling

16  'im, ya know, we can bring people in, ya know, we can also

17  help people business wise, ya know, entertainment people, but

18  he's, ya know.

19          That's actually Carlo that's trying to lean on the

20  guy in Penthouse right?

21  A    He was another fellow that was trying to do what we

22  wanted to do there.

23  Q    Carlo was?

24  A    Yes.

25  Q    He was trying to shake down Penthouse, right?

*J. Franzese - cross/ Colon*                                    872

1   A    We were all trying to shake him down.

2   Q    Right. And Catapano says:

3           He don't want nobody to fuck this shit up.

4           Who is he referring to?

5   A    I believe Joe D.

6   Q    You believe but you don't know?

7   A    It is Joe D.

8   Q    He doesn't say it there, does he?

9   A    No, but that's who he is referring to because of the

10  Penthouse.

11  Q    And in fact, at Penthouse you had a brother by the name

12  of Carmine, right?

13  A    Yeah.

14  Q    That tried to get into Penthouse in order to just

15  undertake a legitimate or provide a legitimate service in

16  terms of servicing the ice machine for the refrigerator,

17  right?

18  A    I don't remember anything involving my brother Carmine in

19  this regard at all.

20  Q    Carmine was able to get a job at Hustler filling their

21  ice machines and running the refrigeration, correct?

22  A    I don't remember.

23  Q    What does your brother Carmine do for a living?

24  A    He is in air conditioning.

25  Q    Which would involve refrigeration as well, right?

1    A    Yes.

2    Q    And you wanted your brother as part of all of this that

3    was going on to get that job in Penthouse, did you not?

4    A    Yes, I would have wanted him to.  I am not sure I

5    remembered at that time to do that.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Franzese - cross/Colon

1        THE COURT:  Continue, please.

2   BY MR. COLON:

3   Q    Right.  And you were upset with Joe DiGorga because Joe

4   didn't want to put your brother in there because he wanted

5   nothing to do with Penthouse, right?

6   A    I don't remember that at all, actually.

7   Q    Well, you don't want nobody to have this shit up, on that

8   top line, line 1, and you say no, but he knows, we'll get a

9   line on it, I told him.  We already got a line on it.  Mr.

10  Catapano, who happens to be a captain or just a made guy?

11  A    He was a captain, an acting captain at the time.

12  Q    Right.  So he's a big shot in the organization; correct?

13  A    He is what he is.

14  Q    Right.  He says, he tells this to Joe, I presume, line 4,

15  I said, let me tell you something, Joe, I don't give a fuck.

16  John went to the bathroom -- meaning you, correct?

17  A    Yes.

18  Q    And I got a loan 'cause I didn't want John, no, I said

19  Joe, I don't give a fuck where you get that money.  I'm the

20  first guy, I don't give a fuck who's in line, me first.  I

21  don't want to hear no fuckin' shit from you.  I'm the guy

22  whose getting it first.  He's like, no, no, I know, I know.

23        You remember that dialogue between you and Catapano,

24  Catapano deciding what Joe told him, no, no, I know.

25        You were there?

J. Franzese - cross/Colon

1   A     I remember this conversation.

2   Q     Sure you do.  Because Michael Catapano was threatening

3   Joe DiGorga, wasn't he?

4   A     He was being very aggressive with collecting the money,

5   yeah.

6   Q     There is not much of a difference between being

7   very aggressive --

8   A     I agree with you.

9           THE COURT:  At a good point, Mr. Colon.

10          MR. COLON:  Judge, I have more to go, but we'll

11   break.

12          THE COURT:  If you have more on this line you can

13   continue for about 5, 10 minutes.  If not, if this is a good

14   breaking point --

15          MR. COLON:  We should break.

16          THE COURT:  Ladies and gentlemen, we will take lunch

17   until 10 to 2.  Again, keep an open mind.  Do not discuss the

18   case amongst yourselves nor with anyone else and have a nice

19   lunch.  See you at 10 to 2.

20          (Jury leaves.)

21          THE COURT:  Be seated, please.

22          You can take the witness out.

23          (Witness leaves.)

24          THE COURT:  Mr. Colon, I have one point I wanted to

25   make to you.  I notice as you're reading the transcript here,

J. Franzese - cross/Colon

1   you're not really differentiating between when you're quoting

2   and when you're asking a question, and I'm just concerned

3   about the quality of the transcript you're going to get out of

4   this.  Just bear that in mind.

5           MR. COLON:  I apologize, your Honor.  I'll make a

6   very clear break and not interject any comments.

7           THE COURT:  The reporters are doing their best and

8   often they are getting it, but often, because you start

9   reading and then you go right in a question of the witness,

10  it's not coming out that part is transcript and part is

11  question.

12          MR. COLON:  I acknowledge that.  I will do my very

13  best to avoid that.

14          MR. PAUL:  Can we approach for a minute?

15          THE COURT:  You need to approach?

16          MR. PAUL:  I will do it in open court.

17          Your Honor has suggested with regard to the jury

18  staying awake.  I wanted to tell the court -- I didn't want to

19  interrupt Mr. Colon's cross, but during the course of much of

20  the testimony, Juror No. 12 I would ask your Honor please to

21  just keep an eye on because Juror No. 12 has been nodding out.

22          THE COURT:  All right.

23          I have been watching and I did not observe that.  I

24  will give them the after-lunch-be-especially-careful speech

25  that I have when they get back.

877

J. Franzese - cross/Colon

1          I will tell you, I mean, I don't want to tell the

2    defendants how to do their case, but it seems like it's going

3    on a very long time to me.  That is not a ruling, it's just a

4    suggestion that you might want to pick it up a little.  If you

5    do, you will have jurors who have an easier time being

6    focused.

7          But, certainly, whether you pick it up or not, they

8    have to stay focused, so I will instruct them accordingly.

9    All right.  Have a good lunch.

10          (Luncheon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Franzese - cross/Colon

1      A F T E R N O O N    S E S S I O N

2      (Open court.)

3      THE COURT:  Let's have the witness on the stand,

4  please.

5      MS. POSA:  We were able to locate a copy of the

6  agreement that Mr. Franzese signed with the US Marshals.

7      THE COURT:  You've turned it over?

8      MS. POSA:  Would your Honor like a copy?

9      THE COURT:  I can't hear you, Miss Posa.

10      MS. POSA:  Would you like a copy, your Honor?

11      THE COURT:  Please.

12      (Witness resumes the stand.)

13      (Jury present.)

14      THE COURT:  Be seated, please.

15      Ladies and gentlemen, before we continue, I did want

16  to remind you, as I mentioned to you when we first started

17  this trial, that, particularly following lunch, it becomes

18  more difficult for you to focus as intensively as we need you

19  to focus on the case.

20      I mention this particularly now because I did notice

21  before lunch that one or two of you weren't quite as focused

22  as you had been earlier in the case.

23      I don't want to have to single anybody out.  I did

24  want to remind you that if you're looking down for a long

25  period of time, I have to wonder whether you are still with us

J. Franzese - cross/Colon

1    entirely and I'll have to single you out and ask you if you

2    are.  Please don't make me do that.

3            It's very important to all the parties here, this is

4    a very important case, that you focus at all times.  I'm not

5    saying it's easy, but I am saying it is really important.  So

6    we appreciate your attention.

7            Mr. Colon, you may continue.

8            MR. COLON:  Thank you so much, your Honor.

9    BY MR. COLON:

10   Q    Mr. Franzese, I'm going to draw your attention to 111 D,

11   a conversation that occurred on July 10, 2005.

12           That is 111 D as in David.  I just want you to look

13   at that first page with the exhibit tab on it.  Before you go

14   into that fully, I'm just going to ask you a couple of

15   questions.

16           Keep your voice up, please, and speak loud, okay?

17   A    Yes.

18   Q    Thank you.

19           During the course of this investigation and your

20   role playing on behalf of the government, you essentially

21   became an actor; correct?

22   A    No.

23   Q    You weren't acting the part of a mobster or a wannabe

24   mobster, someone trying to get back into the fold, your crime

25   family's fold?

J. Franzese - cross/Colon

1   A    I just show up, kind of be myself and keep a recorder on.

2   Q    You obviously weren't planning any of the crimes that

3   were being discussed here; correct?

4   A    Yes, correct.

5   Q    You weren't participating, you were just doing this as a

6   ruse in order to get your family and friends in trouble;

7   correct?

8   A    I was recording conversations for the government.

9   Q    Right.  So the things you said often were not true, you

10  were just saying them because it was going to promote or

11  advance the mission you were on; correct?

12  A    As far as me committing any violent crimes or anything,

13  that would not have be true.

14  Q    I'm not saying -- you didn't have any intention to commit

15  any crimes you were discussing here with these other

16  individuals, right?

17  A    No.

18  Q    So I'm saying, you were playing the part of someone who

19  wanted to return to that organized crime life; correct?

20  A    Yes, somebody that came back to New York, yes.

21  Q    You were acting, that's what I mean by acting.

22  A    I would think that an actor reads from a script and

23  something, but I just showed up and kind of let them talk.

24  Q    So there were -- in fact, some of things you said --

25  well, many of the things you said were not true in terms of

J. Franzese - cross/Colon

1  what your intentions were; correct?

2  A    Yes, for me.

3  Q    And drawing your attention to July 10, 2005, 111 D, I'm

4  just going to take you to page 4, if I may.

5  A    Page 4?

6  Q    Yes, page 4, line 9, where you're captured on tape saying

7  the following: You're supposed to tell them, you're supposed

8  to give him money anyway.

9        Catapano:  Here ya go, here's your money.  Franzese:

10  You say something like, the kid told you he was doing real

11  good.  So you say, well, you got something for over here, and

12  that's all you stick to.  Laughs.  Okay?  That's all, you

13  just, so you ask him and you say, I made a score with this

14  kid, fuckin' kid, ever says anything, say you lying

15  cocksucker.

16        You remember saying that?

17  A    Yes, I remember why, who I was saying it about.

18  Q    Okay.  Who were you saying it about, by the way?

19  A    I believe at this time it was Nicky Bova.

20  Q    And then it goes on to say, Catapano:  No, I told him, I

21  said listen, I don't know what you're doing.  Franzese:  Yeah.

22  Catapano:  He says, unintelligible.  Franzese:  But right

23  away, you lying motherfucker, that lying moth, let me get this

24  kid right in his face, you lying cocksucker.

25        You said that, right?

J. Franzese - cross/Colon

882

1  A    I said, yes.

2  Q    Then well jump to page 5 line 1.  Franzese:  Yeah, right.

3  Because even if I do, right to your fuckin' face, I'm gonna

4  tell you ya, you're a fuckin' lying cocksucker.

5         You said that, correct?

6  A    I did upon advice to do that, yes.

7  Q    You had lied so many times in the past you were pretty

8  good at lying, correct?

9  A    I knew that was a trick to do what you tell someone when

10  you want to make believe you don't want to talk about drug

11  deals.

12  Q    Where did you learn that trick?

13  A    Just over the years in listening to other guys.

14  Q    And practicing that trick yourself; correct?

15  A    Maybe.

16  Q    Okay.  And you say  -- well, Catapano says:  I'll deny it

17  right to your face.  Then you respond:  Right, of course, I'll

18  deny it right to your fuckin' face.

19         You said that, right?

20  A    Yes.

21  Q    So how does the jury know that you're telling the truth

22  these last two or three, given what you told us in your

23  testimony and what we just read?

24  A    Because it is the truth.  It's on the tapes.

25  Q    Even though you're well versed at lying, right?

J. Franzese - cross/Colon                                           883

1   A    I --

2   Q    Yes or no will do.

3   A    No, I'm not well versed at lying.

4   Q    It's not because of the lack of lying, is it?

5            MS. NASH:  Objection.

6            THE COURT:  Sustained as to form.

7   Q    You've lied a thousand times in your life, haven't you?

8   A    I've lied often, yes.

9   Q    Would you care to put a number on it?

10  A    That would be a lie if I tried to put a number on it.

11  Q    Even that would be a lie, wouldn't it?

12  A    Well, if I said 5 or five thousand, I don't know.

13  Q    Let's go to 111 C.

14           I ask you to tell the jury what 111 C is about, the

15  conversation between yourself, Mr. Catapano, and Frank

16  Campione, correct?

17           The question was do you recall who participated in

18  that phone call -- in that taped conversation?

19  A    Oh, it was John Franzese, me, Michael Catapano and Frank

20  Campione.

21  Q    July 10, right?

22  A    Yes.

23  Q    Okay.  Mr. Catapano says, line 1, page two:  You know who

24  hates me, Frankie, when he sees me, he sees the devil, Cugini?

25  A    Yes.

J. Franzese - cross/Colon

1  Q    He's referring to Frank Campione, right, when he says,

2  Frankie?

3  A    No, he's talking to Frankie.

4  Q    You know who hates me Frankie, when he sees me he sees

5  the devil, Cugini; that's where Catapano is talking to Frank

6  Campione, correct?

7  A    Right.

8  Q    Further down, Catapano says on line 16:  Oh, my God, he

9  sees the fuckin' devil when he sees me, and he laughs, right?

10 A    Yes.

11 Q    You say, oh, he's a, yeah, unintelligible, abused him.

12 Catapano says:  I had abused him one day in the fuckin'

13 parking lot.

14       You weren't there in that parking lot, right, Mr.

15 Franzese?

16 A    No.

17 Q    Okay.  But you believed that he was referring to abusing

18 who?

19 A    Tony from the first Cugini's.

20 Q    Tony Franzella?

21 A    I don't remember his last name.  I seen him a hundred

22 times though.

23 Q    But you know who he is?

24 A    Yes, I know who he is.

25 Q    And Franzese says:  Yeah, and Campione says, fuck em,

                    J. Franzese - cross/Colon

1   right?  Yes?

2   A    Yes.

3   Q    All right.  Next page, page 3, line 1.  Catapano says, I

4   fuckin', he tells me, I don't have to do anything, my guy told

5   me that -- my guy told me that we have to wait for -- I said,

6   let me tell you something, you that ain't on the fuckin' table

7   no more, we ain't waiting, I said, and who's the guy who told

8   you?  But I knew who it was, it was Joe Voto, but Joe Voto

9   didn't say it, I says Joe Voto.

10             Remember that?

11  A    Yes.

12  Q    In fact, it's Mr. Catapano who is driving this whole

13  extortion scheme with Cugini Due, isn't it?

14  A    He was retelling the story to us, to me and Frankie.

15  Q    Right, when he meet Mr. Franzella in the parking lot and

16  abuses him, right?

17  A    Yes, that was one of the events.

18  Q    He doesn't mention Joe DiGorga there at all, does he?

19  A    Not in the parking lot.

20  Q    Right.  And on page 4, line 1, Mr. Franzese, you say:

21  No, he won't show up cause he's scared of you anyway.  Joe.

22  Catapano: To show up.  Campione:  How could he get involved?

23             Then we go down to line 22, it picks up where

24  Mr. Catapano says:  One time I went to his brother, you know

25  his brother's got that hair cutting joint over there,

J. Franzese - cross/Colon

1    Angelo's.

2            Do you recall that?

3    A    I recall the stories.

4    Q    Right.  And on line -- page 5, Catapano says on line 7:

5    I went in there.  Line 9, you say:  On purpose or by accident?

6    And Catapano responds on line 10:  No, I went on purpose.

7    Campione laughs.

8            Franzese, you, say oh.  Then Catapano says, Fuckin',

9    he had Angelo's mother in the chair.  He was doing her hair.

10   When he seen me walk in, he got so nervous I felt so sorry for

11   Angelo's mother 'cause I seen her head going down like this,

12   could see this curling the hair and pulling it out.

13           You recall Catapano saying that, right?

14   A    Yes.

15   Q    And he makes no mention whatsoever of Mr. DiGorga?

16   A    Not at this time.

17   Q    Mr. Catapano goes in on his own by himself, right?

18   A    I'm not sure if he was saying that he went in there by

19   himself.

20   Q    You wouldn't know because you weren't there, right?

21   A    From this conversation, I believed Joe was with him

22   because of other conversations.

23           MR. COLON:  Move to strike.

24   Q    You weren't there?

25   A    I was not there.

J. Franzese - cross/Colon

1    Q    So you don't know personally?

2    A    Other than Michael telling me.

3    Q    Michael said -- you don't know personally, you weren't

4    there like you said, right?

5    A    I was not physically present.

6    Q    Right.

7              And Catapano says, on line 5 -- rather, line 21,

8    page 5:  Yeah, they're related.  And once I showed up in there

9    then they fuckin' signed the papers.  It was all over.

10             You recall Mr. Catapano taking the credit for that,

11   right?

12   A    Yes.

13   Q    And he didn't mention Mr. DiGorga there, did he?

14   A    Not in this conversation.

15   Q    No.

16             And later on, page 6, Mr. Catapano line 21:  Listen,

17   I'll talk to him, talk to him, all right?  Please, please try

18   not to, listen, I said, I won't come back unless you can do

19   what I gotta ask you to do, otherwise I gotta come back.

20             That's Mr. Catapano; no mention of Mr. DiGorga,

21   right?

22   A    Correct.

23   Q    Then on 116 A, you and Mr. DiGorga and Mr. Franzese are

24   having a discussion.  I believe the discussion has to do with

25   a club in Lindenhurst, right?

888

J. Franzese - cross/Colon

1    Take a look at that, familiarize yourself with the

2  time.  If you know the date, please let the jury know, let me

3  know if you know the date -- the time, rather.

4  A    No, I don't.

5  Q    I believe the discussion had to do with the club and

6  getting a C of O, a certificate of occupancy by Mr. DiGorga,

7  right?

8  A    Yes.

9  Q    And in that, Mr. DiGorga is advising you or telling you

10  that someone is pushing it in the town of Babylon, somebody by

11  the name of Steve Bellone, yes?  Line 12?

12  A    Somebody got close to Steve Bellone.

13    MS. POSA:  Your Honor, objection.  We object to the

14  comments "right, right, yes, no," after the question.

15    THE COURT:  Let's just ask questions.

16  BY MR. COLON:

17  Q    You understand the scenario there, right, Mr. Bellone

18  getting a C of O in about six months or so for Mr. DiGorga?

19  A    I did not know the time frame.  I thought it was a lot

20  quicker.

21  Q    It's actually six months, according to Mr. DiGorga on

22  page two line 20, right, when he says, I was with him.  I was

23  with him.  I was with -- unintelligible -- they're the ones

24  who pushed the whole thing, took six months to get a fuckin'

25  CO.

Burton H. Sulzer, OCR, CRR, CSR, CM

J. Franzese - cross/Colon

1   A    Okay.

2   Q    That's correct, you heard that from Mr. DiGorga's mouth,

3   right, correct?

4   A    Yes, that's what he said here.

5   Q    All right.  And then you asked -- page 3 line 9:  Asking

6   you for anything?  Line 10, Mr. DiGorga says:  He's expecting,

7   and he laughs.  You say:  You're expecting right?  Line 11.

8   Mr. DiGorga says:  He's expecting.

9         That's all, correct?

10  A    Yes.

11  Q    No mention of money in that conversation with respect to

12  what Mr. Bellone received?

13  A    The word money, no.  But it was about money.

14  Q    He's expecting?

15  A    Yes.

16  Q    Nobody knows what he's expecting, right?

17  A    I know what I was talking about.

18  Q    I see.

19        MR. COLON:  I will go to 115 a for a second -- maybe

20  a little longer a second, Judge, I apologize for describing it

21  that way.

22  Q    115, page two, Carlo is a -- Carlo is really the problem

23  with Penthouse, do you agree with me?

24  A    Carlo is one of the problems.

25  Q    Yeah, and you're having this conversation with your dad,

J. Franzese - cross/Colon

1    Sonny?

2    A    Yes.

3    Q    And your dad tells you on line 5, page two,

4    unintelligible, but he starts out with:  I don't know why you

5    put yourself in these things, John.  And you say, line 7:

6    Because he's -- and it goes to line 8, what you wanna go to

7    Penthouse, for what?

8              So Sonny is asking you why you want to get involved

9    in Penthouse, isn't that a fact?

10   A    Yes, that was the question he asked.

11   Q    You had an interest in pushing this agenda that the

12   government was giving you with respect to your family and

13   friends in terms of gathering evidence against them, right?

14   A    Can you repeat that again.

15   Q    With respect to why you were interested in going to

16   Penthouse, because you were interested in facilitating or

17   pushing the agenda that the government had designed for you?

18   A    The only reason why I went to any of these places was

19   because I was doing this stuff.  I was around it.

20   Q    Your service to your fellow man, correct?

21             MS. NASH:  Objection.

22             THE COURT:  Sustained.

23   Q    And let's go down to page two line 21.  You say:  I'll do

24   it with him, we'll supersede him.  He ain't doing nothing,

25   Carlo.  Sonny:  What?  You again:  He ain't doing nothing

J. Franzese - cross/Colon

1   there.  Sonny says:  No, he ain't doing nothing there.  You

2   say:  Can't do nothing.  And Sonny says:  Nothing there.

3   Neither does Joe D.

4          Right, do you recall that?

5   A    That was the words used describing that conversation.

6   Q    Right.  Thank you.

7          Going back to Joe Toursto for a second with respect

8   to page 3, if you look on line one, it's you that introduces

9   the idea into this conversation of going with Joe D to see Joe

10  Toursto, correct?

11  A    Yes.

12  Q    Line 1:  Why don't I go with Joe D?  Sonny:  Huh.  You:

13  To see Joe Toursto, to take Joe D to see Joe.

14         That was you instigating or moving that Joe Toursto

15  situation, isn't it a fact?

16  A    Yes, I brought up the topic.

17  Q    116 C.  This has to do with Joe Toursto, yourself and Joe

18  DiGorga again?

19  A    Yes.

20  Q    You don't recall where that took place, do you?

21  A    No, I know some were made in Babylon, some were made in

22  other restaurants, I'm not sure day or night, some were at the

23  Hustler Club I think.  I'm not even sure.

24  Q    At this time you didn't trust Joe D, but you wanted to

25  make sure that he was paying his fair share of whatever he was

J. Franzese - cross/Colon

1  collecting, so you were pushing him along, weren't you?

2  A    I was just going in to talk to Joe about what was going

3  on.

4  Q    So you asked, on page two, line 1, on July -- rather, on

5  August 4, in 116 C, How do you want to approach Terrence.

6  DiGorga:  We're gonna go and I'm talk.  You say:  You wanna

7  make me the bad guy, you want to be -- DiGorga:  No, no bad

8  guys, you're not gonna go in.  You're gonna, I'm gonna go in

9  there and I'm gonna tell them some people came to us okay, and

10 they're going to make a move on the fuckin' joint and they

11 reached out to me because they know you used to work with me.

12         You say, right.  DiGorga:  So I'm here to tell ya,

13 if you don't come along and do what you gotta do, you're gonna

14 have fuckin' problems over here.  You say, I can see that.

15         With me so far?

16 A    Yes, I'm with you.

17 Q    DiGorga says:  I sent two guys in there and --

18         By the way, what two guys did he send, if you know?

19 A    I thought at the time --

20 Q    Do you know?

21 A    Right now, no.

22 Q    DiGorga says:  Scared the fuck out of them, line 17.

23 Line 19:  Yeah, we scared the fuck outta them.

24 A    No.

25 Q    May I finish?  Line 20:  You sent Michael and his son,

893

J. Franzese - cross/Colon

1  right?  DiGorga says:  Yeah.  No, not Joey Joey and Mike, I

2  sent two other guys in there.  They loath Joey.

3            Now, who was he referring to?

4  A    The second time he sent people in there, not the first.

5  Q    But you thought he had sent somebody else in, right?

6  A    He did.  You see it says you told me, and that's why I

7  thought he was referring to when he sent Michael and Joey in

8  there first.

9  Q    Line 21 he says -- sends two other guys, correct?

10  A    Yeah, so must have done it twice.

11  Q    He must have -- do you know who he sent in for sure?

12  A    I don't remember.  No.

13  Q    So he doesn't say who he sent in, does he?

14  A    Nope.

15  Q    And you don't know who he actually sent in, do you?

16  A    I didn't know at this time.

17  Q    And you don't know if he sent anyone in, do you?

18  A    I'm kinda sure he did, because I got the name Terrence.

19  I didn't know who Terrence was.

20  Q    Well, if you don't know -- strike that.  You don't know

21  who if anybody he sent in, do you?

22  A    I don't know who he sent in, the other two guys.

23  Q    Right.

24            Then go down to line 27.  He says  -- Joe DiGorga

25  says:  Yeah, but they didn't go in there to shake him up, they

Burton H. Sulzer, OCR, CRR, CSR, CM

J. Franzese - cross/Colon

1   just went in cause they know Joey, he fuckin' -- line 30,

2   right, okay.  Over to page 3, They know who he is, and -- line

3   2.  It was you, Carlo, you sent Carlo.  DiGorga, line 3:  Huh?

4        You, line 4:  You sent Carlo there, didn't you?

5   DiGorga: No, I never sent Carlo.  Oh, you say on line 6, and

6   DiGorga in line 7 says:  He went with Joey one night to have a

7   good time, the next fuckin' thing you know it's like he owns

8   the fuckin' joint.

9        Line 14.  DiGorga:  It's like he owned it.  Line 13.

10  DiGorga:  And then -- line 14, yourself:  What kind a move he

11  makes?  DiGorga: Then he tells them, this is what he tells

12  them, if anything happens to you come to me and I'll

13  straighten it out.  The guy says:  Come to you?  Fuck you.

14       Who is he saying that to, who's he saying come to

15  you, fuck you?

16  A    He's telling me a story of what someone told him somebody

17  said to Carlo.

18  Q    He's telling you a story about somebody -- what somebody

19  said to Carlo?

20  A    Yes..

21  Q    Somebody at Penthouse, right?

22  A    Yes.

23  Q    That they basically told him to take a hike, right?

24  A    Told Carlo to take a hike with Joe.

25  Q    Because in fact nobody was shaking down Penthouse, isn't

J. Franzese - cross/Colon

1    it a fact?

2    A    We were trying to at that time.

3    Q    You were trying to, right?

4    A    No.  We were -- that was part of where I went.

5              MR. COLON:  Judge, this is 117.  It goes on for

6    awhile, and I have to get to 117.

7    Q    Now, we discussed earlier the topics of Toursto and

8    Giangrande, so we're going to go through some of this -- going

9    to go through some of the dialogue here on Toursto, okay.

10             117, page two.  Franzese, line 1:  Well, let me ask

11   you the thing, look, I don't want to push it for this, but I

12   told them guys I got with you so you wouldn't have to go

13   alone.

14             DiGorga, line 4.  Who's that?  You say:  My father

15   and Michael.  DiGorga says:  Ahum.  And Toursto and them, line

16   7.  Then DiGorga says:  Yeah, listen, you want to know

17   something.  DiGorga, line 10:  Listen it got to the point like

18   this, you know, what I told your dad?  I says, you want the 16

19   thousand, it's actually 20,000, but you want the 16 thousand,

20   I give him in cash that day you were there, get it and do me a

21   favor, keep it.  You can have it.  I'm on the balls of --

22             You recall that dialogue, right?

23   A    Yes.

24   Q    In other words, Joe D didn't want to have any part of

25   Mr. Toursto after he got burned by him; correct.

J. Franzese - cross/Colon

1    A    In this conversation he was saying that.

2    Q    Right.

3         Down on line 22, DiGorga says -- line 20, you ask:

4    Let me ask you this, how much does he owe you?  DiGorga says,

5    he owes me.  DiGorga, line 24:  With the vig?  You say, line

6    25:  Well, sure, you're gonna let him get away?

7         DiGorga says:  Your old man said forget it.  You

8    say, line 27:  I'm not gonna.  DiGorga says:  He told me to

9    forget it.

10        That's what Joe DiGorga said, right?

11   A    Yes, he said the words, He told me to forget it.

12   Q    He wanted no part of Mr. Toursto even after three years,

13   any money that supposedly went down or occurred or any

14   transaction that occurred between Mr. Toursto and Mr. DiGorga?

15   A    In this conversation.

16   Q    Right.  This conversation.

17        You say, Well, I won't, line 1 on page 3, and

18   DiGorga says, it's three years.  In fact, he says, on line 4,

19   Four years and I'm going pay it, which implies that

20   Mr. DiGorga owes somebody money now, doesn't he?

21   A    Yes.

22   Q    Who did he owe that money to?

23   A    I guess my father, at this point.

24   Q    Further on down the page, DiGorga says, page 3, line 15:

25   I swear on my mother, he came to me and he asked me for money

J. Franzese - cross/Colon

1    for the fuckin', unintelligible, thing.

2         You ask, line 17:  Oh, the jean shit?  DiGorga, 18:

3    Okay?  Not the jeans, the underwear.  Next line, all right,

4    right, right off the Internet?  DiGorga says, right?  You say,

5    yeah.

6         DiGorga says on line 22:  I said to him, Joe, get

7    the fuck outta here.  I'm not giving you no money, take a

8    walk.  Your dad came in and sat down with me in the restaurant

9    and --

10        What was Joe DiGorga referring to -- who was Joe

11   DiGorga referring to when he says, I said to him, Joe, get the

12   fuck outta here?

13   A    He was referring to Joe Toursto.

14   Q    So Joe DiGorga is telling Joe Toursto get out of here,

15   I'm not giving you any money, as opposed to asking Joe Toursto

16   for money, right?

17   A    Yes.

18   Q    And one line down, DiGorga says:  And he says, take care

19   of it because I got a piece of that.  I says, you sure?  He

20   said, yeah, I got 20 percent of that business.  Toursto came

21   in, I handed him 16 thousand cash, then he asked me if he

22   could use two of my girls to model the thing.  I said, Listen,

23   I don't control the girls.

24        What is your understanding of that statement by

25   Mr. DiGorga in terms of 20 percent of the business that he was

J. Franzese - cross/Colon

1   referring to?

2   A    What did Joe DiGorga mean by saying that?

3   Q    Yes, 20 percent of the business.

4   A    I think he was referring to my father being involved with

5   Joe Toursto.

6   Q    Your father, Sonny, had invested money in Joe Toursto's

7   endeavors or enterprises; correct.

8   A    He was referring to being 20 percent partners with Joe

9   Toursto.

10  Q    Right, 20 percent partnership; that doesn't imply that

11  there was a loan involved necessarily, does it?

12  A    Does 20 percent partnership imply that?  No.

13  Q    In fact, 20 percent is an investment by your father in

14  Joe Toursto's business; correct?

15  A    I'm not sure exactly the workings of their deal was.

16  Q    When you talk about loans in the world of organized

17  crime --

18  A    Yes.

19  Q    Do people talk about 20 percent other than points?

20  A    20 percent sometimes was a business deal that you get

21  paid on, he's going to pay me 20 percent.

22  Q    It wasn't a loan, it was an investment by your dad?

23  A    I'm not sure what they were referring to exactly.  I know

24  that whatever happened, Joe lent him the money because my

25  father told him he had 20 percent of the business.

J. Franzese - cross/Colon

1   Q    Rather, more like Joe --

2   A    No, Joe did not invest in Joe Toursto's business, that's

3   a fact.

4   Q    Joe D did not, but Joe gave Joe Toursto the money because

5   it was an investment on the part of your father, correct?

6   A    Joe D gave Joe Toursto a shylock loan and charged him

7   interest on that loan.

8   Q    It doesn't say that there, does it?

9   A    You asked me.  I'm just answering what you asked me.

10  Q    That paragraph talked about an investment by Sonny

11  Franzese of 20 percent, right?

12  A    Talks about the transaction that happened between Joe

13  Toursto, Joe D, and my father.

14  Q    And the 20 percent, right?

15  A    It mentions 20 percent.

16  Q    Right.  That your father had in that business; correct?

17  A    That my father had something to do with Joe Toursto's

18  business, yes.

19  Q    It doesn't mention anything about a loan there, does it,

20  the word specifically, a "loan"?

21  A    The word "loan" is not used in there.

22  Q    Then Joe says -- actually, you say in line 7:  You gotta

23  work a deal out, and DiGorga says, You gotta work a deal with

24  him.  So he offered the girls 25 hundred dollars to do the

25  fuckin' deal.  The girls tells him I can't model this like

J. Franzese - cross/Colon

1   this, like you wanna go on TV.  I'm naked under here.  She

2   said, my pussy's sticking out, so he said no, no, no, it's

3   gonna be good.  She goes, when you put the bright lights on,

4   these girls know what they're talking about.

5           You recall that part of the conversation, right?

6   A    Yes.

7   Q    Then later on Joe says, two lines down, 17, he says, No,

8   no, no, so he gives them a check.  Two lines later, DiGorga:

9   So the fuckin' checks bounce.

10          Two lines later on 21, So the girls --

11          MS. NASH:  Could we have a brief sidebar?

12          THE COURT:  Yes.

13          (Continued next page.)

901

J. Franzese - cross/Colon

1    (Sidebar.)

2    MS. NASH:  Judge, I have been trying to avoid doing

3  this, but at this point, under the rules, Rule 611, to avoid

4  needless continuation of time, could we at least direct --

5    THE COURT:  I'm waiting for your objection.  I think

6  this jury is looking at you, Mr. Colon, wondering why is he

7  doing this, why?

8    MS. NASH:  It has to be reasonable --

9    MR. COLON:  I understand your advice or admonition

10 earlier on, but this bottom line explains whatever it is that

11 Joe DiGorga did that --

12    MS. NASH:  You have to direct him to certain parts

13 of the tape instead of reading the transcript.  I tried to

14 refrain from objecting.

15    THE COURT:  Mr. Colon, what does this mean to you?

16 He tells you what he thinks it means.  Then you said, Well,

17 does he use this word or that word?

18    If you didn't ask him what he thought it meant, you

19 wouldn't have to show that what he thinks it meant is this.

20    By the way, this is not peculiar to you.  I have the

21 same issues with the other defense counsel.  I am really loath

22 to utilize the power, as Miss Nash points out, I have under

23 611 because I let lawyers run their cases.  This is going on

24 and on.  I don't think you're scoring any points here.

25    MR. COLON:  If I may?

J. Franzese - cross/Colon

1      This has been a witness who continuously throughout

2  this trial has had to be admonished by the court in terms of

3  giving narrow answers, yes and no.  That's what I'm trying to

4  pin him down to.

5      If I give him these open-ended questions he's going

6  to run far afield and it's probably not going to be an answer

7  that I'm going to like since he has a bad habit of going on

8  and not answering the questions.

9      This is a major tape and it's last one.  All the

10  other ones are short and I won't go much -- I won't go beyond

11  this, you know, this tape, but I've got to get this out.

12      MS. NASH:  My point is, you can direct him to

13  certain parts and ask him about that part.

14      THE COURT:  You don't have to -- the jury has it in

15  front of them, they see it.  You see that part?  What did you

16  understand that part to mean, instead of reading the whole

17  thing.

18      While you are right to the extent that the witness

19  has not always confined himself to the narrow question that is

20  being asked, he has been much better about that with you than

21  he was with the other lawyers and this last hour, he's given

22  you yes or no answers to just about everything except when you

23  ask him for something more.

24      So I have no objection.  I'm not making any rulings

25  right now, but I am putting defense counsel on notice, we have

J. Franzese - cross/Colon

1    to move this thing alone.

2              MR. COLON:  Fine.

3              (Open court.)

4    BY MR. COLON:

5    Q    As you testified earlier, you are aware that Mr. Toursto

6    bounced checks with respect to this venture to both the young

7    ladies and your nephew; yes?

8    A    Yeah, I know he didn't pay my nephew and Joe said he

9    bounced a check with the girls, so, yeah.

10   Q    Now, going to page 8, 117, line 8.  You made the

11   statement, line 8:  Wanna, wanna, could you do me a favor?

12   The other thing I need, if you can.  Look, I, I, I told ya at

13   the beginning I had some differences with you for no reason.

14             Would you tell the jury what you meant with respect

15   to those differences, what you meant by that.

16   A    Just a personality conflict over something at the Hustler

17   Club, I guess.

18   Q    What was that?

19   A    I didn't like the way he way -- people were getting

20   treated, I guess.  I thought he could have done more.

21   Q    You wanted him to be more forceful with respect to the

22   Hustler Club, huh?

23   A    I wanted him to extend the same courtesy he had for

24   himself with others.  That's all.

25   Q    You wanted him to threaten people?

J. Franzese - cross/Colon

1  A    No, I wanted him -- it was over letting people in the

2  door.

3  Q    What did that have to do with you?

4  A    Well, I had -- sometimes I went there and that's all, I

5  just -- that's what I was talking about.

6  Q    On line 16 it says:  In any event, but you know, now my

7  dad, ya know, you're so close with my dad as well, so I might

8  as well help ya because truthfully my dad is lax.  He wants

9  this Joe Toursto, he wants us to do it but he's lax too I

10  figured.

11       What did you mean by that?

12  A    There was a whole lot of stuff going on here.  I was

13  referring to --

14            MS. NASH:  Objection.

15            THE COURT:  No.  Overruled.

16       The question is what did you mean by that?

17  A    I meant that we're taking our time with Joe Toursto.

18  Q    You mean Joe D was taking his time with Joe Toursto,

19  right?

20  A    It just seemed the way these guys talked about Joe

21  Toursto and how much he owed everyone that they were taking

22  their time.

23       So I just -- it looked to me after them discussing

24  it with me, I kept saying, well, it was pretty lax over here.

25  You guys talk about this a lot but you never do anything.

                    J. Franzese - cross/Colon

1  Q    So Joe wasn't acting on your request or your orders, was

2  he?

3  A    We were just talking together about this.

4  Q    Joe wasn't doing what you wanted him to do, isn't that a

5  fact?

6  A    I threw a topic up, Joe responded to it.

7           THE COURT:  Mr. Franzese, you need to answer the

8  question narrowly.

9           Is it correct that Joe wasn't doing what you wanted

10 him to do, yes or no?

11          THE WITNESS:  Yes.

12 Q    And you'll agree with me that Joe -- that you and

13 Mr. Catapano thought that generally Joe was stalling most of

14 the time, holding off on you, right?

15 A    We thought -- yes.

16 Q    And, in fact, you believed that what was going on in the

17 Hustler Club was out of order, isn't it a fact?

18 A    Yes.

19 Q    And did you know that Joe was involved in many consulting

20 ventures as an adult club, either owner, manager, including a

21 place like the Habitat; correct?

22 A    No.  I think -- is the Habitat on Long Island?  Is that

23 the place you're talking about?

24 Q    I don't know, I've never been there.  Do you know where

25 it is?

Burton H. Sulzer, OCR, CRR, CSR, CM

J. Franzese - cross/Colon

1  A     No, a fellow named Guy owns it, I know about the first

2  time Joe talked about it to me.

3  Q     That was the subject of a conversation on or about

4  December 29 of '05, in page 128 D, correct?

5  A     I don't remember the time and the place, but I remember

6  that Joe did have a conversation with me about something about

7  the habitat and how he would want to run the club.

8  Q     Right, but that conversation had nothing to do with

9  shaking anyone down, did it?

10 A     That conversation --

11 Q     Yes or no?

12 A     Well, I can't say that.

13 Q     Well, I'm at the September 29, '05 conversation.  Did

14 that have anything to do with shaking the habitat down by Joe

15 D?

16 A     Any conversation regarding the Habitat, I can't say if

17 him or anyone else was interested in shaking them down at that

18 point.

19 Q     Let's --

20 A     Or were involved in a shakedown.

21 Q     Let's look at 129 B, the Habitat conversation, September

22 29, page two, line 20.  You say: All right, what do you want

23 to do, you want to do something?  And what is Mr. DiGorga's

24 response?

25 A     What do you want to do -- he said he had no girls and he

J. Franzese - cross/Colon                    907

1   needed help over at the Habitat.

2   Q    So that is essentially what the guy, Guy, this individual

3   named Guy wanted, he wanted Joe's help with obtaining the

4   services or getting dancers for the club, isn't that a fact?

5   A    This was one of the discussions about the Habitat, yes,

6   that I had with Joe.

7   Q    And, in fact, Joe had to see what the operation was like

8   so that he could staff the place accordingly, isn't that a

9   fact?

10  A    Yes, I believe that was his reply.

11  Q    That's what this conversation was all about, wasn't it?

12  I draw your attention to -- you haven't answered.

13  A    I don't know if that's all it was about.  Well, let's

14  look at page 3 line 14.  DiGorga:  I got a -- the operation, I

15  don't even know what he's got.  He's got a fuckin' guy there,

16  a guy who's working for him as a manager, John, is an

17  alcoholic.

18            What did Joe DiGorga mean by that?

19  A    Yes, he was discussing how the operation was going.

20            (Continued next page)

21

22

23

24

25

John Franzese-cross-Colon                          908

1    EXAMINATION CONTINUES

2    BY  MR. COLON:

3    Q    Anything there in that conversation on September 29th

4    about shaking the Habitat down?

5    A     No, not in this conversation.

6    Q    Any conversation that's on tape?

7              THE COURT:  Asked and answered.

8              Let's have the next question, please.

9              MR. COLON:  I think I'm almost done, actually.  I

10   will start wrapping up.

11             THE COURT:  Okay.

12   Q    Let's go back to a couple of things that I didn't get

13   into earlier on.

14             When you started your testimony a few days ago and

15   there was a question posed on direct about your drug use and

16   you gave an answer somewhere along the lines of, it wasn't

17   anything I did.

18             Do you recall that?

19   A    No, I don't know in what context.

20             MR. COLON:  May I approach the witness, Judge?

21             THE COURT:  You may.

22   Q    Mr. Franzese, I am just going to show you page 234, just

23   read those lines on page 234.  See if that refreshes your

24   recollection as to what you said on direct.

25             (Pause.)

John Franzese-cross-Colon                                909

1   A    Oh, in regards to me stopping using drugs?  Is that

2   what -- that's in reference to?  How I stopped?  When I

3   stopped?

4   Q    Specifically with respect to, it wasn't anything you did?

5   A    In regards to was it me personally, stopping, having the

6   ability to stop drugs by myself, on my own will power.

7   Q    You were asked this question and you gave this answer,

8   correct me if I am wrong?

9        Page 34, line nine -- page 234, I apologize, line

10  nine.

11       Question:  Can you explain how you stopped?

12       Ten:  Answer:  I had been drinking and using drugs

13  for a real long time in my life and well, I don't think it was

14  anything I did.  I think I'd rather leave it at that.

15       What do you mean by that?

16       Do you recall being asked that question and giving

17  this answer?

18  A    Yes, I do.

19  Q    What did you mean by that?

20  A    I meant that what I believe is that there is a certain

21  moment or time when you cross the line as an addict or an

22  alcoholic, when nothing but something beyond yourself can help

23  you get sober again.  I think that's more involved with grace

24  than it is on any efforts of self-determination at that point

25  that had failed me.  I wouldn't have been able to stop on my

GR      OCR      CM      CRR      CSR

1   own.

2   Q    You also testified back on June 9th that when you decided

3   to turn your life around, it was the right thing to do.

4           Yes?

5   A    I don't take any credit or virtue out of that, that I

6   decided to.  Something happened to me that was different at

7   that moment than my whole life had been, and I guess I was

8   just ready, and at that moment I just accepted something that

9   happened to me instead of turning away from it.

10  Q    That was about 2003 or 2004?

11  A    That was 10/9/01.

12  Q    That was October of 2001 when --

13  A    October 9, 2001.

14  Q    Right.

15          When was the right thing to do, in terms of your

16  cooperation with the government, you -- you testified that the

17  reason why you are cooperating is because it was the right

18  thing to do?

19          Yes?

20  A    I said there are a lot of things that had happened to me

21  and it seems -- it still seems like the right thing to do, as

22  hard as it is to do.

23  Q    In 2003 or 2004, the government did not come knocking on

24  your door for you to cooperate, did it?

25  A    I think they did make the first phone call.  I am not

GR        OCR        CM        CRR        CSR

1    sure if I called or they called, honestly.

2    Q    You can't tell the jury whether on your own you went to

3    the government or the government -- the government went

4    looking for you in '03 or '04?

5    A    Well, the first time, if you are talking about the LA

6    County Sheriff's Department, another alcoholic that I had been

7    working with introduced me to these two sheriffs that I got

8    friendly with, and in that somehow a turn of events came that

9    a friend of my father's came around and tried to start selling

10   pot to people I was sober with and I just figured I didn't

11   want that to be part of my life.

12   Q    Okay.  But --

13   A    I didn't know what else to do.

14   Q    It wasn't the federal government that was seeking you out

15   at that point?

16   A    At that point, no.

17   Q    When you made the decision to go -- strike that.

18        When you made the decision to reach out to the

19   federal government, that was you yourself that made that

20   decision independent of any other force, correct?

21   A    I had asked them for help.

22   Q    Okay.  You weren't -- were you facing any criminal

23   charges at that time?

24   A    No.

25   Q    So nobody was pressuring you or holding over your head,

1  let's say, some sort of quid pro quo between dropping the
2  charges if you would cooperate?
3  A    Dropping what charges?
4  Q    Any charges that were pending or could be pending.
5  A    That wasn't why that happened.
6  Q    In fact, you hadn't committed a crime in really many
7  years that you could be prosecuted for, correct?
8  A    I would believe that at that time.
9  Q    When you came to the government knocking on their door --
10 A    That was my belief.
11 Q    In 2003, 2004, when you came to the government knocking
12 on their door to cooperate against your father and the rest of
13 the -- your family members or friends, you had no exposure to
14 any criminal conduct at that point, did you?
15 A    There were things that did come up in those times, I
16 guess.  But I had no personal -- I was trying to do something
17 different.
18 Q    Did you seek out the services of an attorney when you
19 approached the government?
20 A    Which time?
21 Q    In 2003, 2004.
22 A    No, I don't believe so at all.
23 Q    But you were given an attorney when you signed the
24 cooperation agreement?
25       Yes?

John Franzese-cross-Colon                              913

1   A    Yes.

2   Q    In that agreement you actually committed yourself to not

3   committing any crimes?

4   A    Yes, I guess so.

5         The government ain't going to let me commit any

6   crimes.

7   Q    The agreement said any crimes, is that correct?

8   A    Yeah, any kind of crime.

9   Q    It didn't say you couldn't commit any violent crimes

10  which you testified to the other day.  It said you couldn't

11  commit any crimes.

12        Correct?

13  A    I meant during the investigation, I was told as long as

14  this investigation could continue, as long as I did not

15  personally get involved in any violent crimes, the government

16  had to immediately arrest everybody.

17        MR. COLON:  One second, if I may, Your Honor?

18        THE COURT:  All right.

19        MR. COLON:  May I approach the witness, Your Honor?

20        THE COURT:  Yes.

21        MR. COLON:  I am approaching with 3500-JF-1.

22  Q    Can you tell me if you look -- I believe it's paragraph

23  five -- okay.  I am going to give you the whole document here.

24  A    Okay.

25  Q    I think it's paragraph five that is the operative

John Franzese-cross-Colon                                914

1  paragraph.

2        Can you tell us -- tell the jury whether the

3  agreement was to commit -- to not commit any crimes or just

4  violent crimes?

5  A    Must not commit or attempt to commit any further crime.

6  Q    It doesn't -- thank you.

7  A    It doesn't specify.

8  Q    It --

9        THE COURT:  Mr. Colon, you asked him, was it any

10 crime.  He said yes.  You have shown him the agreement.  He

11 agrees it says any crime.

12       Move on to something else.

13       MR. COLON:  Thank you.

14 Q    You testified that you  were on Medicaid at one time, is

15 that a fact?

16 A    Yes.

17 Q    When was it that you became eligible for Medicaid?

18 A    In 1990, when I applied for disability, ever since then,

19 automatically, whatever state you live in, because when I

20 finally got approved for Medicare, I automatically through the

21 state get some kind of state thing that goes through it.  I

22 don't even have to do anything, generally.

23 Q    So your health -- your -- what I would say, your

24 principal manner of health care for health insurance is

25 Medicaid?

John Franzese-cross-Colon                                    915

1   A     Medicare.

2   Q     Medicare?

3   A     Yes.

4         And the Medicaid in like New York and California.

5   In certain states automatically becomes effective when you

6   move or become a resident of the new state.  But it's not like

7   that all over the country.

8   Q     What are the eligibility requirements for Medicaid or

9   Medicare, if you know?

10  A     For me, the --

11        MS. NASH:  Objection.

12        THE COURT:  Sustained.

13        Next.

14  Q     Is there an income eligibility requirement, if you know?

15        MS. NASH:  Objection.

16        THE COURT:  Sustained.

17  Q     So that's -- that's a government entitlement program that

18  the taxpayers pay for, correct?

19  A     Yes.

20  Q     Did you at any time, especially since you have told us

21  that you have been on Medicare or Medicaid since 1990, did you

22  at any time report to Medicaid or Medicare the payments you

23  received from the government?

24        MS. NASH:  Objection.

25        THE COURT:  Sustained.

John Franzese-cross-Colon                          916

1   Q    Did you at any time while you were in California at all
2   use steroids?
3   A    I told you this yesterday.  I'm still using steroids as
4   per protocol for my diagnosis.
5   Q    So it's -- they are legally prescribed?
6             MS. NASH:  Objection.
7             THE COURT:  Sustained.
8   Q    Did you ever traffic in steroids?
9             MS. NASH:  Objection.
10            We have been through this.
11  Q    Other than for your own use?
12            THE COURT:  All right.  Let's have a side bar.
13            (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

John Franzese-cross-Colon                                917

1              (Side bar.)

2              THE COURT:  May I have a proffer for the good faith

3    basis for this question, please?

4              MR. COLON:  The -- besides the fact that he may have

5    put out a ruse that he was using steroids while he was trying

6    to undertake this endeavor.

7              THE COURT:  You asked him if he ever illegally used

8    steroids.

9              MR. COLON:  Yes.

10             THE COURT:  What's your good faith basis for

11   thinking that he has?

12             MR. COLON:  Judge, I was told by a source, I can

13   reveal that source but it would be -- it would violate any

14   attorney-client privilege, that he used to take steroids and

15   bought steroids or got steroids from -- from illegal activity,

16   even prior to this situation.

17             THE COURT:  He's already been asked about that.

18             MR. COLON:  Then I will move.  I will move along.

19             THE COURT:  The objection is sustained.

20             (Continued on next page.)

21

22

23

24

25

John Franzese-cross-Colon                                918

1              (In open court.)

2    CROSS-EXAMINATION CONTINUES

3    BY MR. COLON:

4    Q    Now, you had a sister, did you not, by the name of Gia?

5    Correct?

6    A    Yes, I did.

7    Q    And did your sister use drugs?

8              MS. NASH:  Objection; relevance.

9              THE COURT:  Sustained.

10   Q    Did you supply your sister with drugs, yes or no?

11   A    No.

12   Q    Isn't it a fact that you helped cause her death by giving

13   her drugs?

14             MS. NASH:  Objection.

15             THE COURT:  Sustained as to form.

16   Q    Did you provide the drugs that resulted in your sister's

17   death?

18   A    My sister died in Florida.  I was in New York.

19   Q    She died of what cause?

20   A    Here is what you may be talking about.  She called me the

21   night she was not feeling well and I was getting high.

22   Instead of talking to her, I told her I'd call her back.  She

23   died after that.

24   Q    You never did?

25   A    No.  I was getting high.

GR      OCR      CM      CRR      CSR

1  Q    That was more important than --

2           MS. NASH:  Objection.

3           THE COURT:  Sustained.

4           Any more questions, Mr. Colon?

5           MR. COLON:  One more.

6  Q    Sunday is Father's Day, isn't it?

7           MS. NASH:  Objection.

8           THE COURT:  Sustained.

9           Ms. Seltzer, any questions?

10          MS. SELTZER:  Yes, Your Honor.

11          THE COURT:  Please, proceed.

12  CROSS-EXAMINATION

13  BY MS. SELTZER:

14  Q    Good afternoon, Mr. Franzese.

15          The first transcript that has been marked into

16  evidence by the government is dated March 2005.  Is that when

17  you started recording undercover transcripts for the

18  government?

19  A    If that's the first transcript, yes.

20  Q    Do you have any idea as you look back on those years how

21  many recordings you actually made for the government?

22  A    Actually, I don't recall the number.

23  Q    Well, do you have any idea how many times you went out

24  wearing a recording device that was being used to record the

25  people you were meeting with?

John Franzese-cross-Seltzer                    920

1  A    I don't have an idea to a number for that.  It was often.

2  Q    For how long was it that you were going out recording

3  people?

4  A    All right.  Now I am going to say eight months, but I

5  could be wrong.

6  Q    So it started in or about March 2005?

7  A    I guess so.

8  Q    And for the next eight months, how many times a week

9  would you go out with that recording device recording the

10 people who you met with?

11 A    As many times as I had appointments to go out.

12 Q    Would that be 7 days a week?

13 A    If I had to, yes.

14        I can't say like hey, this week we are going to do

15 this five days and I have to do this six days.  Some days I

16 got to stay home for four days.

17 Q    Mr. Franzese, you were living in New York at the time?

18 A    At first I was going back and forth and then they wanted

19 me to get an apartment in New York and a car there, to stay

20 there longer.

21 Q    Mr. Franzese, was it fair to say that you were recording

22 five days a week for those eight months?

23        Would that be a round about number?

24        MS. NASH:  Objection.

25        THE COURT:  Overruled.

1    A    No.  Because there was no set period of time.

2    Q    Well, was it three times a week?

3    A    Some weeks were three times, some were six times, some

4    were twice.

5    Q    So say an average of four days a week, six months, or

6    eight months?

7    A    That's a good assumption, yes.

8    Q    So there were hundreds and hundreds of telephone

9    calls -- excuse me -- of conversations that were made over the

10   period of eight months after March 2005, hundreds of them?

11   A    We made a lot of recordings.  We didn't always record.

12   Q    You turned on the device when you were meeting with

13   people hundreds of times over that eight-month period, yes or

14   no?

15   A    A lot of times.

16   Q    After you were finished meeting with the people who you

17   were recording, you would meet with Agent Lewicki or another

18   FBI agent, yes or no?

19   A    Generally following the meeting, if not the next day or

20   morning.

21   Q    At that time would they debrief you about what you had

22   discussed with the people with whom you had met?

23   A    Well, we would talk about it.  Then they'd have to listen

24   to it and sometimes I was told --

25   Q    Please listen to my question.

John Franzese-cross-Seltzer                          922

1    A    Okeydoke.

2    Q    When you met with Agent Lewicki or another FBI agent

3    after you had made a recording, did you have a conversation

4    with them about the meeting that you had recorded, yes or no?

5    A    Generally so, yes.

6    Q    And they would take notes about the meeting, about what

7    you told them about the meeting?

8    A    Well, sometimes because other times they had the tape.

9    They'd just go listen to the tape.

10   Q    Were there oftentimes when the tapes were inaudible?

11   A    They never really told me --

12   Q    Well, they --

13   A    -- if that was the case.

14   Q    Were there times that you were recording when you were in

15   bars or restaurants with background noise?

16   A    Sometimes I think they said to wear it in the front

17   pocket, not in my pants pocket.

18   Q    In any event, the tapes that have been played here in

19   court, is it a fair statement to say, are but a small number

20   of the total number of recordings that were made during that

21   eight months period?

22         Yes or no?

23   A    I wouldn't say a small number.

24   Q    You would say a large percentage?

25   A    I would say a big part, yes.

John Franzese-cross-Seltzer                        923

1   Q     Before you came -- well, withdrawn.

2         The -- there were transcripts that were prepared as

3   an aid to understanding those tapes.  You are aware of that?

4   A     This is the transcript, yes.

5   Q     Did you prepare those transcripts?

6   A     No.

7   Q     Did somebody from the FBI or the US Attorney's Office

8   prepare those transcripts?

9   A     I believe it's someone from the United States Government.

10  I think the FBI has a -- someone that does this.  I don't

11  know.

12  Q     Before you came to testify for these proceedings, did you

13  meet with these US Attorneys or other people from their office

14  to discuss your testimony?

15  A     To discuss the -- the tapes, yes.

16  Q     Did you also discuss the testimony that you were going to

17  give here in the courtroom?

18  A     No.

19        We went over the tapes.

20  Q     When you went over the tapes, did you listen to the

21  tapes?

22  A     Yes.

23  Q     Did they show you the transcript that had been prepared?

24  A     Yes.

25  Q     Did they ask you if you -- if you understood what was

1  being said in the transcript and whether it was a correct

2  rendition of what had been said?

3  A    Yes.

4  Q    Did you -- did they ask you to fill in any words?

5  A    Not really.

6  Q    Did they ask you to describe for them what had been said

7  during those particular conversations?

8  A    Sometimes I reiterated to them what I was saying, what I

9  heard.

10  Q    So that when you testified here this week and the

11  government prosecutor asked you what did you mean when you say

12  this and what did you understand the other person to mean,

13  your recollection has been refreshed by the government before

14  you came in to court to testify here?

15  A    My recollection was refreshed by the tapes and this thing

16  here.

17          I was surprised at how much they didn't know though.

18  Q    The point is that you are talking about conversations or

19  these transcripts are about conversations that happened four

20  years ago --

21  A    Yes.

22  Q    -- or more?

23          And you don't necessarily remember off the top of

24  your head about these specific conversations, do you?

25  A    Absolutely.

1  Q    You absolutely remember each conversation?

2  A    No, absolutely you are correct.  Some of them I was -- it

3  took a while to refresh my memory.

4  Q    But then once you read the transcript and you listened to

5  the conversation and you talked to the government, you

6  remember what happened?

7  A    You see they made me listen first and then read.  They

8  wouldn't let me read it without listening to it.

9  Q    Do you know the expression, a give up robbery?

10 A    A what?

11 Q    A give up robbery?

12 A    I --

13          MS. NASH:  Relevance?

14          THE COURT:  Overruled.

15          Let's see where you are going.

16 A    A give up robbery?

17 Q    Yes, a give up robbery.

18 A    I would think it's either an easy robbery or where

19 someone is in on it and just gives you the money.

20 Q    Correct.

21 A    Okay.

22 Q    Relating to that second example that you have given, do

23 you have any other terms that you use to describe that

24 particular scenario?

25 A    Not offhand like that, not now, not at this minute.

GR      OCR      CM      CRR      CSR

John Franzese-cross-Seltzer                    926

1   Q    But you are familiar with that term?

2   A    Right now, yes.

3   Q    Now, you were asked questions about a fellow named Ori

4   Spado?

5   A    Yes.

6   Q    Do you know him?

7   A    Yes.

8   Q    He's somebody you knew in California?

9   A    Yes.

10  Q    Did he live in California?

11  A    Yes, he did.

12  Q    How long in California did you know him for?

13  A    I knew Ori since 1978 or '76, '75.

14  Q    Was that in New York or in California?

15  A    I met him in New York.  He's from Utica.  He moved to

16  California there shortly after in the eighties.

17  Q    Now, Mr. Spado was involved in various businesses, is

18  that correct?

19  A    I never seen one legitimate business he was in.

20  Q    So you are not aware that he was also in the movie

21  business?

22  A    Ori Spado?

23  Q    Ori Spado.

24  A    I am not.  I am not aware of it.

25  Q    Were you aware that he was involved in some way in the

GR      OCR      CM      CRR      CSR

John Franzese-cross-Seltzer                                927

1    entertainment business on the Queen Mary cruise ship out in

2    California?

3    A    Yes.  That I do remember.  He did something there.

4    Q    Are you aware that he was involved in any way in the

5    entertainment business?

6    A    Not really.

7    Q    Are you involved -- are you aware that he was involved in

8    any respect in the movie business?

9    A    None at all.

10   Q    Are you aware that he was involved in any respect in the

11   music business with rap artists?

12   A    The only people Ori knew in the rap business were people

13   I introduced him to.

14   Q    Those were -- some of them were involved in rap?

15   A    They were drug dealers.

16   Q    Were there any people involved with rap music?

17   A    They were drug dealers who managed rap artists, yes.

18   Q    Was he involved also with Andrea Bocelli in booking shows

19   for him?

20            Did you know that?

21   A    No, I did not know that.

22            I wish I did.

23   Q    You prefer opera to rap?

24   A    No; but I would like to meet Andrea Bocelli.

25   Q    Let me direct your attention to one of the government

John Franzese-cross-Seltzer                    928

1  tapes.  That's 118 A.  That's on August 14, 2005.

2          Mr. Franzese, would you open your book to that

3  conversation?

4  A    Yes.

5          What page?  I'm sorry.

6  Q    It's T 118 A.

7  A    Yes.

8  Q    As you just told us, you now recall these particular

9  conversations because your recollection has been refreshed?

10 A    It's easier to recall, yes.

11 Q    Do you recall where this conversation took place?

12 A    No, I don't.

13 Q    Well, it took place in New York State?

14 A    I think this was one of the trips Ori made into New York

15 but I could be wrong.  For some reason it's letting me think

16 that.

17 Q    So you -- you recall the conversation but you don't

18 recall where -- even in what state it occurred?

19 A    Yes.  I don't remember at this time.

20 Q    It could have been in California?

21 A    Yes, it could have been there.

22 Q    Now, I am going to direct your attention to page three of

23 the transcript of that conversation.

24 A    Okay.

25 Q    By the way, were you -- were you aware that Mr. Spado

GR      OCR      CM      CRR      CSR

1  actually lived in California, right?

2  A    Yes.

3        I was over his house many, many, many times for many

4  years.

5  Q    He lived in a condo?

6  A    He lived in a condo, yes.

7  Q    Whatever -- whatever work he was doing, it was based out

8  of California?

9  A    Ori lived in a condo, yes.

10  Q    Where?

11  A    In Beverley Hills.

12  Q    In Beverley Hills.

13        Okay.  The government asked you certain questions

14  about what you understood certain lines in this conversation

15  to mean.  I am going to do the same thing.  I am going to

16  start on page three and I am going to direct your attention to

17  lines 17 through 23, where Mr. Spado says to you, okay.  This

18  stuff has been sitting here for 45 days but it's not the real

19  good stuff.

20        It's the garbage stuff.

21        That you pick up for $300.

22        What did you understand Mr. Spado to be talking

23  about?

24  A    He was talking about pot.

25  Q    He says to you, line 24, all right.  There's a thousand

1  pounds, twelve hundred, fifteen, I don't know what.

2           And that's marijuana or pot?

3  A    Yes.

4  Q    And then you say, that the Mexicans have?

5           He says, yeah.

6           When you said that the Mexicans have, what did you

7  mean?

8  A    I meant that he was getting it from the -- from the

9  Mexicans that he was talking about, moving up the ladder with

10 the Mexicans.

11 Q    Which Mexicans?

12 A    I don't know the Mexicans.  I only met them once in

13 New York.

14 Q    But you knew enough to know that he was dealing with

15 Mexicans?

16 A    He said it.  He'd been saying it all along.  In here --

17 Q    Will you just answer my question?

18          You knew that he was dealing with Mexicans, yes or

19 no?

20 A    Yes.

21 Q    And that's where he was getting his pot from?

22 A    Some of it.

23 Q    Now, on page four, you say to Mr. Spado, all right.  This

24 is at line one.  Well, does Larry want you to do, buy it from

25 them?  That's what I'm saying.  Or move it for them?

1              What did you mean when you said that and who is

2    Larry?

3    A    Okay.  At this time I was asking him what he was telling

4    me about the deal so I was trying to figure out what he was

5    telling me he was doing.

6    Q    But you brought up the name of somebody called Larry.

7    Who was Larry?

8    A    I don't remember at this point.  Someone he was dealing

9    with.

10   Q    But he didn't talk about anyone named Larry before this,

11   did he?

12   A    Yes.  I'm sure he did.  If I mentioned Larry's name.  I

13   just can put my mind on it.

14   Q    Now, at line five, you say to him, oh, they'll let you

15   move it without giving them no fucking money.  All right.

16             And he says, right.  I'm building up the plus --

17   now, the guy who led them to this one is the guy --

18             You say all right.

19             He says, already thought I left, I didn't.

20             Do you understand what he means and what you meant

21   in that four line sequence?

22   A    In that four line sequence I can't exactly tell you what

23   we were exchanging for that minute.

24   Q    Now, let's go to line 11, lines eleven through 18.

25             You say, Mr. Franzese, he was one of the Mexicans?

John Franzese-cross-Seltzer                   932

1          Mr. Spado says, it's not one of those Mexicans.

2          MS. NASH:  Objection.

3          THE COURT:  Sustained.

4    Q    Could you explain to us what you and Mr. Spado are

5    discussing in lines eleven through 18?

6    A    The crew of Mexicans either from California or the ones

7    in Texas he dealt with and now he's telling me he had -- that

8    someone in Brownsville.

9    Q    In other words, you were aware that he was dealing with

10   people in Texas and in Brownsville and in other places for his

11   marijuana business?

12   A    He always talked about the group of Mexicans that

13   distributed pot around the country that he sold pot with.

14   Q    Now, then Mr. Spado told you, this is another thing that.

15          Do you know what he meant by that?

16   A    I believe he is talking about another deal.

17   Q    Do you know what other deal?

18   A    I think he gets into it later.

19   Q    Now, at line 23, he tells you, and will you read lines 23

20   to 25, please?

21   A    Yes.

22   Q    And do you know what he's saying in lines 23 to 25?

23   A    Yes.

24          On the first batch that he was talking about, there

25   is not enough money to make any money that he is happy with.

GR      OCR      CM      CRR      CSR

John Franzese-cross-Seltzer                              933

1    Q     Why was that?

2    A     Because it was lousy pot.

3    Q     You asked him at line 26, how many partners do you have.

4          And then you said, just two ends?

5          And Mr. Spado said, two ends.

6          What did you understand that meant?

7    A     He had two partners.

8    Q     In which deal?

9          Was that the deal with the junky bad pot?

10   A     Yes.

11   Q     I direct your attention to lines five through lines 16 on

12   page five of this transcript.

13         Where Mr. Spado begins, probably had two months to

14   sell it because it's not the best.

15         What do you understand he is saying and you are

16   saying in lines five through 16?

17   A     I'm asking him and he's saying he don't -- he'd rather

18   not do that deal because there is not enough money it in for

19   him.

20         THE COURT:  Ms. Seltzer, at a convenient point I

21   would like to take a break.  You can continue.  When it is

22   convenient in your examination, I would like to take a break.

23         MS. SELTZER:  I am sort of right in the middle of a

24   transcript.  I am happy to take a break.

25         THE COURT:  I don't want to interrupt you in the

John Franzese-cross-Seltzer                         934

1  middle of the transcript unless you are going to be gong for

2  another hour on this transcript.

3          MS. SELTZER:  No.  I have very little.  If the jury

4  would like to take a break.

5          THE COURT:  I'm sure they would.  If you are just

6  going to be a few minutes we will not interrupt your line of

7  questioning any more than I already.

8          MS. SELTZER:  That's okay.  As long as you don't

9  shut me up, I don't mind being interrupted.

10          THE COURT:  Ladies and gentlemen, we will take our

11  15-minute break.  We will reconvene in here at 3:30.  Please

12  remember, don't discuss the case among yourselves or with

13  anyone else.  Keep an open mind.  We will see you shortly.

14          (The following occurred in the absence of the jury.)

15          THE COURT:  Let's have the witness out.  I have

16  something for the lawyers.

17          You may be seated.

18          (Witness leaves courtroom.)

19          I thought I had severed Mr. Spado and so I am

20  wondering why we are doing this and I can only assume that's

21  going to have something to do with the credibility of this

22  witness.

23          MS. SELTZER:  No.

24          THE COURT:  All right.

25          MS. SELTZER:  Your Honor, when the government

John Franzese-cross-Seltzer                    935

1   proffered this particular tape, and I believe it was my

2   cocounsel that had objected to these, the government proffered

3   the tape on the theory that this was -- I don't know if I am

4   using the correct words -- but that I was just getting to the

5   point where Mr. Spado is describing a give up robbery of this

6   marijuana.

7           THE COURT:  Right.

8           MS. SELTZER:  As I understand the government's

9   theory, and I think that's what they expressed to you when

10  they made their proffer, is that the robbery that my client

11  allegedly committed in California was -- had a modus operandi

12  that was designed by Mr. Spado in which it was analogous to

13  this particular robbery.

14          THE COURT:  I got you.  You are going to point out

15  the differences?

16          MS. SELTZER:  Correct.

17          THE COURT:  Okay.  That's fine.

18          When are you going to get there?

19          MS. SELTZER:  It's the next line.  We are almost

20  there.  This is a short tape.

21          THE COURT:  I probable interrupted at the wrong

22  time.

23          MS. SELTZER:  No.  They will get the point exactly

24  when they get back, at least.

25          THE COURT:  Very good.

John Franzese-cross-Seltzer                    936

1          MS. SELTZER:  There are no other tapes.  I don't

2     have any other tapes.

3          MR. LIND:  Maybe I could follow up on that?  Related

4     but a separate point?

5          THE COURT:  Sure.

6          MR. LIND:  We just got from the government some

7     tapes relating to Mr. Fatato.  Hopefully the last set.  What I

8     would like to bring up are two matters.

9          First of all, there may be the same concerns that

10    you just raised with Ms. Seltzer with regard to a lot of these

11    Fatato tapes are just with Spado, dealing with drugs.

12    Basically, marijuana or cocaine transactions.

13         Every one of us has been doing a lot of work really

14    on John Franzese but I would like to have an opportunity to

15    review with the Court before they call Fatato to the stand

16    about the relevancy of a lot of these, what I consider

17    extraneous transactions after he has been severed.

18         MS. SELTZER:  I would join in that application.

19         MR. LIND:  Can I just finish, Ms. Seltzer?

20         MS. SELTZER:  I'm sorry.

21         MR. LIND:  My other point is, Ms. Seltzer and I, I

22    think, are the only two defendants that are going to be

23    referred to in the Fatato testimony and without trying to make

24    a big thing about this, I have been carrying sort of the

25    laboring oar in terms of this case because I have to deal with

John Franzese-cross-Seltzer                    937

1    both of these major witnesses.

2           I would like to have at least 48 hours notice one

3    way or the other whether or not this guy is going to actually

4    be called to testify.  I think that's only fair to both me and

5    Ms. Seltzer.

6           THE COURT:  I thought agreed, the government was

7    going to give you at least 18 hours notice.  They were going

8    to tell you the day before, by noon the day before who their

9    witnesses were the next day.

10          Isn't that what we established?

11          MR. LIND:  Yes, Judge.

12          I think this falls into a different category.  Once

13   we get past Thursday, then if they want to call him the

14   following week, that's a different matter.  But if they are

15   going to call him on Thursday, then I have to start devoting

16   tonight and tomorrow night to Mr. Fatato.  Mr. Franzese had a

17   fair amount of 3500.  This guy's 3500 is mammoth.  It's over

18   2000 pages long.  I am not -- I have reviewed it, Judge.

19   Obviously, there is a -- you know, I think that -- that's

20   fair.

21          THE COURT:  He does have a point considering how

22   important a witness Fatato apparently is going to be if he is

23   called, that it would be -- it would certainly streamline the

24   trial, I would hope, if the defendants had more notice for

25   that particular witness.

1          Is the government in a position to do that?

2          MS. POSA:  Your Honor, we don't intend to call

3  Mr. Fatato this week.  We can even say who we expect our next

4  witnesses to be.  We are happy to do that.

5          MR. LIND:  That's fine.  That's all I am asking for.

6          THE COURT:  One at a time, please.

7          MS. POSA:  We would like to clarify something.

8  Mr. Lind said that , quote, we just got these transcripts from

9  Mr. Fatato.  These are exactly the same transcripts we

10 provided months and months ago.  As a courtesy, we provided

11 one complete set.  To the extent any have been amended, we

12 have been sending them sort of piecemeal one by one so they

13 have immediate notice of this.  As a courtesy, we produced a

14 complete set with a complete disk for all four defendants.

15 There is nothing new that they have to learn.  The 3500

16 material they've also had I think for almost two months now.

17         MR. LIND:  Judge, I didn't mean to misspeak.

18 Ms. Posa totally -- for once I totally agree with her, okay.

19 Judge, what I was saying is that we did get the final set

20 today.  I am not saying -- there is --

21         MS. POSA:  Significantly shorter than the prior set,

22 if I may add.

23         MR. LIND:  Judge, I didn't mean to imply in any way

24 that they are back-dooring us or giving us something at the

25 last minute here.  That was not -- I want to make it very

1   clear.  I think they have been very careful and productive in

2   terms of turning over stuff.

3            What I am saying is that now that we have the final

4   set, I would like to know if this guy is actually -- they have

5   answered that question I think, Judge, that's fine.

6            I still would like to address at some point, you

7   know, this week, whether or not -- you know, at least have an

8   opportunity on behalf of my client, and I suppose Ms. Seltzer

9   would like the opportunity also -- I cut her off before -- to

10  address this issue of these Spado tapes.  That certainly

11  is -- that's about half or at least a third of these tape

12  recordings.

13           THE COURT:  Okay.  He is not going to be called this

14  week.  We can address this before we adjourn for the weekend

15  on Thursday.  The government may be in a position to give you

16  more information then.  The good news is you don't have to

17  work all night tonight and tomorrow.

18           MR. LIND:  That's great.  Thank you very much.

19           MS. POSA:  I could -- I don't want -- if Your Honor

20  wants to move on from this?  I could tell --

21           THE COURT:  Let me ask, is there anybody else who

22  needs to be heard on that point?  I think we have a plan.  We

23  will talk about it again Thursday night with regard to Fatato.

24           MS. SELTZER:  We will do a motion in limine and give

25  you a list of the tapes that I consider totally drug related

1    and basically irrelevant to this trial.

2            THE COURT:  You can give me a motion in limine.

3    Since the tapes have been in your possession for quite a long

4    time and we had so many motions in limine before, I just -- I

5    would prefer not to have any more.  But I am not going to tell

6    you you can't file it.

7            MS. SELTZER:  I will just give you a list.  If you

8    go through a few of them, 205 A and 205 D, they are just about

9    drugs.  It's Spado.

10           MS. POSA:  Your Honor, I think I can abbreviate

11   this.  I have a little privileged chart here that I did of all

12   the contents.  There are only three different conversations

13   involving Spado and drugs out of I think more than 20 that we

14   have produced.  To the extent that we have produced those it's

15   to show Spado was charged with Mr. Curanovic in the robbery.

16   He is charged with robbing one of his drug associates.  We

17   have to show he that he was in fact a drug dealer who was

18   robbing a drug associate in order to show the entire robbery

19   and how he knew whom to target.  That's the only reason why we

20   have this.  Literally three separate conversations out of -- I

21   haven't counted them -- out of at least more than 20.

22           MS. SELTZER:  I don't think there is any dispute

23   that Mr. Spado was a drug dealer, at least in this trial.

24           THE COURT:  Is that a stipulation?

25           MS. SELTZER:  Well, I -- from my questions I think

1   it is clear that we are not disputing that he dealt marijuana.

2           THE COURT:  Oh, I don't know that I would draw any

3   inferences from an attorney's questions.  If you want to

4   stipulate, we can talk about that.  If not, the government has

5   to go ahead and do what they have to do with a reasonable

6   amount of evidence.

7           Am I hearing it correctly, that to the extent

8   Ms. Seltzer has a motion in limine and, Mr. Lind, for that

9   reason, it -- it's only three transcripts that are involved?

10          MS. POSA:  It's three conversations and we tried to

11  reduce them as much as possible.  So on one of them, for

12  example, on June 4, 2006, we have cut it into three very short

13  little excerpts, rather than playing one long conversation.

14  There are three transcripts but they are each maybe just a few

15  pages long because we were trying to reduce them.

16          THE COURT:  Okay.  In that case feel free to make

17  your motion.

18          MS. SELTZER:  My motions tend to go on and on and

19  on.

20          THE COURT:  That's all right.  My rulings don't.

21          Okay.  One other thing I wanted to mention.

22          I'm sorry.  Ms. Posa, you had something else?  Were

23  you going to move to something else?

24          MS. POSA:  No.

25          THE COURT:  Okay.  I was handed, as Ms. Posa did on

1    the record, and I think it was given to defense counsel, the

2    written agreement that this witness has with the marshals, the

3    non-publicity agreement.  I assume the government is not going

4    to go into that on redirect unless there is further inquiry

5    now by Ms. Seltzer.

6              Is that right?

7              MS. NASH:  Actually, I had planned to go into just

8    confirming the fact that he had this agreement that he was not

9    going to write a book.

10             THE COURT:  The problem is that if the defendants

11   had the agreement before cross-examination, they would not

12   have asked the questions about publicity.

13             I think you can tell me if I am wrong, the agreement

14   probably should have been produced to them before the witness

15   was called.

16             MS. NASH:  If we had had it.  I had no idea it

17   existed.

18             THE COURT:  I am not faulting you for it.  The point

19   is they would not have asked those questions because to ask

20   those questions, to imply a motive to get book sales or movie

21   rights or TV shows, those questions would have been shot down.

22   As it stands now I don't see any prejudice to the defendants.

23   They have asked the witness.  He says they have an agreement.

24   At worst, it's a neutral inquiry.

25             If you are now going to hammer that point by saying

John Franzese-cross-Seltzer                943

1  in fact that cannot be a motive because here is the written

2  agreement, then I think the defendants have been a bit

3  surprised by that.  As I say, I don't think they would have

4  asked those questions had they known.

5       MS. NASH:  I understand Your Honor's point.  The

6  possible problem is, at this point, to be perfectly frank, we

7  were a little bit surprised by the defendant's line of

8  questioning and at this point I think that it will leave the

9  jury with an impression that he can still profit by his

10 testimony and he can't.  Perhaps we could enter some sort of

11 stipulation so that we don't have to question him about it but

12 the jury is not left with the misimpression that he could

13 continue in any plan he might have had in the past to write a

14 book.

15      THE COURT:  I will consider any stipulation that you

16 all work out of course.

17      As I say, if Ms. Seltzer opens the door on it now,

18 having full notice, that would be a different question.  I

19 don't anticipate her doing that.

20      I do think, Ms. Nash, that once you turned over the

21 other day the other late document which is the -- I forget his

22 former colleague's name that wrote this manuscript, once that

23 was there, pretty clear to me that the defendants were then

24 going to say, well, you are doing this in order to sell a

25 book, aren't you.  Particularly, the questions about you are

John Franzese-cross-Seltzer                    944

1  now here writing the last chapter, aren't you.  Those

2  questions wouldn't have been asked but if they had known that

3  there is a written agreement saying he can't make any money

4  off of this.

5          MS. NASH:  Actually, I have a feeling that those

6  questions would have been asked, Judge, in light of the

7  various attempts here to impeach the credibility of this

8  witness.  I think that the questions would have been

9  formulated to suggest that whatever he was doing here today

10  was in an effort to get publicity.  If not write a book.  Then

11  make a name for himself in one way or another.  I find it hard

12  possible.

13          THE COURT:  We will see if the defendants want to

14  stipulate to a one line stipulation that the witness has an

15  agreement with the United States Government that prohibits him

16  from making any money from the sale of any movie rights or

17  book rights relating to this matter.  If they do want to do

18  that, that will end the matter.  If they don't want to do

19  that, then maybe I will give you one question and

20  just -- maybe I will give you just the exhibit and that's it.

21          MS. NASH:  That would be fine, fine with the

22  exhibit.

23          THE COURT:  I am not going to rule on it yet.  Let's

24  see how it goes.  I did want to alert you to the issue before

25  redirect.

GR        OCR        CM        CRR        CSR

1          MR. PAUL:  Your Honor, obviously the -- your initial

2     ruling and termination with respect to this exhibit is exactly

3     our point and what we would argue.  For the government to

4     claim surprise that we went into some type of book possibility

5     for this witness when they turned over the actual document of

6     a transcript that he is writing with another person is a bit

7     beyond what I would say is surprise.  So clearly by them

8     providing that document the door was certainly open for us to

9     go through and for them to now claim we didn't think the

10    defense counsel were going to go into the possibility of a

11    book future with this witness is a bit hard to fathom.

12         So I think, Your Honor is correct, had we ever seen

13    what's been marked for identification as 93, the questions

14    would never have been asked of this witness.

15         THE COURT:  Obviously, the defendants will at least

16    need to stipulate that they will not argue to the jury in

17    closing that this witness's motivation in testifying was in

18    order to sell a book.

19         MR. PAUL:  We would -- I would have no problem with

20    that stipulation.  But the -- but for this exhibit to come in

21    or for us to stipulate that there was in fact an agreement

22    when we are now being told for the first time in fact there

23    was one, we are not going to stipulate to that.

24         But I can speak for myself.  I am certainly not

25    going to argue to the jury that this person's lying about a

John Franzese-cross-Seltzer                946

1    possibility of a book deal and he never had such an agreement
2    when we now know for the first time there was one.  I can only
3    speak for myself.
4         THE COURT:  How are your clients prejudiced if I
5    give the government two questions saying can you identify this
6    agreement?  What is it?  He said this is an agreement that
7    says I can't sell my movie rights.
8         MR. PAUL:  Judge, we are prejudiced because we would
9    never have even gone into this subject.
10        THE COURT:  Right.  The jury concludes that's not a
11   valid point.  But, of course, in fact it is not a valid point.
12   How are you prejudiced?
13        MR. LIND:  Judge, the way that the testimony is now
14   he said he had -- he does have an agreement and I think at
15   that point the questioning ended.  About that point.  And so
16   there is -- speaking for myself, I join what Mr. Paul said.  I
17   don't think defense counsel would have raised it.  I didn't go
18   into it.  I might have gone into it but I certainly would not
19   have gone into it if I had known that there was an agreement
20   out there.
21        THE COURT:  I understand that.
22        MR. LIND:  I would agree to stipulate that certainly
23   it would be improper to raise that in defense summation.  I
24   would be willing to stipulate to it and agree that won't be
25   raised.

1          But the government can't have it both ways.  I don't

2    think that Your Honor -- Your Honor yourself raised the issue,

3    shouldn't we have had this as part of discovery.  Whether or

4    not they should or shouldn't, we shouldn't be trapped by not

5    having it raising it and then their being able to show

6    affirmatively that there is --

7               MR. PAUL:  Your Honor, I --

8               MS. NASH:  Could I be heard?

9               THE COURT:  Let's have all the defendants.

10              MR. PAUL:  I would just add, as Your Honor knows,

11   when we went side bar, even the government -- at that point we

12   were inquiring of the witness -- was not aware of such an

13   agreement.  In fact, seemed surprised by the witness even

14   claiming there was such an agreement.  They then turn over

15   this exhibit, this afternoon, and now for them to be permitted

16   to go into this exhibit with one question, I would object to

17   any question with regard to an exhibit that we are now being

18   provided after the fact.  I think it is prejudicial and should

19   not be permitted.

20              (Continued on next page.)

21

22

23

24

25

1          THE COURT:  Ultimately if I let in the exhibit, the

2     jury understands the truth, right?

3          That's not always a good thing, but generally the

4     default is that that works.  This is not a reason they should

5     not believe this witness.  You've all given them lots of

6     reasons they might not, but this isn't one of them.  Shouldn't

7     we take it out of the case?

8          MS. SELTZER:  I think it goes to the credibility of

9     the defense attorneys.

10          THE COURT:  I agree with you.

11          MS. SELTZER:  Those questions were asked in good

12     faith.  Now it gives the impression that it was not asked in

13     good faith.

14          THE COURT:  What if I allow the government to

15     introduce the exhibit and then I instruct the jury that the

16     government had an obligation to disclose that exhibit prior to

17     trial and that defense counsel did not know about that exhibit

18     during the cross-examination?

19          MR. LIND:  Then I think it makes both counsel look

20     bad.

21          THE COURT:  It must be a perfect solution.

22          MR. LIND:  It leaves the court looking bad, which I

23     guess is not the best thing.

24          I would say, I don't think that the questioning

25     stopped when -- you know, when he answered the question.  I

949

1    think it just complicates and confuses this matter.

2            THE COURT:  It's still a theoretical possibility --

3    it may be more than theoretical -- that the jury could not

4    believe this witness because they think he's trying to sell a

5    book when that is not the truth.  Right?  That's the problem.

6            MS. SELTZER:  Hypothetically, what happens if he

7    leaves the Witness Protection Program, which is not an unheard

8    of thing?

9            THE COURT:  You can argue that the to the jury.

10           MS. SELTZER:  I choose not to.

11           THE COURT:  Right.

12           MS. SELTZER:  But there really is a very real

13   possibility, your Honor, that at some stage when -- for

14   whatever financial reasons he decides he doesn't have to run

15   away, that he decides to leave and write a book.  I can see

16   that.

17           THE COURT:  How much more examination do you have?

18           MS. SELTZER:  Very short, very brief.  Could I ask

19   you a question about your Honor's ruling, just to digress?

20           THE COURT:  Have I ruled?

21           MS. SELTZER:  When I was asking questions and I was

22   reading from the transcripts, I got the impression that your

23   Honor had prohibited that and I wasn't quite sure I understood

24   --

25           THE COURT:  I have not prohibited that.  I asked

1    counsel to curtail that to the extent possible.  When you were

2    doing it, I did not know where you were going with it.  You

3    have now advised me out of the presence of the jury and I'm

4    not stopping you from doing it.

5              MS. SELTZER:  It's only about half a page, but I

6    would like to use the words.

7              THE COURT:  That's fine.

8              MS. NASH:  If I could just be heard on this issue

9    with the agreement that he signed?

10             The Marshals Service is not a branch of our office

11   and other than what we specifically requested in the ordinary

12   course, like with respect to the WitSec payments, we are not

13   provided with their documents; in fact, the only reason we got

14   this document was because this door was opened and then

15   because of how the witness testified, you know, we learned he

16   had signed the document.

17             This is nothing that we ever would have had and

18   overlooked for whatever reason.  So I think the marshals are

19   not part of the prosecution team.  As far as I understand it,

20   they are really more part of -- I think the Bureau of Prisons,

21   but, in any case, my suggestion would be, because I feel that

22   the jury is going to be left with a misimpression -- those

23   questions were -- they weren't two brief questions, they

24   lasted a fairly significant period of time and I think that

25   the jury is going to be misled.

1           I object to the presentation that the government had

2    an obligation to turn it over and did not because in fact this

3    was simply not in our possession and not something that we

4    were required to go out and get until we found out about it.

5           Perhaps a compromise would be to craft some language

6    to indicate it, because I understand the defense didn't have

7    it, and I don't mean to suggest otherwise, so perhaps there

8    would be some way of conveying to the jury that this was

9    something that neither of the parties had in advance and

10   learned about after the witness' testimony on cross, something

11   to that effect.

12          MR. PAUL:  Judge, to me the issue raised stops with

13   the witness' testimony.  Your Honor is going to instruct the

14   jury, evidence is the question combined with the answer.  The

15   witness has stated he has an agreement.  End of story.

16          THE COURT:  Mr. Paul, you've just spent two and a

17   half days trying to convince the jury that they can't believe

18   one word this witness says.

19          MR. PAUL:  Not about this, your Honor.

20          THE COURT:  Well, falsus in unum falsus in omnibus.

21   I'm sure someone is going to say that to the jury.

22          MR. PAUL:  To say what, that he can't be believed?

23          THE COURT:  If they lie about something they can't

24   be believed about anything.

25          MR. PAUL:  We're certainly not going to argue, it

1    would not be in good faith for us to argue anything in regard

2    to the book arrangement that has been gone into certainly now

3    for the first time that we're receiving Exhibit 903.

4              THE COURT:  Here is I'm going to do.  I am going to

5    instruct the jury when they come back that there was some

6    testimony by the witness about an agreement he entered into

7    that prohibits him from earning money as a result of his

8    criminal history.

9              I'm going to tell them there is such an agreement.

10   It does prohibit him.  Defense counsel were entirely unaware

11   of that agreement during their cross-examination.

12             That's the truth.

13             MS. SELTZER:  Could you maybe do that after I

14   finish, your Honor?

15             THE COURT:  Yes, I will do that after you finish.

16   That's the truth.  It doesn't make you look bad, it doesn't

17   make your clients look bad and it lets the jury know the real

18   story.

19             MR. PAUL:  Again, this topic would have never been

20   broached by anybody had we been provided with the exhibit.

21             I think it's unfair and improper for the suggestion

22   to be made that this was raised by defense counsel at any time

23   because you know we would not have raised it.

24             THE COURT:  No one will be harmed based on the

25   instruction I'm going to give; you will not be harmed, the

J. Franzese - cross/Seltzer                953

1  jury will not think less of you, they will not think less of

2  your clients and they will know the truth, so it strikes me as

3  the right solution.

4          We're now past our break.  Let's have the jury back

5  and then our witness.

6          MR. PAUL:  Can I take a quick break?

7          THE COURT:  A minute and a half.

8          (Recess.)

9          THE COURT:  Everyone here?  Let's have the jury

10 back.

11         ( Witness resumes the stand.)

12         (Jury present.)

13         THE COURT:  Be seated, please.

14         Sorry for the slight delay, ladies and gentlemen, we

15 had a small matter we had to take care of.

16         Miss Seltzer, you may continue.

17         MS. SELTZER:  Thank you, your Honor.

18 BY MS. SELTZER:

19 Q   Mr. Franzese, before the break we were going over the

20 transcript of a conversation between you and Orie Spado on

21 August 14, 2005, number 118 A.  I'd like to direct your

22 attention to page 5 line 11.

23 A   Right.

24 Q   Where Mr. Spado says to you, quote, Throw up my arms and

25 say fuck it, okay?  I don't want to deal with it, all right?

J. Franzese - cross/Seltzer

1    I'm walking away and when I do, all right, tell them to get a

2    truck and come to get it, all right.  Now, all it is is

3    between Southern State and Sunrise, it's off Grand, so we get

4    to be at least a couple guys.

5         Do you understand what Mr. Spado was saying in that

6    statement?

7    A    Yeah, he's planning to tell me how we're going to take

8    the pot from these guys.

9    Q    When he described in the next line, Grand, Grand Avenue,

10   it's the location where you're going to take the pot.

11        Was it you who was going to take the pot?

12   A    Eventually it turns to, yeah, me being the one to steal

13   the pot from these guys that he walked away to deal with.

14   Q    And this is what I referred to before as a give-up

15   robbery?

16   A    I wouldn't consider this -- I would consider Orie giving

17   up the guys who had the pot, but I wouldn't consider it where

18   the guy who has the pot turns it over to you.

19   Q    He goes on at line 25 to say, All right, now one guy

20   would take the truck, load it up, drive it a little ways.

21        Who would that one guy be, if you know?

22   A    One of the original guys that were bringing the load from

23   the Mexicans he was buying it from.

24   Q    That would have been one of his partners?

25   A    I'm not sure.

J. Franzese - cross/Seltzer

955

1   Q    Then he says:  The Mexicans would get in the truck and

2   start driving.  And these guys don't speak English, these guys

3   I seen them, these guys don't, okay?  If somebody went like

4   this, flashed a badge.

5         You say, Flash a badge, right?  And he says:  All

6   right.  Okay.  More than likely they're gonna run.

7         You recall this conversation?

8   A    Yes.

9   Q    And, in fact, what Mr. Spado was telling you is that he

10  believed that it would be a group of nonEnglish speaking

11  Mexicans who would be driving that truck with the marijuana?

12  A    That would be delivering that, working the order, yeah.

13  Q    And he was proposing that you would get a badge and

14  something that looked like a cop car?

15  A    Eventually that was the plan on how we were going to rob

16  them.

17  Q    And you would flash the badge and they would see the cop

18  car; is that correct?

19  A    Similar to that.

20  Q    And they would run away because they would be scared?

21  A    In general, that was one of the descriptions.

22  Q    And basically if this is a modus operandi of Orie Spado,

23  it's that he would flash a badge and scare away the guys with

24  the drugs, he uses a badge and a cop car, that is his modus

25  operandi?

J. Franzese - cross/Seltzer                    956

1   A    For this particular deal.

2   Q    Correct?

3   A    What he's asking us to do on this deal.

4   Q    Correct, yes.  So this is an example of how he steals

5   from drug dealers, this is how he was proposing it on this

6   occasion?

7   A    On this occasion, this was his proposal.  I can't speak

8   for any others.

9   Q    Now, at the close of the -- or at some point at the end

10  of your direct testimony, the federal prosecutor asked you

11  about a gun that Orie Spado had sold to you in California.  Do

12  you recall that testimony?

13  A    Yes.

14  Q    And that was an in 2002, wasn't it?

15  A    It was somewhere around -- I don't remember the times,

16  but I believe you when you say you know it's 2002.

17  Q    Well, it's when you were working for the Sheriff's

18  Department in Los Angeles County, do you recall that?

19  A    Yes.

20  Q    And that's the gun that you supposedly bought?

21  A    If that was what you have in the file, yeah, that's it.

22  Q    That was around 2002?

23  A    Yes.

24          MS. SELTZER:  I have no further questions.

25          THE COURT:  All right.  We'll have redirect

J. Franzese - redirect/Nash

957

1   examination.

2          Before we do that, do the parties need to be heard

3   further on the instruction that he talked about during the

4   break?

5          (No response.)

6          THE COURT:  Ladies and gentlemen, there was some

7   testimony during cross-examination of the witness concerning

8   an agreement to which he testified with the government that he

9   is not allowed to make money off of his criminal history or

10  the work that he did for the government.

11         I instruct you that there is in fact such an

12  agreement.  I also instruct you that the defense lawyers did

13  not know and could not possibly have known that there was such

14  an agreement until the witness said so.

15         All right.  Let's proceed with redirect examination.

16  REDIRECT EXAMINATION

17  BY MS. NASH:

18  Q    Good afternoon, Mr. Franzese.

19  A    Good afternoon.

20  Q    How much of your life did the defendant Franzese spend in

21  prison?

22  A    Over 25 years, I believe.

23  Q    You were asked questions on cross-examination about when

24  and where you had certain meetings with the defendant

25  Franzese.

J. Franzese - redirect/Nash

1      Do you recall those questions?

2  A    Yes.

3  Q    Did some of those meetings occur when you were visiting

4  the defendant Franzese in prison?

5  A    Yes.

6  Q    Directing your attention in particular to the Cugini

7  Restaurant?

8  A    Yes.

9  Q    You were asked questions on cross-examination about that

10 restaurant?

11 A    Yes, I was.

12 Q    Was the defendant Franzese in jail when the dispute over

13 that restaurant occurred?

14 A    I believe he was.  What did you say?

15 Q    At the time the dispute over the Cugini Restaurant

16 occurred, was the defendant Franzese in jail?

17 A    Yes.

18 Q    What was your understanding of how the defendant Franzese

19 was supposed to be paid as a result of the resolution of the

20 dispute relating to the Cugini Restaurant?

21 A    Angelo was with my father, so Joe and Michael took care

22 of his problem and collected money for my father for that.

23 Q    When you say Joe, who do you mean?

24 A    Joe DiGorga.

25 Q    When you say Michael who do you mean?

J. Franzese - redirect/Nash                959

1   A    Michael Catapano.

2   Q    Did you have conversations with the defendant Franzese

3   about whether he actually got paid?

4   A    Yes.  We had conversations.

5   Q    What is your understanding about whether he was paid?

6   A    I believe that the money was received -- I think he got

7   ten thousand --

8            MR. LIND:  I object to the question and the answer.

9            THE COURT:  Sustained as to form.

10  Q    Did you have conversations with the defendant Franzese

11  about the resolution of this dispute over the Cugini

12  Restaurant?

13  A    Yes.

14  Q    What did you learn?

15  A    I believe he got some money --

16           MR. LIND:  Objection to the form of that question,

17  what did he learn.

18           THE COURT:  Yes.

19           MS. NASH:  I can rephrase.

20  Q    What did the defendant Franzese tell you?

21  A    He got some money but he didn't get all of it.

22  Q    What is your understanding about where the rest of the

23  money went?

24  A    Well, I had a lot of conversations about --

25           MR. LIND:  Objection.

J. Franzese - redirect/Nash

1        THE COURT:  Sustained.

2    Q    Did you have conversations with Michael Catapano about

3    the rest of the money?

4    A    Yes, I did.

5    Q    What did you understand from those conversations happened

6    to the rest of the money?

7    A    Michael had to lend -- Michael had collected the money

8    and he had to lend a bunch of it to Joe D -- had to give some

9    to Joe D until my father got out, then he was supposed to get

10   it back and pay my father.

11        Michael also at that time had used the money and

12   came and asked me what he should do cause he was nervous on

13   what he was going to tell my father why he didn't have the

14   other 15 thousand for him that he had used.

15   Q    When you say "get out," what are you referring to?

16   A    He --

17   Q    You said I believe, Michael was going to hold it until

18   your father got out.  What did you mean?

19   A    My father was in jail.  When he came home they were

20   supposed to give him the money for that.

21   Q    On cross-examination you were shown notes at various

22   times taken by different agents during this investigation.  Do

23   you recall that on cross-examination?

24   A    Yes.

25   Q    Prior to your cross-examination had you ever seen those

Burton H. Sulzer, OCR, CRR, CSR, CM

J. Franzese - redirect/Nash                    961

1   notes?

2   A     No.

3   Q     Were you ever asked to sign any kind of notes like that?

4   A     No, I was not.

5   Q     You were asked a lot of questions on cross-examination

6   about payments that you received from the government.  Do you

7   recall those questions?

8   A     Yes, I do.

9   Q     And are you currently in a Witness Protection Program?

10            THE COURT:  You can answer that.

11  A     Yes.

12  Q     As part of the Witness Protection Program was it

13  necessary for you to relocate?

14  A     Yes.

15  Q     You were asked questions on cross-examination about

16  payments you received as part of the Witness Protection

17  Program for documents.

18            Do you recall that?

19  A     Yes.

20  Q     As part of the Witness Protection Program, did you get a

21  new identity?

22  A     Absolutely.

23  Q     Other than in court here, are you allowed to use your

24  real name in your life?

25  A     No.

J. Franzese - redirect/Nash

962

1  Q    You were also asked about travel expenses as part of the

2  Witness Protection Program.

3        Do you recall those questions on cross-examination?

4  A    Yes, I do.

5  Q    Were those travel expenses for vacations for you?

6  A    Vacations?  No, they're not vacations.

7  Q    You were also asked about payments for command posts.  Do

8  you have any idea what that term means, "command posts"?

9  A    I believe it's a group of people where they stay that

10 generally accompany me.

11 Q    Do you have any idea whether your participation in the

12 Witness Security Program, or the Witness Protection Program is

13 affected by whether the defendants are acquitted?

14        MS. SELTZER:  Objection.

15        THE COURT:  He can answer what he knows, if he

16 knows.

17 A    Can you repeat that again.

18 Q    Do you have any of idea whether your participation in the

19 Witness Protection Program would be affected by what happens

20 to the defendants in this case?

21        MR. LIND:  I'll object to the form of the question,

22 Judge.

23        THE COURT:  I will overrule it.

24        We're asking for the witness' understanding as to

25 whether it makes a difference with regard to his participation

J. Franzese - redirect/Nash

1   in the program whether the defendants are acquitted or

2   convicted.

3   A     No, there's not.

4   Q     You were also asked questions on cross-examination about

5   how the defendant Franzese, when he is not in prison, is on

6   parole.

7            Do you recall some of those questions?

8   A     Yes, I do.

9   Q     What is your understanding of what can happen to the

10  defendant Franzese if he's caught while on parole with other

11  members or associates of organized crime?

12  A     He would get violated.

13  Q     Now, for some of the time that you passed messages for

14  the defendant Franzese, was he in jail?

15  A     Yes.

16  Q     For some of the time that you passed messages for him,

17  was he on parole?

18  A     Yes.

19  Q     What is your understanding of the purpose of you passing

20  messages when he's on parole?

21  A     To not jeopardize his freedoms because of his

22  restriction.

23  Q     You were also asked questions on cross-examination about

24  the defendant John Capolino and The Butcher, an individual

25  known as The Butcher.

J. Franzese - redirect/Nash

1            Do you recall those questions?

2   A    Yes.

3   Q    Do you recall being asked questions about what

4   Mr. Capolino needed money for?

5   A    Yes.

6   Q    Do you recall being asked to compare the defendant

7   Capolino's situation to your situation when you borrowed money

8   from Michael Catapano?

9   A    Yes.  I do remember that.

10  Q    Now, after you borrowed money from Michael Catapano, did

11  you lend it out to other people?

12           MR. PAUL:  Objection.

13  A    No.

14           THE COURT:  Overruled.

15  A    No, I did not.

16  Q    What is your understanding of what the defendant Capolino

17  did with some of the money that he borrowed from The Butcher?

18  A    He lent it back out at points.

19  Q    You were also asked on cross-examination whether money

20  that the defendant Capolino borrowed from The Butcher was on

21  record.

22           Do you recall those questions?

23  A    Yes.

24  Q    Whether or not a loan is on record, does that affect

25  whether the borrower can lend out the money to other people?

J. Franzese - redirect/Nash

1    A    No.  He can lend it out.  But it's -- it's usually, if

2    the guy's a goodfellow, he's always on record.

3                MR. LIND:  Objection.

4                THE COURT:  You answered the question.

5                Go on.

6    Q    You were also asked on cross-examination about various

7    conversations that you had with the defendant Franzese.  Do

8    you recall that?

9    A    Yes.

10   Q    And you were asked questions about whether the defendant

11   Franzese gave you advise.

12               Do you recall that?

13   A    Yes.

14   Q    Who gave you advise about loan-sharking?

15   A    My father.

16   Q    Who gave you advise about shaking people down?

17   A    My father.

18   Q    Who gave you advise about what to do if someone did not

19   pay what they were supposed to pay?

20   A    My father.

21   Q    You were asked questions, if you recall, at the beginning

22   of your cross-examination about certain of your prior crimes.

23   Do you recall that?

24   A    Yes, I do.

25   Q    And you were asked questions about whether certain of

J. Franzese - recross/Lind

1    your past crimes were for the Colombo family.

2           Do you recall those questions?

3    A    Yes, I do.

4    Q    When the defendant Franzese asked you to pass messages

5    for him, was that for the Colombo family?

6    A    Yes.

7    Q    When the defendant Franzese was involved in

8    loan-sharking, was that for the Colombo family?

9    A    A portion of that.

10   Q    When the defendant Franzese shook businesses down was

11   that for the Colombo family?

12   A    Many times they were.

13          MS. NASH:  Can I have a second, Judge?

14          THE COURT:  Sure.

15          (Pause.)

16          MS. NASH:  I have nothing further.

17          THE COURT:  All right.

18          Any recross?

19          MR. LIND:  Yes, Judge.

20   RECROSS EXAMINATION

21   BY MR. LIND:

22   Q    When you had this conversation about the Cugini Due pizza

23   place with your father, that you had with him in prison?

24   A    I don't know.

25   Q    What?

J. Franzese - recross/Lind

967

1   A    No, because I was in California.

2   Q    That was after the event; correct?

3   A    Yeah.  After -- yes, after he came home.

4   Q    Now your father was in prison from 2001 to 2004; correct?

5   A    I'm not sure of the dates.

6            MR. LIND:  If I could have a moment?

7            THE COURT:  All right.

8            (Pause.)

9   BY MR. LIND:

10  Q    Let me go down a few lines.  Does that refresh your

11  recollection that he was admitted in January 23, 2001?

12  A    Okay.

13  Q    And he was paroled exactly three years later, January 22,

14  2004?

15  A    That's when he was released, yeah.

16  Q    So he was in prison from January 23, 2001 to January --

17  nearly exactly three years later, he was paroled.

18            You are aware, you heard the jury -- you testified

19  in front of the jury a number of times about this loan, or

20  this business transaction with Joe Toursto.

21            That occurred in 2002, correct?

22            MS. NASH:  Objection, Judge.  This is beyond the

23  scope of my redirect.

24            THE COURT:  I think so, Mr. Lind.

25  Q    You heard, and you knew a lot about this Cugini Due Pizza

J. Franzese - recross/Lind

1    transaction, that was brought up on redirect, remember

2    testifying about that on redirect?

3    A    Yes.

4    Q    Your father was in prison in 2003; correct?

5    A    Yes.

6    Q    That's when that transaction occurred; correct?

7    A    Yes.

8    Q    Okay.  Now, that transaction occurred in 2003 when your

9    father was in prison, correct?

10             THE COURT:  We have that.  He just said yes.

11             Next question.

12   Q    You didn't come to -- you didn't talk to your father in

13   2003 in prison, did you?

14   A    No.  I didn't visit him in prison on that -- in that

15   time.

16   Q    You didn't visit him the whole year of 2003 in prison,

17   did you?

18   A    No.

19   Q    You didn't visit him the whole year of 2002 in prison,

20   did you?

21   A    I don't believe so.

22   Q    You didn't visit him the whole year of 2001 in prison?

23   A    Wait a minute.  I think I did fly to Michigan in my first

24   year of sobriety to visit him.

25   Q    When was that?

J. Franzese - recross/Lind

1  A    I don't remember, but I'm positive I visited him once

2  because I had to get permission to go.

3  Q    And --

4  A    We didn't discuss this.

5  Q    You didn't discuss the Toursto thing, you didn't discuss

6  the --

7  A    No.

8  Q    -- the Cugini Due Pizza?

9  A    No.

10  Q    So what you found out was two years after the event, in

11  2005; correct?

12  A    It might have happened a little bit before then.  I don't

13  know.  I don't know the exact dates, but yes, I heard about it

14  after the fact that it happened.  Yes, if that's what you're

15  saying.

16  Q    You heard about it from Michael Catapano, right?

17  A    He was one of the people I heard it from.

18  Q    Now, this advice about loan-sharking, shylocking, that

19  took place in the mid-seventies; correct?

20  A    Yeah.  Till when --

21  Q    You learned about that in the mid-seventies; correct?

22  A    And after.

23        THE COURT:  He just said yes.

24  Q    Okay.  And the questions that the prosecutor -- I asked

25  you questions about other types of advice.

J. Franzese - recross/Lind

1    Do you recall the questions I asked you and the
2    transcripts I asked you about?
3  A    I remember you asked me the question, but I don't
4    remember the questions, but if you tell me I'll answer you.
5  Q    The advice that he was giving you on the transcript I
6    referred you to were about other things, how to have some
7    personality -- do you recall that advice?
8    How not to be bitter, how to be nuanced, how to be
9    smooth; do you recall those?  That was the advice in the
10    transcripts I was referring to.
11  A    Yeah, I think that it was in regards to Joe D.  Maybe so.
12  Q    That was in regards to you, that was advice to you;
13    correct?
14  A    For me it had to be towards other people.
15  Q    Right.
16  A    Right.
17  Q    And in those tapes he was not telling you, instructing
18    you about loan-sharking, was he?  You had learned that 35
19    years before, right?
20  A     Yes. I had learned that 35 years before.
21  Q    And in that 35 years things had changed a lot, had they
22    not?
23  A    Yeah, 35 years -- yes, that's right.
24  Q    When you met your father in 2005, 2004, he no longer had
25    a Lear jet, did he?

1   A    No, that's when he didn't.

2   Q    No longer had a big house, did he?

3           MS. NASH:  Objection.  Beyond scope.

4           THE COURT:  Sustained.

5           MR. LIND:  Nothing further.

6           THE COURT:  Mr. Paul, anything?

7           MR. PAUL:  I have no questions.

8           THE COURT:  All right.

9           Mr. Colon.

10          MR. COLON:  No, your Honor.

11          THE COURT:

12          Miss Seltzer?

13          MS. SELTZER:  No, your Honor.

14          THE COURT:  The witness is excused.

15          Thank you very much.  You may step down.

16          (Witness excused.)

17          THE COURT:  Do you have a short witness?

18          MS. NASH:  We actually have some stipulations.

19          THE COURT:  Let's do that.

20          Ladies and gentlemen, the government is about to

21  read to you some documents that are known as stipulations.

22  Those are agreements between the parties as to certain facts

23  or certain testimony that would be given but is not going to

24  be given.

25          My instruction to you is that when those

972

1    stipulations are read, as to the facts stated therein, you

2    have to accept those facts as true.  The parties have agreed

3    to them.

4              MS. POSA:  Your Honor, may I start?

5              THE COURT:  You may.

6              MS. POSA:  Government Exhibit 600.

7              It is hereby stipulated and agreed by and between

8    the United States of America, by assistant United States

9    attorneys Cristina Posa and RachelJ. Nash, defendant John

10   Franzese, by his attorney Richard B. Lind, Esquire, defendant

11   John Capolino, by his attorney Kenneth A Paul, Esquire,

12   defendant Christopher Curanovic, by his attorney, Marion A.

13   Seltzer, Esquire, and defendant Joseph DiGorga by his attorney

14   Raymond L. Colon, Esquire, that:

15             Paragraph one, Government Exhibit 25 is a true and

16   accurate copy of call detail records, subscriber information

17   and billing records for the period from January first, 2006

18   through May 29, 2006, for telephone number 917 517-4650,

19   subscribed to by John Capolino.

20             Paragraph 2.  Government Exhibit 32 is a true and

21   accurate copy of call detail records, subscriber information

22   and billing records for the period from May 2, 2006 to May 31,

23   2006, for telephone number (917) 335-2000, subscribed to by

24   Christopher Curanovic.

25             Paragraph 3.  Government Exhibit 33 is a true and

1  accurate copy of call detail records, subscriber information

2  and billing records for the period from January 15, 2006

3  through May 31, 2006 for telephone numbers 310 418-0862 and.

4  310 739-4667, subscribed to by Orlando Spado.

5        Paragraph 4.  Government Exhibit 34 is a true and

6  accurate copy of call detail records, subscriber information

7  and billing records for the period from May 15, 2006 to June

8  16, 2006, for telephone number (310) 273-2811 subscribed to by

9  Orlando Spado.

10        Paragraph 5.  Government Exhibit 35 is a true and

11  accurate copy of call detail records, subscriber information

12  and billing records for May 19, 2006 for telephone number

13  (323) 997-2646, subscribed to by Dahomey Smith.

14        Paragraph 6.  Government Exhibit 38 is a disk

15  containing a true and accurate copy of cellular telephone and

16  sector records for the period from March 1, 2006 through

17  November 7, 2006 for the telephone number (917) 335-2000,

18  subscribed to by Christopher Curanovic.  Government Exhibit 38

19  A is a printed excerpt from this disk reflecting calls made on

20  May 18, 2006 and May 19, 2006.

21        Paragraph 7.  Government Exhibit 40 is a map

22  reflecting the location of certain cellular towers listed in

23  Government Exhibit 38 referenced in paragraph 6 of this

24  stipulation as having received a signal transmitted to or from

25  cellular telephone number (917) 335-2000 subscribed to by

974

1    Christopher Curanovic on May 18, 2006 and May 19, 2006.

2            Paragraph 8.  Government Exhibit 37 is a true and

3    accurate copy of call detail records for the period from

4    February 21, 2006 through August 24, 2006 for telephone number

5    (914) 774-8581 subscribed to by Beznik Neza.

6            Paragraph 9.  This stipulation and Government

7    Exhibits 25, 32, 33, 34, 35, 37, 38, 38 A and 40 are

8    admissible in evidence at trial.

9            That is signed by all counsel on June 7, 2010.

10           THE COURT:  You're offering 600 and all those

11   exhibits and the stipulation?

12           MS. POSA:  As well as the stipulation.

13           THE COURT:  They are received.

14           (So marked.)

15           THE COURT:  Miss Posa, what is the exhibit number of

16   the next stipulation?

17           MS. POSA:  Government Exhibit 601.

18           THE COURT:  I'm going to ask you to skip the

19   preamble.

20           All the parties and all their attorneys agree that

21   the following facts are stipulated to.  601.  Let's go right

22   into it.

23           MS. POSA:  Thank you, your Honor.

24           Paragraph one.  Government Exhibit 29 is a true and

25   accurate copy of a United Airlines passenger report, also

1    known as a flight manifest, listing all passengers on board
2    United Airlines Flight 0033 from New York John F. Kennedy
3    International Airport, JFK, to Los Angeles International
4    Airport, LAX, on May 18, 2006.
5          Government Exhibit 31 is a true and accurate copy of
6    United Airlines passenger report, also known as a flight
7    manifest, listing all passengers on board United Airlines
8    Flight 0028 from LAX to JFK on May 19, 2006.
9          On Flight 0033, the defendant Christopher Curanovic
10   was assigned seat number 22 E and Beznik Neza was assigned
11   seat number 22 F.  On Flight 0028 Curanovic was assigned seat
12   number 18 F and Neza was assigned seat number 18 E.
13         Paragraph 2.  Government Exhibit 29 A is a true and
14   accurate copy of United Airlines passenger data report showing
15   that the airline tickets for Curanovic and Neza on the flights
16   discussed above in paragraph one were purchased in the name
17   Frank A. Yacullo.
18         Paragraph 3.  Government Exhibit 28 is a true and
19   accurate copy of an American Express account statement for
20   Frank A. Yacullo for the period May between, 2006 to June 6,
21   2006 showing United Airlines charges incurred on May 10, 2006
22   for the purchase of airline tickets for Chris Curanovic and
23   Beznik Neza with the departure date of May 18, 2006.
24         Paragraph 4.  Government Exhibit 30 is a true and
25   accurate still photograph of Curanovic from a security video

1    recording taken at LAX on May 19, 2006.

2           Paragraph 5.  Government Exhibit 38 is a true and

3    accurate still photograph of Curanovic and Neza from a

4    security video recording taken at LAX on May 19, 2006.

5           Paragraph 6.  Government Exhibit 30 B is a true and

6    accurate still photograph of Neza from a security video

7    recording taken at LAX on May 19, 2006.

8           Paragraph 7.  This stipulation and Government

9    Exhibits 29 through 30 A and B, are admissible in evidence at

10   trial.

11          That is signed by all counsel on June 7, 2010.

12          THE COURT:  All right.  Exhibit 601 and the

13   documents referenced therein are admitted.

14          (So marked.)

15          MS. POSA:  Government Exhibit 602, another

16   stipulation.

17          THE COURT:  The parties all agree to the following:

18          MS. POSA:  If called to testify, representatives

19   from the Burbank Police Department would state that they

20   seized the following items at 4121 Hood Avenue, Burbank

21   California after responding to a 911 call reporting an

22   attempted robbery at that location on May 19, 2006.

23          One.  A black case identified as Government Exhibit

24   45.  2.  Plastic zip ties identified as Government Exhibit 47.

25   3.  A notebook identified as Government Exhibit 48.

1          4.   In addition, the parties agree that Exhibits

2     520, 520 A through E; 521 and 521 A through C are photographs

3     of 4121 Hood Avenue, the location of the robbery attempt that

4     occurred on May 19, 2006.

5          Paragraph 5.  This stipulation and Government

6     Exhibits 45, 47, 48; 520, 520 A through E, 521 and 521 A

7     through C, are admissible in evidence at trial.

8          Signed by all counsel on June 7, 2010.

9          THE COURT:  That was 602?

10          MS. POSA:  Yes, your Honor.

11          THE COURT:  That and the exhibits referenced therein

12     are admitted into evidence.

13          MS. POSA:  Government Exhibit 603.

14          THE COURT:  Another stipulation to which all parties

15     have agreed provides as follows:

16          MS. POSA:  If called to testify, representatives

17     from the Burbank Police Department Tape and Records Unit would

18     state the following:

19          Paragraph one.  Government Exhibit 41 is a true and

20     accurate recording of 911 calls received by the Burbank Police

21     Department's 911 operators and dispatchers on May 6, 2006 at

22     approximately 4:07 p.m.

23          Paragraph 2.  Government Exhibit 42 is a true and

24     accurate transcript of the 911 calls reproduced on the CD

25     marked as Government Exhibit 43 and referenced in paragraph

978

1    one.

2            Paragraph three.  Government Exhibit 43 is a true

3    and accurate recording of 911 calls received by the Burbank

4    Police Department's 911 operators and dispatchers on May 19,

5    2006 at approximately 10:05 a.m.

6            Paragraph 4.  Government Exhibit 44 is a true and

7    accurate transcript of the 911 calls reproduced on the CD

8    marked as Government Exhibit 45 and reference in paragraph

9    three.

10           Paragraph 5.  The information contained in

11   Government Exhibits 41 and 43 was recorded and maintained in

12   the ordinary course of business of the Burbank Police

13   Department.

14           Paragraph 6.  It was the regular practice of the

15   Burbank Police Department to record and maintain the

16   information contained in Government Exhibits 41 and 43.

17           Paragraph 7.  The Burbank Police Department recorded

18   and maintained the information contained in Government

19   Exhibits 41 and 43 at or near the time of its making from

20   information made or transmitted by a person with knowledge.

21           Paragraph 8.  This stipulation and Government

22   Exhibits 41, 42, 43 and 44 are admissible in evidence at

23   trial.

24           Signed by all counsel on June 7, 2010.

25           THE COURT:  603 and the accompanying exhibits are

1    admitted into evidence.

2              (So marked.)

3              MS. POSA:  One moment, your Honor?

4              THE COURT:  All right.

5              (Pause.)

6              MS. POSA:  That's all we have for right now.

7              THE COURT:  Ladies and gentlemen, we'll adjourn just

8    a bit early today.  I will remind you to keep an open mind and

9    not discuss the case amongst yourselves or with anyone else.

10   No research, Internet or otherwise; stay away from my media

11   that might reference anything having to do with this case.

12             Have a restful evening.  Be here sharply at 9:30.

13   We'll start then.  Thank you very much.

14             (Jury leaves.)

15             THE COURT:  Thank you all.  Recess until tomorrow

16   morning 9:30.

17             (Continued to June 16, 2010 at 9:30 a.m.)

18

19

20

21

22

23

24

25

980

```
 1              INDEX
 2   JOHN FRANZESE JUNIOR                745      16
 3   CROSS-EXAMINATION                   791      20
 4   CROSS-EXAMINATION (Cont'd)          818      1
 5   BY MR. COLON:
 6   CROSS-EXAMINATION                   919      12
 7   REDIRECT EXAMINATION                957      16
 8   RECROSS EXAMINATION                 966      20
 9              EXHIBITS
10    25, 32, 33, 34, 35, 37, 38, 38 A and   974      7
11   40
12   600                                974      10
13   601                                974      17
14    29 through 30 A and B             976      9
15   602                                976      15
16   45, 47, 48; 520, 520 A through E, 521   977      6
17   and 521 A through C
18    41, 42, 43 and 44                 978      22
19
20
21   D                                  793      16
22   E                                  799      16
23   F                                  799      17
24
25
```

Burton H. Sulzer, OCR, CRR, CSR, CM

1

## $

**$10,000** [3] - 808:9, 808:12, 808:15
**$14,000** [5] - 835:16, 835:19, 835:21, 838:22
**$250** [6] - 814:22, 814:24, 818:12, 818:16, 819:4, 824:2
**$30,000** [1] - 854:24
**$300** [1] - 929:21
**$4,000** [1] - 837:22
**$5,000** [3] - 752:14, 752:20, 814:16
**$50,000** [3] - 851:24, 852:6, 852:23

## '

**'01** [3] - 774:3, 815:2, 816:9
**'03** [1] - 911:4
**'04** [1] - 911:4
**'05** [6] - 758:21, 759:3, 815:2, 816:9, 906:4, 906:13
**'75** [1] - 926:13
**'76** [1] - 926:13
**'97** [4] - 811:3, 819:5, 819:13, 824:12
**'em** [11] - 834:6, 836:14, 839:7, 842:6, 842:19, 842:21, 842:23, 842:25, 843:12, 861:14, 861:19
**'im** [3] - 870:12, 870:15, 871:16

## 0

**0028** [2] - 975:8, 975:11
**0033** [2] - 975:2, 975:9
**05** [2] - 750:24, 751:1
**08cr240** [1] - 743:3

## 1

**1** [13] - 762:1, 762:13, 874:8, 882:2, 883:23, 885:3, 885:20, 891:12, 892:4, 895:10, 896:17, 973:16, 980:4
**10** [14] - 749:12, 756:4, 806:17, 875:13, 875:17, 875:19, 879:11, 881:3, 883:21, 886:6, 889:6, 895:17, 975:21, 980:12
**10,000** [4] - 752:6, 752:10, 752:18, 753:7
**10/9/01** [2] - 774:24, 910:11
**10006** [1] - 744:2
**10128** [1] - 744:10
**10151** [1] - 743:22
**102** [6] - 828:6, 828:7, 829:22, 831:1, 839:5, 842:18
**10279** [1] - 744:6
**103** [3] - 846:16, 846:20, 849:9
**105** [2] - 856:1, 856:4
**106** [4] - 764:23, 765:22, 865:20, 865:23
**10:05** [1] - 978:5
**11** [4] - 835:24, 889:7, 931:24, 953:22

**111** [6] - 744:1, 879:10, 879:12, 881:3, 883:13, 883:14
**11201** [2] - 743:18, 744:14
**115** [2] - 889:19, 889:22
**116** [3] - 887:23, 891:17, 892:5
**117** [4] - 895:5, 895:6, 895:10, 903:10
**118** [3] - 928:1, 928:6, 953:21
**11:13** [1] - 804:4
**11:15** [3] - 804:5, 804:8, 804:10
**11:30** [1] - 745:6
**12** [6] - 750:6, 761:12, 876:20, 876:21, 888:11, 980:6
**125** [7] - 763:5, 764:7, 765:8, 765:19, 765:23, 765:24, 765:25
**128** [1] - 906:4
**129** [1] - 906:21
**12:00** [1] - 761:8
**13** [2] - 808:3, 894:9
**136** [12] - 746:4, 746:5, 746:6, 748:24, 750:19, 750:24, 751:1, 751:11, 752:4, 752:24, 752:25, 754:15
**14** [9] - 750:6, 763:5, 765:19, 770:10, 894:9, 894:10, 907:14, 928:1, 953:21
**14,000** [2] - 869:7, 869:10
**15** [12] - 743:6, 752:5, 752:17, 753:4, 782:12, 807:1, 865:18, 896:24, 960:14, 973:2, 973:7, 980:15
**15-minute** [1] - 934:11
**16** [18] - 746:10, 748:6, 750:24, 751:1, 756:24, 884:8, 895:18, 895:19, 897:21, 904:6, 933:11, 933:16, 973:8, 979:17, 980:2, 980:7, 980:21, 980:22
**16,000** [1] - 838:11
**17** [6] - 892:22, 897:2, 900:7, 929:17, 980:13, 980:23
**1725** [1] - 744:9
**18** [11] - 836:12, 897:2, 931:24, 932:5, 937:7, 973:20, 974:1, 975:4, 975:12, 975:23
**19** [14] - 749:12, 832:25, 855:8, 892:23, 973:12, 973:20, 974:1, 975:8, 976:1, 976:4, 976:7, 976:22, 977:4, 978:4
**1970s** [1] - 864:23
**1978** [1] - 926:13
**1990** [3] - 819:14, 914:18, 915:21
**1990s** [1] - 865:1
**1997** [2] - 805:14, 812:2

## 2

**2** [8] - 875:17, 875:19, 894:3, 972:20, 972:22, 975:13, 976:24, 977:23
**20** [28] - 752:1, 752:5, 752:17, 753:6, 753:17, 754:9, 888:22, 892:25, 896:3, 897:20, 897:25, 898:3, 898:8, 898:10, 898:12, 898:13, 898:19, 898:20, 898:21, 898:25, 899:11, 899:14, 899:15, 906:22, 940:13, 940:21, 980:3, 980:8
**20,000** [4] - 752:9, 754:10, 758:19,

895:19
**2000** [2] - 796:1, 937:18
**2001** [14] - 773:23, 775:2, 803:15, 812:4, 819:5, 819:13, 819:14, 824:13, 910:12, 910:13, 967:4, 967:11, 967:16, 968:22
**2002** [11] - 779:21, 779:23, 780:4, 796:2, 798:22, 803:15, 956:14, 956:16, 956:22, 967:21, 968:19
**2003** [8] - 910:10, 910:23, 912:11, 912:21, 968:4, 968:8, 968:13, 968:16
**2004** [7] - 910:10, 910:23, 912:11, 912:21, 967:4, 967:14, 970:24
**2005** [25] - 746:10, 748:6, 762:1, 762:13, 763:5, 770:10, 811:25, 828:21, 829:24, 849:16, 852:17, 856:5, 865:21, 865:23, 866:3, 867:7, 879:11, 881:3, 919:16, 920:6, 921:10, 928:1, 953:21, 969:11, 970:24
**2006** [36] - 771:14, 771:16, 772:8, 773:15, 773:17, 941:12, 972:17, 972:18, 972:22, 972:23, 973:2, 973:3, 973:7, 973:8, 973:12, 973:16, 973:17, 973:20, 974:1, 974:4, 975:4, 975:8, 975:20, 975:21, 975:23, 976:1, 976:4, 976:7, 976:22, 977:4, 977:21, 978:5
**2010** [7] - 743:6, 806:17, 974:9, 976:11, 977:8, 978:24, 979:17
**205** [2] - 940:8
**21** [6] - 887:7, 887:16, 890:23, 893:9, 900:10, 974:4
**22** [10] - 755:1, 771:16, 772:8, 885:23, 896:3, 897:6, 967:13, 975:10, 975:11, 980:18
**225** [1] - 744:13
**23** [7] - 757:11, 929:17, 932:19, 932:22, 967:11, 967:16
**233** [1] - 744:5
**234** [3] - 908:22, 908:23, 909:9
**24** [3] - 896:5, 929:25, 974:4
**25** [10] - 833:12, 896:6, 899:24, 932:20, 932:22, 954:19, 957:22, 972:15, 974:7, 980:10
**26** [3] - 871:10, 871:11, 933:3
**27** [3] - 857:12, 893:24, 896:8
**271** [1] - 743:18
**273-2811** [1] - 973:8
**28** [1] - 975:18
**29** [10] - 759:4, 762:3, 906:4, 906:13, 906:22, 972:18, 974:24, 975:13, 976:9, 980:14
**29th** [1] - 908:3

## 3

**3** [17] - 752:4, 752:16, 752:24, 753:2, 755:1, 837:22, 885:3, 889:5, 891:8, 894:2, 894:3, 896:17, 896:24, 907:14, 972:25, 975:18, 976:25
**30** [7] - 807:4, 894:1, 975:24, 976:5, 976:9, 980:14

**30th** [3] - 828:2, 829:24, 830:5
**31** [3] - 972:22, 973:3, 975:5
**310** [2] - 973:4, 973:8
**31O** [1] - 973:3
**32** [3] - 972:20, 974:7, 980:10
**323** [1] - 973:13
**33** [3] - 972:25, 974:7, 980:10
**335-2000** [3] - 972:23, 973:17, 973:25
**34** [4] - 909:9, 973:5, 974:7, 980:10
**35** [7] - 970:18, 970:20, 970:21, 970:23, 973:10, 974:7, 980:10
**350** [1] - 777:7
**3500** [5] - 772:1, 793:21, 937:17, 938:15
**3500-JF-1** [1] - 913:21
**37** [3] - 974:2, 974:7, 980:10
**38** [8] - 973:14, 973:18, 973:23, 974:7, 976:2, 980:10
**380** [2] - 806:18, 806:20
**3:30** [1] - 934:11

### 4

**4** [22] - 755:20, 756:23, 759:12, 760:24, 769:20, 772:1, 772:2, 856:4, 874:14, 881:4, 881:5, 881:6, 885:20, 892:5, 894:4, 895:14, 896:18, 941:12, 973:5, 975:24, 977:1, 978:6
**40** [3] - 973:21, 974:7, 980:11
**41** [6] - 977:19, 978:11, 978:16, 978:19, 978:22, 980:18
**4121** [2] - 976:20, 977:3
**418-0862** [1] - 973:3
**42** [3] - 977:23, 978:22, 980:18
**43** [7] - 977:25, 978:2, 978:11, 978:16, 978:19, 978:22, 980:18
**44** [3] - 978:6, 978:22, 980:18
**45** [5] - 929:18, 976:24, 977:6, 978:8, 980:16
**47** [5] - 779:13, 810:7, 976:24, 977:6, 980:16
**48** [4] - 937:2, 976:25, 977:6, 980:16
**4900** [1] - 837:23
**4:07** [1] - 977:22
**4th** [1] - 860:13

### 5

**5** [16] - 753:11, 757:13, 775:1, 849:9, 875:13, 882:2, 883:12, 886:4, 887:7, 887:8, 890:3, 953:22, 973:10, 976:2, 977:5, 978:10
**50** [2] - 851:23, 852:2
**500,000** [1] - 777:7
**517-4650** [1] - 972:18
**520** [6] - 977:2, 977:6, 980:16
**521** [6] - 977:2, 977:6, 980:16, 980:17
**5th** [6] - 846:22, 847:10, 847:16, 847:24, 848:4, 849:16

### 6

**6** [11] - 758:8, 760:22, 887:16, 894:5, 973:14, 973:23, 975:20, 976:5, 977:21, 978:14, 980:16
**600** [4] - 768:16, 972:6, 974:10, 980:12
**601** [4] - 974:17, 974:21, 976:12, 980:13
**602** [3] - 976:15, 977:9, 980:15
**603** [2] - 977:13, 978:25
**611** [2] - 901:3, 901:23
**613-2481** [1] - 744:14
**613-2505** [1] - 744:15

### 7

**7** [18] - 759:24, 849:19, 850:6, 886:4, 890:5, 894:6, 895:16, 899:22, 920:12, 973:17, 973:21, 974:9, 976:8, 976:11, 977:8, 978:17, 978:24, 980:10
**70s** [1] - 864:25
**718** [2] - 744:14, 744:15
**739-4667** [1] - 973:4
**745** [2] - 743:21, 980:2
**774-8581** [1] - 974:5
**791** [1] - 980:3
**793** [1] - 980:21
**799** [2] - 980:22, 980:23

### 8

**8** [7] - 759:24, 890:6, 903:10, 903:11, 974:2, 978:21
**818** [1] - 980:4

### 9

**9** [10] - 865:21, 865:23, 866:2, 867:7, 881:6, 886:5, 889:5, 910:13, 974:6, 980:14
**90** [1] - 773:25
**902** [1] - 743:22
**903** [1] - 952:3
**911** [7] - 976:21, 977:20, 977:21, 977:24, 978:3, 978:4, 978:7
**914** [1] - 974:5
**917** [4] - 972:18, 972:23, 973:17, 973:25
**919** [1] - 980:6
**93** [2] - 772:1, 945:13
**957** [1] - 980:7
**966** [1] - 980:8
**974** [3] - 980:10, 980:12, 980:13
**976** [2] - 980:14, 980:15
**977** [1] - 980:16
**978** [1] - 980:18
**98.7** [1] - 860:8
**997-2646** [1] - 973:13

**9th** [1] - 910:2

### A

**a.m** [3] - 743:7, 978:5, 979:17
**AA** [3] - 774:12, 774:14, 775:1
**abbreviate** [1] - 940:10
**ability** [1] - 909:6
**able** [12] - 778:8, 778:19, 781:6, 783:16, 803:22, 813:9, 832:4, 836:7, 872:20, 878:5, 909:25, 947:5
**absence** [2] - 804:9, 934:14
**absolutely** [7] - 764:23, 774:17, 833:22, 924:25, 925:1, 925:2, 961:22
**absorbs** [1] - 781:6
**abused** [2] - 884:11, 884:12
**abuses** [1] - 885:16
**abusing** [1] - 884:17
**abut** [1] - 869:15
**accept** [1] - 972:2
**acceptable** [1] - 823:10
**accepted** [1] - 910:8
**accident** [3] - 867:20, 867:21, 886:5
**accompany** [1] - 962:10
**accompanying** [2] - 750:1, 978:25
**according** [6] - 753:19, 761:20, 768:6, 811:17, 862:21, 888:21
**accordingly** [2] - 877:8, 907:8
**account** [3] - 844:17, 853:7, 975:19
**accredited** [1] - 776:20
**accrued** [1] - 758:19
**accurate** [18] - 972:16, 972:21, 973:1, 973:6, 973:11, 973:15, 974:3, 974:25, 975:5, 975:14, 975:19, 975:25, 976:3, 976:6, 977:20, 977:24, 978:3, 978:7
**acknowledge** [2] - 818:12, 876:12
**acknowledging** [1] - 830:4
**acknowledgment** [1] - 815:23
**acquitted** [2] - 962:13, 963:1
**acting** [5] - 874:11, 879:23, 880:21, 905:1
**action** [4] - 810:15, 834:14, 834:18, 834:19
**activity** [3] - 827:8, 850:25, 917:15
**actor** [2] - 879:21, 880:22
**actual** [1] - 945:5
**add** [3] - 803:5, 938:22, 947:10
**addict** [3] - 794:17, 795:3, 909:21
**addiction** [1] - 778:9
**addition** [1] - 977:1
**address** [4] - 779:15, 939:6, 939:10, 939:14
**adjourn** [2] - 939:14, 979:7
**admissible** [4] - 974:8, 976:9, 977:7, 978:22
**admitted** [4] - 967:11, 976:13, 977:12, 979:1
**admonished** [2] - 832:13, 902:2

3

**admonishes** [1] - 843:7
**admonition** [1] - 901:9
**adult** [2] - 805:15, 905:20
**advance** [5] - 747:23, 748:8, 791:14, 880:11, 951:9
**advances** [1] - 821:10
**advice** [8] - 882:6, 901:9, 969:18, 969:25, 970:5, 970:7, 970:9, 970:12
**advise** [5] - 748:8, 965:11, 965:14, 965:16, 965:18
**advised** [2] - 745:7, 950:3
**advising** [2] - 823:9, 888:9
**affect** [1] - 964:24
**affected** [2] - 962:13, 962:19
**affirmatively** [1] - 947:6
**afield** [1] - 902:6
**after-lunch-be-especially-careful** [1] - 876:24
**afternoon** [4] - 919:14, 947:15, 957:18, 957:19
**agenda** [2] - 890:11, 890:17
**Agent** [9] - 747:22, 748:14, 847:19, 848:3, 848:15, 848:20, 849:3, 921:17, 922:2
**agent** [5] - 787:9, 787:10, 849:4, 921:18, 922:2
**agents** [1] - 960:22
**aggressive** [2] - 875:4, 875:7
**ago** [21] - 759:23, 783:11, 790:14, 790:19, 792:18, 793:1, 793:10, 793:12, 794:24, 795:13, 801:19, 806:14, 810:12, 811:12, 811:18, 824:20, 826:6, 827:22, 908:14, 924:20, 938:10
**agree** [17] - 764:25, 801:18, 802:15, 852:19, 856:12, 863:4, 869:4, 875:8, 889:23, 905:12, 938:18, 946:22, 946:24, 948:10, 974:20, 976:17, 977:1
**agreed** [5] - 775:23, 937:6, 972:2, 972:7, 977:15
**agreement** [40] - 786:5, 787:3, 787:4, 787:17, 787:25, 790:10, 790:20, 790:24, 852:16, 878:6, 912:24, 913:2, 913:7, 914:3, 914:10, 942:2, 942:3, 942:8, 942:11, 942:13, 942:23, 943:2, 944:3, 944:15, 945:21, 946:1, 946:6, 946:14, 946:19, 947:13, 947:14, 950:9, 951:15, 952:6, 952:9, 952:11, 957:8, 957:12, 957:14
**agreements** [1] - 971:22
**agrees** [3] - 745:11, 837:10, 914:11
**ahead** [1] - 941:5
**ahh** [12] - 832:15, 833:5, 836:12, 839:7, 839:8, 843:8, 843:12, 844:2, 850:17, 857:15, 861:5, 871:13
**ahum** [1] - 895:15
**aid** [1] - 923:3
**ain't** [15] - 758:9, 760:2, 761:12, 834:1, 842:2, 842:7, 842:14, 869:18, 869:21, 885:6, 885:7, 890:24, 890:25, 891:1, 913:5
**Air** [1] - 837:8

**air** [1] - 872:24
**airline** [2] - 975:15, 975:22
**Airlines** [6] - 974:25, 975:2, 975:6, 975:7, 975:14, 975:21
**Airport** [2] - 805:16, 975:3, 975:4
**Airstrip** [3] - 811:6, 812:3, 812:13
**alcohol** [2] - 774:16, 778:8
**alcoholic** [3] - 907:17, 909:22, 911:6
**alert** [1] - 944:24
**allegedly** [1] - 820:9
**allow** [2] - 777:17, 948:14
**allowed** [8] - 787:11, 789:2, 819:4, 820:22, 820:25, 866:15, 957:9, 961:23
**allowing** [2] - 823:3, 823:7
**alluded** [1] - 822:7
**almost** [4] - 852:14, 908:9, 935:19, 938:16
**alone** [3] - 758:5, 895:13, 903:1
**amended** [1] - 938:11
**amends** [3] - 816:10, 817:3, 818:10
**AMERICA** [1] - 743:3
**America** [1] - 972:8
**American** [1] - 975:19
**amount** [4] - 777:7, 834:25, 937:17, 941:6
**analogous** [1] - 935:12
**Anderson** [7] - 784:14, 785:7, 793:8, 793:9, 795:18, 795:22, 803:16
**Andrea** [2] - 927:18, 927:24
**Angeles** [2] - 956:18, 975:3
**Angelo** [6] - 854:25, 855:1, 855:3, 869:1, 869:2, 958:21
**Angelo's** [4] - 854:24, 886:1, 886:9, 886:11
**anger** [1] - 820:9
**answer** [35] - 755:11, 755:12, 769:5, 777:17, 777:21, 781:11, 781:16, 785:13, 785:15, 786:7, 788:23, 789:6, 789:7, 790:5, 791:4, 794:19, 806:15, 807:3, 807:8, 807:10, 807:13, 825:25, 830:24, 902:6, 905:7, 908:16, 909:7, 909:12, 909:17, 930:17, 951:14, 959:8, 961:10, 962:15, 970:4
**answered** [7] - 791:8, 858:6, 907:12, 908:7, 939:5, 948:25, 965:4
**answering** [5] - 781:13, 787:8, 787:23, 899:9, 902:8
**answers** [5] - 806:16, 806:20, 807:16, 902:3, 902:22
**Anthony** [15] - 748:25, 750:14, 750:17, 839:18, 858:24, 860:20, 860:21, 861:6, 862:17, 863:3, 863:23, 863:25, 864:5, 864:7, 864:15
**anticipate** [1] - 943:19
**anyway** [4] - 818:23, 851:19, 881:8, 885:21
**apart** [1] - 782:25
**apartment** [3] - 784:17, 796:7, 920:19
**apologize** [3] - 876:5, 889:20, 909:9
**apparition** [1] - 797:22
**appealing** [1] - 782:8

**APPEARANCES** [1] - 743:12
**appearances** [1] - 745:1
**application** [2] - 822:4, 936:18
**applied** [1] - 914:18
**applies** [1] - 846:7
**appointment** [1] - 747:14
**appointments** [1] - 920:11
**appreciate** [1] - 879:6
**appreciated** [1] - 797:13
**approach** [9] - 793:22, 799:18, 842:8, 842:15, 876:14, 876:15, 892:5, 908:20, 913:19
**approached** [1] - 912:19
**approaching** [2] - 821:23, 913:21
**approved** [1] - 914:20
**approximate** [1] - 824:4
**April** [7] - 846:22, 847:10, 847:16, 847:24, 848:4, 849:9, 849:16
**argue** [6] - 945:3, 945:16, 945:25, 949:9, 951:25, 952:1
**arm** [3] - 774:21, 775:4, 775:8
**arms** [1] - 953:24
**arrange** [1] - 756:10
**arranged** [1] - 769:14
**arrangement** [3] - 756:19, 768:15, 952:2
**arrest** [1] - 913:16
**arrested** [1] - 860:20
**artists** [2] - 927:11, 927:17
**aside** [2] - 772:15, 778:18
**ass** [1] - 749:20
**assaulted** [1] - 816:12
**assigned** [4] - 975:10, 975:11, 975:12
**assistance** [3] - 772:17, 773:3, 785:6
**assistant** [1] - 972:8
**Assistant** [1] - 743:17
**assisted** [1] - 808:20
**associate** [1] - 940:18
**associated** [1] - 783:12
**associates** [2] - 940:16, 963:11
**assume** [4] - 757:21, 847:21, 934:20, 942:3
**assumption** [1] - 921:7
**assure** [1] - 791:2
**attempt** [7] - 749:25, 778:12, 781:21, 781:23, 792:15, 816:8, 863:2, 914:5, 977:3
**attempted** [7] - 784:7, 785:1, 821:16, 822:22, 829:8, 976:22
**attempts** [1] - 944:7
**attended** [1] - 774:11
**attention** [11] - 828:2, 879:6, 879:10, 881:3, 907:12, 927:25, 928:22, 929:16, 933:11, 953:22, 958:6
**Attorney** [1] - 743:16
**attorney** [8] - 790:17, 912:18, 912:23, 917:14, 972:10, 972:11, 972:12, 972:13
**attorney's** [1] - 941:3
**Attorney's** [1] - 923:7
**attorney-client** [1] - 917:14
**attorneys** [3] - 948:9, 972:9, 974:20

4

**Attorneys** [2] - 743:17, 923:13
**audio** [4] - 751:9, 751:10, 751:21, 764:13
**audios** [1] - 770:6
**audiotape** [1] - 827:24
**August** [6] - 762:1, 762:13, 892:5, 928:1, 953:21, 974:4
**aunts** [1] - 792:21
**authorization** [1] - 849:3
**automatically** [3] - 914:19, 914:20, 915:5
**avenue** [3] - 785:22, 785:25, 786:2
**Avenue** [5] - 743:21, 744:9, 954:9, 976:20, 977:3
**avenues** [1] - 790:25
**average** [1] - 921:5
**avoid** [3] - 876:13, 901:2, 901:3
**awake** [1] - 876:18
**aware** [16] - 782:3, 818:21, 838:18, 838:21, 903:5, 923:3, 926:20, 926:24, 926:25, 927:4, 927:7, 927:10, 928:25, 932:9, 947:12, 967:18
**awhile** [1] - 895:6

## B

**Babylon** [2] - 888:10, 891:21
**back-dooring** [1] - 938:24
**backed** [1] - 861:13
**background** [5] - 782:1, 783:11, 785:4, 785:19, 922:15
**backs** [2] - 840:21, 858:2
**backwards** [1] - 758:23
**bad** [10] - 785:22, 823:13, 892:7, 902:7, 933:9, 948:20, 948:22, 952:16, 952:17
**badge** [6] - 955:4, 955:5, 955:13, 955:17, 955:23, 955:24
**bail** [1] - 812:8
**balls** [1] - 895:21
**bank** [1] - 853:7
**bar** [8] - 786:11, 786:12, 787:1, 819:24, 820:1, 916:12, 917:1, 947:11
**bar)** [1] - 823:17
**bars** [1] - 922:15
**bartender** [2] - 823:2, 823:10
**baseball** [1] - 797:10
**based** [2] - 929:7, 952:24
**basis** [4] - 822:15, 822:21, 917:3, 917:10
**batch** [1] - 932:24
**bathroom** [1] - 874:16
**bay** [2] - 843:24, 845:9
**bear** [1] - 876:4
**beat** [3] - 836:25, 837:1, 837:3
**became** [4] - 783:2, 819:21, 879:21, 914:17
**because's** [1] - 871:4
**become** [3] - 869:22, 869:23, 915:6
**becomes** [3] - 862:25, 878:17, 915:5

**becoming** [1] - 821:20
**beekeeper** [1] - 843:1
**BEFORE** [1] - 743:10
**began** [2] - 826:12, 864:23
**begged** [1] - 814:18
**beginning** [2] - 903:13, 965:21
**begins** [2] - 763:7, 933:13
**behalf** [4] - 812:20, 853:1, 879:20, 939:8
**behind** [2] - 777:11, 777:15
**beings** [1] - 860:8
**belief** [1] - 912:10
**beliefs** [1] - 781:10
**believes** [1] - 787:5
**Bellone** [4] - 888:11, 888:12, 888:17, 889:12
**below** [1] - 752:16
**benefitting** [1] - 845:12
**best** [6] - 771:11, 825:13, 876:7, 876:13, 933:14, 948:23
**better** [6] - 769:17, 770:19, 771:1, 778:9, 783:3, 902:20
**between** [29] - 756:6, 759:4, 761:25, 784:25, 801:11, 803:14, 803:19, 812:2, 815:2, 816:8, 819:5, 819:8, 819:13, 819:14, 824:12, 838:13, 858:21, 874:23, 875:6, 876:1, 883:15, 896:14, 899:12, 912:1, 953:20, 954:3, 971:22, 972:7, 975:20
**Between** [1] - 749:20
**Beverley** [2] - 929:11, 929:12
**beyond** [5] - 902:10, 909:22, 945:7, 967:22, 971:3
**Beznik** [2] - 974:5, 975:10, 975:23
**bias** [3] - 820:10, 820:11, 820:16
**big** [7] - 775:7, 861:19, 861:20, 874:12, 922:25, 936:24, 971:2
**Big** [15] - 752:6, 752:11, 752:13, 752:18, 752:19, 753:7, 753:10, 753:19, 753:20, 758:1, 758:4, 758:9, 772:20, 772:23, 772:24
**billing** [5] - 972:17, 972:22, 973:2, 973:7, 973:12
**bills** [3] - 749:21, 750:1, 825:22
**binder** [3] - 746:5, 750:20, 763:6
**bis** [1] - 820:6
**bit** [11] - 842:18, 848:19, 857:24, 858:16, 868:20, 943:2, 943:7, 945:6, 945:11, 969:12, 979:8
**bitter** [1] - 970:8
**black** [1] - 976:23
**blank** [1] - 833:19
**block** [1] - 829:8
**blood** [1] - 800:11
**BMC** [1] - 743:10
**board** [2] - 975:1, 975:7
**Bocelli** [2] - 927:18, 927:24
**body** [1] - 860:8
**book** [37] - 784:8, 786:5, 790:21, 800:10, 800:16, 800:19, 800:25, 801:2, 801:12, 801:14, 801:16, 801:18,

801:24, 802:1, 802:7, 802:8, 803:6, 803:8, 803:9, 803:23, 815:14, 828:3, 928:2, 942:9, 942:20, 943:14, 943:25, 944:10, 944:17, 945:4, 945:11, 945:18, 946:1, 949:5, 949:15, 952:2
**booking** [1] - 927:18
**books** [8] - 787:11, 799:8, 799:12, 799:22, 799:25, 800:14, 802:17, 802:19
**borrow** [1] - 814:1
**borrowed** [6] - 869:4, 869:6, 964:7, 964:10, 964:17, 964:20
**borrower** [1] - 964:25
**borrowing** [2] - 756:1, 868:24
**boss** [1] - 806:2
**bother** [2] - 775:22, 775:24
**bothered** [1] - 761:19
**bottom** [2] - 845:22, 901:10
**bought** [7] - 808:24, 809:1, 809:25, 810:3, 810:5, 917:15, 956:20
**bounce** [1] - 900:9
**bounced** [6] - 837:19, 837:20, 838:1, 838:3, 903:6, 903:9
**Bova** [1] - 881:19
**boy** [1] - 850:12
**branch** [1] - 950:10
**break** [19] - 745:11, 786:10, 791:12, 791:17, 804:2, 865:16, 865:18, 875:11, 875:15, 876:6, 933:21, 933:22, 933:24, 934:4, 934:11, 953:4, 953:6, 953:19, 957:4
**breaking** [1] - 875:14
**BRIAN** [1] - 743:10
**brief** [5] - 745:9, 786:10, 900:11, 949:18, 950:23
**bright** [1] - 900:3
**bring** [4] - 769:19, 842:20, 871:16, 936:8
**bringing** [4] - 766:4, 766:7, 839:13, 954:22
**brings** [1] - 871:12
**bro** [1] - 759:25
**broached** [1] - 952:20
**Broadway** [2] - 744:1, 744:5
**broken** [1] - 783:15
**Brooklyn** [6] - 743:4, 743:18, 744:14, 747:3, 763:25, 782:7
**brother** [13] - 772:11, 773:3, 774:7, 799:6, 799:22, 802:1, 802:19, 872:11, 872:18, 872:23, 873:2, 874:4, 885:24
**brother's** [2] - 799:25, 885:25
**brothers** [2] - 840:10, 861:4
**brought** [4] - 862:22, 891:16, 931:6, 968:1
**Brownsville** [2] - 932:8, 932:10
**bucks** [1] - 763:21
**buddies** [1] - 867:10
**buddy** [1] - 851:22
**building** [1] - 931:16
**bullshitting** [1] - 861:5
**bunch** [2] - 776:10, 960:8
**Burbank** [8] - 976:19, 976:20, 977:17,

977:20, 978:3, 978:12, 978:15, 978:17
**Bureau** [1] - 950:20
**burn** [1] - 868:8
**burned** [1] - 895:25
**Burton** [1] - 744:13
**business** [33] - 780:12, 780:13, 780:14, 805:23, 805:25, 841:1, 841:2, 841:15, 845:11, 845:17, 845:18, 852:10, 864:24, 871:17, 897:20, 897:25, 898:3, 898:14, 898:20, 898:25, 899:2, 899:16, 899:18, 926:19, 926:21, 927:1, 927:5, 927:8, 927:11, 927:12, 932:11, 967:20, 978:12
**businesses** [2] - 926:17, 966:10
**Butcher** [53] - 748:10, 748:19, 748:21, 749:5, 749:16, 750:8, 751:12, 752:1, 752:10, 752:18, 754:17, 755:6, 755:15, 756:5, 756:9, 756:13, 756:20, 757:5, 757:14, 758:1, 758:4, 758:12, 758:15, 758:22, 758:24, 759:15, 760:8, 760:15, 760:19, 762:7, 762:15, 762:18, 763:20, 767:16, 767:18, 768:8, 768:9, 768:12, 769:15, 769:18, 770:24, 770:25, 771:13, 771:24, 772:12, 772:18, 773:3, 963:24, 963:25, 964:17, 964:20
**Butcher's** [2] - 763:10, 764:2
**button** [1] - 758:11
**buy** [4] - 803:6, 809:17, 810:5, 930:24
**buying** [2] - 810:8, 954:23
**BY** [20] - 746:2, 771:10, 784:2, 790:9, 791:21, 805:6, 818:2, 824:1, 874:2, 879:9, 888:16, 903:4, 908:2, 918:3, 919:13, 953:18, 957:17, 966:21, 967:9, 980:5

## C

**cab** [12] - 812:8, 812:12, 812:16, 812:18, 812:24, 812:25, 813:1, 813:11, 813:17, 813:19, 814:6
**Cadman** [2] - 743:18, 744:13
**California** [26] - 774:2, 774:5, 775:5, 781:8, 782:9, 812:4, 816:16, 817:2, 855:13, 860:4, 915:4, 916:1, 926:8, 926:10, 926:12, 926:14, 926:16, 927:2, 928:20, 929:1, 929:8, 932:6, 935:11, 956:11, 967:1, 976:21
**called-appearances** [1] - 745:1
**Campione** [7] - 883:16, 883:20, 884:1, 884:6, 884:25, 885:22, 886:7
**cannot** [1] - 943:1
**capacity** [1] - 822:19
**Capolino** [57] - 744:1, 746:17, 748:5, 748:8, 748:18, 749:3, 749:14, 749:24, 750:9, 751:11, 752:5, 753:13, 754:16, 755:5, 755:7, 755:13, 756:1, 756:13, 756:24, 757:4, 757:25, 758:8, 758:14, 759:4, 759:8, 760:5, 760:25, 761:2, 762:6, 762:14, 763:10, 766:5, 766:6, 766:8, 766:16, 766:17, 766:25, 767:10, 769:14, 769:22, 770:13, 770:16,

770:23, 771:12, 771:18, 771:19, 771:22, 772:8, 772:11, 773:7, 773:11, 963:24, 964:4, 964:16, 964:20, 972:11, 972:19
**CAPOLINO** [1] - 743:5
**Capolino's** [5] - 755:9, 755:14, 761:20, 772:17, 964:7
**captain** [6] - 806:6, 839:14, 839:15, 874:10, 874:11
**captains** [1] - 863:23
**captured** [1] - 881:6
**car** [8] - 763:19, 765:20, 767:2, 813:21, 920:19, 955:14, 955:18, 955:24
**cards** [1] - 841:15
**care** [10] - 766:6, 766:14, 835:17, 870:12, 870:15, 883:9, 897:18, 914:24, 953:15, 958:21
**careful** [2] - 876:24, 939:1
**cares** [1] - 803:24
**Carlo** [32] - 862:4, 866:6, 866:7, 866:12, 866:19, 866:20, 866:24, 867:5, 867:7, 867:12, 867:16, 867:23, 867:25, 869:15, 870:15, 870:20, 871:10, 871:19, 871:23, 889:22, 889:24, 890:25, 894:3, 894:4, 894:5, 894:17, 894:19, 894:24
**Carmine** [9] - 850:8, 850:9, 850:10, 850:11, 870:20, 872:12, 872:18, 872:20, 872:23
**carry** [3] - 782:8, 792:13, 851:4
**carrying** [1] - 936:24
**case** [21] - 745:1, 786:1, 804:6, 852:22, 860:5, 866:15, 875:18, 877:2, 878:19, 878:22, 879:4, 922:13, 934:12, 936:25, 941:16, 948:7, 950:21, 962:20, 976:23, 979:9, 979:11
**cases** [1] - 901:23
**cash** [8] - 781:18, 782:19, 785:18, 802:22, 852:14, 852:20, 895:20, 897:21
**CAT** [1] - 744:18
**Catapano** [113] - 748:12, 761:25, 762:6, 762:14, 769:22, 769:23, 806:21, 808:12, 828:9, 828:20, 829:15, 829:23, 831:2, 831:12, 832:20, 833:3, 833:11, 833:20, 833:23, 833:25, 834:3, 834:6, 835:9, 835:21, 836:1, 836:12, 836:19, 838:22, 839:6, 839:12, 839:23, 840:1, 840:4, 840:19, 842:5, 842:22, 842:24, 843:2, 843:4, 843:7, 843:15, 843:19, 844:2, 844:5, 844:12, 844:15, 844:18, 844:24, 845:2, 846:10, 847:1, 847:17, 848:4, 849:10, 849:22, 850:6, 850:7, 850:14, 850:21, 851:14, 851:19, 851:24, 852:23, 853:15, 853:17, 854:10, 854:17, 855:12, 855:19, 866:6, 866:20, 868:21, 868:23, 868:24, 869:5, 869:14, 869:17, 869:20, 870:14, 872:2, 874:10, 874:23, 874:24, 875:2, 881:9, 881:20, 881:22, 882:16, 883:15, 883:19, 883:23, 884:5, 884:8, 884:12, 885:3, 885:12, 885:22, 885:24, 886:4,

886:6, 886:8, 886:13, 886:17, 887:7, 887:10, 887:16, 887:20, 905:13, 959:1, 960:2, 964:8, 964:10, 969:16
**category** [1] - 937:12
**caught** [1] - 963:10
**caused** [1] - 749:24
**CD** [2] - 977:24, 978:7
**cellular** [3] - 973:15, 973:22, 973:25
**certain** [15] - 783:14, 823:3, 856:19, 901:12, 902:13, 909:20, 915:5, 929:13, 929:14, 957:24, 965:22, 965:25, 971:22, 971:23, 973:22
**certainly** [15] - 758:20, 788:4, 788:10, 793:18, 806:8, 870:8, 877:7, 937:23, 939:10, 945:8, 945:24, 946:18, 946:22, 951:25, 952:2
**certificate** [1] - 888:6
**chain** [2] - 761:14, 761:22
**chair** [1] - 886:9
**changed** [2] - 783:2, 970:21
**changing** [1] - 766:17
**channel** [1] - 782:2
**chapter** [4] - 803:5, 803:13, 944:1
**charge** [2] - 824:8, 824:10
**charged** [3] - 899:6, 940:15, 940:16
**charges** [5] - 911:23, 912:2, 912:3, 912:4, 975:21
**chart** [1] - 940:11
**chasing** [1] - 835:17
**cheating** [1] - 845:14
**check** [9] - 837:19, 838:1, 851:23, 852:2, 852:6, 852:23, 900:8, 903:9
**checks** [5] - 838:3, 853:4, 853:6, 900:9, 903:6
**chewing** [1] - 751:5
**child** [1] - 778:9
**children** [1] - 792:21
**chime** [1] - 822:12, 833:22
**chimes** [1] - 869:14
**choice** [2] - 777:23, 778:1
**choose** [1] - 949:10
**chose** [2] - 777:22, 780:21
**chosen** [1] - 778:5
**Chris** [1] - 975:22
**CHRISTOPHER** [1] - 743:6
**Christopher** [6] - 744:9, 972:12, 972:24, 973:18, 974:1, 975:9
**chronological** [1] - 762:12
**City** [1] - 825:14
**claim** [2] - 945:4, 945:9
**claiming** [1] - 947:14
**clarify** [1] - 938:7
**clear** [7] - 823:7, 828:16, 853:21, 876:6, 939:1, 941:1, 943:23
**clearer** [1] - 748:3
**clearly** [5] - 754:11, 787:13, 807:18, 850:2, 945:7
**CLERK** [1] - 793:16
**client** [7] - 745:11, 745:12, 804:19, 804:22, 917:14, 935:10, 939:8
**clients** [3] - 946:4, 952:17, 953:2

6

**close** [8] - 755:25, 767:5, 773:17, 814:16, 819:15, 888:12, 904:7, 956:9
**closed** [1] - 785:25
**closer** [1] - 792:3
**closing** [3] - 868:8, 868:12, 945:17
**club** [43] - 757:24, 757:25, 758:24, 805:16, 805:19, 814:1, 814:7, 814:18, 819:5, 819:17, 821:2, 824:18, 825:5, 825:10, 825:12, 825:15, 825:19, 826:2, 826:9, 826:10, 826:12, 826:14, 826:17, 837:6, 837:8, 838:20, 844:1, 844:8, 844:9, 851:8, 858:23, 859:17, 862:24, 865:2, 865:4, 868:10, 868:22, 887:25, 888:5, 905:20, 906:7, 907:4
**Club** [31] - 826:20, 840:11, 840:20, 841:10, 844:7, 852:4, 852:5, 853:23, 854:1, 854:3, 854:6, 854:13, 856:16, 858:12, 858:13, 858:22, 859:10, 859:12, 859:14, 859:16, 859:19, 860:7, 862:12, 862:25, 863:3, 864:1, 864:6, 891:23, 903:17, 903:22, 905:17
**clubs** [4] - 819:11, 819:12, 824:23, 827:8
**co** [1] - 745:6
**CO** [1] - 888:25
**co-counsel** [1] - 745:6
**coattails** [2] - 802:22, 803:3
**cocaine** [5] - 777:24, 867:11, 867:13, 867:14, 936:12
**cocksucker** [3] - 881:15, 881:24, 882:4
**cocounsel** [1] - 935:2
**COGAN** [1] - 743:10
**collaborate** [1] - 795:21
**collaborated** [2] - 795:18, 797:1
**colleague's** [1] - 943:22
**collected** [3] - 868:25, 958:22, 960:7
**collecting** [1] - 807:4, 875:4, 892:1
**Colombo** [8] - 806:2, 806:6, 839:15, 856:16, 966:1, 966:5, 966:8, 966:11
**Colon** [16] - 791:10, 805:3, 823:6, 828:4, 836:6, 862:6, 865:15, 875:9, 875:24, 879:7, 901:6, 901:15, 914:9, 919:4, 971:9, 972:14
**colon** [1] - 821:4
**COLON** [66] - 744:5, 791:11, 791:14, 791:19, 791:21, 791:22, 793:13, 793:20, 793:24, 799:14, 799:21, 805:4, 805:6, 810:22, 812:22, 818:2, 819:25, 820:4, 821:6, 821:15, 821:20, 822:1, 822:6, 822:24, 824:1, 828:1, 828:6, 832:1, 832:3, 836:8, 846:16, 849:18, 856:1, 862:7, 865:17, 865:20, 874:2, 875:10, 875:15, 876:5, 876:12, 879:8, 879:9, 886:23, 888:16, 889:19, 895:5, 901:9, 901:25, 903:2, 903:4, 908:2, 908:9, 908:20, 913:17, 913:19, 913:21, 914:13, 917:4, 917:9, 917:12, 917:18, 918:3, 919:5, 971:10, 980:5
**Colon's** [1] - 876:19
**combined** [1] - 951:14

**coming** [4] - 756:18, 820:15, 863:9, 876:10
**command** [2] - 962:7, 962:8
**comments** [3] - 820:15, 876:6, 888:14
**commit** [2] - 812:14, 880:14, 913:5, 913:9, 913:11, 914:3, 914:5
**committed** [6] - 798:14, 812:11, 853:1, 912:6, 913:2, 935:11
**committing** [2] - 880:12, 913:3
**commonly** [1] - 864:16
**compare** [1] - 964:6
**complaining** [2] - 833:5, 833:17
**complete** [4] - 819:14, 938:11, 938:14
**completeness** [1] - 764:20
**complicates** [1] - 949:1
**compromise** [1] - 951:5
**compromises** [1] - 787:11
**concede** [2] - 765:2, 765:11
**concerned** [5] - 759:22, 761:17, 773:20, 774:15, 876:2
**concerning** [2] - 771:13, 957:7
**concerns** [2] - 822:2, 936:9
**concludes** [1] - 946:10
**concurrence** [2] - 815:23, 849:3
**condition** [2] - 816:9, 816:22
**conditioning** [1] - 872:24
**conditions** [3] - 815:7, 816:10, 816:13
**condo** [3] - 929:5, 929:6, 929:9
**conduct** [1] - 912:14
**confidential** [2] - 850:24, 851:5
**confined** [1] - 902:19
**confirm** [1] - 865:25
**confirmed** [1] - 787:10
**confirming** [1] - 942:8
**conflict** [1] - 903:16
**confused** [2] - 839:25, 858:21
**confuses** [1] - 949:1
**connected** [1] - 859:12
**Connecticut** [5] - 839:24, 857:7, 863:12, 863:13, 863:23
**consented** [1] - 804:22
**consider** [6] - 936:16, 939:25, 943:15, 954:16, 954:17
**considering** [1] - 937:21
**consultant** [5] - 781:22, 781:24, 782:2, 826:24, 863:1
**consulting** [2] - 852:15, 905:19
**Cont'd** [2] - 818:1, 980:4
**cont'd** [1] - 849:19
**contained** [3] - 978:10, 978:16, 978:18
**containing** [1] - 973:15
**contents** [2] - 796:10, 940:12
**context** [4] - 807:11, 824:21, 858:8, 908:19
**continuation** [4] - 750:20, 764:9, 770:9, 901:4
**Continue** [1] - 874:1
**CONTINUE** [1] - 790:8
**continue** [13] - 745:22, 748:17, 768:16, 769:19, 805:3, 845:22, 875:13, 878:15, 879:7, 913:14, 933:21, 943:13,

953:16
**Continued** [12] - 783:23, 786:13, 789:11, 804:24, 817:7, 823:18, 873:6, 900:13, 907:20, 916:13, 917:20, 947:20
**continued** [2] - 759:10, 775:20, 979:17
**CONTINUES** [4] - 784:1, 805:5, 908:1, 918:2
**continues** [5] - 760:3, 761:2, 761:9, 766:9, 767:2
**continuing** [2] - 759:24, 806:22
**continuously** [1] - 902:1
**contraband** [1] - 870:18
**contract** [2] - 822:4, 837:16
**contracted** [1] - 823:5
**control** [1] - 897:23
**convenient** [2] - 933:20, 933:22
**conversation** [98] - 746:9, 746:12, 746:16, 746:21, 746:23, 746:24, 747:10, 747:24, 748:2, 748:9, 748:15, 749:4, 750:6, 753:19, 754:12, 754:19, 755:20, 756:17, 759:4, 759:8, 759:10, 759:17, 760:3, 760:14, 761:25, 762:2, 762:5, 762:13, 762:23, 763:4, 763:7, 764:10, 767:10, 767:12, 767:14, 770:9, 771:12, 771:18, 771:22, 816:15, 824:17, 830:16, 830:20, 830:22, 831:1, 832:7, 836:16, 843:18, 845:6, 845:8, 846:25, 847:3, 849:15, 849:16, 850:3, 850:21, 850:22, 851:11, 853:24, 856:4, 860:13, 875:1, 879:11, 883:18, 886:21, 887:14, 889:11, 889:25, 891:5, 891:9, 896:1, 896:15, 896:16, 900:5, 906:3, 906:6, 906:8, 906:10, 906:13, 906:16, 906:21, 907:11, 908:3, 908:5, 908:6, 922:3, 925:1, 925:5, 928:3, 928:11, 928:17, 928:23, 929:14, 941:13, 953:20, 955:7, 966:22
**conversations** [32] - 747:22, 768:18, 769:1, 771:2, 811:25, 827:7, 827:14, 827:18, 828:8, 828:9, 828:16, 828:24, 846:14, 860:1, 880:8, 886:22, 921:9, 924:7, 924:18, 924:19, 924:24, 928:9, 940:12, 940:20, 941:10, 959:2, 959:4, 959:10, 959:24, 960:2, 960:5, 965:7
**conveying** [1] - 951:8
**convicted** [1] - 963:2
**convince** [1] - 951:17
**cooperate** [4] - 773:23, 910:24, 912:2, 912:12
**cooperating** [5] - 777:8, 781:3, 829:1, 829:3, 910:17
**cooperation** [3] - 773:18, 910:16, 912:24
**cop** [3] - 955:14, 955:17, 955:24
**copy** [14] - 878:5, 878:8, 878:10, 972:16, 972:21, 973:1, 973:6, 973:11, 973:15, 974:3, 974:25, 975:5, 975:14, 975:19
**Corporation** [1] - 826:25
**corporation** [1] - 811:21
**correct** [141] - 749:8, 756:2, 756:14,

760:19, 774:18, 774:25, 777:3, 777:11, 792:8, 792:19, 792:25, 793:2, 794:23, 795:4, 795:16, 796:12, 797:4, 797:13, 797:17, 798:7, 798:11, 798:17, 799:6, 799:9, 801:2, 802:18, 802:23, 803:20, 805:16, 805:21, 806:11, 806:12, 807:18, 807:19, 808:1, 808:13, 808:16, 810:1, 811:6, 811:13, 811:19, 811:21, 811:25, 812:4, 812:13, 812:16, 813:2, 813:22, 814:7, 814:10, 819:21, 824:6, 825:15, 826:14, 827:8, 827:12, 827:19, 828:10, 828:14, 828:17, 829:4, 829:9, 829:11, 831:4, 832:7, 832:22, 833:9, 837:6, 837:8, 839:12, 840:25, 843:20, 849:11, 851:5, 851:25, 853:2, 856:17, 858:5, 858:7, 861:6, 864:1, 864:5, 870:5, 871:11, 872:21, 874:12, 874:16, 879:21, 880:3, 880:4, 880:7, 880:11, 880:19, 881:1, 882:5, 882:8, 882:14, 883:16, 884:6, 887:22, 889:2, 889:3, 889:9, 890:20, 891:10, 893:9, 895:25, 898:7, 898:14, 899:5, 899:16, 905:9, 905:21, 906:4, 909:8, 911:20, 912:7, 913:7, 913:12, 915:18, 918:5, 924:1, 925:2, 925:20, 926:18, 935:4, 935:16, 945:12, 955:18, 956:2, 956:4, 967:2, 967:4, 967:21, 968:4, 968:6, 968:9, 969:11, 969:19, 969:21, 970:13

**correctly** [1] - 941:7
**cosa** [1] - 852:9
**coughing** [1] - 751:5
**counsel** [15] - 745:6, 901:21, 902:25, 942:1, 945:10, 946:17, 948:17, 948:19, 950:1, 952:10, 952:22, 974:9, 976:11, 977:8, 978:24
**counselors** [1] - 776:20
**counted** [1] - 940:21
**country** [2] - 915:7, 932:13
**County** [2] - 911:6, 956:18
**couple** [10] - 746:4, 777:20, 799:22, 806:13, 824:20, 826:6, 827:22, 879:14, 908:12, 954:4
**course** [12] - 784:25, 822:3, 844:18, 844:24, 861:9, 876:19, 879:19, 882:17, 943:16, 946:11, 950:12, 978:12
**Court** [1] - 744:13
**COURT** [1] - 743:1
**court** [9] - 745:1, 790:1, 876:16, 878:2, 903:3, 918:1, 922:19, 924:14, 961:23
**court's** [1] - 777:19
**court-case** [1] - 745:1
**courtesy** [3] - 903:23, 938:10, 938:13
**Courthouse** [1] - 743:4
**courtroom** [4] - 799:3, 803:10, 923:17, 934:18
**cousin** [4] - 849:2, 850:21, 862:22, 870:21
**cousin's** [1] - 755:4
**Covenant** [1] - 800:11
**cover** [1] - 745:6
**covered** [1] - 848:13

**crack** [4] - 777:23, 867:13, 867:15, 867:16
**craft** [1] - 951:5
**created** [1] - 802:17
**credibility** [6] - 822:23, 823:13, 843:16, 934:21, 944:7, 948:8
**credible** [1] - 823:14
**credit** [2] - 887:10, 910:5
**crew** [7] - 840:21, 841:14, 845:14, 860:24, 871:4, 871:6, 932:6
**crime** [25] - 780:16, 797:25, 798:2, 807:11, 812:11, 812:14, 812:20, 825:16, 825:17, 825:20, 825:24, 826:1, 826:3, 826:9, 852:10, 852:13, 879:24, 880:19, 898:17, 912:6, 913:8, 914:5, 914:10, 914:11, 963:11
**Crime** [6] - 785:8, 792:25, 794:23, 806:6, 815:15, 856:17
**crimes** [15] - 852:25, 853:5, 880:2, 880:12, 880:15, 913:3, 913:6, 913:7, 913:9, 913:11, 913:15, 914:3, 914:4, 965:22, 966:1
**criminal** [4] - 911:22, 912:14, 952:8, 957:9
**Cristina** [1] - 972:9
**CRISTINA** [1] - 743:16
**criticizing** [2] - 849:11, 849:13
**cross** [21] - 745:10, 876:19, 909:21, 942:11, 948:18, 951:10, 952:11, 957:7, 957:23, 958:9, 960:21, 960:23, 960:25, 961:5, 961:15, 962:3, 963:4, 963:23, 964:19, 965:6, 965:22
**CROSS** [8] - 746:1, 791:20, 818:1, 918:2, 919:12, 980:3, 980:4, 980:6
**cross-examination** [18] - 745:10, 942:11, 948:18, 952:11, 957:7, 957:23, 958:9, 960:21, 960:23, 960:25, 961:5, 961:15, 962:3, 963:4, 963:23, 964:19, 965:6, 965:22
**CROSS-EXAMINATION** [8] - 746:1, 791:20, 818:1, 918:2, 919:12, 980:3, 980:4, 980:6
**cruise** [1] - 927:1
**Cugini** [10] - 883:24, 884:5, 885:13, 958:6, 958:15, 958:20, 959:11, 966:22, 967:25, 968:8
**Cugini's** [1] - 884:19
**Cujini** [5] - 827:17, 827:18, 855:1, 855:4, 869:2
**CURANOVIC** [1] - 743:6
**Curanovic** [12] - 744:9, 940:15, 972:12, 972:24, 973:18, 974:1, 975:9, 975:11, 975:15, 975:22, 975:25, 976:3
**curling** [1] - 886:12
**current** [2] - 776:15, 810:7
**curtail** [1] - 950:1
**cut** [3] - 845:3, 939:9, 941:12
**cutting** [1] - 885:25
**cuz** [1] - 761:10

# D

**D's** [1] - 838:20
**dad** [14] - 797:5, 828:20, 839:2, 843:19, 860:1, 863:6, 889:25, 890:3, 895:18, 897:8, 898:22, 904:7, 904:8
**dad's** [1] - 819:18
**Dahomey** [1] - 973:13
**dancers** [2] - 819:19, 907:4
**dancing** [1] - 819:19
**data** [1] - 975:14
**date** [20] - 765:19, 774:18, 774:20, 774:23, 774:25, 775:4, 775:6, 775:9, 775:11, 775:16, 775:18, 775:25, 776:3, 821:11, 829:25, 847:10, 864:21, 888:2, 888:3, 975:23
**date's** [1] - 775:8
**dated** [1] - 919:16
**dates** [3] - 796:1, 967:5, 969:13
**David** [1] - 879:12
**days** [21] - 762:2, 775:13, 780:15, 806:13, 811:12, 811:18, 824:20, 826:6, 852:15, 867:11, 908:14, 920:12, 920:15, 920:16, 920:22, 921:5, 929:18, 951:17
**deal** [33] - 756:10, 762:8, 768:8, 769:14, 769:17, 770:19, 770:24, 771:1, 788:20, 840:24, 841:1, 841:2, 841:7, 852:14, 853:4, 862:24, 898:15, 898:20, 899:23, 899:25, 931:4, 932:16, 932:17, 933:8, 933:9, 933:18, 936:25, 946:1, 953:25, 954:13, 956:1, 956:3
**dealer** [2] - 940:17, 940:23
**dealers** [3] - 927:15, 927:17, 956:5
**dealing** [5] - 930:14, 930:18, 931:8, 932:9, 936:11
**dealings** [1] - 784:24
**deals** [1] - 882:11
**dealt** [2] - 932:7, 941:1
**death** [2] - 918:12, 918:17
**debrief** [1] - 921:21
**debt** [1] - 773:2
**December** [1] - 906:4
**decided** [2] - 910:2, 910:6
**decides** [2] - 949:14, 949:15
**deciding** [1] - 874:24
**decision** [5] - 755:8, 786:2, 911:17, 911:18, 911:20
**default** [1] - 948:4
**defendant** [26] - 957:20, 957:24, 958:4, 958:12, 958:16, 958:18, 959:2, 959:10, 959:20, 963:5, 963:10, 963:14, 963:24, 964:6, 964:16, 964:20, 965:7, 965:10, 966:4, 966:7, 966:10, 972:9, 972:10, 972:12, 972:13, 975:9
**Defendant** [4] - 743:21, 744:1, 744:5, 744:9
**defendant's** [5] - 799:15, 799:16, 799:17, 799:24, 943:7
**Defendants** [1] - 743:7

**defendants** [14] - 877:2, 936:22, 937:24, 938:14, 942:10, 942:22, 943:2, 943:23, 944:13, 945:15, 947:9, 962:13, 962:20, 963:1

**defense** [17] - 793:14, 794:4, 800:22, 802:16, 870:2, 901:21, 902:25, 942:1, 945:10, 946:17, 946:23, 948:9, 948:17, 951:6, 952:10, 952:22, 957:12

**Deja** [2] - 826:24, 864:24

**delay** [1] - 953:14

**delivering** [1] - 955:12

**Denise** [3] - 746:25, 776:15, 779:2

**deny** [2] - 882:16, 882:18

**Department** [7] - 911:6, 956:18, 976:19, 977:17, 978:13, 978:15, 978:17

**Department's** [2] - 977:21, 978:4

**departure** [1] - 975:23

**describe** [3] - 826:5, 924:6, 925:23

**described** [1] - 954:9

**describing** [6] - 758:9, 761:18, 761:21, 889:20, 891:5, 935:5

**descriptions** [1] - 955:21

**designed** [2] - 890:17, 935:12

**detail** [6] - 972:16, 972:21, 973:1, 973:6, 973:11, 974:3

**determination** [1] - 909:24

**determine** [1] - 764:19

**devastating** [1] - 822:4

**develop** [2] - 829:2, 851:3

**device** [6] - 830:13, 847:13, 848:8, 919:24, 920:9, 921:12

**devil** [3] - 883:24, 884:5, 884:9

**devoted** [3] - 794:16, 795:2, 798:22

**devoting** [1] - 937:15

**diagnosis** [1] - 916:4

**dialogue** [3] - 874:23, 895:9, 895:22

**died** [4] - 772:25, 918:18, 918:19, 918:23

**difference** [5] - 775:14, 803:19, 803:21, 875:6, 962:25

**differences** [3] - 903:13, 903:15, 935:15

**different** [18] - 767:12, 767:14, 800:2, 803:23, 810:22, 820:5, 820:8, 820:11, 825:18, 836:15, 855:15, 910:6, 912:17, 937:12, 937:14, 940:12, 943:18, 960:22

**differentiating** [1] - 876:1

**difficult** [2] - 832:3, 878:18

**DiGorga** [140] - 743:6, 744:5, 792:7, 792:12, 801:23, 804:1, 805:8, 805:10, 805:13, 806:14, 807:23, 808:18, 808:20, 809:15, 809:25, 810:4, 810:14, 810:19, 811:4, 811:17, 811:24, 812:7, 814:15, 816:16, 817:1, 818:9, 818:21, 819:4, 820:7, 820:14, 821:1, 821:14, 821:23, 821:24, 824:3, 824:23, 825:15, 828:8, 828:9, 828:12, 828:13, 828:14, 828:21, 829:16, 831:9, 835:12, 835:21, 837:16, 838:6, 838:9, 838:13, 840:20, 840:25, 849:11, 849:14, 851:25, 852:2, 852:22, 855:16, 856:12, 856:17,

856:23, 857:1, 857:3, 857:6, 857:12, 859:15, 859:18, 860:14, 860:22, 861:3, 861:13, 861:17, 861:20, 861:22, 862:2, 863:7, 864:10, 864:11, 864:18, 866:21, 866:22, 870:19, 874:3, 875:3, 885:18, 886:15, 887:13, 887:20, 887:23, 888:6, 888:9, 888:18, 888:21, 889:6, 889:8, 891:18, 892:6, 892:7, 892:12, 892:17, 892:22, 893:1, 893:24, 894:3, 894:5, 894:6, 894:9, 894:10, 894:11, 895:14, 895:15, 895:16, 895:17, 896:3, 896:4, 896:5, 896:7, 896:8, 896:10, 896:14, 896:18, 896:20, 896:24, 897:2, 897:4, 897:6, 897:10, 897:11, 897:14, 897:18, 897:25, 898:2, 899:23, 900:8, 901:11, 907:14, 907:18, 958:24, 972:13

**DiGorga's** [5] - 821:2, 822:2, 837:6, 889:2, 906:23

**digress** [1] - 949:19

**direct** [13] - 826:17, 827:21, 901:4, 901:12, 902:12, 908:15, 908:24, 927:25, 928:22, 929:16, 933:11, 953:21, 956:10

**directing** [1] - 958:6

**disability** [1] - 914:18

**disclose** [1] - 948:16

**discovery** [1] - 947:3

**discuss** [15] - 760:15, 780:11, 780:13, 792:19, 793:4, 804:6, 875:17, 923:14, 923:15, 923:16, 934:12, 969:4, 969:5, 979:9

**discussed** [6] - 815:21, 820:12, 880:3, 895:7, 921:22, 975:16

**discussing** [7] - 748:18, 780:16, 801:12, 880:15, 904:23, 907:19, 932:5

**discussion** [5] - 748:24, 871:11, 887:24, 888:5

**discussions** [2] - 811:24, 907:5

**disk** [3] - 938:14, 973:14, 973:19

**dispatchers** [2] - 977:21, 978:4

**display** [1] - 764:8

**dispute** [5] - 940:22, 958:12, 958:15, 958:20, 959:11

**disputing** [1] - 941:1

**disregard** [2] - 780:23, 781:1

**distinction** [1] - 803:14

**distributed** [1] - 932:13

**DISTRICT** [3] - 743:1, 743:1, 743:11

**divorced** [1] - 783:1

**document** [13] - 772:4, 788:17, 788:19, 793:14, 794:11, 794:13, 795:9, 913:23, 943:21, 945:5, 945:8, 950:14, 950:16

**documentation** [1] - 809:21

**documents** [8] - 762:10, 772:1, 787:5, 787:19, 950:13, 961:17, 971:21, 976:13

**dokey** [1] - 846:24

**dollar** [1] - 753:18

**dollars** [9] - 752:1, 753:11, 753:18, 753:21, 768:16, 778:22, 782:13, 814:20, 899:24

**done** [14] - 767:1, 772:14, 773:22, 788:21, 816:11, 836:15, 840:20, 840:25, 844:6, 844:13, 845:13, 893:10, 903:20, 908:9

**door** [8] - 825:21, 904:2, 910:24, 912:9, 912:12, 943:17, 945:8, 950:14

**dooring** [1] - 938:24

**down** [69] - 749:19, 752:13, 753:20, 754:9, 760:24, 768:17, 769:20, 770:14, 796:22, 814:17, 824:18, 824:23, 825:2, 825:5, 825:8, 825:10, 825:15, 825:19, 826:2, 826:4, 826:8, 826:9, 827:1, 827:3, 832:25, 833:11, 835:5, 836:7, 840:11, 841:25, 842:18, 855:8, 856:16, 857:11, 857:24, 858:13, 859:14, 859:18, 860:15, 862:4, 862:7, 862:13, 862:15, 871:25, 872:1, 878:24, 884:8, 885:23, 886:11, 890:23, 893:24, 894:25, 896:3, 896:13, 896:24, 897:8, 897:18, 900:7, 902:4, 906:9, 906:14, 906:17, 908:4, 942:21, 965:16, 966:10, 967:10, 971:15

**drank** [1] - 819:14

**draw** [5] - 792:3, 828:1, 879:10, 907:12, 941:2

**drawing** [1] - 881:3

**drink** [4] - 819:11, 824:11, 824:13, 824:14

**drinking** [1] - 909:12

**drinks** [2] - 814:17, 824:10

**drive** [1] - 954:20

**driver** [1] - 813:19

**drivers** [10] - 812:8, 812:12, 812:16, 812:18, 812:24, 812:25, 813:1, 813:12, 813:17, 814:6

**driving** [5] - 763:9, 763:24, 885:12, 955:2, 955:11

**dropping** [2] - 912:1, 912:3

**drug** [15] - 777:23, 778:1, 778:8, 794:17, 795:3, 882:10, 908:15, 927:15, 927:17, 939:25, 940:16, 940:17, 940:18, 940:23, 956:5

**Drugs** [4] - 785:8, 792:25, 794:23, 815:15

**drugs** [14] - 774:16, 777:22, 812:6, 909:1, 909:6, 909:12, 918:7, 918:10, 918:13, 918:16, 936:11, 940:9, 940:13, 955:24

**drunk** [2] - 784:15, 865:3

**dry** [2] - 776:12, 776:13

**Due** [9] - 827:17, 827:18, 855:1, 855:4, 869:2, 885:13, 966:22, 967:25, 969:8

**duly** [1] - 745:17

**during** [12] - 826:16, 847:21, 876:19, 879:19, 913:13, 922:20, 924:7, 948:18, 952:11, 957:3, 957:7, 960:22

**déjà** [3] - 811:13, 812:3, 812:13

## E

**early** [5] - 780:8, 785:5, 800:5, 800:8,

979:8

**earn** [1] - 782:12
**earning** [1] - 952:7
**ease** [1] - 857:24
**easier** [2] - 877:5, 928:10
**East** [2] - 743:18, 744:13
**EASTERN** [1] - 743:1
**easy** [2] - 879:5, 925:18
**eat** [1] - 824:5
**eating** [2] - 751:5, 814:23
**eeh** [1] - 868:8
**effect** [2] - 758:6, 951:11
**effective** [1] - 915:5
**effort** [2] - 793:11, 944:10
**efforts** [2] - 829:9, 909:24
**eight** [11] - 793:1, 793:10, 793:12, 860:18, 920:4, 920:8, 920:22, 921:6, 921:10, 921:13, 922:21
**eight-month** [1] - 921:13
**eighties** [1] - 926:16
**either** [11] - 764:4, 786:10, 810:15, 833:14, 838:24, 848:10, 857:15, 866:12, 905:20, 925:18, 932:6
**elements** [1] - 856:19
**eleven** [6] - 745:5, 791:12, 791:13, 931:24, 932:5
**eligibility** [2] - 915:8, 915:14
**eligible** [1] - 914:17
**em** [11] - 750:9, 833:18, 833:19, 833:20, 833:23, 833:24, 834:1, 834:2, 834:5, 836:12, 884:25
**employees** [5] - 821:23, 821:25, 822:3, 823:4, 825:22
**encountered** [1] - 841:14
**end** [13] - 756:6, 757:1, 774:16, 780:15, 805:7, 813:9, 813:15, 823:17, 845:19, 845:25, 944:18, 951:15, 956:9
**endeavor** [1] - 917:6
**endeavors** [1] - 898:7
**ended** [5] - 752:2, 773:19, 868:11, 902:5, 946:15
**ends** [2] - 933:4, 933:5
**enforcement** [1] - 863:17
**English** [1] - 955:2
**enter** [1] - 943:10
**entered** [3] - 790:19, 837:15, 952:6
**enterprises** [1] - 898:7
**entertainment** [3] - 871:17, 927:1, 927:5
**entire** [4] - 772:17, 773:3, 824:12, 940:18
**entirely** [2] - 879:1, 952:10
**entitlement** [1] - 915:17
**environment** [1] - 776:13
**especially** [4] - 812:2, 835:13, 876:24, 915:20
**ESQ** [5] - 743:15, 743:21, 744:1, 744:5, 744:9
**Esquire** [4] - 972:10, 972:11, 972:13, 972:14
**essential** [1] - 843:7

**essentially** [5] - 830:4, 840:19, 852:10, 879:20, 907:2
**established** [1] - 937:10
**establishment** [3] - 811:5, 811:18, 852:3
**euphemisms** [1] - 821:22
**evening** [2] - 745:21, 979:12
**event** [4] - 904:6, 922:18, 967:2, 969:10
**events** [2] - 885:17, 911:8
**eventually** [5] - 845:19, 846:3, 869:11, 954:12, 955:15
**evicted** [2] - 779:25, 808:24
**evidence** [15] - 764:9, 764:16, 794:4, 848:21, 848:22, 890:13, 919:16, 941:6, 951:14, 974:8, 976:9, 977:7, 977:12, 978:22, 979:1
**evidence.** [1] - 770:6
**exact** [2] - 864:21, 969:13
**exactly** [14] - 747:9, 756:21, 764:5, 811:11, 818:12, 849:25, 898:15, 898:23, 931:22, 935:23, 938:9, 945:2, 967:13, 967:17
**examination** [22] - 745:10, 933:22, 942:11, 948:18, 949:17, 952:11, 957:1, 957:7, 957:15, 957:23, 958:9, 960:21, 960:23, 960:25, 961:5, 961:15, 962:3, 963:4, 963:23, 964:19, 965:6, 965:22
**EXAMINATION** [16] - 746:1, 784:1, 790:8, 791:20, 805:5, 818:1, 908:1, 918:2, 919:12, 957:16, 966:20, 980:3, 980:4, 980:6, 980:7, 980:8
**examined** [1] - 745:18
**example** [6] - 782:18, 820:6, 866:19, 925:22, 941:12, 956:4
**except** [2] - 778:14, 902:22
**excerpt** [1] - 973:19
**excerpts** [1] - 941:13
**exchanges** [1] - 862:10
**exchanging** [1] - 931:23
**exclusively** [1] - 852:14
**excuse** [8] - 768:24, 776:22, 793:21, 799:16, 800:22, 815:15, 815:19, 921:9
**excused** [2] - 971:14, 971:16
**Exhibit** [37] - 793:14, 794:4, 800:22, 802:16, 846:20, 952:3, 972:6, 972:15, 972:20, 972:25, 973:5, 973:10, 973:14, 973:18, 973:21, 973:23, 974:2, 974:17, 974:24, 975:5, 975:13, 975:18, 975:24, 976:2, 976:5, 976:12, 976:15, 976:23, 976:24, 976:25, 977:13, 977:19, 977:23, 977:25, 978:2, 978:6, 978:8
**exhibit** [14] - 879:13, 944:20, 944:22, 945:2, 945:20, 947:15, 947:16, 947:17, 948:1, 948:15, 948:16, 948:17, 952:20, 974:15
**EXHIBITS** [1] - 980:9
**Exhibits** [8] - 974:7, 976:9, 977:1, 977:6, 978:11, 978:16, 978:19, 978:22
**exhibits** [3] - 974:11, 977:11, 978:25
**exist** [1] - 788:3

**existed** [1] - 942:17
**exists** [2] - 788:4, 788:5
**exotic** [1] - 819:19
**expand** [1] - 769:7
**expect** [1] - 938:3
**expected** [1] - 852:23
**expecting** [6] - 855:19, 889:6, 889:7, 889:8, 889:14, 889:16
**expenses** [2] - 962:1, 962:5
**experience** [2] - 782:1, 782:19
**experiences** [1] - 783:16
**expert** [1] - 798:2
**explain** [3] - 822:17, 909:11, 932:4
**explains** [1] - 901:10
**explored** [1] - 786:2
**exposed** [2] - 852:10, 852:12
**exposing** [1] - 820:5
**exposure** [2] - 820:19, 912:13
**Express** [1] - 975:19
**expressed** [1] - 935:9
**expression** [1] - 925:9
**extend** [1] - 903:23
**extended** [1] - 808:8
**extent** [7] - 787:20, 862:8, 902:18, 938:11, 940:14, 941:7, 950:1
**extort** [4] - 863:2, 864:2, 864:6, 864:8
**extorting** [1] - 863:25
**extortion** [5] - 859:25, 860:22, 863:2, 864:4, 885:13
**extraneous** [1] - 936:17
**extremely** [1] - 779:8
**eye** [1] - 876:21

## F

**F-ing** [8] - 850:12, 856:23, 857:7, 857:16, 860:16, 861:22, 870:18
**F-ng** [1] - 856:24
**face** [4] - 881:24, 882:3, 882:17, 882:18
**facilitate** [1] - 851:4
**facilitating** [1] - 890:16
**facility** [3] - 776:12, 776:17, 776:19
**facing** [1] - 911:22
**fact** [80] - 749:24, 751:18, 752:9, 754:16, 755:19, 756:23, 759:12, 762:13, 763:19, 767:24, 772:11, 772:16, 773:14, 774:20, 774:25, 775:16, 779:24, 780:3, 780:7, 788:16, 788:18, 788:24, 792:24, 795:14, 797:6, 799:3, 799:11, 808:6, 808:20, 810:14, 812:7, 812:10, 814:6, 814:15, 814:21, 820:6, 825:9, 828:19, 829:15, 832:13, 835:2, 838:23, 839:20, 840:20, 841:5, 859:18, 872:11, 880:24, 885:12, 890:9, 891:15, 894:25, 895:1, 896:18, 898:13, 899:3, 905:5, 905:16, 905:17, 907:4, 907:7, 907:9, 912:6, 914:15, 917:4, 918:12, 940:17, 942:8, 943:1, 945:21, 945:22, 946:11, 947:13, 947:18,

950:13, 951:2, 955:9, 957:11, 969:14

**facts** [6] - 835:7, 841:7, 971:22, 972:1, 972:2, 974:21

**fail** [1] - 783:21

**failed** [4] - 810:20, 812:16, 812:18, 909:25

**fair** [12] - 747:2, 753:17, 758:14, 771:11, 811:2, 813:10, 891:25, 920:21, 922:19, 937:4, 937:17, 937:20

**fairly** [4] - 758:7, 773:21, 801:17, 950:24

**faith** [5] - 917:2, 917:10, 948:12, 948:13, 952:1

**fallen** [1] - 782:25

**falls** [2] - 871:15, 837:12

**falsus** [2] - 951:20

**familiar** [8] - 793:25, 795:9, 795:10, 800:25, 841:7, 858:20, 859:13, 926:1

**familiarize** [2] - 794:6, 888:1

**family** [23] - 749:21, 750:1, 750:2, 772:17, 773:4, 779:17, 779:23, 784:21, 784:22, 792:19, 793:4, 798:23, 805:21, 808:6, 815:15, 849:2, 880:6, 890:12, 912:13, 966:1, 966:5, 966:8, 966:11

**Family** [9] - 785:8, 792:25, 794:23, 806:2, 806:6, 827:2, 839:15, 845:23, 856:17

**family'** [1] - 780:11

**family's** [2] - 780:13, 879:25

**far** [11] - 769:16, 773:19, 774:15, 778:11, 784:22, 816:5, 832:17, 880:12, 892:15, 902:6, 950:19

**Fatato** [9] - 936:7, 936:11, 936:15, 936:23, 937:16, 937:22, 938:3, 938:9, 939:23

**father** [59] - 755:25, 766:13, 778:10, 779:23, 780:20, 792:21, 797:4, 797:7, 797:14, 797:15, 797:16, 797:21, 798:23, 802:2, 802:3, 802:8, 802:9, 802:12, 803:20, 805:24, 808:22, 814:23, 818:19, 824:6, 828:8, 832:6, 832:12, 832:13, 849:1, 850:10, 854:21, 870:8, 895:14, 896:23, 898:4, 898:6, 898:13, 898:25, 899:5, 899:13, 899:16, 899:17, 912:12, 958:21, 958:22, 960:9, 960:10, 960:13, 960:18, 960:19, 965:15, 965:17, 965:20, 966:23, 967:4, 968:4, 968:9, 968:12, 970:24

**Father's** [1] - 919:6

**father's** [8] - 766:7, 782:3, 802:22, 843:24, 854:11, 854:18, 854:21, 911:9

**fathom** [1] - 945:11

**faulting** [1] - 942:18

**favor** [15] - 840:5, 840:20, 840:23, 840:25, 857:22, 858:1, 858:7, 858:9, 860:19, 861:19, 861:20, 862:24, 864:14, 895:21, 903:11

**favors** [2] - 845:12, 864:17

**Fax** [1] - 744:15

**FBI** [13] - 787:9, 787:10, 788:7, 841:13, 841:14, 841:22, 863:18, 863:21,

863:22, 921:18, 922:2, 923:7, 923:10

**February** [2] - 801:13, 974:4

**federal** [4] - 866:13, 911:14, 911:19, 956:10

**feds** [8] - 860:20, 861:22, 863:9, 863:11, 863:12, 863:14, 863:16

**Felix** [10] - 860:19, 860:21, 861:6, 862:17, 863:3, 863:23, 863:25, 864:5, 864:7, 864:15

**fellow** [8] - 794:17, 795:3, 810:2, 850:10, 871:21, 890:20, 906:1, 926:3

**felt** [2] - 783:15, 886:10

**few** [14] - 769:11, 774:11, 775:13, 792:18, 794:23, 795:13, 811:12, 811:17, 812:8, 908:14, 934:6, 940:8, 941:14, 967:10

**fiction** [2] - 795:16, 796:18

**fifteen** [2] - 782:16, 930:1

**fifth** [1] - 743:21

**figure** [2] - 847:8, 931:4

**figured** [2] - 904:10, 911:10

**file** [2] - 940:6, 956:21

**fill** [1] - 924:4

**filling** [1] - 872:20

**final** [2] - 938:19, 939:3

**finally** [2] - 796:7, 914:20

**finances** [1] - 825:11

**financial** [1] - 949:14

**fine** [11] - 765:17, 820:15, 821:24, 821:25, 903:2, 935:17, 938:5, 939:5, 944:21, 950:7

**finish** [6] - 803:10, 815:11, 892:25, 936:19, 952:14, 952:15

**finished** [1] - 921:16

**first** [45] - 755:20, 763:15, 766:9, 782:17, 796:6, 800:14, 800:16, 800:19, 801:4, 801:12, 801:14, 802:1, 805:19, 811:8, 821:11, 839:19, 854:1, 863:4, 865:1, 865:2, 865:25, 871:12, 874:20, 874:22, 878:16, 879:13, 884:19, 893:4, 893:8, 906:1, 910:25, 911:5, 919:15, 919:19, 920:18, 925:7, 932:24, 936:9, 945:22, 946:2, 952:3, 968:23, 972:17

**firsthand** [1] - 840:17

**fit** [1] - 783:7

**five** [15] - 753:20, 778:22, 795:23, 810:12, 814:20, 841:25, 883:12, 913:23, 913:25, 920:15, 920:22, 931:14, 933:11, 933:12, 933:16

**fixing** [1] - 868:19

**Flash** [1] - 955:5

**flash** [2] - 955:17, 955:23

**flashed** [1] - 955:4

**Flemmo** [11] - 748:12, 750:17, 760:3, 760:5, 766:14, 766:23, 767:19, 767:25, 768:7, 770:15, 770:16

**flesh** [1] - 788:4

**flight** [2] - 975:1, 975:6

**Flight** [4] - 975:2, 975:8, 975:9, 975:11

**flights** [1] - 975:15

**flipped** [1] - 795:1

**Florida** [1] - 918:18

**fly** [1] - 968:23

**focus** [3] - 878:18, 878:19, 879:4

**focused** [3] - 877:6, 877:8, 878:21

**fold** [2] - 879:24, 879:25

**follow** [1] - 936:3

**followed** [1] - 781:10

**following** [12] - 765:21, 804:9, 820:1, 878:17, 881:7, 921:19, 934:14, 937:14, 974:21, 976:17, 976:20, 977:18

**follows** [2] - 745:18, 977:15

**force** [1] - 911:20

**forceful** [1] - 903:21

**foreclosure** [4] - 808:8, 808:21, 809:16, 810:15

**forget** [5] - 858:22, 896:7, 896:9, 896:11, 943:21

**form** [6] - 769:25, 883:6, 918:15, 959:9, 959:16, 962:21

**formed** [1] - 811:21

**former** [2] - 845:17, 943:22

**formulated** [1] - 944:9

**forth** [1] - 920:18

**forty** [1] - 837:25

**forty-nine** [1] - 837:25

**forward** [1] - 864:5

**Four** [1] - 896:19

**four** [11] - 795:23, 806:22, 814:20, 861:17, 920:16, 921:5, 924:19, 930:23, 931:21, 931:22, 938:14

**frame** [2] - 777:4, 888:19

**frank** [1] - 943:6

**Frank** [6] - 883:15, 883:19, 884:1, 884:5, 975:17, 975:20

**Frankie** [5] - 883:24, 884:2, 884:3, 884:4, 885:14

**frankly** [2] - 803:23, 817:3

**Franzella** [2] - 884:20, 885:15

**FRANZESE** [3] - 743:5, 745:16, 980:2

**Franzese** [84] - 743:21, 769:5, 785:8, 790:6, 791:4, 791:25, 792:15, 792:24, 794:3, 794:19, 794:22, 796:10, 797:4, 797:6, 798:21, 799:1, 799:3, 799:8, 800:12, 802:11, 802:15, 802:16, 802:18, 803:5, 803:14, 803:19, 805:7, 805:9, 812:23, 815:14, 816:4, 843:9, 844:20, 846:21, 850:16, 856:13, 861:21, 863:23, 866:6, 870:12, 878:6, 879:10, 881:9, 881:21, 881:22, 882:2, 883:19, 884:15, 884:25, 885:20, 886:8, 887:23, 895:10, 899:11, 905:7, 908:22, 919:14, 920:17, 920:21, 928:2, 931:25, 936:14, 937:16, 953:19, 957:18, 957:20, 957:25, 958:4, 958:12, 958:16, 958:18, 959:2, 959:10, 959:20, 963:5, 963:10, 963:14, 965:7, 965:11, 966:4, 966:7, 966:10, 972:10

**freaked** [1] - 761:7

**freaks** [1] - 761:20

**free** [2] - 824:5, 941:16

**freedoms** [1] - 963:21

**Friday** [1] - 851:15
**friend** [11] - 783:1, 805:21, 807:4, 807:8, 807:9, 807:12, 807:19, 808:6, 813:13, 849:2, 911:9
**friendly** [3] - 819:21, 820:2, 911:8
**friends** [7] - 783:3, 807:14, 807:21, 819:18, 880:6, 890:13, 912:13
**friendship** [2] - 783:6, 783:19
**front** [9] - 746:6, 758:1, 759:6, 792:20, 794:14, 802:3, 902:15, 922:16, 967:19
**fuck** [15] - 759:25, 761:12, 766:20, 872:3, 874:15, 874:19, 874:20, 884:25, 892:22, 892:23, 894:13, 894:15, 897:7, 897:12, 953:25
**fuckin'** [32] - 756:25, 759:13, 759:18, 760:6, 760:22, 761:5, 761:9, 854:11, 857:13, 861:9, 861:10, 862:2, 874:21, 881:14, 882:3, 882:4, 882:18, 884:9, 884:12, 885:4, 885:6, 887:9, 888:24, 892:10, 892:14, 894:1, 894:7, 894:8, 897:1, 899:25, 900:9, 907:15
**Fuckin'** [1] - 886:8
**fucking** [2] - 759:25, 761:7, 931:15
**full** [1] - 943:18
**fully** [2] - 828:20, 879:14
**fun** [3] - 796:23, 870:22, 870:25
**funny** [3] - 782:20, 783:20, 867:1
**furtherance** [1] - 850:24
**future** [1] - 945:11

## G

**gambling** [2] - 749:5, 749:24
**game** [1] - 843:1
**games** [1] - 797:10
**gangster** [2] - 785:1, 785:2
**gangsters** [1] - 782:4
**Garaufis** [1] - 745:5
**garbage** [3] - 785:1, 785:2, 929:20
**gathered** [1] - 778:22
**gathering** [1] - 890:13
**gear** [1] - 748:9
**general** [7] - 789:2, 832:21, 845:11, 848:7, 848:10, 852:19, 955:21
**generally** [15] - 807:13, 807:20, 813:15, 818:15, 819:16, 848:23, 852:20, 863:17, 869:12, 905:13, 914:22, 921:19, 922:5, 948:3, 962:10
**Genovese** [10] - 827:2, 840:11, 840:14, 840:21, 841:13, 841:14, 860:24, 862:17, 862:23, 863:20
**gentleman** [1] - 761:5
**gentlemen** [9] - 745:20, 804:4, 875:16, 878:15, 934:10, 953:14, 957:6, 971:20, 979:7
**Gia** [1] - 918:4
**Giangrande** [1] - 895:8
**Gioeli** [1] - 808:13
**girls** [10] - 819:19, 820:2, 897:22, 897:23, 899:24, 899:25, 900:4, 900:10,

903:9, 906:25
**give-up** [1] - 954:14
**given** [9] - 837:19, 882:22, 902:21, 912:23, 925:22, 942:1, 948:5, 971:23, 971:24
**glad** [1] - 784:15
**God** [2] - 861:10, 884:8
**gong** [2] - 784:4, 934:1
**gonna** [18] - 842:1, 842:7, 842:14, 850:14, 851:21, 857:16, 861:8, 882:3, 892:6, 892:8, 892:9, 892:13, 896:6, 896:8, 900:3, 955:6
**goodfella** [5] - 798:8, 798:17, 806:11, 807:19, 807:24
**goodfellas** [1] - 807:13
**goodfellow** [7] - 762:18, 762:21, 762:23, 762:24, 768:9, 965:2
**goodfellows** [1] - 782:7
**gotta** [13] - 750:14, 760:24, 768:16, 769:19, 850:15, 851:14, 851:23, 866:25, 887:19, 892:13, 899:22, 899:23
**government** [63] - 765:19, 769:6, 773:10, 773:19, 773:23, 777:9, 781:3, 786:9, 788:6, 788:15, 790:7, 790:20, 790:21, 793:24, 799:16, 802:3, 866:14, 879:20, 880:8, 890:12, 890:17, 910:16, 910:23, 911:3, 911:14, 911:19, 912:9, 912:11, 912:19, 913:5, 913:15, 915:17, 915:23, 919:16, 919:18, 919:21, 924:11, 924:13, 925:5, 927:25, 929:13, 934:25, 935:2, 936:6, 937:6, 938:1, 939:15, 941:4, 942:3, 945:3, 946:5, 947:1, 947:11, 948:14, 948:16, 951:1, 957:8, 957:10, 961:6, 971:20
**Government** [40] - 743:15, 923:9, 944:15, 972:6, 972:15, 972:20, 972:25, 973:5, 973:10, 973:14, 973:18, 973:21, 973:23, 974:2, 974:6, 974:17, 974:24, 975:5, 975:13, 975:18, 975:24, 976:2, 976:5, 976:8, 976:15, 976:23, 976:24, 976:25, 977:5, 977:13, 977:19, 977:23, 977:25, 978:2, 978:6, 978:8, 978:11, 978:16, 978:18, 978:21
**government's** [1] - 935:8
**grace** [1] - 909:23
**Graham** [2] - 764:4, 764:6
**grand** [1] - 854:3
**Grand** [3] - 954:3, 954:9
**Grant** [10] - 839:17, 839:18, 840:10, 858:20, 858:21, 858:24, 859:1, 861:4, 862:2
**granted** [1] - 780:25
**gratitude** [1] - 818:25
**great** [6] - 783:19, 797:14, 797:15, 797:16, 797:21, 939:18
**grew** [1] - 783:19
**group** [3] - 932:12, 955:10, 962:9
**growing** [1] - 779:6
**Guardino** [1] - 749:1
**guess** [15] - 747:20, 750:22, 781:19, 787:2, 802:24, 846:4, 865:12, 896:23,

903:17, 903:20, 910:7, 912:16, 913:4, 920:7, 948:23
**gun** [2] - 956:11, 956:20
**guy** [41] - 748:10, 751:14, 752:10, 758:5, 766:9, 788:1, 834:24, 835:6, 835:17, 836:5, 836:10, 836:13, 839:8, 856:23, 857:13, 859:9, 863:23, 866:22, 866:25, 869:15, 871:7, 871:8, 871:20, 874:10, 874:20, 874:21, 885:4, 885:5, 885:7, 892:7, 894:13, 907:2, 907:15, 907:16, 931:17, 937:3, 939:4, 954:18, 954:19, 954:21
**Guy** [3] - 906:1, 907:2, 907:3
**guys** [54] - 827:2, 829:14, 836:13, 839:7, 839:24, 840:11, 841:8, 841:20, 845:10, 845:16, 850:7, 857:1, 857:2, 857:4, 857:8, 857:20, 858:15, 858:18, 858:22, 859:19, 860:19, 860:22, 860:25, 861:4, 861:6, 861:13, 861:18, 861:21, 861:22, 861:25, 862:17, 862:23, 864:4, 864:14, 869:23, 882:13, 892:8, 892:17, 892:18, 893:2, 893:9, 893:22, 895:12, 904:20, 904:25, 954:4, 954:8, 954:13, 954:17, 954:22, 955:2, 955:3, 955:23

## H

**habit** [1] - 902:7
**habitat** [2] - 906:7, 906:14
**Habitat** [7] - 905:21, 905:22, 906:16, 906:21, 907:1, 907:5, 908:4
**hadda** [2] - 851:17, 851:19
**hair** [5] - 870:12, 870:15, 885:25, 886:9, 886:12
**half** [4] - 939:11, 950:5, 951:17, 953:7
**hall** [1] - 853:15
**hammer** [1] - 942:25
**hand** [1] - 853:3
**handed** [2] - 897:21, 941:25
**handing** [1] - 772:2
**happy** [10] - 766:19, 766:22, 766:23, 768:1, 768:2, 769:23, 784:6, 932:25, 933:24, 938:4
**hard** [3] - 910:22, 944:11, 945:11
**harmed** [2] - 952:24, 952:25
**Harry** [3] - 859:5, 859:9, 861:24
**hates** [2] - 883:24, 884:4
**head** [4] - 825:4, 886:11, 911:25, 924:24
**health** [3] - 914:23, 914:24
**hear** [7] - 751:5, 792:2, 832:3, 832:4, 856:18, 874:21, 878:9
**heard** [17] - 751:8, 754:2, 759:17, 759:20, 760:1, 820:19, 889:2, 924:9, 939:22, 947:8, 950:8, 957:2, 967:18, 967:25, 969:13, 969:16, 969:17
**hearing** [2] - 816:5, 941:7
**hearsay** [1] - 771:20
**heat** [1] - 863:24
**help** [22] - 772:11, 780:10, 783:2,

783:17, 799:23, 808:8, 808:16, 809:6, 809:8, 809:9, 809:15, 810:19, 814:19, 834:7, 838:23, 871:17, 904:8, 907:1, 907:3, 909:22, 911:21
**helped** [5] - 767:6, 807:4, 810:4, 810:14, 918:12
**helping** [1] - 839:2
**hereby** [1] - 972:7
**heroin** [1] - 867:17
**high** [9] - 773:24, 774:3, 813:8, 819:12, 867:5, 867:7, 867:11, 918:21, 918:25
**hike** [2] - 894:23, 894:24
**Hills** [2] - 929:11, 929:12
**himself** [9] - 756:2, 760:14, 762:8, 771:1, 886:17, 886:19, 902:19, 903:24, 944:11
**history** [2] - 952:8, 957:9
**HIV** [6] - 820:5, 820:15, 821:4, 821:25, 822:20, 823:9
**hold** [5] - 812:3, 813:12, 830:3, 845:23, 960:17
**holding** [5] - 829:19, 849:11, 849:14, 905:14, 911:25
**hole** [2] - 756:2, 757:18
**Hollow** [2] - 779:13, 810:8
**Hollywood** [2] - 785:1, 790:25
**home** [8] - 749:21, 776:19, 808:7, 825:22, 833:25, 920:16, 960:19, 967:3
**honest** [1] - 767:19
**honestly** [1] - 911:1
**Honor** [49] - 745:4, 745:23, 764:11, 765:13, 765:23, 769:3, 781:11, 788:17, 791:22, 793:13, 793:22, 799:18, 805:4, 820:11, 822:11, 822:12, 827:25, 876:5, 876:17, 876:20, 878:8, 878:10, 879:8, 888:13, 913:17, 913:19, 919:10, 934:25, 938:2, 939:19, 940:10, 945:1, 945:12, 947:2, 947:7, 947:10, 949:13, 949:23, 951:13, 951:19, 952:14, 953:17, 971:10, 971:13, 972:4, 974:23, 977:10, 979:3
**Honor's** [4] - 765:14, 822:15, 943:5, 949:19
**HONORABLE** [1] - 743:10
**Hood** [2] - 976:20, 977:3
**hope** [2] - 745:20, 937:24
**hopefully** [1] - 936:7
**hopeless** [2] - 794:17, 795:3
**hoping** [4] - 813:3, 813:5, 814:1, 851:22
**hot** [3] - 757:12, 857:13, 860:16
**hour** [3] - 865:17, 902:21, 934:2
**hours** [2] - 937:2, 937:7
**house** [18] - 759:13, 759:18, 776:10, 779:25, 780:3, 780:10, 808:21, 808:24, 809:1, 809:5, 809:17, 809:24, 809:25, 810:3, 810:5, 810:9, 929:3, 971:2
**House** [5] - 784:16, 796:5, 796:6, 816:9, 816:22
**how'd** [1] - 861:25

**human** [2] - 860:8, 860:9
**humm** [1] - 868:4
**Humm** [2] - 842:13, 854:12
**hundred** [13] - 757:2, 760:22, 760:24, 763:21, 769:20, 778:22, 782:13, 782:16, 821:21, 837:25, 884:21, 899:24, 930:1
**hundreds** [4] - 921:8, 921:10, 921:13
**hurt** [4] - 845:19, 845:20, 845:24, 846:3
**hustler** [2] - 852:5, 858:12
**Hustler** [44] - 826:20, 826:24, 827:10, 833:9, 833:12, 833:13, 840:11, 840:20, 841:10, 841:16, 844:7, 846:11, 852:4, 853:13, 853:23, 854:1, 854:3, 854:6, 854:8, 854:13, 855:20, 855:22, 855:24, 856:16, 857:1, 858:13, 858:22, 859:12, 859:14, 859:16, 859:17, 859:19, 860:7, 862:12, 862:25, 863:3, 864:1, 864:6, 864:8, 872:20, 891:23, 903:16, 903:22, 905:17
**Hustler's** [1] - 841:13
**hypothetically** [1] - 949:6
**hysterical** [1] - 761:14

# I

**ice** [2] - 872:16, 872:21
**idea** [10] - 821:10, 841:22, 891:9, 919:20, 919:23, 920:1, 942:16, 962:8, 962:11, 962:18
**identification** [8] - 793:14, 793:18, 794:4, 799:15, 799:24, 800:22, 800:23, 945:13
**identified** [4] - 822:8, 976:23, 976:24, 976:25
**identify** [2] - 783:17, 946:5
**identity** [1] - 961:21
**illegal** [1] - 917:15
**illegally** [1] - 917:7
**immediate** [1] - 938:13
**immediately** [1] - 913:16
**immune** [1] - 846:2
**impeach** [1] - 944:7
**impeded** [1] - 820:7
**implication** [2] - 821:22, 821:24
**implies** [1] - 896:19
**imply** [4] - 898:10, 898:12, 938:23, 942:20
**important** [13] - 769:6, 774:18, 774:20, 775:9, 775:25, 776:2, 783:22, 851:15, 879:3, 879:4, 879:5, 919:1, 937:22
**impress** [1] - 857:20
**impression** [3] - 943:9, 948:12, 949:22
**improper** [3] - 822:10, 946:23, 952:21
**in-between** [1] - 801:11
**inaudible** [1] - 922:10
**incident** [5] - 757:23, 758:9, 758:22, 758:23, 761:18
**including** [1] - 905:20

**income** [1] - 915:14
**incorrect** [1] - 836:23
**incredibly** [1] - 820:18
**incurred** [1] - 975:21
**independent** [1] - 911:20
**INDEX** [1] - 980:1
**indicate** [1] - 951:6
**indicates** [3] - 746:6, 746:9, 795:1
**indict** [1] - 857:16
**individual** [3] - 823:1, 907:2, 963:24
**individual's** [1] - 859:7
**individuals** [8] - 816:11, 838:19, 838:21, 839:20, 841:14, 859:11, 860:8, 880:16
**inferences** [1] - 941:3
**informant** [6] - 850:24, 851:5, 869:22, 869:23, 870:4
**information** [15] - 748:11, 802:2, 802:7, 823:1, 829:2, 939:16, 972:16, 972:21, 973:1, 973:6, 973:11, 978:10, 978:16, 978:18, 978:20
**informed** [1] - 787:2
**ing** [8] - 850:12, 856:23, 857:7, 857:16, 860:16, 861:22, 870:18
**initial** [1] - 945:1
**initiated** [1] - 747:8
**initiates** [1] - 871:11
**initiating** [2] - 850:2, 851:11
**injured** [1] - 816:12
**inquiring** [1] - 947:12
**inquiry** [3] - 788:6, 942:4, 942:24
**instance** [2] - 827:10, 828:20
**instead** [4] - 901:13, 902:16, 910:9, 918:22
**instigating** [1] - 891:14
**instruct** [6] - 877:8, 948:15, 951:13, 952:5, 957:11, 957:12
**instructed** [2] - 780:25, 787:13
**instructing** [1] - 970:17
**instruction** [6] - 788:18, 789:1, 848:1, 952:25, 957:3, 971:25
**instructions** [1] - 848:7
**insurance** [1] - 914:24
**intend** [4] - 813:12, 822:9, 938:2
**intended** [1] - 821:11
**intensively** [1] - 878:18
**intent** [4] - 813:5, 813:8, 813:25, 814:4
**intention** [2] - 813:1, 880:14
**intentional** [1] - 820:19
**intentions** [2] - 851:7, 881:1
**interaction** [1] - 811:4
**interest** [4] - 835:12, 835:14, 890:11, 899:7
**interested** [4] - 835:15, 890:15, 890:16, 906:17
**interject** [1] - 876:6
**International** [2] - 975:3
**Internet** [2] - 897:4, 979:10
**interrupt** [3] - 876:19, 933:25, 934:6
**interrupted** [2] - 934:9, 935:21
**intervened** [2] - 862:19, 862:21

**intimate** [1] - 821:20
**intimidate** [1] - 866:22
**introduce** [2] - 765:10, 948:15
**introduced** [5] - 765:7, 765:18, 765:23, 911:7, 927:13
**introduces** [1] - 891:8
**introducing** [2] - 765:24, 850:20
**invest** [1] - 899:2
**invested** [1] - 898:6
**investigation** [6] - 788:16, 851:4, 879:19, 913:13, 913:14, 960:22
**investment** [4] - 898:13, 898:22, 899:5, 899:10
**involve** [1] - 872:25
**involved** [30] - 755:22, 761:13, 826:20, 855:16, 861:23, 863:10, 863:14, 863:16, 864:18, 864:19, 864:20, 885:22, 890:8, 898:4, 898:11, 905:19, 906:20, 909:23, 913:15, 926:17, 926:25, 927:4, 927:7, 927:10, 927:14, 927:16, 927:18, 941:9, 966:7
**involvement** [1] - 863:11
**involving** [3] - 827:18, 872:18, 940:13
**irrelevant** [2] - 822:21, 940:1
**Island** [5] - 779:11, 780:5, 825:12, 826:13, 905:22
**isolated** [1] - 819:12
**isolation** [1] - 819:15
**issue** [11] - 787:21, 788:12, 820:5, 824:2, 829:22, 843:23, 939:10, 944:24, 947:2, 950:8, 951:12
**issues** [2] - 792:21, 901:21
**items** [1] - 976:20
**itself** [2] - 749:11, 765:14

## J

**jail** [7] - 808:22, 819:10, 839:2, 958:12, 958:16, 960:19, 963:14
**jammed** [1] - 851:16
**January** [6] - 967:11, 967:13, 967:16, 972:17, 973:2
**jean** [1] - 897:2
**jeans** [1] - 897:3
**jeopardize** [1] - 963:21
**jerks** [1] - 857:7
**jet** [1] - 970:25
**JF** [2] - 772:1, 793:20
**JF-8** [1] - 793:21
**JFK** [4] - 805:16, 811:8, 975:3, 975:8
**Jim** [4] - 836:14, 839:8, 859:3, 861:23
**Jimmy** [1] - 751:16
**job** [2] - 872:20, 873:3
**Joe** [208] - 807:4, 808:18, 808:24, 809:1, 809:6, 809:8, 809:9, 809:25, 810:4, 810:8, 812:17, 813:3, 813:5, 814:2, 814:10, 814:13, 817:4, 818:9, 818:11, 820:7, 820:9, 824:17, 824:23, 825:5, 825:15, 827:4, 827:7, 827:14, 828:9, 828:12, 828:21, 829:16, 829:23,

831:3, 831:7, 831:9, 831:13, 832:10, 834:7, 834:11, 834:13, 835:5, 835:9, 835:12, 835:21, 836:4, 836:9, 837:23, 838:6, 838:9, 838:10, 838:12, 838:13, 838:14, 838:18, 838:20, 838:22, 839:1, 840:20, 840:25, 842:15, 843:8, 843:10, 843:15, 843:19, 843:24, 845:9, 845:14, 845:16, 845:20, 846:2, 846:6, 846:8, 849:11, 849:14, 850:1, 850:7, 850:8, 850:12, 851:7, 851:9, 851:15, 851:21, 851:25, 852:2, 852:22, 854:22, 855:9, 855:16, 856:12, 856:17, 857:12, 857:16, 857:20, 857:25, 858:7, 859:15, 859:18, 860:1, 862:21, 862:22, 862:25, 863:6, 863:9, 864:10, 864:11, 864:18, 865:8, 865:9, 866:21, 866:22, 867:4, 868:2, 868:3, 869:8, 869:10, 869:23, 870:2, 870:21, 872:5, 872:7, 874:3, 874:14, 874:15, 874:19, 874:24, 875:3, 885:8, 885:9, 885:18, 885:21, 886:21, 891:3, 891:7, 891:9, 891:12, 891:13, 891:14, 891:17, 891:24, 892:2, 893:24, 894:24, 895:24, 896:10, 897:6, 897:10, 897:11, 897:13, 897:14, 897:15, 898:2, 898:5, 898:6, 898:8, 898:14, 898:24, 899:1, 899:2, 899:4, 899:6, 899:12, 899:13, 899:17, 899:22, 900:7, 901:11, 903:8, 904:9, 904:17, 904:18, 904:20, 905:1, 905:4, 905:6, 905:9, 905:12, 905:13, 905:19, 906:2, 906:6, 906:14, 907:6, 907:7, 907:18, 958:21, 958:23, 958:24, 960:8, 960:9, 967:20, 970:11
**Joe's** [2] - 843:23, 907:3
**Joey** [8] - 755:21, 755:25, 893:1, 893:2, 893:7, 894:1, 894:6
**JOHN** [4] - 743:5, 743:5, 745:16, 980:2
**John** [51] - 743:21, 744:1, 746:16, 747:11, 747:13, 748:5, 748:13, 748:20, 753:22, 756:12, 759:4, 761:8, 761:20, 768:22, 769:14, 771:12, 771:18, 772:8, 785:8, 792:15, 792:24, 794:22, 796:10, 797:6, 798:21, 802:16, 805:9, 815:14, 816:4, 832:15, 842:3, 850:16, 857:9, 859:3, 860:14, 860:15, 866:6, 870:12, 874:16, 874:18, 883:19, 890:5, 907:16, 936:14, 963:24, 972:9, 972:11, 972:19, 975:2
**John's** [1] - 768:10
**join** [3] - 778:13, 936:18, 946:16
**joint** [3] - 885:25, 892:10, 894:8
**joke** [6] - 775:7, 775:15, 775:20, 775:25, 776:5, 776:9
**jokes** [1] - 776:2
**joking** [1] - 871:3
**JOSEPH** [1] - 743:6
**Joseph** [24] - 744:5, 792:7, 801:23, 804:1, 805:8, 805:10, 805:12, 806:14, 807:23, 808:20, 809:15, 810:14, 810:19, 811:4, 811:17, 811:24, 812:7, 814:15, 816:16, 817:1, 818:21, 819:4, 828:14, 972:13
**Joseph's** [1] - 819:17

**JUDGE** [1] - 743:11
**Judge** [27] - 745:5, 765:16, 771:7, 777:19, 788:14, 791:11, 810:22, 819:25, 820:17, 822:1, 822:25, 823:3, 828:6, 846:16, 849:18, 856:2, 889:20, 908:20, 937:11, 937:18, 939:5, 944:6, 962:22, 966:13, 966:19, 967:22
**judge** [13] - 765:2, 780:22, 799:14, 875:10, 895:5, 901:2, 917:12, 938:17, 938:19, 938:23, 946:8, 946:13, 951:12
**juice** [1] - 756:25
**July** [6] - 759:4, 762:3, 879:11, 881:3, 883:21, 892:4
**jump** [1] - 882:2
**jumps** [1] - 842:5
**June** [20] - 743:6, 746:10, 748:6, 750:24, 751:1, 758:21, 758:22, 759:3, 759:9, 806:17, 910:2, 941:12, 973:7, 974:9, 975:20, 976:11, 977:8, 978:24, 979:17
**JUNIOR** [1] - 745:16, 980:2
**junkie** [1] - 818:19, 818:21
**junky** [1] - 933:9
**Juror** [2] - 876:20, 876:21
**jurors** [1] - 877:5
**Jury** [3] - 745:15, 875:20, 979:14
**jury** [72] - 743:11, 745:2, 745:7, 745:14, 764:8, 765:22, 780:23, 780:25, 786:1, 788:18, 791:17, 792:20, 802:4, 804:9, 804:23, 805:1, 805:12, 807:18, 812:10, 818:3, 818:5, 823:4, 828:1, 845:15, 847:3, 848:21, 853:20, 856:7, 856:24, 858:14, 859:17, 859:20, 860:11, 860:12, 866:5, 869:21, 876:17, 878:13, 882:21, 883:14, 888:2, 901:6, 902:14, 903:14, 911:2, 914:2, 934:3, 934:14, 943:9, 943:12, 945:16, 945:25, 946:10, 948:2, 948:15, 949:3, 949:9, 950:3, 950:22, 950:25, 951:8, 951:14, 951:17, 951:21, 952:5, 952:17, 953:1, 953:4, 953:9, 953:12, 967:18, 967:19

## K

**keep** [15] - 748:2, 748:15, 767:5, 804:7, 829:12, 843:24, 845:9, 845:10, 875:17, 876:21, 879:16, 880:1, 895:21, 934:13, 979:8
**keeping** [1] - 868:11
**keeps** [1] - 860:13
**Kennedy** [1] - 975:2
**kENNETH** [1] - 744:1
**Kenneth** [1] - 972:11
**kept** [6] - 767:17, 773:24, 861:11, 868:18, 869:9, 904:24
**key** [1] - 825:21
**kicked** [1] - 779:24
**kid** [6] - 758:10, 784:19, 881:10, 881:14, 881:24
**kiddin** [1] - 759:24
**kidding** [5] - 752:19, 753:10, 757:8,

14

766:8, 766:11
**kill** [1] - 861:8
**kind** [15] - 748:9, 778:3, 778:4, 783:15, 784:23, 796:21, 819:12, 829:18, 863:17, 880:1, 880:23, 894:10, 913:8, 914:21, 961:3
**kinda** [1] - 893:18
**kinds** [1] - 870:17
**knock** [2] - 760:24, 768:16
**knocked** [1] - 754:9
**knocking** [3] - 910:23, 912:9, 912:11
**knowing** [1] - 829:13
**knowledge** [7] - 824:23, 825:13, 840:17, 859:24, 860:3, 865:7, 978:20
**known** [14] - 797:7, 805:12, 808:3, 818:15, 831:9, 863:15, 943:4, 944:2, 946:19, 957:13, 963:25, 971:21, 975:1, 975:6
**knows** [6] - 823:5, 874:8, 889:16, 947:10, 962:15, 962:16

## L

**LA** [1] - 911:5
**laboring** [1] - 936:25
**lack** [1] - 883:4
**ladder** [1] - 930:9
**ladies** [12] - 745:20, 804:4, 838:4, 838:9, 875:16, 878:15, 903:7, 934:10, 953:14, 957:6, 971:20, 979:7
**language** [3] - 758:16, 829:18, 951:5
**large** [1] - 922:24
**Larry** [5] - 930:24, 931:2, 931:6, 931:7, 931:10
**Larry's** [1] - 931:12
**last** [11] - 790:3, 827:22, 830:15, 849:15, 882:22, 884:21, 902:9, 902:21, 936:7, 938:25, 944:1
**lasted** [2] - 830:17, 950:24
**late** [2] - 759:25, 943:21
**laughing** [1] - 782:23
**laughs** [4] - 881:12, 884:9, 886:7, 889:7
**law** [1] - 863:17
**lawyers** [4] - 901:23, 902:21, 934:16, 957:12
**LAX** [5] - 975:4, 975:8, 976:1, 976:4, 976:7
**lax** [3] - 904:8, 904:9, 904:24
**lazy** [3] - 834:15, 834:16, 834:22
**lean** [2] - 871:15, 871:19
**Lear** [1] - 970:25
**learn** [8] - 771:23, 772:10, 772:16, 773:1, 882:12, 938:15, 959:14, 959:17
**learned** [5] - 950:15, 951:10, 969:21, 970:18, 970:20
**learning** [1] - 776:14
**least** [17] - 769:16, 789:2, 808:21, 821:7, 823:3, 852:23, 865:17, 901:4, 935:24, 937:2, 937:7, 939:7, 939:11,

940:21, 940:23, 945:15, 954:4
**leave** [10] - 745:5, 758:5, 777:15, 803:9, 808:25, 809:24, 810:10, 909:14, 943:8, 949:15
**leaves** [6] - 875:20, 875:23, 934:18, 948:22, 949:7, 979:14
**led** [1] - 931:17
**leet's** [1] - 800:7
**left** [16] - 746:3, 773:16, 773:17, 777:11, 784:16, 792:14, 796:6, 809:5, 810:9, 812:4, 813:11, 824:2, 869:8, 931:19, 943:12, 950:22
**legally** [1] - 916:5
**legitimate** [3] - 872:15, 926:19
**lend** [10] - 807:5, 807:6, 813:3, 813:5, 818:14, 960:7, 960:8, 964:11, 964:25, 965:1
**lending** [1] - 819:1
**length** [1] - 793:4
**lent** [5] - 818:23, 835:19, 854:22, 898:24, 964:18
**less** [4] - 763:5, 768:17, 953:1
**letting** [2] - 904:1, 928:15
**Lewicki** [10] - 747:23, 748:7, 748:14, 847:19, 848:3, 848:15, 848:20, 849:3, 921:17, 922:2
**lie** [4] - 843:12, 883:10, 883:11, 951:23
**lied** [3] - 882:7, 883:7, 883:8
**life** [38] - 775:1, 775:10, 776:1, 776:4, 777:2, 778:5, 778:7, 778:13, 779:24, 780:21, 781:3, 781:5, 781:6, 781:17, 782:25, 783:2, 783:13, 783:15, 783:21, 784:5, 784:23, 785:12, 791:2, 794:17, 795:3, 797:12, 845:25, 852:10, 853:1, 880:19, 883:7, 909:13, 910:3, 910:7, 911:11, 957:20, 961:24
**lifestyle** [1] - 782:3
**lifetime** [1] - 803:15
**light** [3] - 820:6, 820:17, 944:6
**lights** [1] - 900:3
**likely** [1] - 955:6
**limine** [4] - 939:24, 940:2, 940:4, 941:8
**limit** [1] - 823:2
**limited** [1] - 790:25
**LIND** [28] - 743:21, 780:22, 787:25, 804:19, 822:11, 936:3, 936:6, 936:19, 936:21, 937:11, 938:5, 938:17, 938:23, 939:18, 946:13, 946:22, 948:19, 948:22, 959:8, 959:16, 959:25, 962:21, 965:3, 966:19, 966:21, 967:6, 967:9, 971:5
**Lind** [5] - 788:2, 938:8, 941:8, 967:24, 972:10
**Lindenhurst** [7] - 825:7, 826:14, 826:15, 844:8, 844:10, 868:10, 887:25
**line** [137] - 749:12, 750:6, 752:5, 752:17, 753:4, 753:6, 755:1, 756:4, 756:24, 757:11, 759:12, 759:16, 759:24, 761:12, 788:16, 806:20, 806:22, 807:1, 810:22, 823:16, 832:14, 832:25, 833:11, 833:12, 833:17,

835:24, 836:12, 841:25, 843:25, 845:17, 845:22, 849:17, 849:19, 850:2, 850:4, 850:6, 855:8, 856:22, 857:12, 860:18, 861:22, 869:14, 871:10, 871:11, 874:8, 874:9, 874:14, 874:20, 875:12, 881:6, 882:2, 883:23, 884:8, 885:3, 885:20, 885:23, 886:4, 886:5, 886:6, 887:7, 887:16, 888:11, 888:22, 889:5, 889:6, 889:7, 890:3, 890:5, 890:6, 890:23, 891:8, 891:12, 892:4, 892:22, 892:23, 892:25, 893:9, 893:24, 894:1, 894:2, 894:3, 894:4, 894:5, 894:6, 894:9, 894:10, 895:10, 895:14, 895:15, 895:17, 896:3, 896:5, 896:8, 896:17, 896:18, 896:24, 897:2, 897:3, 897:6, 897:18, 899:22, 901:10, 903:10, 903:11, 904:6, 906:22, 907:14, 909:9, 909:21, 929:25, 930:24, 931:14, 931:21, 931:22, 931:24, 932:19, 933:3, 934:6, 935:19, 943:7, 944:14, 953:22, 954:9, 954:19
**lines** [10] - 900:7, 900:8, 900:10, 908:16, 908:23, 929:14, 929:17, 931:24, 932:5, 932:19, 932:22, 933:11, 933:16, 967:10
**list** [3] - 843:17, 939:25, 940:7
**listed** [1] - 973:22
**listen** [15] - 755:11, 756:25, 760:21, 768:24, 806:25, 881:21, 887:16, 887:18, 895:16, 895:17, 921:23, 921:25, 922:9, 923:20, 925:7
**Listen** [2] - 757:1, 897:22
**listened** [1] - 751:3, 925:4
**listening** [2] - 882:13, 925:8
**listing** [2] - 975:1, 975:7
**literally** [1] - 940:20
**live** [11] - 776:14, 777:10, 784:5, 784:16, 784:17, 809:20, 823:4, 914:19, 926:10
**lived** [9] - 779:17, 795:23, 796:6, 798:4, 808:25, 929:1, 929:5, 929:6, 929:9
**lives** [1] - 783:7
**living** [14] - 774:6, 776:10, 776:17, 776:19, 779:9, 779:13, 779:24, 780:3, 780:4, 783:9, 784:19, 809:19, 872:23, 920:17
**load** [2] - 954:20, 954:22
**loan** [42] - 748:18, 749:4, 749:16, 749:25, 751:25, 752:9, 752:13, 753:18, 753:20, 754:17, 757:19, 758:15, 758:19, 758:21, 760:15, 762:25, 763:11, 768:10, 771:13, 771:23, 771:24, 772:12, 772:16, 835:20, 838:13, 838:16, 869:8, 869:10, 874:18, 898:11, 898:22, 899:6, 899:7, 899:19, 899:20, 899:21, 964:24, 965:14, 966:8, 967:19, 969:18, 970:18
**loan-sharking** [4] - 965:14, 966:8, 969:18, 970:18
**loaned** [1] - 835:21

**loans** [5] - 748:21, 757:4, 767:18, 869:12, 898:16
**loansharking** [1] - 798:11
**loath** [2] - 893:2, 901:21
**locate** [1] - 878:5
**location** [5] - 763:10, 954:10, 973:22, 976:22, 977:3
**look** [31] - 746:15, 752:4, 752:5, 755:1, 763:14, 763:15, 764:24, 772:3, 781:6, 781:19, 782:7, 792:12, 794:5, 794:9, 800:23, 828:12, 836:10, 865:25, 879:12, 888:1, 891:8, 895:11, 903:12, 906:21, 907:14, 913:22, 919:20, 948:19, 952:16, 952:17
**looked** [2] - 904:23, 955:14
**looking** [10] - 746:21, 772:25, 802:22, 833:18, 847:10, 851:24, 878:24, 901:6, 911:4, 948:22
**IORETTA** [1] - 743:15
**Lorimer** [1] - 764:5
**Los** [2] - 956:18, 975:3
**lost** [2] - 752:23, 782:25
**lotta** [1] - 857:13
**Lou** [15] - 752:6, 752:11, 752:13, 752:18, 752:19, 753:7, 753:10, 753:14, 753:19, 753:20, 758:1, 758:4, 758:9, 772:20, 772:23
**Lou's** [3] - 752:22, 753:13, 772:24
**loud** [1] - 879:16
**lousy** [1] - 933:2
**loving** [2] - 794:16, 795:2
**luck** [1] - 814:17
**lunch** [8] - 865:16, 865:19, 875:16, 875:19, 876:24, 877:9, 878:17, 878:21
**luncheon** [1] - 877:10
**luxury** [1] - 779:24
**lying** [14] - 753:23, 754:3, 754:6, 775:15, 881:14, 881:23, 881:24, 882:4, 882:8, 882:25, 883:3, 883:4, 945:25
**LYNCH** [1] - 743:15

# M

**machine** [1] - 872:16
**machines** [1] - 872:21
**mad** [6] - 770:13, 770:16, 770:18, 772:24, 820:9
**mafia** [1] - 794:16
**Mafia** [4] - 795:2, 852:9, 853:1, 853:5
**main** [1] - 859:19
**maintain** [1] - 978:15
**maintained** [2] - 978:11, 978:18
**major** [2] - 902:9, 937:1
**mammoth** [1] - 937:17
**man** [14] - 755:21, 758:16, 758:24, 769:15, 780:20, 782:25, 794:16, 794:17, 795:2, 795:3, 806:8, 806:10, 890:20, 896:7
**managed** [1] - 927:17
**manager** [2] - 905:20, 907:16

**Manhattan** [5] - 824:23, 824:25, 825:4, 825:13, 826:17
**manifest** [2] - 975:1, 975:7
**manner** [1] - 914:24
**manuscript** [2] - 792:15, 943:22
**map** [1] - 973:21
**March** [11] - 771:14, 771:16, 772:8, 773:14, 828:2, 829:24, 830:5, 919:16, 920:6, 921:10, 973:16
**MARIE** [1] - 743:16
**marijuana** [6] - 930:2, 932:11, 935:6, 936:12, 941:1, 955:11
**MARION** [1] - 744:9
**Marion** [1] - 972:12
**mark** [2] - 793:17, 799:14
**Marked** [1] - 799:19
**marked** [14] - 793:14, 793:19, 794:3, 794:5, 799:24, 800:21, 801:5, 919:15, 945:13, 974:14, 976:14, 977:25, 978:8, 979:2
**marketing** [2] - 785:3, 785:4
**marshals** [5] - 787:6, 787:22, 788:7, 942:2, 950:18
**Marshals** [2] - 878:6, 950:10
**Mary** [1] - 927:1
**Massachusetts** [3] - 840:12, 841:8, 864:15
**material** [2] - 791:23, 938:16
**matter** [12] - 745:4, 789:3, 823:12, 832:9, 832:10, 856:15, 864:10, 937:14, 944:17, 944:18, 949:1, 953:15
**matters** [1] - 936:8
**meals** [2] - 814:16, 814:22
**mean** [51] - 751:9, 752:21, 753:12, 761:10, 766:5, 766:6, 766:19, 766:20, 793:7, 796:13, 806:22, 807:2, 807:8, 807:9, 807:12, 823:14, 825:21, 826:24, 835:14, 836:4, 836:9, 848:24, 851:1, 853:8, 867:13, 868:9, 869:20, 877:1, 880:21, 898:2, 901:15, 902:16, 904:11, 904:16, 904:18, 907:18, 909:15, 909:19, 924:11, 924:25, 930:7, 931:1, 938:17, 938:23, 951:7, 958:23, 958:25, 960:18
**meaning** [18] - 752:18, 753:7, 755:21, 756:4, 757:5, 757:14, 757:17, 760:19, 767:25, 773:6, 834:13, 843:8, 845:9, 854:21, 862:15, 869:2, 869:22, 874:16
**means** [3] - 901:16, 931:20, 962:8
**meant** [12] - 825:8, 901:18, 901:19, 903:14, 903:15, 904:17, 909:20, 913:13, 930:8, 931:20, 932:15, 933:6
**mechanical** [1] - 744:17
**media** [1] - 979:10
**Medicaid** [7] - 914:14, 914:17, 914:25, 915:4, 915:8, 915:21, 915:22
**Medicare** [5] - 914:20, 915:2, 915:9, 915:21, 915:22
**medicare** [1] - 915:1
**meet** [17] - 747:11, 778:19, 805:17, 836:14, 839:9, 840:1, 844:25, 848:15,

848:20, 848:23, 851:16, 851:19, 851:22, 885:15, 921:17, 923:13, 927:24
**meeting** [30] - 747:7, 747:13, 747:17, 748:5, 748:8, 749:4, 750:21, 757:18, 771:17, 774:12, 774:15, 775:1, 829:23, 830:2, 830:4, 830:15, 830:16, 848:3, 848:4, 848:5, 848:14, 848:23, 867:25, 919:25, 921:12, 921:16, 921:19, 922:4, 922:6, 922:7
**meetings** [2] - 957:24, 958:3
**member** [3] - 797:24, 798:17, 808:1
**members** [3] - 841:13, 912:13, 963:11
**memory** [1] - 925:3
**men** [3] - 776:10, 776:12, 776:17
**men's** [1] - 776:19
**mention** [20] - 749:11, 751:22, 801:23, 805:7, 805:9, 822:25, 824:17, 833:9, 833:12, 833:14, 833:16, 861:10, 878:20, 885:18, 886:15, 887:13, 887:20, 889:11, 899:19, 941:21
**mentioned** [7] - 798:22, 802:9, 802:21, 820:4, 824:2, 878:16, 931:12
**mentions** [2] - 751:14, 899:15
**messages** [4] - 963:13, 963:16, 963:20, 966:4
**met** [15] - 776:15, 776:22, 821:12, 841:19, 841:20, 850:10, 861:1, 865:1, 865:4, 920:10, 921:22, 922:2, 926:15, 930:12, 970:24
**Mexicans** [15] - 930:4, 930:6, 930:9, 930:10, 930:11, 930:12, 930:15, 930:18, 931:25, 932:1, 932:6, 932:12, 954:23, 955:1, 955:11
**Michael** [65] - 748:12, 761:25, 762:6, 762:14, 766:21, 767:6, 767:19, 767:25, 768:7, 768:9, 769:22, 769:23, 770:13, 774:9, 799:1, 799:3, 799:8, 799:22, 800:12, 802:17, 803:5, 803:14, 803:19, 806:21, 828:19, 832:10, 832:23, 833:10, 835:16, 835:18, 835:19, 835:21, 839:18, 841:20, 842:2, 851:6, 851:8, 852:8, 858:20, 860:1, 862:22, 866:6, 868:23, 869:5, 869:7, 870:21, 875:2, 883:19, 887:2, 887:3, 892:25, 893:7, 895:15, 958:21, 958:25, 959:1, 960:2, 960:7, 960:11, 960:17, 964:8, 964:10, 969:16
**Michael's** [1] - 807:6
**Michigan** [4] - 836:14, 839:8, 839:21, 968:23
**mid** [2] - 969:19, 969:21
**mid-seventies** [2] - 969:19, 969:21
**middle** [4] - 746:25, 761:19, 933:23, 934:1
**might** [17] - 763:1, 778:17, 783:2, 788:8, 789:3, 811:7, 823:9, 823:13, 825:17, 856:18, 877:4, 904:7, 943:13, 946:18, 948:6, 969:12, 979:11
**Mike** [49] - 748:10, 748:18, 748:21, 749:5, 749:16, 751:12, 751:25, 752:9, 752:10, 752:18, 753:7, 753:18, 754:17,

755:15, 756:5, 756:9, 756:13, 756:19, 757:5, 757:14, 757:25, 758:4, 758:12, 758:15, 758:22, 758:24, 759:15, 759:17, 760:15, 760:19, 762:7, 762:15, 763:10, 763:20, 768:12, 769:2, 769:15, 769:18, 770:24, 770:25, 771:13, 771:24, 772:12, 772:18, 773:2, 834:5, 893:1

**mike** [2] - 792:3, 832:4
**mind** [7] - 804:7, 875:17, 876:4, 931:13, 934:9, 934:13, 979:8
**mine** [2] - 783:1, 836:25
**minute** [8] - 771:6, 772:15, 876:14, 925:25, 931:23, 938:25, 953:7, 968:23
**minutes** [5] - 830:17, 865:18, 868:1, 875:13, 934:6
**misimpression** [2] - 943:12, 950:22
**misled** [1] - 950:25
**Miss** [6] - 764:24, 878:9, 901:22, 953:16, 971:12, 974:15
**missed** [1] - 781:9
**missing** [2] - 804:17, 804:20
**mission** [1] - 880:11
**misspeak** [1] - 938:17
**mistake** [1] - 763:2
**mistrusted** [1] - 829:4
**mob** [1] - 798:15
**mobster** [2] - 879:23, 879:24
**mobsters** [1] - 852:13
**model** [2] - 897:22, 899:25
**modeling** [1] - 837:17
**modus** [3] - 935:11, 955:22, 955:24
**moment** [8] - 774:14, 776:3, 847:23, 909:21, 910:7, 910:8, 967:6, 979:3
**moments** [1] - 783:11
**money** [121] - 749:8, 749:25, 751:18, 754:1, 754:8, 755:2, 755:15, 756:1, 760:4, 766:7, 772:25, 773:4, 777:6, 778:17, 779:1, 779:5, 779:19, 784:16, 807:6, 808:19, 812:15, 813:3, 813:5, 813:13, 813:18, 814:1, 814:10, 814:13, 814:16, 816:12, 818:20, 818:23, 819:1, 825:10, 829:5, 829:6, 829:7, 829:13, 832:11, 834:25, 835:2, 835:18, 836:5, 836:10, 836:25, 838:8, 838:12, 838:18, 838:23, 844:14, 844:17, 844:23, 845:16, 846:10, 854:11, 854:18, 854:21, 854:22, 855:10, 855:11, 855:12, 855:19, 857:2, 857:5, 858:16, 862:25, 868:10, 868:11, 868:13, 868:17, 868:18, 868:19, 868:24, 868:25, 869:4, 869:6, 869:8, 874:19, 875:4, 881:8, 881:9, 889:11, 889:13, 896:13, 896:20, 896:22, 896:25, 897:7, 897:15, 897:16, 898:6, 898:24, 899:4, 925:19, 931:15, 932:25, 933:18, 944:3, 944:16, 952:7, 957:9, 958:22, 959:6, 959:15, 959:21, 959:23, 960:3, 960:6, 960:7, 960:11, 960:20, 964:4, 964:7, 964:10, 964:17, 964:19, 964:25
**month** [9] - 759:5, 759:23, 760:22,

760:25, 763:4, 763:5, 797:2, 864:22, 921:13
**months** [16] - 795:23, 796:7, 888:18, 888:21, 888:24, 920:4, 920:8, 920:22, 921:5, 921:6, 921:10, 922:21, 933:13, 938:10, 938:16
**Moody** [1] - 859:5
**Mooney** [2] - 859:9, 861:24
**Moosie** [1] - 751:14
**morning** [8] - 745:2, 745:11, 745:19, 745:20, 791:25, 792:1, 921:20, 979:16
**mortgage** [2] - 779:25, 838:24
**most** [4] - 775:9, 775:25, 865:3, 905:13
**mostly** [1] - 796:19
**moth** [1] - 881:23
**mother** [28] - 761:14, 761:21, 778:10, 780:7, 780:11, 780:12, 780:18, 784:24, 792:21, 808:7, 808:16, 808:20, 808:24, 808:25, 809:5, 809:16, 809:24, 810:4, 810:9, 810:10, 810:14, 810:19, 838:23, 839:2, 850:12, 886:9, 886:11, 896:25
**motherfucker** [1] - 881:23
**motion** [5] - 780:25, 939:24, 940:2, 941:8, 941:17
**motions** [2] - 940:4, 941:18
**motivation** [1] - 945:17
**motive** [3] - 820:16, 942:20, 943:1
**mouth** [1] - 889:2
**move** [26] - 778:11, 780:22, 796:8, 810:4, 812:22, 823:15, 826:20, 826:22, 834:8, 834:11, 834:13, 835:25, 846:16, 856:1, 886:23, 892:10, 894:10, 903:1, 914:12, 915:6, 917:18, 930:25, 931:15, 939:20, 941:23
**moved** [4] - 777:2, 778:5, 778:21, 926:15
**movie** [5] - 926:20, 927:8, 942:20, 944:16, 946:7
**moving** [4] - 829:9, 839:5, 891:14, 930:9
**MR** [128] - 745:23, 746:2, 764:13, 764:23, 765:7, 765:13, 765:23, 766:2, 769:3, 771:6, 771:10, 773:13, 777:19, 780:22, 781:11, 784:2, 787:17, 787:25, 788:14, 789:8, 789:10, 790:9, 791:8, 791:11, 791:14, 791:19, 791:21, 791:22, 793:13, 793:20, 793:24, 799:14, 799:21, 804:19, 805:4, 805:6, 810:22, 812:22, 818:2, 819:25, 820:4, 821:6, 821:15, 821:20, 822:1, 822:6, 822:11, 822:24, 824:1, 828:1, 828:6, 832:1, 832:3, 836:8, 846:16, 849:18, 856:1, 862:7, 865:17, 865:20, 874:2, 875:10, 875:15, 876:5, 876:12, 876:14, 876:16, 879:8, 879:9, 886:23, 888:16, 889:19, 895:5, 901:9, 901:25, 903:2, 903:4, 908:2, 908:9, 908:20, 913:17, 913:19, 913:21, 914:13, 917:4, 917:9, 917:12, 917:18, 918:3, 919:5, 936:3, 936:6, 936:19, 936:21, 937:11, 938:5,

938:17, 938:23, 939:18, 945:1, 945:19, 946:8, 946:13, 946:22, 947:7, 947:10, 948:19, 948:22, 951:12, 951:19, 951:22, 951:25, 952:19, 953:6, 959:8, 959:16, 959:25, 962:21, 964:12, 965:3, 966:19, 966:21, 967:6, 967:9, 971:5, 971:7, 971:10, 980:5
**MS** [136] - 745:4, 745:9, 745:13, 747:25, 764:11, 764:16, 764:19, 765:2, 765:5, 765:9, 765:16, 769:24, 771:20, 773:12, 776:6, 776:25, 777:13, 777:16, 778:24, 779:3, 786:10, 787:2, 787:9, 787:16, 787:19, 788:10, 788:22, 802:5, 802:13, 803:11, 804:12, 804:14, 809:10, 809:13, 810:17, 810:21, 818:6, 819:2, 819:22, 820:17, 820:24, 821:7, 830:23, 839:3, 841:23, 870:9, 878:5, 878:8, 878:10, 883:5, 888:13, 890:21, 900:11, 901:2, 901:8, 901:12, 902:12, 904:14, 915:11, 915:15, 915:24, 916:6, 916:9, 918:8, 918:14, 919:2, 919:7, 919:10, 919:13, 920:24, 925:13, 932:2, 933:23, 934:3, 934:8, 934:23, 934:25, 935:8, 935:16, 935:19, 935:23, 936:1, 936:18, 936:20, 938:2, 938:7, 938:21, 939:19, 939:24, 940:7, 940:10, 940:22, 940:25, 941:10, 941:18, 941:24, 942:7, 942:16, 943:5, 944:5, 944:21, 947:8, 948:8, 948:11, 949:6, 949:10, 949:12, 949:18, 949:21, 950:5, 950:8, 952:13, 953:17, 953:18, 956:24, 957:17, 962:19, 962:14, 966:13, 966:16, 967:22, 971:3, 971:13, 971:18, 972:4, 972:6, 974:12, 974:17, 974:23, 976:15, 976:18, 977:10, 977:13, 977:16, 979:3, 979:6
**music** [2] - 927:11, 927:16
**must** [6] - 772:13, 866:18, 893:10, 893:11, 914:5, 948:21
**musta** [1] - 861:25

## N

**N.Y** [4] - 743:22, 744:2, 744:6, 744:10
**nailed** [1] - 869:18
**naked** [1] - 900:1
**name** [37] - 751:14, 781:18, 782:19, 783:11, 785:19, 800:2, 800:10, 805:10, 811:6, 811:7, 811:8, 811:10, 811:13, 811:16, 815:25, 822:25, 837:13, 839:19, 854:8, 855:24, 856:23, 858:20, 860:10, 860:12, 861:10, 866:7, 872:11, 884:21, 888:11, 893:18, 918:4, 931:6, 931:12, 943:22, 944:11, 961:24, 975:16
**named** [5] - 859:9, 906:1, 907:3, 926:3, 931:10
**names** [10] - 799:11, 799:23, 858:21, 858:23, 859:7, 859:20, 859:21, 859:23, 860:6, 860:8
**narrow** [2] - 902:3, 902:19
**narrowly** [3] - 769:6, 781:16, 905:8

17

**NASH** [72] - 743:17, 747:25, 764:16, 764:19, 765:2, 765:5, 765:9, 765:16, 769:24, 771:20, 773:12, 776:6, 776:25, 777:13, 777:16, 778:24, 779:3, 786:10, 787:2, 787:19, 788:10, 802:5, 802:13, 803:11, 809:10, 809:13, 810:17, 810:21, 818:6, 819:2, 819:22, 820:17, 820:24, 821:7, 830:23, 839:3, 841:23, 870:9, 883:5, 890:21, 900:11, 901:2, 901:8, 901:12, 902:12, 904:14, 915:11, 915:15, 915:24, 916:6, 916:9, 918:8, 918:14, 919:2, 919:7, 920:24, 925:13, 932:2, 942:7, 942:16, 943:5, 944:5, 944:21, 947:8, 950:8, 957:17, 959:19, 966:13, 966:16, 967:22, 971:3, 971:18

**Nash** [4] - 764:25, 901:22, 943:20, 972:9

**nature** [1] - 796:9

**near** [3] - 805:16, 821:4, 978:19

**nearby** [2] - 847:19, 847:22

**nearly** [1] - 967:17

**necessarily** [3] - 807:19, 898:11, 924:23

**necessary** [4] - 764:20, 765:3, 765:12, 961:13

**need** [11] - 766:2, 769:5, 791:18, 808:18, 816:21, 876:15, 878:18, 903:12, 905:7, 945:16, 957:2

**needed** [5] - 749:8, 749:25, 826:17, 907:1, 964:4

**needless** [1] - 901:4

**needs** [4] - 787:13, 788:24, 866:23, 939:22

**negotiated** [1] - 769:16

**neighborhood** [2] - 750:11

**nephew** [11] - 836:22, 836:25, 837:1, 837:10, 837:14, 837:19, 838:1, 838:9, 903:7, 903:8

**nephew's** [1] - 837:13

**nervous** [2] - 886:10, 960:12

**neutral** [1] - 942:24

**never** [26] - 778:19, 780:12, 782:16, 786:5, 801:1, 801:6, 809:5, 813:9, 814:13, 829:5, 838:6, 843:17, 843:19, 866:14, 867:20, 868:11, 894:5, 904:25, 905:24, 918:24, 922:11, 926:19, 945:14, 946:1, 946:9, 952:19

**nevertheless** [1] - 818:23

**NEW** [1] - 743:1

**new** [4] - 778:13, 915:6, 938:15, 961:21

**New** [25] - 743:4, 743:18, 743:22, 744:2, 744:6, 744:10, 744:14, 747:10, 773:16, 816:17, 825:14, 846:12, 862:3, 880:20, 915:4, 918:18, 920:17, 920:19, 926:14, 926:15, 928:13, 928:14, 930:13, 975:2

**news** [1] - 939:16

**next** [34] - 750:19, 759:5, 761:2, 763:4, 778:17, 783:23, 786:13, 789:11, 804:24, 817:7, 822:6, 823:18, 832:14,

833:16, 861:17, 873:6, 885:3, 894:7, 897:3, 900:13, 907:20, 908:8, 915:13, 916:13, 917:20, 920:8, 921:19, 935:19, 937:9, 938:3, 947:20, 954:9, 968:11, 974:16

**Neza** [7] - 974:5, 975:10, 975:12, 975:15, 975:23, 976:3, 976:6

**ng** [1] - 856:24

**nice** [1] - 875:18

**Nicky** [1] - 881:19

**night** [8] - 761:8, 761:19, 891:22, 894:6, 918:21, 937:16, 939:17, 939:23

**nine** [4] - 837:25, 869:14, 909:9, 909:10

**nineties** [4] - 774:1, 800:5, 800:8, 800:19

**nobody** [6] - 845:1, 872:3, 874:7, 889:16, 894:25, 911:25

**noise** [2] - 751:5, 922:15

**non** [2] - 838:24, 942:3

**non-payment** [1] - 838:24

**non-publicity** [1] - 942:3

**nondisclosure** [1] - 822:22

**none** [3] - 776:20, 791:2, 927:9

**nonEnglish** [1] - 955:10

**nonpayment** [2] - 779:25, 810:15

**noon** [1] - 937:8

**North** [1] - 780:4

**nostra** [1] - 852:9

**note** [3] - 804:17, 804:20, 828:3

**notebook** [1] - 976:25

**noted** [3] - 745:1, 794:22, 820:11

**notes** [4] - 922:6, 960:21, 961:1, 961:3

**nothing** [26] - 766:14, 783:10, 816:3, 831:15, 839:1, 842:8, 842:14, 842:15, 853:12, 855:18, 855:21, 855:22, 857:22, 874:5, 890:24, 890:25, 891:1, 891:2, 906:8, 909:22, 938:15, 950:17, 966:16, 971:5

**notice** [8] - 875:25, 878:20, 902:25, 937:2, 937:7, 937:24, 938:13, 943:18

**notoriety** [1] - 802:23

**November** [1] - 973:17

**nowhere** [5] - 760:2, 761:12, 784:16, 796:8, 825:4

**nuanced** [1] - 970:8

**number** [23] - 856:22, 883:9, 883:10, 919:22, 920:1, 920:23, 922:19, 922:20, 922:23, 953:21, 967:19, 972:18, 972:23, 973:8, 973:12, 973:17, 973:25, 974:4, 974:15, 975:10, 975:11, 975:12

**numbers** [2] - 828:5, 973:3

**numerous** [2] - 828:7, 828:8

## O

**o'clock** [1] - 761:8

**oar** [1] - 936:25

**object** [7] - 765:11, 765:12, 888:13, 947:16, 951:1, 959:8, 962:21

**objected** [1] - 935:2

**objecting** [2] - 765:4, 901:14

**objection** [60] - 747:25, 764:11, 764:15, 765:15, 769:24, 771:20, 773:12, 776:6, 776:25, 777:13, 777:16, 778:24, 779:3, 786:8, 787:8, 787:23, 802:5, 802:13, 803:11, 809:10, 809:13, 810:17, 810:21, 818:6, 819:2, 819:22, 822:5, 822:10, 822:12, 822:16, 823:15, 830:23, 839:3, 841:23, 870:9, 883:5, 888:13, 890:21, 901:5, 902:24, 904:14, 915:11, 915:15, 915:24, 916:6, 916:9, 917:19, 918:8, 918:14, 919:2, 919:7, 920:24, 932:2, 959:16, 959:25, 962:14, 964:12, 965:3, 967:22, 971:3

**obligation** [2] - 948:16, 951:2

**obligations** [1] - 788:12

**observe** [1] - 876:23

**obtained** [1] - 787:5

**obtaining** [1] - 907:3

**obvious** [1] - 864:17

**obviously** [2] - 756:11, 880:2, 937:19, 945:1, 945:15

**occasion** [4] - 748:8, 814:6, 956:6, 956:7

**occasions** [2] - 808:22, 810:15

**occupancy** [1] - 888:6

**occupied** [2] - 825:23, 826:11

**occur** [1] - 958:3

**occurred** [12] - 804:9, 879:11, 896:13, 896:14, 928:18, 934:14, 958:13, 958:16, 967:21, 968:6, 968:8, 977:4

**October** [1] - 775:1, 910:12, 910:13

**Odessa** [9] - 776:8, 776:10, 784:16, 796:5, 796:6, 815:1, 815:4, 816:9, 816:22

**OF** [3] - 743:1, 743:3, 743:10

**offered** [1] - 899:24

**offering** [3] - 764:12, 764:13, 974:10

**offhand** [2] - 847:7, 925:25

**Office** [1] - 923:7

**office** [2] - 923:13, 950:10

**often** [9] - 747:22, 812:6, 819:5, 848:15, 876:8, 880:9, 883:8, 920:1

**oftentimes** [1] - 922:10

**okey** [1] - 846:24

**okeydoke** [1] - 846:24

**old** [3] - 755:21, 867:11, 896:7

**older** [1] - 799:6

**omnibus** [1] - 951:20

**once** [27] - 753:4, 754:15, 754:16, 754:24, 760:15, 770:13, 770:23, 773:22, 781:5, 785:18, 788:15, 810:13, 810:24, 813:8, 819:7, 839:1, 846:25, 848:2, 856:18, 887:8, 925:4, 930:12, 937:12, 938:18, 943:20, 943:22, 969:1

**one** [97] - 757:23, 766:4, 771:6, 774:2, 775:14, 776:24, 781:2, 781:7, 787:5, 791:22, 795:6, 799:25, 800:7, 800:14, 801:4, 801:6, 801:9, 801:10, 803:5, 803:6, 803:13, 803:23, 808:7, 814:6,

815:7, 816:10, 816:13, 819:10, 824:16, 825:7, 829:12, 834:18, 841:15, 844:8, 849:17, 850:2, 850:4, 854:1, 856:22, 866:14, 871:4, 875:24, 878:21, 884:12, 885:17, 885:24, 889:24, 891:8, 894:6, 897:18, 902:9, 907:5, 913:17, 914:14, 919:5, 926:19, 927:25, 928:14, 930:24, 931:17, 931:25, 932:1, 936:13, 937:2, 938:6, 938:11, 938:12, 940:16, 941:11, 941:13, 941:21, 944:11, 944:14, 944:19, 945:23, 946:2, 947:16, 948:6, 951:18, 952:24, 954:12, 954:19, 954:21, 954:22, 954:24, 955:21, 969:17, 972:15, 974:24, 975:16, 976:23, 977:19, 978:1, 979:3

**ones** [5] - 813:21, 863:25, 888:23, 902:10, 932:6

**ongoing** [1] - 860:13

**open** [14] - 745:1, 790:1, 804:7, 826:12, 868:11, 875:17, 876:16, 902:5, 918:1, 928:2, 934:13, 945:8, 979:8

**Open** [2] - 878:2, 903:3

**open-ended** [1] - 902:5

**opened** [4] - 805:19, 825:12, 868:12, 950:14

**opening** [1] - 868:11

**opens** [1] - 943:17

**opera** [1] - 927:23

**operandi** [3] - 935:11, 955:22, 955:25

**operates** [3] - 849:21, 849:24, 850:5

**operation** [4] - 848:8, 907:7, 907:14, 907:19

**operative** [1] - 913:25

**operators** [2] - 977:21, 978:4

**opinion** [1] - 869:18

**opportunity** [3] - 936:14, 939:8, 939:9

**opposed** [1] - 897:15

**options** [2] - 802:24, 843:14

**oral** [1] - 837:16

**order** [10] - 762:12, 822:21, 851:4, 872:14, 880:6, 905:17, 940:18, 943:24, 945:18, 955:12

**orders** [1] - 905:1

**ordinary** [2] - 950:11, 978:12

**organization** [1] - 874:12

**organize** [1] - 791:23

**organized** [16] - 780:16, 797:24, 798:2, 807:11, 825:16, 825:17, 825:20, 825:24, 826:1, 826:3, 826:9, 852:9, 852:13, 880:19, 898:16, 963:11

**Ori** [7] - 926:3, 926:13, 926:22, 926:23, 927:12, 928:14, 929:9

**Orie** [4] - 953:20, 954:16, 955:22, 956:11

**original** [1] - 954:22

**originally** [1] - 753:17

**Orlando** [2] - 973:4, 973:9

**otherwise** [6] - 750:4, 803:6, 804:12, 887:19, 951:7, 979:10

**outside** [1] - 828:12

**outstanding** [2] - 751:25, 752:9,

753:20, 771:24, 772:12, 773:2

**outta** [3] - 892:23, 897:7, 897:12

**overlooked** [1] - 950:18

**overreacted** [1] - 832:13

**overrule** [2] - 870:10, 962:23

**overruled** [6] - 748:1, 810:23, 904:15, 920:25, 925:14, 964:14

**Overruled** [1] - 870:7

**owe** [8] - 752:20, 753:11, 814:15, 814:20, 814:22, 814:24, 896:4, 896:22

**owed** [9] - 754:1, 772:25, 818:13, 824:3, 835:2, 835:17, 838:8, 838:18, 904:21

**owes** [6] - 751:11, 834:24, 836:5, 836:10, 896:5, 896:20

**owing** [2] - 751:14, 751:16

**own** [16] - 755:24, 760:7, 762:7, 762:8, 762:15, 766:24, 768:15, 769:21, 770:14, 770:24, 770:25, 773:4, 784:8, 886:17, 909:6, 910:1, 911:2, 916:11

**owned** [2] - 811:5, 894:9

**owner** [5] - 811:18, 811:23, 825:23, 871:14, 905:20

**owners** [1] - 841:16

**owns** [2] - 894:7, 906:1

# P

**p.m** [1] - 977:22

**page** [88] - 749:12, 750:6, 751:16, 752:4, 752:16, 752:24, 753:2, 755:1, 755:20, 755:21, 756:23, 757:13, 758:8, 759:12, 761:2, 763:8, 783:23, 786:13, 789:11, 795:1, 804:24, 806:18, 806:20, 806:22, 817:7, 823:18, 831:4, 832:25, 835:24, 854:3, 854:5, 854:7, 854:9, 855:4, 855:8, 856:22, 857:12, 860:17, 860:18, 861:17, 865:25, 871:10, 873:6, 879:13, 881:4, 881:5, 881:6, 882:2, 883:23, 885:3, 885:20, 886:4, 887:8, 887:16, 888:22, 889:5, 889:22, 890:3, 890:23, 891:8, 892:4, 894:2, 895:10, 896:17, 896:24, 900:13, 903:10, 906:4, 906:22, 907:14, 907:20, 908:22, 908:23, 909:9, 916:13, 917:20, 928:5, 928:22, 929:16, 930:23, 933:12, 947:20, 950:5, 953:22

**pages** [2] - 937:18, 941:15

**paid** [16] - 771:23, 772:11, 772:17, 773:2, 782:14, 812:14, 812:17, 812:20, 814:13, 829:6, 838:6, 853:6, 898:21, 958:19, 959:3, 959:5

**pain** [1] - 749:20

**pants** [1] - 922:17

**papers** [1] - 887:9

**paperwork** [1] - 868:7

**paragraph** [33] - 899:10, 913:22, 913:25, 914:1, 972:15, 972:20, 972:25, 973:5, 973:10, 973:14, 973:21, 973:23, 974:2, 974:6, 974:24, 975:13, 975:16, 975:18, 975:24, 976:2, 976:5, 976:8,

977:5, 977:19, 977:23, 977:25, 978:2, 978:6, 978:8, 978:10, 978:14, 978:17, 978:21

**pardon** [3] - 791:7, 807:10, 830:21

**park** [1] - 767:4

**parking** [5] - 767:2, 884:13, 884:14, 885:15, 885:19

**parole** [4] - 963:6, 963:10, 963:17, 963:20

**paroled** [2] - 967:13, 967:17

**part** [40] - 764:17, 765:7, 765:24, 765:25, 784:17, 784:18, 785:11, 787:2, 821:4, 825:14, 830:20, 830:22, 841:6, 851:20, 855:17, 863:3, 864:11, 871:6, 873:2, 876:10, 879:23, 880:18, 895:4, 895:24, 896:12, 899:5, 900:5, 902:13, 902:15, 902:16, 911:11, 922:25, 947:3, 950:19, 950:20, 961:12, 961:16, 961:20, 962:1

**partially** [3] - 794:8, 795:14, 795:16

**participants** [2] - 866:1, 866:2

**participate** [1] - 841:2

**participated** [3] - 797:12, 846:25, 883:17

**participating** [1] - 880:5

**participation** [3] - 962:11, 962:18, 962:25

**particular** [10] - 847:23, 862:9, 924:7, 925:24, 928:8, 935:1, 935:13, 937:25, 956:1, 958:6

**particularly** [3] - 878:17, 878:20, 943:25

**partied** [2] - 867:12, 867:13

**parties** [9] - 879:3, 951:9, 957:2, 971:22, 972:2, 974:20, 976:17, 977:1, 977:14

**partners** [4] - 898:8, 933:3, 933:7, 954:24

**partnership** [2] - 898:10, 898:12

**parts** [2] - 901:12, 902:13

**pass** [2] - 747:12, 966:4

**passed** [2] - 963:13, 963:16

**passenger** [3] - 974:25, 975:6, 975:14

**passengers** [2] - 975:1, 975:7

**passing** [1] - 963:19

**past** [6] - 783:21, 882:7, 937:13, 943:13, 953:4, 966:1

**PAUL** [37] - 744:1, 745:23, 746:2, 764:13, 764:23, 765:7, 765:13, 765:23, 766:2, 769:3, 771:6, 771:10, 773:13, 777:19, 781:11, 784:2, 787:17, 788:14, 789:8, 789:10, 790:9, 791:8, 876:14, 876:16, 945:1, 945:19, 946:8, 947:7, 947:10, 951:12, 951:19, 951:22, 951:25, 952:19, 953:6, 964:12, 971:7

**Paul** [11] - 745:22, 765:21, 777:18, 792:13, 792:19, 794:13, 802:21, 946:16, 951:16, 971:6, 972:11

**Pause** [6] - 763:16, 771:9, 772:5, 966:15, 967:8, 979:5

**pause** [4] - 765:1, 794:1, 794:10,

908:25
  **pay** [36] - 749:19, 749:25, 750:9, 750:13, 750:14, 756:25, 771:1, 780:10, 810:20, 812:16, 812:18, 812:24, 812:25, 813:5, 813:8, 813:12, 813:20, 813:25, 814:4, 814:7, 814:12, 818:18, 825:22, 829:8, 845:18, 854:22, 869:11, 869:12, 896:19, 898:21, 903:8, 915:18, 960:10, 965:19
  **paying** [8] - 757:19, 768:7, 768:16, 769:19, 797:18, 812:12, 813:1, 891:25
  **payment** [2] - 763:11, 838:24
  **payments** [6] - 756:19, 915:22, 950:12, 961:6, 961:16, 962:7
  **peculiar** [1] - 901:20
  **pending** [2] - 912:4
  **Pent** [1] - 850:16
  **Penthouse** [28] - 827:12, 833:14, 850:17, 850:20, 850:23, 851:3, 851:8, 851:11, 859:10, 862:5, 866:10, 871:11, 871:14, 871:20, 871:25, 872:10, 872:11, 872:14, 873:3, 874:5, 889:23, 890:7, 890:9, 890:16, 894:21, 894:25
  **people** [47] - 753:25, 775:3, 775:5, 781:9, 782:9, 783:11, 787:22, 804:18, 825:22, 829:9, 835:5, 840:14, 845:17, 845:18, 852:13, 858:1, 860:8, 861:14, 866:20, 871:16, 871:17, 892:9, 893:4, 898:19, 903:19, 903:25, 904:1, 911:10, 919:25, 920:3, 920:10, 921:13, 921:16, 921:22, 923:13, 927:12, 927:16, 932:10, 962:9, 964:11, 964:25, 965:16, 969:17, 970:14
  **people's** [1] - 858:2
  **per** [1] - 916:4
  **percent** [14] - 897:20, 897:25, 898:3, 898:8, 898:10, 898:12, 898:13, 898:19, 898:20, 898:21, 898:25, 899:11, 899:14, 899:15
  **percentage** [1] - 922:24
  **perfect** [1] - 948:21
  **perfectly** [1] - 943:6
  **performance** [2] - 837:17, 838:20
  **performed** [1] - 838:4
  **perhaps** [6] - 801:2, 801:18, 854:22, 943:10, 951:5, 951:7
  **period** [18] - 758:17, 812:2, 815:2, 824:12, 848:18, 878:25, 921:1, 921:10, 921:13, 922:21, 950:24, 972:17, 972:22, 973:2, 973:7, 973:16, 974:3, 975:20
  **periods** [1] - 819:9
  **perjury** [1] - 822:22
  **permission** [4] - 765:14, 777:20, 849:6, 969:2
  **permitted** [3] - 790:21, 947:15, 947:19
  **person** [10] - 748:25, 773:6, 783:15, 785:7, 809:19, 823:13, 823:15, 924:12, 945:6, 978:20
  **person's** [1] - 945:25
  **personal** [13] - 780:14, 780:17, 780:19,

784:24, 792:21, 818:4, 820:10, 824:22, 859:24, 860:3, 865:7, 869:17, 912:16
  **personality** [2] - 903:16, 970:7
  **personally** [8] - 818:10, 864:9, 868:14, 869:6, 887:1, 887:3, 909:5, 913:15
  **perusing** [3] - 830:3, 854:7, 856:8
  **phone** [8] - 746:25, 747:14, 747:15, 748:16, 763:19, 773:6, 883:18, 910:25
  **photograph** [3] - 975:25, 976:3, 976:6
  **photographs** [1] - 977:2
  **physically** [3] - 826:11, 837:3, 887:5
  **pick** [5] - 748:3, 792:13, 877:4, 877:7, 929:21
  **picked** [1] - 748:11
  **picks** [1] - 885:23
  **picture** [1] - 861:9
  **piece** [2] - 748:3, 897:19
  **piecemeal** [1] - 938:12
  **pills** [3] - 778:2, 778:3, 778:4
  **pin** [1] - 902:4
  **pizza** [1] - 966:22
  **Pizza** [2] - 967:25, 969:8
  **place** [44] - 746:9, 746:13, 746:23, 747:10, 748:3, 751:6, 762:1, 763:4, 790:13, 790:15, 811:10, 811:16, 811:22, 820:1, 825:6, 826:1, 826:11, 830:2, 830:5, 830:6, 830:8, 830:11, 832:21, 847:4, 847:5, 847:6, 847:11, 853:17, 853:20, 853:21, 853:22, 854:2, 856:7, 856:10, 863:22, 891:20, 905:21, 905:23, 906:5, 907:8, 928:11, 928:13, 966:23, 969:19
  **placed** [2] - 771:16, 816:13
  **places** [2] - 890:18, 932:10
  **plan** [2] - 939:22, 943:13, 955:15
  **planned** [1] - 942:7
  **planning** [2] - 880:2, 954:7
  **plastic** [1] - 976:24
  **play** [7] - 764:7, 764:13, 765:5, 765:6, 765:10, 765:13, 827:25
  **played** [1] - 922:18
  **player** [1] - 828:23
  **playing** [3] - 879:20, 880:18, 941:13
  **Plaza** [2] - 743:18, 744:13
  **pleased** [1] - 821:5
  **plural** [1] - 813:1
  **plus** [2] - 838:11, 931:16
  **pocket** [2] - 922:17
  **point** [53] - 762:17, 765:9, 771:14, 780:8, 781:17, 819:11, 822:2, 823:6, 832:6, 832:8, 832:9, 833:19, 835:6, 838:7, 844:9, 847:10, 849:10, 875:9, 875:14, 875:24, 895:17, 896:23, 901:3, 902:12, 906:18, 909:24, 911:15, 911:16, 912:14, 924:18, 931:8, 933:20, 935:5, 935:14, 935:23, 936:4, 936:21, 937:21, 939:6, 939:22, 942:18, 942:25, 943:5, 943:6, 943:8, 945:3, 946:11, 946:15, 947:11, 956:9
  **points** [5] - 798:11, 898:19, 901:22, 901:24, 964:18

  **Police** [7] - 976:19, 977:17, 977:20, 978:4, 978:12, 978:15, 978:17
  **policies** [1] - 787:23
  **Port** [1] - 780:4
  **portion** [1] - 966:9
  **POSA** [28] - 743:16, 764:11, 787:9, 787:16, 788:22, 878:5, 878:8, 878:10, 888:13, 938:2, 938:7, 938:21, 939:19, 940:10, 941:10, 941:24, 972:4, 972:6, 974:12, 974:17, 974:23, 976:15, 976:18, 977:10, 977:13, 977:16, 979:3, 979:6
  **Posa** [6] - 878:9, 938:18, 941:22, 941:25, 972:9, 974:15
  **posed** [1] - 908:15
  **posing** [1] - 821:8
  **position** [4] - 764:17, 864:6, 938:1, 939:15
  **positive** [4] - 798:20, 809:8, 864:19, 969:1
  **possession** [2] - 940:3, 951:3
  **possibility** [5] - 945:4, 945:10, 946:1, 949:2, 949:13
  **possible** [6] - 747:4, 773:17, 941:11, 943:6, 944:12, 950:1
  **possibly** [3] - 781:17, 782:1, 957:13
  **posts** [2] - 962:7, 962:8
  **pot** [14] - 911:10, 929:24, 930:2, 930:21, 932:13, 933:2, 933:9, 954:8, 954:10, 954:11, 954:13, 954:17, 954:18
  **pounds** [1] - 930:1
  **power** [2] - 901:22, 909:6
  **practice** [1] - 978:14
  **practicing** [1] - 882:14
  **preamble** [1] - 974:19
  **prefer** [2] - 927:23, 940:5
  **prejudice** [1] - 942:22
  **prejudiced** [3] - 946:4, 946:8, 946:12
  **prejudicial** [2] - 820:18, 947:18
  **prepare** [2] - 923:5, 923:8
  **prepared** [2] - 923:2, 923:23
  **prescribed** [1] - 916:5
  **presence** [1] - 950:3
  **present** [6] - 745:15, 790:17, 805:1, 878:13, 887:5, 953:12
  **presentation** [1] - 951:1
  **pressure** [1] - 866:21
  **pressuring** [1] - 911:25
  **presume** [1] - 874:14
  **pretty** [6] - 773:19, 798:13, 882:7, 904:24, 943:23
  **prevented** [1] - 822:13
  **previous** [2] - 753:5, 759:16
  **previously** [1] - 745:17
  **price** [1] - 797:18
  **principal** [1] - 914:24
  **principles** [1] - 783:14
  **printed** [1] - 973:19
  **prison** [15] - 866:13, 870:25, 957:21, 958:4, 963:5, 966:23, 967:4, 967:16, 968:4, 968:9, 968:13, 968:14, 968:16,

968:19, 968:22
**Prisons** [1] - 950:20
**privilege** [1] - 917:14
**privileged** [1] - 940:11
**pro** [1] - 912:1
**probable** [1] - 935:21
**problem** [10] - 761:1, 821:22, 862:3, 862:22, 889:22, 942:10, 943:6, 945:19, 949:5, 958:22
**problems** [3] - 863:15, 889:24, 892:14
**proceed** [5] - 791:15, 791:16, 804:21, 919:11, 957:15
**proceedings** [1] - 923:12
**Proceedings** [1] - 744:17
**process** [2] - 813:4, 817:4
**produced** [5] - 744:18, 938:13, 940:14, 942:14
**productive** [1] - 939:1
**proffer** [5] - 764:21, 819:23, 822:8, 917:2, 935:10
**proffered** [3] - 823:10, 935:1, 935:2
**profit** [1] - 943:9
**Program** [10] - 787:3, 949:7, 961:9, 961:12, 961:17, 961:20, 962:2, 962:12, 962:19
**program** [8] - 776:8, 776:11, 787:10, 787:15, 789:2, 815:7, 915:17, 963:1
**prohibit** [1] - 952:10
**prohibited** [2] - 949:23, 949:25
**prohibition** [1] - 789:4
**prohibitions** [1] - 791:5
**prohibits** [2] - 944:15, 952:7
**promote** [1] - 880:10
**proper** [1] - 825:11
**proposal** [1] - 956:7
**propose** [1] - 821:7
**proposing** [2] - 955:13, 956:5
**prosecuted** [1] - 912:7
**prosecution** [1] - 950:19
**prosecutor** [3] - 924:11, 956:10, 969:24
**prospective** [1] - 848:16
**prostitutes** [2] - 822:13, 822:14
**protecting** [2] - 821:24, 822:3
**Protection** [8] - 949:7, 961:9, 961:12, 961:16, 961:20, 962:2, 962:12, 962:19
**protocol** [1] - 916:4
**provide** [2] - 872:15, 918:16
**provided** [10] - 787:6, 808:8, 841:15, 848:7, 848:10, 938:10, 947:18, 950:13, 952:20
**provides** [1] - 977:15
**providing** [1] - 945:8
**publicity** [3] - 942:3, 942:12, 944:10
**pulling** [2] - 808:21, 886:12
**purchase** [1] - 975:22
**purchased** [1] - 975:16
**purpose** [3] - 886:5, 886:6, 963:19
**purposes** [1] - 764:20
**pursuant** [1] - 853:1
**pursues** [1] - 788:16

**pursuing** [1] - 790:25
**push** [1] - 895:11
**pushed** [2] - 870:21, 888:24
**pushing** [8] - 834:19, 834:20, 835:9, 839:12, 888:10, 890:11, 890:17, 892:1
**pussy's** [1] - 900:2
**put** [12] - 772:15, 778:18, 781:15, 814:10, 870:17, 874:4, 883:9, 883:10, 890:5, 900:3, 917:5, 931:13
**putting** [2] - 795:11, 902:25

## Q

**quality** [1] - 876:3
**Queen** [1] - 927:1
**Queens** [3] - 763:8, 763:24
**questioning** [6] - 822:13, 832:11, 934:7, 943:8, 946:15, 948:24
**questions** [59] - 761:24, 762:9, 769:7, 777:20, 792:18, 794:20, 806:15, 807:15, 822:18, 832:21, 870:1, 879:15, 888:15, 902:5, 902:8, 919:4, 919:9, 926:3, 929:13, 940:25, 941:3, 942:12, 942:19, 942:20, 942:21, 943:4, 943:25, 944:2, 944:6, 944:8, 945:13, 946:5, 948:11, 949:21, 950:23, 956:24, 957:23, 958:1, 958:9, 961:5, 961:7, 961:15, 962:3, 963:4, 963:7, 963:23, 964:1, 964:3, 964:22, 965:10, 965:21, 965:25, 966:2, 969:24, 969:25, 970:1, 970:4, 971:7
**quick** [2] - 848:23, 953:6
**quicker** [1] - 888:20
**quid** [1] - 912:1
**quietly** [1] - 804:12
**quite** [6] - 803:23, 817:3, 823:7, 878:21, 940:3, 949:23
**quo** [1] - 912:1
**quote** [7] - 756:6, 756:25, 757:1, 757:4, 938:8, 953:24
**quoted** [2] - 756:5, 843:24
**quoting** [1] - 876:1

## R

**RACHEL** [1] - 743:17
**RachelJ** [1] - 972:9
**raise** [1] - 946:23
**raised** [7] - 936:10, 946:17, 946:25, 947:2, 951:12, 952:22, 952:23
**raising** [1] - 947:5
**ran** [3] - 811:22, 814:7, 836:2
**rap** [6] - 927:11, 927:12, 927:14, 927:16, 927:17, 927:23
**rather** [13] - 791:17, 800:22, 821:7, 821:9, 826:8, 850:6, 887:7, 888:3, 892:4, 899:1, 909:14, 933:17, 941:13
**ratted** [1] - 862:1
**rattled** [1] - 859:11
**Raymond** [1] - 972:14

**RAYMOND** [1] - 744:5
**reach** [1] - 911:18
**reached** [1] - 892:11
**reaction** [2] - 761:15, 761:22
**Read** [23] - 766:3, 790:3, 794:15, 794:18, 801:4, 801:6, 801:9, 801:16, 801:21, 801:22, 802:1, 847:7, 847:9, 854:7, 862:6, 882:23, 908:23, 925:4, 925:7, 925:8, 932:19, 971:21, 972:1
**Read** [1] - 790:4
**reading** [7] - 802:7, 856:22, 875:25, 876:9, 901:13, 902:16, 949:22
**reads** [2] - 750:22, 880:22
**ready** [3] - 857:9, 860:15, 910:8
**real** [4] - 775:8, 778:10, 881:10, 909:13, 929:18, 949:12, 952:17, 961:24
**reality** [4] - 781:22, 781:24, 782:2, 828:13
**realize** [2] - 822:11, 845:4
**realized** [1] - 781:8
**really** [23] - 750:11, 761:2, 764:20, 780:12, 787:23, 809:3, 809:12, 826:2, 829:1, 863:3, 869:16, 871:4, 876:1, 879:5, 889:22, 901:21, 912:6, 922:11, 924:5, 927:6, 936:13, 949:12, 950:20
**reason** [14] - 749:8, 750:4, 753:23, 820:8, 858:6, 890:18, 903:13, 910:17, 928:15, 940:19, 941:9, 948:4, 950:13, 950:18
**reasonable** [2] - 901:8, 941:5
**reasons** [6] - 781:2, 821:3, 829:12, 864:17, 948:6, 949:14
**received** [9] - 889:12, 915:23, 959:6, 961:6, 961:16, 973:24, 974:13, 977:20, 978:3
**receiving** [3] - 756:18, 777:6, 952:3
**recent** [1] - 801:2
**Recess** [1] - 953:8
**recess** [3] - 804:16, 877:10, 979:15
**reckless** [1] - 823:8
**recollection** [10] - 746:22, 762:12, 767:9, 772:7, 772:10, 908:24, 924:13, 924:15, 928:9, 967:11
**recommendations** [1] - 848:11
**reconvene** [2] - 804:4, 934:11
**record** [21] - 748:2, 748:22, 751:19, 754:18, 755:2, 755:15, 756:6, 762:21, 762:22, 768:13, 768:23, 769:2, 807:18, 820:11, 919:24, 921:11, 942:1, 964:21, 964:24, 965:2, 978:15
**recorded** [13] - 744:17, 747:19, 747:22, 811:25, 830:20, 830:22, 849:5, 849:6, 851:9, 865:11, 922:4, 978:11, 978:17
**recorder** [1] - 880:1
**recording** [31] - 765:10, 771:17, 773:10, 828:2, 830:13, 837:17, 838:20, 842:9, 846:13, 847:13, 847:24, 848:8, 848:21, 848:22, 849:1, 865:13, 880:8, 919:17, 919:24, 920:2, 920:9, 920:21, 921:17, 922:3, 922:14, 976:1, 976:4,

976:7, 977:20, 978:3

**recordings** [10] - 748:12, 754:2, 773:19, 827:24, 848:16, 919:21, 921:11, 922:20, 939:12

**records** [12] - 972:16, 972:17, 972:21, 972:22, 973:1, 973:2, 973:6, 973:7, 973:11, 973:12, 973:16, 974:3

**Records** [1] - 977:17

**recross** [1] - 966:18

**RECROSS** [2] - 966:20, 980:8

**redeem** [1] - 815:7

**redemption** [4] - 783:13, 815:9, 815:12, 816:3

**Redemption** [5] - 785:8, 792:25, 794:23, 815:15

**REDIRECT** [2] - 957:16, 980:7

**redirect** [7] - 942:4, 944:25, 956:25, 957:15, 967:23, 968:1, 968:2

**reduce** [2] - 941:11, 941:15

**reedited** [3] - 800:15, 800:19, 801:13

**reediting** [1] - 800:3

**reference** [5] - 820:20, 828:13, 909:2, 978:8, 979:11

**referenced** [4] - 973:23, 976:13, 977:11, 977:25

**referred** [9] - 748:25, 751:16, 762:3, 791:1, 807:14, 864:16, 936:23, 954:14, 970:6

**referring** [42] - 749:16, 758:12, 758:23, 759:14, 760:20, 767:16, 793:20, 806:17, 815:17, 815:19, 815:20, 816:21, 820:21, 826:10, 828:18, 829:22, 831:3, 831:7, 833:8, 837:5, 840:19, 842:15, 861:6, 867:8, 868:3, 870:20, 872:4, 872:9, 884:1, 884:17, 893:3, 893:7, 897:10, 897:11, 897:13, 898:1, 898:4, 898:8, 898:23, 904:13, 960:15, 970:10

**refers** [1] - 771:19

**reflecting** [2] - 973:19, 973:22

**refrain** [1] - 901:14

**refresh** [7] - 746:22, 762:12, 767:9, 772:7, 772:10, 925:3, 967:10

**refreshed** [3] - 924:13, 924:15, 928:9

**refreshes** [1] - 908:23

**refrigeration** [2] - 872:21, 872:25

**refrigerator** [1] - 872:16

**regard** [10] - 761:25, 767:9, 790:25, 872:19, 876:17, 936:10, 939:23, 947:17, 952:1, 962:25

**regarding** [1] - 906:16

**regards** [5] - 863:22, 909:1, 909:5, 970:11, 970:12

**regular** [1] - 978:14

**rehab** [1] - 778:16

**rehabilitating** [1] - 817:2

**reinstruct** [1] - 789:5

**reinstructed** [1] - 788:24

**reiterated** [1] - 924:8

**relate** [1] - 783:17

**related** [4] - 857:10, 887:8, 936:3,

939:25

**relating** [4] - 925:22, 936:7, 944:17, 958:20

**relations** [2] - 821:16, 821:19

**relationship** [3] - 778:16, 811:4, 820:8

**relationships** [1] - 784:24

**relaying** [1] - 759:9

**released** [1] - 967:15

**relevance** [4] - 776:25, 818:6, 918:8, 925:13

**relevancy** [1] - 936:16

**reliance** [1] - 774:16

**relocate** [2] - 778:6, 961:13

**relocated** [2] - 777:3, 777:8

**relocation** [1] - 838:24

**remark** [2] - 780:22, 781:1

**remember** [113] - 746:12, 746:16, 746:18, 746:19, 746:20, 747:1, 747:6, 747:7, 747:9, 747:12, 749:1, 749:3, 749:5, 751:7, 751:19, 751:20, 752:1, 752:8, 752:15, 754:19, 754:22, 754:23, 755:24, 762:6, 762:16, 762:17, 763:9, 763:12, 763:13, 763:17, 763:22, 763:23, 766:15, 768:18, 768:21, 768:22, 768:25, 769:9, 769:11, 770:1, 771:15, 771:22, 772:19, 772:21, 773:5, 774:4, 778:14, 779:6, 779:25, 785:6, 785:10, 785:16, 785:17, 793:6, 796:1, 799:13, 799:23, 800:4, 800:6, 800:9, 801:15, 801:20, 808:10, 808:13, 810:11, 810:13, 810:24, 811:1, 811:10, 811:11, 815:4, 817:3, 819:6, 824:21, 830:1, 830:3, 830:8, 830:10, 836:16, 837:14, 839:10, 845:6, 845:8, 848:6, 848:22, 856:9, 864:22, 866:25, 872:18, 872:22, 874:6, 874:23, 875:1, 881:16, 881:17, 884:21, 885:10, 893:12, 906:5, 924:23, 925:1, 925:6, 927:3, 928:19, 931:8, 934:12, 956:15, 964:9, 968:1, 969:1, 970:3, 970:4

**remembered** [2] - 818:10, 873:5

**remind** [4] - 746:24, 878:16, 878:24, 979:8

**rendition** [1] - 924:2

**rent** [3] - 780:10, 810:20, 837:16

**rental** [1] - 780:4

**rented** [1] - 826:11

**rents** [1] - 837:6

**repeat** [3] - 803:17, 890:14, 962:17

**repeating** [1] - 843:19

**rephrase** [1] - 959:19

**reply** [1] - 907:10

**report** [4] - 915:22, 974:25, 975:6, 975:14

**Reporter** [1] - 744:13

**reporter** [2] - 790:2, 836:6

**reporters** [1] - 876:7

**reporting** [1] - 976:21

**represent** [1] - 792:7

**representatives** [2] - 976:18, 977:16

**reproduced** [2] - 977:24, 978:7

**request** [1] - 905:1

**requested** [1] - 950:11

**required** [1] - 951:4

**requirement** [2] - 787:14, 915:14

**requirements** [1] - 915:8

**research** [1] - 979:10

**resident** [2] - 810:7, 915:6

**resolution** [2] - 958:19, 959:11

**respect** [37] - 792:14, 795:18, 806:14, 809:16, 809:21, 810:14, 816:8, 823:1, 827:14, 827:17, 828:9, 837:5, 838:3, 838:19, 841:7, 843:23, 847:17, 848:8, 848:16, 851:2, 853:4, 862:11, 863:20, 863:21, 866:10, 889:11, 890:12, 890:15, 891:7, 903:6, 903:14, 903:21, 909:4, 927:8, 927:10, 945:2, 950:12

**respectfully** [1] - 822:1

**respond** [4] - 761:6, 767:25, 769:3, 882:17

**responded** [1] - 905:6

**responding** [2] - 753:5, 976:21

**responds** [3] - 759:17, 768:1, 886:6

**response** [2] - 906:24, 957:5

**responsibility** [1] - 757:18

**responsible** [1] - 794:8

**rest** [9] - 844:14, 844:16, 844:17, 850:7, 850:8, 912:12, 959:22, 960:3, 960:6

**restaurant** [5] - 746:17, 747:9, 897:8, 958:10, 958:13

**Restaurant** [4] - 958:7, 958:15, 958:20, 959:12

**restaurants** [2] - 891:22, 922:15

**restful** [1] - 979:12

**restriction** [1] - 963:22

**result** [6] - 803:22, 811:5, 827:1, 845:25, 952:7, 958:19

**resulted** [1] - 918:16

**resumes** [2] - 878:12, 953:11

**retelling** [1] - 885:14

**return** [1] - 880:19

**reveal** [1] - 917:13

**revenge** [1] - 820:9

**review** [1] - 936:15

**reviewed** [2] - 790:11, 937:18

**reviewing** [1] - 762:11

**rich** [2] - 779:6, 779:8

**Richard** [1] - 972:10

**RICHARD** [1] - 743:21

**rid** [1] - 825:21

**ridiculing** [3] - 870:19, 870:24, 871:2

**rights** [4] - 942:21, 944:16, 944:17, 946:7

**RL** [2] - 772:1, 772:2

**road** [1] - 815:5

**Road** [2] - 779:13, 810:8

**rob** [1] - 955:15

**robbed** [1] - 816:12

**robbery** [13] - 925:9, 925:11, 925:16, 925:17, 925:18, 935:5, 935:10, 935:13, 940:15, 940:18, 954:15, 976:22, 977:3

**robbing** [2] - 940:16, 940:18
**role** [3] - 851:5, 856:17, 879:20
**romantic** [1] - 821:10
**Roslyn** [2] - 779:9, 780:3
**Rossotti** [1] - 751:16
**round** [1] - 920:23
**Rule** [1] - 901:3
**rule** [1] - 944:23
**ruled** [1] - 949:20
**rules** [1] - 901:3
**ruling** [3] - 877:3, 945:2, 949:19
**rulings** [2] - 902:24, 941:20
**run** [7] - 843:14, 901:23, 902:6, 906:7, 949:14, 955:6, 955:20
**running** [3] - 757:24, 757:25, 872:21
**ruse** [2] - 880:6, 917:5

## S

**safe** [1] - 776:13
**sale** [1] - 944:16
**sales** [1] - 942:20
**sat** [2] - 862:23, 897:8
**Saunders** [2] - 755:21, 755:25
**saw** [3] - 772:19, 775:16, 809:24
**scare** [1] - 955:23
**scared** [4] - 885:21, 892:22, 892:23, 955:20
**scenario** [2] - 888:17, 925:24
**scheme** [3] - 859:25, 863:2, 885:13
**schemes** [2] - 798:14, 829:1
**scope** [2] - 967:23, 971:3
**score** [1] - 881:13
**scoring** [1] - 901:24
**screen** [2] - 766:2, 770:11
**script** [1] - 880:22
**search** [1] - 788:21
**seat** [4] - 975:10, 975:11, 975:12
**seated** [7] - 745:19, 805:2, 870:2, 875:21, 878:14, 934:17, 953:13
**Sec** [5] - 787:6, 787:10, 787:20, 787:21, 788:23
**second** [17] - 791:22, 795:13, 812:4, 822:12, 822:25, 836:21, 846:17, 846:19, 847:9, 854:1, 889:19, 889:20, 891:7, 893:4, 913:17, 925:22, 966:13
**seconds** [2] - 792:18, 794:24
**sector** [1] - 973:16
**securities** [1] - 853:8
**Security** [2] - 787:3, 962:12
**security** [6] - 787:12, 788:12, 853:12, 975:25, 976:4, 976:6
**see** [87] - 748:20, 749:22, 750:7, 750:10, 750:15, 750:20, 752:7, 752:14, 752:15, 753:8, 753:15, 754:11, 755:3, 756:7, 756:10, 757:9, 758:2, 760:10, 760:12, 760:13, 761:16, 762:7, 763:3, 764:19, 764:25, 767:7, 767:8, 767:16, 770:11, 770:20, 770:21, 770:24, 775:19, 776:3, 781:7, 782:5, 784:3,

785:23, 787:25, 788:7, 788:12, 791:3, 795:8, 798:1, 802:10, 804:8, 807:22, 808:11, 813:12, 813:16, 816:2, 819:16, 830:14, 834:23, 838:13, 838:16, 838:17, 841:20, 844:11, 850:14, 851:14, 851:15, 854:8, 861:14, 865:6, 871:9, 875:19, 886:12, 889:18, 891:9, 891:13, 892:14, 893:6, 902:15, 907:7, 908:23, 925:7, 925:15, 934:13, 942:22, 944:13, 944:24, 949:15, 955:17
**seeing** [2] - 766:9, 834:10
**seek** [1] - 912:18
**seeking** [1] - 911:14
**seem** [4] - 788:22, 825:17, 826:4, 857:13
**sees** [6] - 883:24, 884:4, 884:9
**seized** [1] - 976:20
**self** [1] - 909:24
**self-determination** [1] - 909:24
**sell** [6] - 803:23, 933:14, 943:24, 945:18, 946:7, 949:4
**selling** [1] - 911:9
**Seltzer** [14] - 804:21, 919:9, 933:20, 936:10, 936:19, 936:21, 937:5, 939:8, 941:8, 942:5, 943:17, 953:16, 971:12, 972:13
**SELTZER** [39] - 744:9, 745:4, 745:9, 745:13, 804:12, 804:14, 919:10, 919:13, 933:23, 934:3, 934:8, 934:23, 934:25, 935:8, 935:16, 935:19, 935:23, 936:1, 936:18, 936:20, 939:24, 940:7, 940:22, 940:25, 941:18, 948:8, 948:11, 949:6, 949:10, 949:12, 949:18, 949:21, 950:5, 952:13, 953:17, 953:18, 956:24, 962:14, 971:13
**semi** [1] - 798:2
**semi-expert** [1] - 798:2
**send** [2] - 825:22, 892:18
**sending** [1] - 938:12
**sends** [1] - 893:9
**Senior** [1] - 797:6
**sense** [8] - 825:9, 825:16, 825:17, 825:20, 825:24, 826:1, 826:3, 826:9
**sent** [15] - 892:17, 892:25, 893:2, 893:4, 893:5, 893:7, 893:11, 893:13, 893:15, 893:17, 893:21, 893:22, 894:3, 894:4, 894:9
**sentence** [1] - 833:10
**separate** [4] - 789:4, 855:17, 936:4, 940:20
**September** [7] - 763:5, 765:19, 770:9, 774:3, 906:13, 906:21, 908:3
**sequence** [2] - 931:21, 931:22
**series** [2] - 770:1, 770:3
**serious** [2] - 776:9, 822:4
**service** [4] - 794:17, 795:3, 872:15, 890:20
**Service** [1] - 950:10
**services** [3] - 812:12, 907:4, 912:18
**servicing** [1] - 872:16
**session** [1] - 782:13

**set** [8] - 747:7, 921:1, 936:7, 938:11, 938:14, 938:19, 938:21, 939:4
**settle** [1] - 768:10, 857:22, 860:18
**seventies** [3] - 780:8, 969:19, 969:21
**several** [2] - 781:4, 799:8
**severed** [2] - 934:19, 936:17
**sex** [4] - 820:14, 821:1, 821:11, 822:13, 822:20, 823:11
**sexual** [3] - 820:7, 821:16, 821:19
**shake** [3] - 871:25, 872:1, 893:25
**shakedown** [4] - 858:10, 858:11, 859:24, 863:5, 906:20
**shaken** [4] - 840:11, 856:16, 859:14, 859:18
**shakes** [1] - 835:5
**shaking** [8] - 862:13, 862:15, 894:25, 906:9, 906:14, 906:17, 908:4, 965:16
**shall** [1] - 865:16
**share** [2] - 778:23, 891:25
**shares** [2] - 853:10, 853:12
**sharing** [2] - 779:1, 783:14
**sharking** [4] - 965:14, 966:8, 969:18, 970:18
**sharply** [1] - 979:12
**Sheriff's** [2] - 911:6, 956:17
**sheriffs** [1] - 911:7
**ship** [1] - 927:1
**shit** [5] - 843:17, 872:3, 874:7, 874:21, 897:2
**shook** [5] - 826:4, 826:8, 826:9, 858:13, 966:10
**shoot** [1] - 782:17
**shooting** [1] - 777:24
**short** [6] - 848:18, 902:10, 935:20, 941:12, 949:18, 971:17
**shorted** [1] - 763:20
**shorter** [2] - 775:12, 938:21
**shortly** [3] - 773:15, 926:16, 934:13
**shot** [4] - 782:16, 843:16, 874:12, 942:21
**show** [22] - 765:22, 772:1, 781:22, 781:24, 782:2, 783:4, 783:5, 783:8, 794:3, 799:15, 823:8, 829:20, 880:1, 885:21, 885:22, 901:19, 908:22, 923:23, 940:15, 940:17, 940:18, 947:5
**showed** [4] - 762:10, 794:13, 880:23, 887:8
**showing** [4] - 793:24, 800:21, 975:14, 975:21
**shown** [2] - 914:10, 960:21
**shows** [3] - 820:3, 927:18, 942:21
**Shrub** [1] - 779:13
**shut** [11] - 824:18, 825:9, 825:15, 825:17, 825:19, 826:1, 826:2, 826:5, 826:7, 826:10, 934:9
**shutting** [4] - 824:23, 825:2, 825:5, 825:8
**shylock** [1] - 899:6
**shylocking** [1] - 969:18
**side** [7] - 786:11, 786:12, 819:24, 820:1, 823:17, 916:12, 947:11

**Side** [3] - 787:1, 861:18, 917:1
**side-bar** [1] - 823:17
**sidebar** [1] - 900:11
**Sidebar** [1] - 901:1
**sign** [1] - 961:3
**signal** [1] - 973:24
**signed** [14] - 786:5, 787:5, 787:17, 787:20, 790:11, 878:6, 887:9, 912:23, 950:9, 950:16, 974:9, 976:11, 977:8, 978:24
**significant** [2] - 834:24, 950:24
**significantly** [1] - 938:21
**signs** [1] - 787:3
**similar** [1] - 955:19
**simple** [2] - 784:5, 784:7
**simply** [1] - 951:3
**single** [3] - 822:19, 878:23, 879:1
**sister** [4] - 918:4, 918:7, 918:10, 918:18
**sister's** [1] - 918:16
**sisters** [1] - 784:25
**sit** [3] - 782:17, 827:1, 827:3
**sit-down** [2] - 827:1, 827:3
**sitdowns** [1] - 782:8
**sitting** [1] - 929:18
**situation** [8] - 748:13, 837:5, 837:10, 851:4, 891:15, 917:16, 964:7
**six** [9] - 795:24, 796:7, 861:22, 888:18, 888:21, 888:24, 920:15, 921:3, 921:5
**skip** [1] - 974:18
**slash** [1] - 812:3
**sleeping** [1] - 761:9
**slight** [1] - 953:14
**slow** [2] - 836:7, 862:7
**slowly** [1] - 862:6
**small** [3] - 922:19, 922:23, 953:15
**Smith** [1] - 973:13
**smooth** [1] - 970:9
**sniff** [1] - 867:17
**sober** [14] - 774:5, 775:12, 776:10, 776:11, 776:14, 776:19, 784:19, 796:3, 796:24, 796:25, 819:8, 819:15, 909:23, 911:10
**sobriety** [4] - 776:3, 815:5, 816:8, 968:24
**sold** [4] - 783:4, 783:5, 932:13, 956:11
**solidified** [1] - 864:6
**solution** [2] - 948:21, 953:3
**someone** [15] - 849:7, 862:19, 863:6, 879:24, 880:18, 882:9, 888:10, 894:16, 923:9, 923:10, 925:19, 931:8, 932:8, 951:21, 965:18
**someplace** [1] - 747:2
**sometimes** [17] - 751:8, 807:20, 814:4, 824:7, 828:20, 828:22, 829:6, 829:7, 848:13, 848:18, 858:21, 898:20, 904:4, 921:24, 922:8, 922:16, 924:8
**somewhat** [1] - 798:10
**somewhere** [9] - 747:10, 764:4, 798:22, 800:18, 835:4, 866:12, 908:16, 956:15

**son** [5] - 784:23, 792:21, 794:16, 795:2, 892:25
**Sonny** [36] - 797:4, 797:7, 829:23, 831:11, 831:14, 833:2, 833:18, 833:24, 834:2, 834:5, 834:8, 836:4, 842:1, 842:4, 842:19, 842:25, 843:6, 843:14, 844:4, 844:14, 844:16, 844:21, 844:22, 844:25, 845:4, 856:12, 857:9, 863:6, 890:1, 890:8, 890:25, 891:1, 891:2, 891:12, 898:6, 899:10
**sonny** [1] - 836:9
**sorry** [17] - 787:9, 791:7, 804:19, 810:25, 832:1, 832:5, 836:8, 836:24, 856:8, 865:22, 865:23, 868:5, 886:10, 928:5, 936:20, 941:22, 953:14
**sort** [9] - 811:4, 825:19, 838:13, 838:16, 912:1, 933:23, 936:24, 938:12, 943:10
**sorts** [1] - 798:14
**sounded** [1] - 787:18
**source** [2] - 917:12, 917:13
**Southern** [1] - 954:3
**space** [1] - 837:16
**Spado** [30] - 926:4, 926:17, 926:22, 926:23, 928:25, 929:17, 929:22, 930:23, 932:1, 932:4, 932:14, 933:5, 933:13, 934:19, 935:5, 935:12, 936:11, 939:10, 940:9, 940:13, 940:15, 940:23, 953:20, 953:24, 954:5, 955:9, 955:22, 956:11, 973:4, 973:9
**speaking** [2] - 946:16, 955:10
**specific** [7] - 746:12, 749:11, 823:1, 849:6, 859:21, 859:23, 924:24
**specifically** [13] - 746:4, 748:6, 755:1, 793:20, 828:3, 846:6, 846:8, 846:20, 848:2, 858:22, 899:20, 909:4, 950:11
**specifics** [1] - 748:5
**specify** [1] - 914:7
**speech** [1] - 876:24
**spend** [1] - 957:20
**spent** [3] - 819:11, 824:15, 951:16
**Springfield** [1] - 840:5
**squeeze** [1] - 866:21
**St** [1] - 859:3
**staff** [1] - 907:8
**stage** [1] - 949:13
**stall** [2] - 829:8, 829:12
**stalling** [2] - 843:23, 905:13
**stand** [4] - 878:3, 878:12, 936:15, 953:11
**standing** [3] - 869:18, 869:19, 869:21
**stands** [1] - 942:22
**start** [16] - 784:8, 788:2, 804:13, 805:8, 811:3, 849:17, 856:22, 867:4, 876:8, 908:10, 911:9, 929:16, 937:15, 955:2, 972:4, 979:13
**started** [11] - 759:16, 772:20, 805:7, 805:15, 812:2, 864:23, 865:1, 878:16, 908:14, 919:17, 920:6
**starting** [1] - 752:5
**starts** [3] - 831:2, 866:24, 890:4

**State** [3] - 825:14, 928:13, 954:3
**state** [9] - 854:5, 866:13, 914:19, 914:21, 915:6, 928:18, 976:19, 977:18
**statement** [6] - 824:16, 897:24, 903:11, 922:19, 954:6, 975:19
**statements** [1] - 836:17
**STATES** [3] - 743:1, 743:3, 743:11
**states** [1] - 915:5
**States** [5] - 743:16, 923:9, 944:15, 972:8
**stating** [1] - 789:4
**station** [1] - 836:3
**stay** [7] - 750:11, 824:14, 877:8, 920:16, 920:19, 962:9, 979:10
**staying** [1] - 876:18
**steal** [1] - 954:12
**steals** [1] - 956:4
**stenography** [1] - 744:17
**step** [1] - 971:15
**stepped** [1] - 861:9
**steroids** [6] - 916:2, 916:3, 916:8, 917:5, 917:8, 917:14, 917:15
**Steve** [11] - 784:14, 784:15, 785:7, 785:17, 795:11, 796:8, 796:22, 815:21, 815:22, 888:11, 888:12
**stick** [1] - 881:12
**sticking** [1] - 900:2
**stiffed** [2] - 812:8, 838:19
**still** [16] - 752:20, 753:11, 774:3, 775:5, 778:10, 812:5, 862:11, 878:25, 910:21, 916:3, 939:6, 943:9, 949:2, 975:25, 976:3, 976:6
**stipulate** [7] - 941:4, 944:14, 945:16, 945:21, 945:23, 946:22, 946:24
**stipulated** [2] - 972:7, 974:21
**stipulation** [15] - 940:24, 943:11, 943:15, 944:14, 945:20, 973:24, 974:6, 974:11, 974:12, 974:16, 976:8, 976:16, 977:5, 977:14, 978:21
**stipulations** [3] - 971:18, 971:21, 972:1
**stock** [2] - 853:10, 853:12
**stocks** [1] - 853:6
**stolen** [1] - 816:11
**stood** [1] - 776:11
**stop** [6] - 755:12, 822:24, 850:13, 857:10, 909:6, 909:25
**stopped** [13] - 785:20, 820:7, 820:14, 821:1, 821:8, 821:9, 821:14, 864:4, 909:2, 909:3, 909:11, 948:25
**stopping** [3] - 909:1, 909:5, 950:4
**stops** [1] - 951:12
**stories** [1] - 886:3
**story** [9] - 784:4, 796:22, 803:6, 803:24, 885:14, 894:16, 894:18, 951:15, 952:18
**Story** [10] - 785:8, 792:15, 792:25, 794:23, 796:10, 798:21, 802:16, 805:9, 815:14, 816:4
**straighten** [2] - 778:12, 894:13
**straightened** [1] - 770:17

**streamline** [1] - 937:23
**street** [1] - 814:18
**strike** [7] - 780:22, 812:22, 841:5, 849:18, 886:23, 893:20, 911:17
**strikes** [1] - 953:2
**Strip** [1] - 837:8
**strong** [1] - 783:19
**stuff** [16] - 754:1, 793:7, 793:8, 795:10, 795:15, 796:21, 803:3, 848:13, 853:6, 864:17, 890:19, 904:12, 929:18, 929:19, 929:20, 939:2
**subject** [10] - 791:6, 832:9, 832:10, 834:21, 836:15, 839:13, 846:4, 856:15, 906:3, 946:9
**subscribed** [8] - 972:19, 972:23, 973:4, 973:8, 973:13, 973:18, 973:25, 974:5
**subscriber** [5] - 972:16, 972:21, 973:1, 973:6, 973:11
**subtitle** [5] - 792:24, 793:2, 794:22, 795:2, 815:14
**subtitled** [1] - 785:9
**succeed** [2] - 778:8, 783:21
**success** [1] - 784:4
**sudden** [2] - 783:3, 805:23
**suggest** [2] - 944:9, 951:7
**suggested** [1] - 876:17
**suggesting** [1] - 747:16
**suggestion** [3] - 877:4, 950:21, 952:21
**suggestions** [1] - 848:11
**Suite** [1] - 743:22
**Sulzer** [1] - 744:13
**summation** [1] - 946:23
**Sunday** [1] - 919:6
**Sunrise** [1] - 954:3
**supersede** [1] - 890:24
**supplemented** [1] - 862:24
**supply** [2] - 802:2, 918:10
**suppose** [3] - 767:25, 785:6, 939:8
**supposed** [7] - 768:7, 881:7, 958:19, 960:9, 960:20, 965:19
**supposedly** [3] - 856:16, 896:13, 956:20
**surprise** [2] - 945:4, 945:7
**surprised** [4] - 924:17, 943:3, 943:7, 947:13
**survive** [1] - 866:23
**suspicions** [1] - 828:22
**Sustained** [5] - 818:7, 819:3, 819:23, 839:4, 841:24
**sustained** [29] - 769:25, 771:21, 776:7, 777:1, 777:14, 778:25, 779:4, 802:6, 802:14, 803:12, 809:11, 809:14, 810:18, 822:11, 883:6, 890:22, 915:12, 915:16, 915:25, 916:7, 917:19, 918:9, 918:15, 919:3, 919:8, 932:3, 959:9, 960:1, 971:4
**sustaining** [4] - 822:5, 822:10, 822:15, 823:15
**swear** [1] - 896:25
**switched** [1] - 770:15

**sworn** [1] - 745:18

**T**

**T-113** [1] - 759:3
**tab** [2] - 828:4, 879:13
**table** [3] - 782:18, 870:2, 885:6
**talks** [5] - 757:23, 772:22, 839:6, 844:22, 899:12
**tape** [32] - 751:3, 764:12, 764:16, 764:18, 792:13, 811:25, 828:2, 830:16, 831:18, 831:22, 848:17, 855:6, 855:7, 855:18, 855:21, 855:22, 856:1, 862:8, 862:9, 862:11, 862:13, 881:6, 901:13, 902:9, 902:11, 908:6, 922:8, 922:9, 935:1, 935:3, 935:20, 939:11
**Tape** [1] - 977:17
**tape-recorded** [1] - 811:25
**tape-recording** [1] - 828:2
**taped** [1] - 883:18
**tapes** [21] - 762:16, 771:4, 862:10, 882:24, 922:10, 922:18, 923:3, 923:15, 923:19, 923:20, 923:21, 924:15, 928:1, 936:1, 936:2, 936:7, 936:11, 939:10, 939:25, 940:3, 970:17
**target** [1] - 940:19
**tattoo** [1] - 775:16
**tattooed** [3] - 774:21, 775:4, 775:9
**taxpayers** [1] - 915:18
**team** [2] - 828:23, 950:19
**telephone** [14] - 771:17, 771:18, 772:7, 818:8, 921:8, 972:18, 972:23, 973:3, 973:8, 973:12, 973:15, 973:17, 973:25, 974:4
**temperatures** [1] - 860:9
**ten** [6] - 753:18, 801:19, 806:20, 807:5, 909:12, 959:7
**tend** [1] - 941:18
**term** [3] - 807:12, 926:1, 962:8
**termination** [1] - 945:2
**terminology** [2] - 798:6, 798:9
**terms** [12] - 813:19, 864:17, 867:11, 872:16, 880:25, 890:13, 897:25, 902:2, 910:15, 925:23, 936:25, 939:2
**Terrence** [3] - 892:5, 893:18, 893:19
**testified** [30] - 745:18, 747:21, 763:15, 773:22, 774:15, 774:20, 781:2, 792:18, 795:13, 796:11, 802:11, 807:23, 811:12, 812:10, 815:13, 824:16, 824:20, 826:6, 826:16, 827:21, 852:25, 903:5, 910:2, 910:16, 913:10, 914:14, 924:10, 950:15, 957:8, 967:18
**testify** [10] - 789:2, 797:17, 797:21, 818:25, 857:5, 923:12, 924:14, 937:4, 976:18, 977:16
**testifying** [10] - 787:22, 797:23, 797:24, 803:10, 803:20, 810:5, 822:20, 870:8, 945:17, 968:2
**testimony** [39] - 747:25, 748:7, 778:6, 778:14, 778:15, 779:6, 779:7, 806:13, 807:16, 809:15, 809:23, 809:25, 810:2,

811:17, 813:25, 814:24, 820:23, 824:18, 826:7, 826:16, 827:21, 830:19, 846:2, 859:15, 876:20, 882:23, 908:14, 923:14, 923:16, 936:23, 943:10, 946:13, 951:10, 951:13, 952:6, 956:10, 956:12, 957:7, 971:23
**Texas** [2] - 932:7, 932:10
**that'** [1] - 858:8
**THE** [9] - 743:10, 786:7, 791:7, 793:16, 794:21, 812:25, 832:5, 865:22, 905:11
**The court** [233] - 745:2, 745:7, 745:12, 745:14, 745:19, 748:1, 764:12, 764:15, 764:17, 764:21, 764:24, 765:4, 765:15, 765:17, 765:21, 769:5, 769:25, 771:8, 771:21, 776:7, 777:1, 777:14, 777:17, 777:21, 778:25, 779:4, 780:24, 781:15, 785:15, 786:8, 786:12, 787:14, 788:2, 788:11, 788:20, 788:25, 789:9, 790:2, 790:5, 791:4, 791:10, 791:13, 791:16, 791:24, 793:17, 793:23, 794:19, 799:20, 802:6, 802:14, 803:12, 804:2, 804:10, 804:13, 804:15, 804:17, 804:20, 805:2, 809:11, 809:14, 810:18, 810:23, 812:23, 815:11, 818:7, 819:3, 819:23, 820:2, 820:13, 820:22, 820:25, 821:13, 821:18, 821:21, 822:5, 822:8, 822:17, 823:6, 828:4, 830:24, 831:25, 832:2, 836:6, 839:4, 841:24, 846:18, 856:3, 862:6, 865:15, 865:18, 870:7, 870:10, 874:1, 875:9, 875:12, 875:16, 875:21, 875:24, 876:7, 876:15, 876:18, 876:22, 878:3, 878:7, 878:9, 878:11, 878:14, 883:6, 888:15, 890:22, 900:12, 901:5, 901:15, 902:2, 902:14, 904:15, 905:7, 908:7, 908:11, 908:21, 913:18, 913:20, 914:9, 915:12, 915:16, 915:25, 916:7, 916:12, 917:2, 917:7, 917:10, 917:17, 917:19, 918:9, 918:15, 919:3, 919:8, 919:11, 920:25, 925:14, 932:3, 933:20, 933:25, 934:5, 934:10, 934:15, 934:24, 935:7, 935:14, 935:17, 935:21, 935:25, 936:5, 936:15, 937:6, 937:21, 938:6, 939:13, 939:21, 940:2, 940:24, 941:2, 941:16, 941:20, 941:25, 942:10, 942:18, 943:15, 944:13, 944:23, 945:15, 946:4, 946:10, 946:21, 947:9, 948:1, 948:10, 948:14, 948:21, 948:22, 949:2, 949:9, 949:11, 949:17, 949:20, 949:25, 950:7, 951:16, 951:20, 951:23, 952:4, 952:15, 952:24, 953:7, 953:9, 953:13, 956:25, 957:6, 959:9, 959:18, 960:1, 961:10, 962:15, 962:23, 964:14, 965:4, 966:14, 966:17, 967:7, 967:24, 968:10, 969:23, 971:4, 971:6, 971:8, 971:11, 971:14, 971:17, 971:19, 972:5, 974:10, 974:13, 974:15, 974:18, 976:12, 976:17, 977:9, 977:11, 977:14, 978:25, 979:4, 979:7, 979:15
**theft** [1] - 812:11
**theme** [1] - 856:15
**themselves** [3] - 770:7, 782:8, 807:14
**theoretical** [2] - 949:2, 949:3

**theory** [2] - 935:3, 935:9
**therapeutic** [1] - 785:14
**therapists** [1] - 776:20
**thereafter** [1] - 773:15
**therefore** [4] - 747:7, 806:10, 841:5, 841:12
**therein** [3] - 972:1, 976:13, 977:11
**they've** [2] - 860:20, 938:16
**thinking** [2] - 823:14, 917:11
**thinks** [7] - 769:6, 787:8, 788:4, 831:16, 901:16, 901:19
**third** [1] - 939:11
**thoughts** [1] - 785:24
**thousand** [22] - 752:1, 752:6, 752:17, 753:6, 753:11, 753:18, 753:20, 777:7, 778:22, 782:24, 807:5, 814:20, 883:7, 883:12, 895:19, 897:21, 929:25, 959:7, 960:14
**threaten** [1] - 903:25
**threatened** [4] - 825:9, 829:16, 829:17, 829:20
**threatening** [1] - 875:2
**threatens** [1] - 843:7
**threats** [7] - 756:18, 757:12, 757:13, 757:19, 757:23, 758:1, 759:9
**three** [33] - 762:2, 774:8, 806:23, 835:2, 835:6, 835:24, 843:25, 854:5, 854:7, 854:9, 855:4, 855:8, 860:17, 860:18, 868:1, 882:22, 896:12, 896:18, 921:2, 921:3, 928:22, 929:16, 940:12, 940:20, 941:9, 941:10, 941:12, 941:14, 967:13, 967:17, 978:2, 978:9
**threw** [1] - 905:6
**throughout** [2] - 751:6, 902:1
**Throw** [1] - 953:24
**throw** [1] - 785:1
**Thursday** [4] - 937:13, 937:15, 939:15, 939:23
**tickets** [2] - 975:15, 975:22
**Tieri** [6] - 866:6, 866:7, 866:12, 866:19, 866:20, 866:24
**ties** [1] - 976:24
**tight** [1] - 753:14
**timing** [1] - 745:10
**Tina's** [1] - 808:7
**title** [3] - 801:14, 815:22, 815:25
**titles** [1] - 795:7
**today** [5] - 799:3, 809:15, 938:20, 944:9, 979:8
**together** [8] - 747:16, 753:5, 766:3, 778:22, 795:11, 796:23, 867:6, 905:3
**Tommy** [3] - 807:3, 807:6, 841:20
**tomorrow** [5] - 850:15, 851:21, 937:16, 939:17, 979:15
**tonight** [2] - 937:16, 939:19
**Tony** [2] - 884:19, 884:20
**took** [23] - 746:9, 746:12, 746:23, 747:10, 762:1, 812:12, 820:1, 830:5, 830:8, 830:10, 847:3, 847:6, 847:11, 856:7, 856:10, 869:7, 888:24, 891:20, 925:3, 928:11, 928:13, 958:21, 969:19

**tool** [1] - 785:3
**top** [8] - 755:21, 757:13, 758:8, 825:4, 831:5, 854:9, 874:8, 924:23
**topic** [5] - 850:20, 871:12, 891:16, 905:6, 952:19
**topics** [2] - 848:11, 895:7
**total** [3] - 830:15, 830:16, 922:20
**totaling** [1] - 777:7
**totally** [5] - 855:15, 863:6, 938:18, 939:25
**touch** [1] - 758:5
**touching** [1] - 758:9
**Toursto** [49] - 827:15, 833:6, 833:16, 833:17, 834:25, 835:13, 835:15, 835:16, 835:20, 836:16, 836:21, 836:22, 837:1, 837:6, 837:15, 837:20, 838:1, 838:10, 838:12, 838:14, 838:18, 869:9, 891:7, 891:10, 891:13, 891:14, 891:17, 895:7, 895:9, 895:15, 895:25, 896:12, 896:14, 897:13, 897:14, 897:15, 897:20, 898:5, 898:9, 899:4, 899:6, 899:13, 903:5, 904:9, 904:17, 904:18, 904:21, 967:20, 969:5
**Toursto's** [4] - 898:6, 898:14, 899:2, 899:17
**towards** [2] - 748:9, 970:14
**towers** [1] - 973:22
**town** [1] - 888:10
**traffic** [1] - 916:8
**train** [1] - 836:3
**transaction** [7] - 838:17, 896:14, 899:12, 967:20, 968:1, 968:6, 968:8
**transactions** [2] - 936:12, 936:17
**transcript** [39] - 744:17, 746:22, 748:23, 749:11, 750:19, 751:21, 751:23, 752:16, 756:24, 764:8, 764:14, 765:14, 769:10, 771:4, 772:22, 806:17, 830:14, 833:8, 847:8, 875:25, 876:3, 876:10, 901:13, 919:15, 919:19, 923:4, 923:23, 924:1, 925:4, 928:23, 933:12, 933:24, 934:1, 934:2, 945:6, 953:20, 970:5, 977:24, 978:7
**TRANSCRIPT** [1] - 743:10
**transcripts** [26] - 746:4, 751:6, 751:8, 762:11, 768:11, 768:18, 769:1, 769:9, 769:11, 770:2, 770:3, 770:6, 772:15, 866:8, 919:17, 923:2, 923:5, 923:8, 924:19, 938:8, 938:9, 941:9, 941:14, 949:22, 970:2, 970:10
**transitioning** [1] - 804:3
**transmitted** [2] - 973:24, 978:20
**trapped** [1] - 947:4
**travel** [2] - 962:1, 962:5
**treated** [1] - 903:20
**TRIAL** [1] - 743:10
**trial** [10] - 878:17, 902:2, 937:24, 940:1, 940:23, 948:17, 974:8, 976:10, 977:7, 978:23
**trick** [3] - 882:9, 882:12, 882:14
**tried** [14] - 770:19, 771:1, 773:23, 778:16, 783:20, 793:11, 796:22,

821:13, 829:12, 872:14, 883:10, 901:13, 911:9, 941:10
**trips** [1] - 928:14
**trouble** [8] - 772:20, 860:16, 861:5, 863:13, 863:19, 863:20, 880:6
**truck** [4] - 954:2, 954:20, 955:1, 955:11
**true** [31] - 755:16, 756:11, 774:25, 775:11, 781:20, 795:15, 796:11, 803:7, 835:14, 880:9, 880:13, 880:25, 972:2, 972:15, 972:20, 972:25, 973:5, 973:10, 973:15, 974:2, 974:24, 975:5, 975:13, 975:18, 975:24, 976:2, 976:5, 977:19, 977:23, 978:2, 978:6
**Trump** [1] - 810:7
**trust** [7] - 788:1, 829:11, 842:5, 842:19, 842:25, 869:25, 891:24
**trusted** [1] - 828:21
**trusting** [1] - 866:20
**truth** [10] - 802:15, 812:21, 869:17, 882:21, 882:24, 948:2, 949:5, 952:12, 952:16, 953:2
**truthful** [1] - 822:19
**truthfully** [1] - 904:8
**try** [7] - 781:9, 785:18, 792:3, 800:7, 822:21, 847:8, 887:17
**trying** [22] - 823:8, 829:2, 857:24, 862:18, 871:15, 871:19, 871:21, 871:25, 872:1, 879:24, 895:2, 895:3, 901:2, 902:3, 912:16, 917:5, 931:4, 936:23, 941:15, 949:4, 951:17
**turn** [16] - 746:6, 749:12, 754:15, 756:23, 757:13, 759:3, 767:4, 781:3, 802:2, 846:20, 848:1, 849:9, 910:3, 911:8, 947:14, 951:2
**turned** [12] - 775:1, 775:10, 776:4, 781:5, 783:13, 847:16, 848:5, 848:24, 878:7, 921:12, 943:20, 945:5
**turning** [2] - 910:9, 939:2
**turns** [2] - 954:12, 954:18
**TV** [3] - 782:2, 900:1, 942:21
**twelve** [1] - 930:1
**twenty** [1] - 830:17
**twice** [4] - 867:20, 867:21, 893:10, 921:4
**two** [65] - 751:16, 754:17, 754:24, 757:1, 759:12, 763:8, 772:1, 778:15, 790:14, 790:19, 797:2, 808:21, 810:15, 813:22, 831:4, 832:25, 838:3, 838:9, 839:23, 841:20, 844:2, 844:4, 844:5, 844:12, 854:3, 856:22, 857:6, 857:12, 859:19, 861:4, 862:23, 863:23, 864:14, 871:10, 878:21, 882:22, 883:23, 888:22, 889:22, 890:3, 890:23, 892:4, 892:17, 892:18, 893:2, 893:9, 893:22, 895:10, 897:22, 900:7, 900:8, 900:10, 906:22, 911:7, 933:4, 933:5, 933:7, 933:13, 936:8, 936:22, 938:16, 946:5, 950:23, 951:16, 969:10
**type** [1] - 945:4
**types** [1] - 969:25

# U

**U-turn** [1] - 767:4
**U.S** [2] - 743:4, 743:17
**ultimately** [1] - 948:1
**Umm** [2] - 842:13, 854:12
**umm** [1] - 868:4
**Umm-Humm** [2] - 842:13, 854:12
**umm-humm** [1] - 868:4
**unaware** [1] - 952:10
**uncles** [1] - 792:22
**under** [5] - 800:2, 860:20, 900:1, 901:3, 901:22
**underboss** [1] - 806:4
**undercover** [2] - 850:25, 919:17
**understood** [3] - 923:25, 929:14, 949:23
**undertake** [2] - 872:15, 917:6
**undertaking** [1] - 795:19
**undertook** [1] - 813:4
**underwear** [2] - 877:17, 897:3
**unfair** [1] - 952:21
**unfortunately** [2] - 864:16, 871:1
**unhappy** [1] - 768:3
**unheard** [1] - 949:7
**unintelligible** [10] - 749:15, 831:15, 836:13, 839:8, 843:13, 881:22, 884:11, 888:23, 890:4, 897:1
**Unit** [1] - 977:17
**UNITED** [3] - 743:1, 743:3, 743:11
**United** [11] - 743:16, 923:9, 944:15, 972:8, 974:25, 975:2, 975:6, 975:7, 975:14, 975:21
**unless** [6] - 787:21, 787:25, 819:15, 887:18, 934:1, 942:4
**unrelated** [1] - 863:6
**unum** [1] - 951:20
**up** [80] - 747:7, 748:4, 748:11, 752:2, 756:18, 757:18, 770:15, 776:12, 776:13, 777:24, 779:6, 779:21, 792:3, 792:13, 793:7, 793:8, 793:15, 796:12, 809:3, 813:9, 813:15, 816:11, 831:3, 831:12, 831:14, 832:12, 839:13, 839:20, 840:11, 841:8, 841:10, 841:14, 845:19, 851:15, 851:16, 857:7, 862:3, 863:12, 863:13, 863:15, 863:23, 868:7, 868:11, 869:18, 869:19, 869:21, 871:12, 872:3, 874:7, 877:4, 877:7, 879:16, 880:1, 880:23, 885:21, 885:22, 885:23, 887:8, 891:16, 893:25, 905:6, 908:10, 912:15, 925:9, 925:11, 925:16, 925:17, 929:21, 930:9, 931:6, 931:16, 934:9, 935:5, 936:3, 936:8, 953:24, 954:14, 954:17, 954:20, 968:1
**upkeep** [1] - 750:1
**upset** [6] - 756:1, 761:19, 761:21, 767:20, 829:18, 874:3
**US** [3] - 878:6, 923:7, 923:13
**uses** [1] - 955:24
**Utica** [1] - 926:15

**utilize** [1] - 901:22

# V

**vacations** [3] - 962:5, 962:6
**valid** [1] - 946:11
**various** [5] - 770:25, 926:17, 944:7, 960:21, 965:6
**venture** [1] - 903:6
**ventures** [1] - 905:20
**veracity** [1] - 822:18
**versa** [1] - 747:18
**versed** [2] - 882:25, 883:3
**version** [2] - 800:15, 801:13
**vice** [1] - 747:18
**vicinity** [1] - 847:20
**victim** [2] - 860:7, 860:9
**victims** [3] - 860:5, 860:6, 862:12
**video** [6] - 837:17, 838:4, 838:20, 975:25, 976:4, 976:6
**videographer** [1] - 837:11
**vig** [3] - 752:3, 754:9, 896:5
**Vincent** [1] - 748:25
**violate** [1] - 917:13
**violated** [1] - 963:12
**violent** [4] - 880:12, 913:9, 913:15, 914:4
**virtue** [1] - 910:5
**Virtuoso** [3] - 752:10, 753:7, 753:18
**visit** [5] - 968:14, 968:16, 968:19, 968:22, 968:24
**visited** [1] - 969:1
**visiting** [1] - 958:3
**voice** [1] - 879:16
**Voto** [3] - 885:8, 885:9
**vu** [3] - 811:13, 812:3, 812:13
**Vue** [2] - 826:25, 864:24

# W

**wait** [3] - 854:7, 885:5, 968:23
**waiting** [3] - 834:1, 885:7, 901:5
**walk** [3] - 804:12, 886:10, 897:8
**walked** [1] - 954:13
**walking** [1] - 954:1
**wanna** [9] - 834:8, 834:11, 850:17, 851:16, 890:6, 892:6, 900:1, 903:11
**wannabe** [1] - 879:23
**wants** [4] - 760:4, 904:8, 904:9, 939:20
**watching** [1] - 876:23
**water** [3] - 831:20, 857:13, 860:16
**waved** [1] - 794:14
**ways** [3] - 821:18, 947:1, 954:20
**wear** [1] - 922:16
**wearing** [4] - 830:13, 847:13, 871:1, 919:24
**week** [16] - 757:2, 782:13, 819:7, 827:22, 851:21, 920:8, 920:12, 920:14, 920:22, 921:2, 921:5, 924:10, 937:14,

938:3, 939:7, 939:14
**weekend** [1] - 939:14
**weeks** [7] - 774:8, 774:11, 844:3, 844:4, 844:5, 844:12, 921:3
**welcome** [1] - 792:6
**West** [1] - 861:18
**what'd** [1] - 844:1, 871:13
**whatsoever** [2] - 833:9, 886:15
**whole** [15] - 781:8, 784:21, 801:16, 822:2, 856:18, 856:20, 885:12, 888:24, 902:16, 904:12, 910:7, 913:23, 968:16, 968:19, 968:22
**wife** [9] - 746:25, 761:6, 761:13, 761:19, 776:15, 777:11, 777:15, 777:22, 783:1
**wife's** [1] - 761:13
**William** [1] - 859:1
**Williamsburg/Greenpoint** [1] - 764:5
**willing** [2] - 765:5, 946:24
**Willy** [1] - 861:24
**wise** [1] - 871:17
**wish** [1] - 927:22
**Wit** [5] - 787:6, 787:10, 787:20, 787:21, 788:23
**withdrawn** [4] - 746:15, 773:13, 790:16, 923:1
**WITNESS** [7] - 786:7, 791:7, 794:21, 812:25, 832:5, 865:22, 905:11
**witness** [42] - 745:17, 769:3, 781:11, 788:3, 788:8, 830:24, 875:22, 876:9, 878:3, 878:12, 902:1, 902:18, 908:20, 913:19, 934:15, 934:18, 934:22, 937:22, 937:25, 942:2, 942:14, 942:23, 944:8, 944:14, 945:5, 945:11, 945:14, 947:12, 947:13, 948:5, 949:4, 950:15, 951:15, 951:18, 952:6, 953:5, 953:11, 957:7, 957:14, 971:14, 971:16, 971:17
**Witness** [11] - 787:3, 875:23, 949:7, 961:9, 961:12, 961:16, 961:20, 962:2, 962:12, 962:19
**witness'** [5] - 788:11, 822:18, 951:10, 951:13, 962:24
**witness's** [1] - 945:17
**witnesses** [3] - 937:1, 937:9, 938:4
**WitSec** [1] - 950:12
**woman** [2] - 822:20, 823:2
**women** [8] - 820:5, 820:14, 821:1, 821:14, 821:17, 821:20, 823:9, 837:17
**wonder** [1] - 878:25
**wondered** [1] - 866:16
**wondering** [4] - 770:14, 847:9, 901:6, 934:20
**word** [10] - 775:10, 816:3, 825:17, 833:13, 889:13, 899:20, 899:21, 901:17, 951:18
**words** [14] - 758:6, 762:24, 815:16, 815:18, 842:9, 842:12, 851:2, 891:5, 895:24, 896:11, 924:4, 932:9, 935:4, 950:6
**wore** [1] - 782:6
**workings** [1] - 898:15

**works** [1] - 948:4
**world** [2] - 781:8, 898:16
**worried** [6] - 842:2, 857:8, 858:15, 860:14, 860:15
**worry** [1] - 869:15
**worst** [1] - 942:24
**wrapping** [1] - 908:10
**write** [19] - 784:20, 785:7, 786:5, 787:11, 790:21, 795:6, 795:7, 796:13, 796:14, 796:15, 796:23, 803:9, 803:22, 816:5, 942:9, 943:13, 944:10, 949:15
**writing** [7] - 784:8, 785:17, 788:8, 795:10, 800:3, 944:1, 945:6
**written** [13] - 787:14, 787:18, 787:25, 790:10, 790:20, 798:22, 799:8, 799:22, 801:18, 803:14, 942:2, 943:1, 944:3
**wronged** [1] - 816:11
**wrote** [13] - 793:6, 796:21, 797:4, 797:5, 797:7, 799:11, 800:21, 802:19, 803:15, 815:21, 815:22, 815:24, 943:22

## Y

**Yacullo** [2] - 975:17, 975:20
**yas** [1] - 861:19
**yawning** [1] - 831:21
**year** [10] - 749:15, 766:10, 778:17, 783:3, 810:10, 819:10, 968:16, 968:19, 968:22, 968:24
**years** [27] - 778:15, 790:14, 790:19, 793:1, 793:10, 793:12, 801:19, 808:3, 810:12, 835:2, 835:6, 882:13, 896:12, 896:18, 896:19, 912:7, 919:20, 924:20, 929:4, 957:22, 967:13, 967:17, 969:10, 970:19, 970:20, 970:21, 970:23
**yes.** [1] - 894:20
**yesterday** [7] - 746:3, 747:21, 748:24, 761:24, 789:1, 856:24, 916:3
**Yo** [1] - 833:20
**YORK** [1] - 743:1
**York** [26] - 743:4, 743:18, 743:22, 744:2, 744:6, 744:9, 744:10, 744:14, 747:10, 773:16, 816:17, 825:14, 846:12, 862:3, 880:20, 915:4, 918:18, 920:17, 920:19, 926:14, 926:15, 928:13, 928:14, 930:13, 975:2
**young** [3] - 838:3, 838:9, 903:6
**yourself** [19] - 760:8, 794:6, 815:8, 817:2, 829:15, 829:23, 836:17, 847:17, 856:12, 882:14, 883:15, 888:1, 890:5, 891:17, 894:10, 909:22, 911:19, 913:2, 947:2
**yourselves** [4] - 804:6, 875:18, 934:12, 979:9
**yu** [1] - 868:8

## Z

**zero** [1] - 749:10
**zip** [1] - 976:24