# RICHARD B. LIND

ATTORNEY AT LAW

745 FIFTH AVENUE

SUITE 902

NEW YORK, N.Y. 10151

TELEPHONE (212) 888-7725
FACSIMILE (212) 371-2961
E-MAIL: RLINDESQ@AOL.COM

December 29, 2010

**By ECF & Fax**

Hon. Brian M. Cogan
United States District Judge
U.S. Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:   United States v. John Franzese
                08 CR 240 (BMC)

Dear Judge Cogan:

    Set forth below are defendant Franzese's responses to the government's letter, dated December 21, 2010, which addressed Franzese's non-recurring objections to the presentence investigation report ("PSR"), in Franzese's letter dated November 23, 2010 ("11/23 Letter").[1]

    1. Paragraph 24 : In the 11/23 Letter, Franzese asserted that "[t]here is no proof that Franzese conspired starting in 2002; he was in jail" with respect to the Joe Toursto conspiracy. The government has suggested alternative language, to which Franzese has no objection.

    2. Paragraphs 25, 63: In the 11/23 Letter, Franzese contended that "the substance of this paragraph is inaccurate with respect to DiGorga's depiction of Franzese's involvement."[2] In its letter, the government quotes portions of trial testimony, but ignores the substance of paragraphs 25 and 63. Paragraph 25 states in part that "[a]t Franzese's

---

[1] In a separate sentencing memorandum, dated December 9, 2010, the government addressed the recurring objections to the PSR in our 11/23 Letter.

[2] Actually, the 11/23 Letter should have stated that the substance of *these paragraphs* is inaccurate.

instruction, Joseph DiGorga *lent $20,000* to Joe Toursto," and then asserts that "DiGorga then stated he gave Toursto *sixteen thousand dollars* in cash." (Emphasis added). This clear discrepancy makes no sense. Moreover, DiGorga stated that he gave the money to Toursto for "a point." It is unclear for how long Toursto would have to keep paying DiGorga -- and the record is clear Toursto never paid DiGorga anything – in order for Franzese to get his supposed twenty per cent. In addition while no pretense is made that DiGorga is a math professor, 20% of $16,000 is $3,200, not $4,000. Finally, the government Letter ignores, and fails to cite record support for the allegation in paragraph 63 that "[u]pon *Franzese's instructions*, DiGorga made it clear that he was affiliated with the Colombo crime family, and would cause bodily injury if needed." (Emphasis added).

3. Paragraph 28 : The government agrees that paragraph 28 of the PSR should be deleted.

4. Paragraph 30 : In our 11/23 Letter, we asserted that "Franzese never *received* any money from the Cujini Due scheme." The government responds that Catapano "*held* at least a portion" of the proceeds for Franzese, and it is "reasonable to *infer*" that Franzese would have been paid back, based on his senior position and his relationship with Catapano. (Emphasis added.) The government's argument fails for a number of reasons. First, such an "inference" is not a reasonable one here, and is contradicted by the record. It is undisputed that *Catapano* got $30,000 from the scheme, and never passed any portion to Franzese; instead Catapano gave Franzese's supposed portion to another. *See e.g.* GX 106B, lines 17-19 ("So I hadda take ten of your father's and give it to him [another]"). Second, the inference is inconsistent with paragraph 32 of the PSR which notes that Franzese never received any money. Finally, even if supported by the record – which it is not --such an inference would not be sufficient to sustain the government's burden of a preponderance of the evidence.

5. Paragraph 31: With respect to this paragraph, our 11/23 Letter disputed that "Catapano threatened the Franzella brothers with Franzese's knowledge and consent." The government maintains that "defendant consented generally to the use of such tactics." We submit the government's response is insufficient to overcome our specific objection, particularly in light of Franzese's acquittal on Count Three.

6. Paragraphs 35, 64 : In our 11/23 Letter with respect to these paragraphs we disputed "the government's assertion that it is able to prove Franzese's involvement in the Cujini Due scheme." The government quotes testimony that Franzese (while in jail) may have "helped" Angelo. This does not prove, even by a preponderance, that Franzese was involved in the "*extortion* of Cujini Due Pizza," PSR, ¶ 35 (emphasis added), and *id.*, ¶ 65.

7. Paragraph 39 : With respect to this paragraph, we disputed its assertion that "Franzese devised a scheme for payment by the Hustler Club," since it was "inconsistent with the actual payments made to DiGorga described in paragraph *43*." In response, the government quotes a portion of the record in which there were supposed plans that Hustler was going to pay $30,000 per month – phantom payments that were never in fact

made. Instead, as the record makes clear, defendant DiGorga was the only party to receive any monies from Hustler Club. *See*, PSR, ¶ 43. This distinction is important since the PSR contends that Franzese should be held liable for over $150,000 in connection with the Hustler Club extortion (*id.*, ¶ 191); and the government seeks to find Franzese liable to forfeit a like amount. In addition, this loss amount calculation affects the entire offense level because it increases Franzese's Guidelines level by one point, to level 27, *see* PSR, ¶¶ 91, 96, which in turn becomes the starting point for the PSR's overall Guidelines calculation for grouping purposes. *See* PSR, ¶¶ 77, 122.

8. Paragraphs 52, 54, 67: These objections relate to the alleged Vinnie Michaels extortion. Taking the objections in reverse order, the government letter concedes that there is no basis for paragraph 67 of the PSR, which states "Michaels made several repayments on this loan to Curanovic, who delivered each payment to Franzese." Accordingly this paragraph should be struck. According to the government, this error is immaterial "because Franzese clearly was receiving Michaels' payments via Fatato." The government then quotes a portion of agent D'Agostino's trial testimony which has absolutely nothing to do with how Franzese was allegedly *receiving* repayments; if credited, it only shows how D'Agostino claimed that Franzese was able to pass money *to* Fatato. Finally, and importantly, as support for its position, the government next cites GX 223 which is a recording on March 6, 2007, in which Fatato allegedly gives $800 in cash to Franzese. As it did at trial, the government claims that the money Fatato was passing to Franzese was *all* "received from Michaels." This is inaccurate. In fact, at least half of the $800 came from another source – not Michaels. Annexed hereto as Exhibit A are four pages of Fatato/D'Agostino's 3500 material, regarding that transaction/conversation, which support our assertion. One notes that $400 of the "represents profits from the WILLIAM PACA LODGE;" the other states that Fatato gave $800 to Franzese of which "$400 was FRANZESE's portion of profits from the poker room." The government failed to adduce evidence at trial of any other payments to Franzese, much less the $20,000 it claims he received.

9. Paragraphs 56-59, 68 : As stated in our 11/23 Letter, "[w]e dispute that Franzese was involved in the extortion of the Beauty by Andre owners." In its letter, the government counters that Franzese was in fact involved. We adhere to our position. For example, while paragraph 58 of the PSR correctly states that Catapano "*would give* Franzese a portion of the money he [Catapano] earned from the Beauty by Andre scheme," (emphasis added), it fails to state Catapano's actual language in which he dismissively told Franzese that he *might* "chuck" defendant Franzese $500 out of a $150,000 extortion scheme. GX 106B, lines 10-13. Of course, there's no proof that defendant Franzese ever got a penny. Moreover, while paragraph 59 captures defendant Franzese's Cagneyesque comments, we submit they are mere bluster.

10. Paragraph 60 : We adhere that our contention that "the substance of the conversations makes clear that is pathetic boasting by Franzese rather than an accurate recounting of what actually occurred." It is impossible to believe that Franzese was never investigated, let alone arrested for the hundreds of murders he committed.

11. Paragraph 65 : In our 11/23 Letter Franzese disputed "that DiGorga shared a portion of the payments from the Hustler Club with Franzese." Apparently recognizing that the PSR is wrong, the government suggests alternative language. We submit that the paragraph 65 should be struck and the government's alternative language be rejected.

In addition to the foregoing, while we have argued this issue to this Court, we respectfully submit that Ms. Ashok should separately review our challenge to the accuracy of paragraph 74 of the PSR. The relevant 3500 material paints a different picture than that stated in paragraph 74. The 3500 material manifests that Franzese became concerned for his own life and was "visibly upset." According to the report, Franzese told Fatato that "they *might* have to 'call' his son," which Fatato understood to mean that they "*might* have to have to have his son killed." Franzese supposedly stated that "if they *had to do it*," Franzese wanted Fatato to help him. Fatato responded that Fatato "would help him *if needed*." (Emphasis added).

It is submitted that the actual report is markedly different from what is stated in the PSR, and does not make out an obstruction violation. First, Franzese could not even conspire to kill his son with Fatato, who was acting as a government agent. *United States v. Andrades*, 169 F.3d 131, 135 (2d Cir. 1999)("In order to show a conspiracy, the government must establish the fact of a criminal agreement among individuals who are neither government agents nor confidential informants"); *see also United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir.1994).

Second, even assuming *arguendo* that Franzese could conspire with Fatato, Franzese's tentative statements that he "*might*" take action are clearly insufficient to make out an agreement. As then Circuit Judge Ruth Bader Ginsburg observed: " 'Exploratory and inconclusive' or 'preliminary' discussions and negotiations are not sufficient to establish an agreement." *United States v. Iennaco*, 893 F.2d 394, 398 (D.C. Cir. 1990). Franzese's (in)actions were also insufficient also to make out an attempt. *See United States v. Shoulberg*, 895 F.2d 882, 885 (2d Cir. 1990)(observing that mere intention to commit a specified crime does not amount to an attempt. "It is essential that the defendant, with the intent of committing the particular crime, do some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime").

A review of *Shoulberg*, and its contrast to this case, proves instructive. In *Shoulberg*, the court affirmed the district court's holding that defendant's actions constituted an attempt to obstruct justice by attempting to threaten a co-defendant, named Penna thereby mandating an upward adjustment pursuant to § 3C1.1 It was undisputed that the defendant, while in prison awaiting trial, handed a note to a co-defendant, Hamsho. The note combined a request for Penna's address, the indicated intention to use force to prevent Penna from cooperating, and the stated possibility that Shoulberg would soon be released from detention. The district court interpreted the note as a threat against another co-defendant Penna.

In affirming the district court's holding that the defendant's conduct amounted to an attempt to influence or threaten a co-defendant, the Circuit emphasized that mere preparation or mere intent to commit a crime does not amount to attempt, but that some overt act likely to result in the commission of the crime must have occurred. *Id.* The Circuit found that Shoulberg's handing the note to Hamsho constituted a sufficient overt act likely to result in the commission of the offense because the note constituted a threat communicated to the intermediary, Hamsho, and that had the government not intervened, Hamsho would likely have relayed the threat to Penna. *Id.* at 885-86.

Here, by contrast, there was no substantial step or overt act. In a telephone conversation, on December 22, 2010, the government confirmed that agent D'Agostino's testimony would be confined to the January 17, 2007 incident. Thus there was no further substantive act by Franzese to support this uncorroborated allegation. Accordingly, it is submitted that no evidentiary hearing is required on this allegation, and that the two-point obstruction enhancement be struck.

Very truly yours,

Richard B. Lind

Enclosures (by fax)
cc: Rachel Nash/Cristina Posa, Esqs. (by email)(w/encls.)
    Probation Officer Amrita Ashok (by email)(w/ encls.)
    Defense Counsel (by ECF)(w/o encls.)